1
2

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

3
4
5
6
7
8

UNITED STATES OF AMERICA,      )
                               )
          Plaintiff,           )          Case Number
                               )
               v.              )     6:15-cr-219-Orl-41TBS
                               )
GEORGE ADRIEN BROOKS,          )
                               )
          Defendant.           )
_____)

9

10                         Volume III

11             Transcript of the jury trial (day two)

12             before the Honorable Carlos E. Mendoza

13                   March 3, 2016; 8:33 a.m.

14                        Orlando, Florida

15

16

Appearances:

17

Counsel for Plaintiff:  Ilianys Rivera Miranda

18

19   Counsel for Defendant:  Alisha Marie Scott
                             James Skuthan

20

21

        Proceedings recorded by mechanical stenography,
22   transcript produced by computer.

23   _____

                     Diane Peede, RMR, CRR
24             Federal Official Court Reporter
             401 West Central Boulevard, Suite 4600
25                 Orlando, Florida  32801

1                        Index of transcript

2                                                   Page

3    Preliminary matters                            3

4                    Rodney James Hyre
     Cross by Ms. Scott                             16
5    Redirect by Ms. Rivera                        119

6
                        Scott Spruill
7    Direct by Ms. Rivera                          128
     Cross by Mr. Skuthan                          134
8
                     Debra Diane Healy
9    Direct by Ms. Rivera                          136
     Cross by Ms. Scott                            152
10

11                  John Meyer Gopoian
     Direct by Ms. Rivera                          161
12   Cross by Mr. Skuthan                          177

13   Plaintiff rests                               205

14   Motion                                        205

15   Defendant rests                               229

16   Jury charge conference                        230

17

18                     - - - - - - - -

19

20                  Exhibits in evidence
     Government's 8                                142
21   Government's 7                                144

22   Defendant's 2                                 201

23

24

25

1         **P R O C E E D I N G S**

2              **(Jury not present at 8:33 a.m.)**

3              THE COURT:  Miss Darleen has indicated there's an

4    issue you need to take up with the Court this morning.  Go on

5    ahead.

6              MS. SCOTT:  Yes, Your Honor.  There is one matter

7    at hand.  There are the certified business records for the

8    Craigslist ad that is Government Exhibit Number 12.

9              THE COURT:  All right.

10             MS. SCOTT:  Government's Exhibit Number 12 provides

11   a Declaration from William C. Powell, who is also listed on

12   the government's witness list as an individual who is coming

13   in to testify.

14             I have spoken with the government about their

15   records because it is not complete.  They wanted to introduce

16   just a minimal amount of e-mails.  We were going to object to

17   that.  We want to include the entire record.

18             The government has indicated to me that they are,

19   A, no longer calling this witness because of how things have

20   transpired and, B, would not be introducing these records.

21             We, as the defense, would like to introduce the

22   records, and I have a copy of all 661, as Defense Exhibit

23   Number 1.  However, we would like to rely upon the same

24   notification, the same certification that the government gave

25   us as an exception to the business records, and it is 902,

self-authenticating subsection eleven, which says that it's

an original if it's accompanied by a written declaration,

that it was made at or near the time of the occurrence, was

kept in the regular course of conducted activity and was made

at the regularly conducted activity as a regular practice.

The reason for that rule or to provide notice is to

give the other side, the opponents, an opportunity to then

either examine the witness or pull in another expert witness

if they need to.  However, the government does not need to do

that in this case because it is the records that they in fact

did provide to us in the first instance, and the date of the

certification of business records is February 3rd.

So in the rule of completeness, we would like to

introduce the entire record as self-authenticating.

THE COURT:  What's the government's position on

this?

MS. RIVERA:  Your Honor, this is not a rule of

completeness issue.  We haven't moved to introduce that

evidence in the case and we're not.

We understand the defense objected to the

introduction of Exhibit Number 2, for example, with regard to

other ads that the defendant posted in this case, basically

indicating that the prejudicial effect would be unfairly

prejudicial to the defendant.

There are other ads of a similar nature that are

included in the 661 ads.  We made a selection of a few of

them that are -- basically, it's just the same type of ad,

Family Play Time, the same dynamic, to show intent, motive.

On the Court's ruling, we decided not to call the

witness.  My position wouldn't be this is hearsay.  She's

arguing a hearsay objection.  I would like the purpose for

which it is admitted.  If it's trying to be admitted as

evidence of good conduct of the defendant to negate intent,

the Eleventh Circuit has already determined that this type of

evidence is inadmissible.

We actually brought some copies of case law to that

effect.  And if that is the purpose for which they are moving

this into evidence, to show that there are other acts of good

conduct in his lifestyle, then we're definitely objecting to

the introduction of that evidence as inadmissible.

THE COURT:  So you're seeking to introduce a total

of 600 pages representing other ads he's posted on

Craigslist, correct?

MS. SCOTT:  Prior ads before this incident, and

they are not for the purpose of showing good character.

THE COURT:  What is the purpose of this?

MS. SCOTT:  Most of these ads are showing that he

posted them for massage therapist, that he's a massage

therapist; that he posts ads for sex and a lot of them are

explicitly asking for sex.  That would not be of good

1    character.

2              There are certain ads prior to this instant offense

3    that would show that he has posted an ad for Family Play

4    Time.  That is not of good character, but it is prior to.

5              There are ads in there that show that he regularly

6    gets his --

7              THE COURT:  Here's what we're going to do.  You're

8    asking for a ruling on something that is yet to be

9    introduced, and I would imagine you're going to be

10   introducing it in your case in chief, assuming you have one,

11   correct?

12             MS. SCOTT:  No, Your Honor.  We were asking to

13   introduce these records at this point because we are going to

14   cross-examine Agent Hyre, who has also had an opportunity to

15   review all of these records.

16             THE COURT:  Why can't you cross-examine him without

17   introducing 600 pages?  It doesn't have to be in evidence for

18   you to cross him on it.

19             Do you have any legal authority in support of your

20   contention that previously placed ads unrelated to this

21   particular issue -- and I think the government has a point,

22   in light of your objection trying to keep another ad, because

23   the very same arguments you made for keeping that particular

24   ad with a cartoon on it is the same application that you

25   would have here.

1        So tell me -- there are all kinds of concerns I

2    have with this.  Six hundred pages, none of those have

3    anything to do with this, which is precisely why I kept out

4    the other ad on your objection.

5        So why is it relevant?  Why do you need to

6    introduce it if it is relevant?  Why can't you just cross him

7    on it, 600 pages worth of unrelated advertisements on

8    Craigslist?

9        MS. SCOTT:  It is related, Your Honor.  The reason

10    it's related is because during the government's opening and

11    while the government was direct examining Mr. Hyre on whether

12    or not Mr. Brooks shaved his scrotum and trimmed his private

13    areas, she specifically asked him a question about that and

14    said that there was an ad that was placed for someone to do

15    this, and then when he was arrested, he then asked him

16    questions specifically about that and showed that -- and

17    implied to the jury that he was doing this specifically to

18    groom himself for this ten-year-old, as an intention or to

19    show his intent to then induce, persuade or entice said

20    minor.

21        These 661 pages -- and, actually, I wouldn't need

22    661 pages.  If the Court would like for me to limit it to the

23    13 ads that are relevant to that specific purpose, I can pull

24    those out and limit it to those specific 13 pages that are

25    relevant to when he previously, between 2014 and 2015, made

these ads on Craigslist that were relevant to show this is a

matter of course of action and it is not specifically for

this purpose of grooming himself for this incident.

MS. RIVERA:  Your Honor, if I may, there's a

misstatement of the evidence in the defense allocution at

this point.  The agent never said that the defendant posted

an ad advertising or soliciting someone to shave his pubic

hair.  He said that the defendant -- and there's an e-mail.

Actually, it's right after that phone call when the defendant

informed Special Agent Hyre.  That's an e-mail that's in

evidence.  It's not an ad.  He was not referring to anything

outside the context of the evidence that is before the Court

right now.

Our concern again, and just based on what -- the

theory of their case, what they advanced during the opening

statements, he was a lonely man.  He was looking for company,

whatnot.  There's nothing illegal in soliciting sex online.

So now they are trying to portray this as a bad act

at this point when it's convenient to them to get this

evidence in.  It is not.

There's a lot of information there which might be

confusing to the jury, misleading to the jury, completely

outside the scope of the case.  It has nothing to do with the

issues before the Court, where the defendant had the intent

in the context of this case, not some other scenario, to

1    induce a minor to influence a minor into engaging in sexual

2    activity.

3         The evidence to that effect is that e-mail.  It's

4    an Exhibit 3 and we can pinpoint to it.  It's page 138 in

5    Exhibit Number 3.

6         THE COURT:  All right.  Keep going.

7         MS. RIVERA:  So there was absolutely no reference

8    to this ad.  There was no reference to any other ads.  And we

9    were very careful in our direct examination of Special Agent

10   Hyre not to open that door because we didn't want to elicit

11   improper testimony concerning other conduct; and when we did

12   so regarding Exhibit Number 2, which we believe was in the

13   context of this case, basically reposted the same ad, the

14   Court made a ruling and we intend to abide by that ruling.

15        But I think it should apply to both sides as far as

16   bringing in other conduct and specifically other instances,

17   which are really brought to emphasize that the defendant had

18   other traits of character, meaning show him in a good light

19   possibly as well, and that is inadmissible to negate intent,

20   which is what they're trying to do without stating so.

21        We would like to submit case law, Your Honor.  We

22   have copies for the defense and for the Court as well.

23        MS. SCOTT:  We can agree to stipulate to the 13

24   pages that are relevant to Mr. Brooks grooming of himself

25   prior to this incident, and the reason being, Your Honor, is

1    because it does not -- it is different.  It is specifically

2    different from the Court's ruling on the picture that was

3    determined to be more prejudicial or substantially -- the

4    prejudicial effect to be substantially outweighed by any

5    probative effect, because that picture was placed and that ad

6    was placed after he had already --

7              THE COURT:  This is just going to go on endlessly.

8    Let me ask a few questions.  I need information.

9              MS. SCOTT:  Yes.

10             THE COURT:  Is it your contention that on these

11   other advertisements that the defendant posted where -- I

12   understand what your point is.  The government's position and

13   the arc of this case for them is he groomed himself

14   specifically to have interaction with the little boy.

15             Your position is that you have evidence indicating

16   that he normally groomed himself or had groomed himself

17   previously.  Is that information that you in good faith can

18   tell me that Special Agent Hyre is aware of?

19             MS. SCOTT:  Yes.

20             THE COURT:  So you know that he reviewed these

21   advertisements and he knows?

22             MS. SCOTT:  I do.

23             THE COURT:  So why can't you just ask him on cross-

24   examination:  Isn't it true that on at least 13 other

25   occasions when he advertised online, in areas that didn't

1    involve him soliciting sex for minors, per your training,

2    that he groomed himself and advertised himself as such?

3          Why can't you just ask him that without introducing

4    13 documents into evidence that someone might argue is

5    self-serving?  Just ask him, and if he answers in the

6    negative, then you can show it to him.  Do you understand?

7          MS. SCOTT:  Yes.

8          THE COURT:  Okay.  I think what you're pursuing is

9    fair game.  I think what she's complaining about is also

10   legitimate.  Over 600 documents, that was not going to happen

11   unless you had a really strong argument.  But I think what

12   you're trying to employ as a tactic on cross-examination,

13   that, I think, is perfectly acceptable.  If he denies that he

14   ever put anything on the Internet about him grooming himself

15   in these non-child situations, then you impeach him.  You

16   have the documents.

17         MS. SCOTT:  Yes, Your Honor.

18         THE COURT:  Are there any questions about the

19   Court's ruling?

20         MS. RIVERA:  Well, Your Honor, we still object on

21   the basis that it would be completely outside the scope of

22   the testimony that the agent provided on direct examination,

23   and they have an opportunity to present a case and elicit

24   this testimony if they wish through other witnesses.

25         THE COURT:  I understand your concerns.  For the

1    purposes of judicial economy and because I do think this is

2    within the scope of direct examination -- you covered a lot

3    of material, to your credit, during your extensive direct

4    examination, and one of the matters that were brought before

5    the Court were him grooming himself in this very specific way

6    for this very specific instance.

7               The only thing they are pointing out is this isn't

8    the first time.  He's done it before, and they're implying he

9    did it before for lawful purposes or not for unlawful

10   purposes.  I'm going to allow that cross-examination.

11              MS. RIVERA:  Your Honor --

12              THE COURT:  And if you think it's objectionable

13   while they're doing it, feel free to do so; but I will tell

14   you we're never going to get to the finish line if every

15   ruling I make is an invitation to continue arguing.  That's

16   the Court's ruling.

17              If you want to object while it's going on

18   contemporaneous to it, you're welcome to.  That's the Court's

19   decision.

20              MS. RIVERA:  We'd invite the Court to review these

21   cases.

22              THE COURT:  My law clerk is reviewing them right

23   now and highlighting them for me.  I mean, I can't absorb

24   these through osmosis.  I'm going to take a break until the

25   jury is here.  We're going to talk about these cases that

1  he's reviewing since you submitted them; and if I need to

2  reconsider, I will.

3            MS. RIVERA:  Thank you, Your Honor.  We're going to

4  have one other housekeeping matter.

5            THE COURT:  We're going to have to start getting

6  here at 8:00 or 7:45 to handle all these housekeeping issues.

7            MS. RIVERA:  Yes, and this is just the way it's

8  going.  We turned over an N.C.I.C. report regarding John

9  Gopoian.  There was an arrest in 1983 for possession of what

10 is described as a dangerous weapon.  We wanted to make sure

11 the defense is not going to inquire as to that arrest in the

12 cross-examination of Mr. John Gopoian as we foresee his

13 testimony is going to be forthcoming.  We're moving to

14 exclude that evidence as extrinsic and not relevant to

15 truthful or untruthfulness.

16            MR. SKUTHAN:  Your Honor, may I respond?

17            THE COURT:  You may.

18            MR. SKUTHAN:  We learned about Mr. Gopoian on

19 February 12th for the first time; and the government has a

20 continuing obligation under Rule 16 to turn over any prior

21 criminal activity, any criminal record, N.C.I.C.  On the

22 morning that they're going to call him on direct examination,

23 they're giving it to us for the very first time.

24            MS. RIVERA:  No.

25            MR. SKUTHAN:  I stand corrected.

1          THE COURT:  All right.  I appreciate that.  Look,

2    I'm not going to have the defense tell me what their plans

3    are for cross-examination, but I do expect them in good faith

4    to abide by the rules of evidence, and I'm confident they

5    will do so.

6          If you believe -- look, again, what you're doing is

7    complicated and difficult.  It takes many years to master

8    what you two are doing -- what all three of you are doing in

9    this courtroom.  You have to be on your toes.  If you

10   anticipate it's coming, object and ask to approach sidebar;

11   but you will have to be on your toes.

12         I don't know what they're going to do and I can't

13   demand them to give you a blueprint of what their cross-

14   examination is going to be.  I only have to trust that both

15   of you will follow the rules of evidence, and that's what I'm

16   going to expect.

17         Is there anything further?

18         MS. RIVERA:  Nothing further, Your Honor.

19         MS. SCOTT:  No, Your Honor.

20         THE COURT:  All right.  From your perspective, I

21   think we had this Bates number issue with regard to one of

22   the government exhibits that's been ironed out.

23         MS. SCOTT:  Yes, Your Honor.

24         THE COURT:  Miss Darleen, are they here or are we

25   waiting on them?

1          THE COURTROOM DEPUTY:  Jimmy went to get them.

2          THE COURT:  Please let me know when they're ready.

3          THE COURTROOM DEPUTY:  I will, Judge.

4          THE COURT:  I'll see you in a few minutes.  Thank

5   you.

6          (Recess taken at 8:50 a.m.)

7          (Jury not present at 8:55 a.m.)

8          THE COURT:  I'm told the jury is ready to return.

9          Is the government prepared?

10         MS. RIVERA:  Yes, Your Honor.

11         THE COURT:  Is the defense prepared?

12         MS. SCOTT:  Yes, Your Honor.

13         THE COURT:  All right.  Let's bring the jury in.

14         Mr. Hyre, if you could, return to the witness

15   stand.

16         THE WITNESS:  Yes, Your Honor.

17         (Jury present at 8:55 a.m.)

18         THE COURT:  Please be seated, ladies and gentlemen

19   of the jury, once you arrive at your chairs.  Your pads and

20   pens should be there as you left them.

21         Please be seated in the courtroom.

22         Ladies and gentlemen of the jury, are there any

23   matters of concern to report to the Court at this time?  If

24   so, please indicate by raising your hand.

25         (No response.)

1    THE COURT:  All right.  Welcome back.  We're going

2  to continue marching forward.

3    Mr. Skuthan, Ms. Scott, are you ready for your

4  cross-examination?

5    MS. SCOTT:  Yes, Your Honor.

6    THE COURT:  Please proceed.

7    MS. SCOTT:  Thank you.

8                    CROSS-EXAMINATION

9  BY MS. SCOTT:

10  Q    You testified yesterday that you create fictitious

11  personas, correct?

12  A    Yes, ma'am.

13  Q    Okay.  And you do so based on the target you're looking

14  for?

15  A    People interested in having sex with children, yes,

16  ma'am.

17  Q    Specifically, you do it -- you create your fictitious

18  persona based on the need of the target you're looking for?

19  A    I don't understand the question.

20  Q    Okay.  Mr. Brooks indicated in his ad Family Play Time?

21  A    Uh-huh.

22  Q    And that you then -- your persona was a father with

23  children?

24  A    Correct.

25  Q    If it were someone who was interested in just little

1   girls, would your persona have changed?

2   A      The FlyDad1013, I always -- I do a boy and a girl.  My

3   experience is that some people who indicate one sex are happy

4   with both sexes.

5   Q      I understand.  Is FlyDad1013 your only fictitious

6   persona?

7   A      No.  I have four others.

8   Q      Okay.  What are the other four fictitious personas or

9   the other three?  Excuse me.

10  A      I have enjoytohaveya, lookformehere, and SAgooddad.

11  Q      Okay.  And so each of these personas are tailored

12  differently; is that correct?

13  A      No, ma'am.  The reason for using FlyDad1013 on that

14  morning was I was -- like I said yesterday, I have hundreds

15  of these investigations and I have ongoing investigations,

16  and it's basically to keep myself from getting confused.  So

17  I rotate through the -- I rotate through my UC.

18  Q      I understand.  I'm sorry.  Maybe my question was

19  unclear.  The personas that you have, are they different?

20  A      They can be, yes, ma'am.

21  Q      Okay.  And --

22  A      I mean, they're always about me being a bad dad, unless

23  sometimes I play the role of a child; but, generally, I play

24  the role of a bad dad.

25  Q      So then you do have a fictitious persona that's a child?

1   A      I've used that before.  I don't -- you're thinking of

2   this the wrong way, like these are static things that

3   don't -- that don't change, like, when I log on to the

4   Internet.

5          Obviously, though, it wouldn't make sense to me to

6   pretend I was a child using an e-mail with the word "dad" in

7   it.  So I wouldn't use that one if I was a child.

8   Q      I understand, Agent.

9   A      Okay.

10  Q      But let me try to be clear.

11  A      Okay.

12  Q      You have different personas?

13  A      Correct.

14  Q      Each persona is not used the same every time?

15  A      That's correct.

16  Q      Some of your personas are for you to be a dad?

17  A      Correct.

18  Q      And you in the past have used the persona where you

19  portray a child?

20  A      I've done that before, yes, ma'am.

21  Q      And all of these personas are fictitious?

22  A      Correct.

23  Q      You just testified that it wouldn't make sense for you

24  to portray a child and use FlyDad as an e-mail, correct?

25  A      That's right.

 1  Q     Okay.  Because that wouldn't make sense for someone who

 2  was looking for a dad?

 3  A     I would assume that they would see the title and figure

 4  that I was law enforcement.

 5  Q     Understood.  And your whole purpose when you're creating

 6  this fictitious persona is so that you don't look like law

 7  enforcement, correct?

 8  A     That's correct.

 9  Q     Okay.  And here, you played a fictitious dad of a ten-

10  year-old boy?

11  A     Yes, ma'am.

12  Q     And a 13-year-old girl?

13  A     Correct.

14  Q     You don't really have a ten-year-old and a 13-year-old,

15  do you?

16  A     No, ma'am.

17  Q     Okay.  So these are all fictitious items that you've

18  created?

19  A     Correct.

20  Q     Did anyone instruct you to create the ten-year-old and

21  the 13-year-old?

22  A     No, ma'am.

23  Q     That was something you did on your own?

24  A     Yes, ma'am.

25  Q     Okay.  And you testified that you investigate regularly

1   persons who are suspected of persuading, inducing or enticing

2   minors on the Internet?

3   A      Yes, ma'am.

4   Q      And you've testified that you have been involved in

5   hundreds of these investigations?

6   A      Correct.

7   Q      And for seven years you've been the coordinator of these

8   investigations?

9   A      Correct.

10  Q      Okay.  You said you've been 13 years as a special agent,

11  correct?

12  A      I'm actually in my 15th year.

13  Q      Fifteenth year.  Forgive me.

14  A      I've done 14.  I'm in my 15th.

15  Q      Okay.  Have you ever been a regular agent?

16  A      I'm a regular agent now, yes, ma'am.

17  Q      So there's no difference between special and regular?

18  A      Well, no.  "Special agent" is the title you get in

19  Quantico.  You're a special agent.

20  Q      Day one?

21  A      Day one, yes, ma'am.

22  Q      Okay.  But "coordinator" is a special title?

23  A      It's just a title that -- yeah.  My supervisor comes to

24  me for things that happen on my task force, yes, ma'am.

25  Q      Okay.  So there is someone above you?

1    A    Absolutely.

2    Q    Okay.  And now this person, does he or she direct you on

3    how to lead your task force?

4    A    Not on a day-to-day basis.  They're not familiar with

5    how to conduct these invest- -- they're not as familiar on

6    how to conduct these investigations as I am.  However, they

7    are in my management chain of command.  I do answer to them.

8    Q    Okay.  If there was an issue, you would answer to them?

9    A    Correct.

10   Q    Okay.  But on the day-to-day course of action, you are

11   the man in charge?

12   A    For how we're doing our investigations, but when it's

13   time to effect an arrest or do something outside of the

14   normal scope, I have to go through my management.

15   Q    So for investigations, Agent Hyre is the man to go to?

16   A    Yes, ma'am.

17   Q    Okay.  And you said that you've been involved in many

18   types of trainings?

19   A    Yes, ma'am.

20   Q    To do so?

21   A    Yes, ma'am.

22   Q    Okay.  And how -- help the jury to understand.  These

23   trainings, they were just an eight-hour course?

24   A    No.  There's -- I've been to three 40-hour courses.

25   Two -- there's the Dallas Crimes Against Children Conference.

1    I believe I've been there either two or three times; and it's

2    a 40-hour course of instruction centered around child

3    exploitation crimes, not just solicitation but also child

4    pornography matters.

5         I've also been to the Atlanta Crimes Against Children

6    Conference I know once, for sure, and that's also a 40-hour

7    course.

8    Q    So 120 hours total of training?

9    A    Well, in addition to -- in addition to I've been to a

10   week-long F.B.I. basic course and a week-long F.B.I. advanced

11   course; and then -- and like I mentioned in my -- when I was

12   under direct, just being in this field, a lot of our training

13   and learning comes from working with other agents --

14   Q    I understand.

15   A    -- who also have experience.

16   Q    As far as training for specifically dealing with child

17   exploitation, 120 hours?

18   A    Like I said, those courses are not specific to that.

19   They also -- I'm sorry.  Yes.  For child exploitation, yes,

20   ma'am.

21   Q    Okay.  Thank you.  So now we're going to break it down

22   further.  On the cases dealing with online solicitation or

23   specifically persuading, inducing or enticing a minor using

24   the Internet, how many hours of education have you gone

25   through?

1    A    I don't know.

2    Q    How many courses have you taken?

3    A    I'd have to go back and look at the syllabuses from the

4    conference that I attended.  Like I said, for the seven years

5    I've been the coordinator of this task force, I've done this

6    probably 75 percent of the days, and so every one of those

7    days was a learning experience for me and every agent I've

8    talked to has been a learning experience for me.  There's no

9    way for me to quantify how many hours that is.

10    Q    I understand.  I don't want you to quantify that.  I

11    want to talk about the education you received.  And your

12    answer is you don't know?

13             MS. RIVERA:  Objection, Your Honor; misstatement of

14    his testimony.

15    BY MS. SCOTT:

16    Q    Forgive me.  I don't want to put words in your mouth.

17             THE COURT:  I'm going to -- while you're on cross,

18    you can't put words in his mouth.  I'm going to sustain the

19    objection, though.  You can ask your question.

20             MS. SCOTT:  Thank you.

21    BY MS. SCOTT:

22    Q    I want to talk about the specific training you received

23    educationally.  You don't know how many hours you've

24    received?

25    A    There's no way I could quantify that.

1  Q    Well, you just told us that there is a way you can

2  quantify that, because you can go back and look at your

3  records, correct?

4  A    Yes, ma'am.

5  Q    And you didn't do that for this case?

6  A    No, ma'am.

7  Q    So there is a way that you could do it?

8  A    Theoretically, yes, ma'am.

9  Q    Is it theoretically or you can actually go pull the

10 records?

11 A    I don't know if the Dallas Crimes Against Children

12 Conference from 2009, if they still have their syllabus

13 available to me to look at.

14 Q    So the last time you went to an educational training was

15 in 2009?

16 A    No.  That was the first time.

17 Q    Okay.  When was the next time?

18 A    I think I went to the Atlanta training the year before

19 last.

20 Q    2014?

21 A    I believe so, yes, ma'am.

22 Q    Okay.  And so those records will probably be more

23 available?

24 A    Yes, ma'am.  I can't speak for them, but I would assume

25 so.

1    Q    Okay.  But you didn't go pull those records?

2    A    No, ma'am.

3    Q    Okay.  So today -- wait one second.

4         You said that was two years ago?

5    A    I believe -- I believe I was in Atlanta two years ago

6    for that conference, and I don't think I've been to Dallas

7    since then.  I know I've been to Dallas twice, but I don't

8    think I've been there since the Atlanta conference.

9    Q    Okay.  You don't remember the courses you took two years

10   ago?

11   A    Not specifically, no, ma'am.

12   Q    Okay.  And you don't -- okay.  But you do know that in

13   these courses, you were trained to investigate cases?

14   A    Yes, ma'am.

15   Q    You were trained how to look on the Internet for clues?

16   A    Yes, ma'am.

17   Q    You were trained on keywords to look for?

18   A    I've -- I've learned that.  I've learned that probably

19   more through other investigators.  I don't recall being

20   trained on that at the courses.  I may have been, but my

21   knowledge is a compilation of the last seven years of doing

22   this job.

23   Q    So is it that you weren't trained on keywords?

24   A    I don't know.  I can't speak specifically to what I was

25   trained on in a specific class from seven years ago or five

1    years ago or two years ago.  I can't.  I'd be lying if I

2    tried to tell you I specifically remember the class.

3         I know that I know how to do this job and I know that I

4    know what the keywords are to look for because I've been

5    successful at doing it in the past.  I know through my common

6    experience every day how to conduct these investigations.

7    Q    Okay.  So you know from your peers?

8    A    I've learned from my peers as well.

9    Q    Okay.  And the peers -- like I said, you're the

10   coordinator?

11   A    For my task force, yes, ma'am, but I've work with -- I

12   mean, there's all sorts of agencies that do this and I talk

13   with them as well.

14   Q    On a daily basis?

15   A    I wouldn't say on a daily basis, but I frequently talk

16   with them.

17   Q    Okay.  Are you trained to -- let's go back to your

18   training that you took two years ago.  Do you know if you

19   were trained on how to conduct a conversation with the

20   target?

21   A    No, not in that training.  That wouldn't be the scope of

22   that training.  It's basically -- think of the training as

23   more of a best practices type of thing, anecdotal, things

24   that work, things that don't work, things to stay away from,

25   things like that.

1   Q     So you can really just -- excuse me.

2   A     What you're looking for is way too specific of a -- this

3   is not like learning math.  It's not like learning math.

4   Q     Not like learning math?

5   A     Uh-huh.

6   Q     You get to just do whatever works for you?

7           MS. RIVERA:  Objection, Your Honor; that's

8   argumentative and a misstatement of his testimony.

9           THE COURT:  He can disagree.  That is

10  argumentative, but he can disagree.  I'm going to overrule

11  the objection.

12  A     No, I can't do just whatever works.

13  Q     So then there is specific training to tell you how to do

14  this?

15  A     Yes, ma'am.

16  Q     Okay.  And in that specific training to tell you how to

17  do this, did they specifically train you how to have a

18  conversation with a target?

19  A     No.  I've never been told exactly, you know, every word

20  of a conversation, no, ma'am.

21  Q     Maybe not every word.  Do they tell you if you are able

22  to lead the conversation?

23  A     No, I'm not supposed to lead the conversation.

24  Q     You're not supposed to lead?

25  A     No, ma'am.

1    Q     Is that something that is trained to you?

2    A     It's a practice.  You obviously don't want to -- you

3    don't want to suggest -- you don't want to suggest a bad act

4    for the other person.

5    Q     Okay.  Is that something that was trained to you?

6    A     Yes, ma'am.

7    Q     Okay.  Is something else that was trained to you to not

8    bring up sex first?

9    A     Yes.  That's what I just said, to try to let the other

10   person bring up the topic of sex --

11   Q     Okay.  Let's --

12   A     -- because you don't want to suggest that.

13   Q     Let's separate the two issues, okay?  First the question

14   was are you taught to not lead the conversation, and your

15   answer was yes?

16   A     Correct.

17   Q     That is what you were taught?

18   A     Correct.  Taught and learned.  It's what I know.

19   Q     The second question is:  You were taught, learned what

20   you know to not bring up sex first?

21   A     To try to avoid the subject of bringing up sex first.

22   Q     Okay.  Were you also trained to collect evidence?

23   A     Yes, ma'am.

24   Q     And "collecting evidence" being physical evidence?

25   A     Correct.

1    Q    Specifically, e-mails?

2    A    I've been trained on how to collect e-mails, yes, ma'am.

3    Q    Chats?

4    A    Yes.

5    Q    Text messages?

6    A    Correct.

7    Q    Phone recordings?

8    A    Correct.

9    Q    Interviews?

10   A    Correct.

11   Q    You were trained to preserve all evidence that you

12   possibly can for the potential of it coming to a trial?

13   A    Correct.

14   Q    Potentially having to go to a jury?

15   A    Correct.

16   Q    You collected evidence in this case?

17   A    Yes, ma'am.

18   Q    Specifically, you collected the e-mails that were sent

19   back and forth?

20   A    Yes, ma'am.

21   Q    You collected the phone recording from yourself to Mr.

22   Brooks?

23   A    Correct.

24   Q    And you documented or you collected the phone that Mr.

25   Brooks was using?

1    A    I seized the phone, yes, ma'am.

2    Q    Okay.  So those are the physical evidence pieces that

3  you collected here?

4    A    Yes, ma'am.

5    Q    Let me know if I'm missing any piece of physical

6  evidence you collected.

7    A    I was trying to think.  The Callyo records, which I

8  think you mentioned with the phone call.

9    Q    I'm sorry?  I didn't understand.

10    A    The Callyo records, which I think you mentioned with the

11  phone call.

12    Q    That's that specialized piece of equipment that the

13  F.B.I. has?

14    A    It's not just the F.B.I.  It's law enforcement.

15    Q    Law enforcement has?

16    A    Yes, ma'am.

17    Q    But that's that specialized equipment?

18    A    Yes, ma'am.

19    Q    And it is able to capture the phone call in its

20  entirety?

21    A    Correct.

22    Q    Okay.  That Callyo, is that only available to capture

23  calls?

24    A    No.  It also captures text messages.

25    Q    Okay.  Anything else?

```
1    A     I don't believe so, no, ma'am.

2    Q     Okay.  Am I missing any piece of physical evidence you

3    collected here?

4              MS. RIVERA:  Objection, Your Honor; relevance.

5              THE COURT:  Overruled.  This is the second time

6    you've asked the question, though.  So let's move on.

7    A     I -- the only real physical evidence we seized, we

8    seized the phone.  To my knowledge, that's what -- that's the

9    piece of property we seized from him.  I don't think we took

10   any other physical evidence from him.

11   Q     Okay.  You're trained to write reports as well?

12   A     Yes, ma'am.

13   Q     And you wrote reports in this case?

14   A     Correct.

15   Q     And the reason you're trained to write reports is to

16   refresh your recollection --

17   A     Yes, ma'am.

18   Q     -- if it were to come to trial?

19   A     And throughout the process, yes, ma'am.

20   Q     And the purpose of writing a report is to be closer to

21   the time that it actually happened; is that correct?

22   A     (No response.)

23   Q     You write them closer to the time that the incident

24   happened?

25   A     Yes.
```

1   Q      Because your memory is fresher at that time?

2   A      Yes, ma'am.

3   Q      Okay.  Are you also testified how to train -- excuse me.

4          Are you also trained to testify in court?

5   A      I don't know that we ever received any training on that.

6   Q      Okay.

7   A      I think that's a learn-as-you-go process.

8   Q      Okay.  You testified yesterday about the sex websites

9   that you go on to look for potential predators?

10  A      Are you talking about Craigslist?

11  Q      No, sir.  You testified yesterday that there are

12  multiple --

13  A      There's others, yeah.

14  Q      -- websites you go on?

15  A      Yeah.  There's one named -- the one I think I testified

16  yesterday was -- it's a website known as Motherless and,

17  yeah, I would classify that as a sexually -- that's all that

18  website is about is deviant sex.

19  Q      Okay.  And you testified that Craigslist is also a place

20  that you would go on to?

21  A      Yes, ma'am.

22  Q      Okay.  But you also testified Craigslist is not

23  primarily for sex?

24  A      That's correct.

25  Q      You said there are other purposes of Craigslist, like

1  posting ads for jobs, posting ads for selling things?

2  A    Correct.

3  Q    Okay.  And there's a small section for personal or

4  Personals; is that correct?

5  A    Yeah.  I don't know what the -- what the percentage of

6  Craigslist is for Personals, but there is a section of

7  Craigslist that's for Personals, yes, ma'am.

8  Q    And then inside of that is where you say there's a

9  smaller section of Casual Encounters?

10  A    Yes, ma'am.

11  Q    Okay.  And is that the only place you go into is the

12  Casual Encounters to search for people?

13  A    Yes, ma'am.

14  Q    You testified that there were keywords you look for and

15  "family" is one of those keywords?

16  A    Yes, ma'am.

17  Q    Okay.  And then once you see "family," you testified

18  that "family" could be innocent, correct?

19  A    Absolutely.

20  Q    But you went inside this ad and there was something that

21  triggered your mind?

22  A    Well, no.  The word "family" by itself is innocent.

23  "Family play time," to me, in the context of a Craigslist

24  personal ad did not appear to be innocent to me and that's

25  why I looked into the body of the ad.

1   Q    Okay.  You went into the body of the ad and you said

2   that there was something else that triggered you that this

3   may be odd?

4   A    Yes, ma'am.

5   Q    And what was that specifically?

6   A    The person posting the ad was soliciting incestuous sex,

7   was wanting to join a family in which there was incestuous

8   sex, fathers, sons, uncles, nephews, cousins.

9   Q    Is incestuous sex illegal?

10  A    No, ma'am.

11  Q    Okay.

12  A    Not to my knowledge, not in the state of Florida.

13  Q    Okay.  So if adults want to engage in incestuous sex,

14  that would be fine?

15       MS. RIVERA:  Objection, Your Honor; asked and

16  answered.

17       THE COURT:  Response.

18       MS. SCOTT:  My response, Your Honor, is that the

19  ad --

20       THE COURT:  He said, to the best of his knowledge,

21  incestuous sex is not illegal in Florida.  Your next question

22  asked the very same thing again.

23       So is it illegal for -- he said to the best of his

24  knowledge, incestuous sex between adults is not illegal.

25       MS. SCOTT:  I'll move on.

1              THE COURT:   Okay.

2    BY MS. SCOTT:

3    Q    So then inside of the ad, it said 18 and over?

4    A    Yes, ma'am.   The last line, yes, ma'am.

5    Q    There was nothing illegal about that ad?

6    A    You can write anything.   There's nothing illegal about

7    it, no, ma'am.   You could write that you wanted to have sex

8    with a child and that's not illegal.   That would be -- you're

9    allowed to say that.   Now, the ad's going to get flagged and

10   taken down off of Craigslist.   So, yeah, there's nothing

11   illegal about that ad.

12   Q    Okay.   And also you testified that someone would put "18

13   and over" because they don't want it to be flagged?

14   A    Based on my experience, yes, ma'am.

15   Q    But if someone did not put "18 and over," that doesn't

16   necessarily mean it's going to be flagged?

17             MS. RIVERA:   Objection, Your Honor; calls for

18   speculation.

19             THE COURT:   Response.

20             MS. SCOTT:   I can rephrase it.

21             THE COURT:   I'm going to sustain the objection,

22   then.   Feel free to rephrase.

23   BY MS. SCOTT:

24   Q    Based on your training and experience, Agent Hyre, there

25   are ads that you have seen that don't necessarily say "18 and

1   over"?

2           MS. RIVERA:  Objection, Your Honor; relevance.

3           THE COURT:  Overruled.

4   A    Are we talking about with -- that relate to having sex

5   with children or that potentially point to having sex with

6   children?  Because, no.  There's tons of ads on Craigslist

7   that mention nothing about the age.  You're right about that.

8   You're right about that.

9   Q    Okay.  And so in this case there was "18 and over," and

10  then you said that there was -- forgive me.

11          MS. SCOTT:  Can you pull up the Craigslist ad.

12          THE COURT:  I need to know what you're pulling up

13  and I need it marked by exhibit number for the record.

14          MS. SCOTT:  Yes, Your Honor.  It's Exhibit

15  Number 1.

16          THE COURT:  All right.  Exhibit Number 1.

17  BY MS. SCOTT:

18  Q    Now, inside -- that ad, when you read it yesterday, you

19  left out a part of that ad.  What is the last sentence in

20  that ad?

21  A    Yes, ma'am.  The reason I left that out is it says, "Do

22  not contact me without unsolicited services or offers" --

23  Q    Okay.

24  A    -- and that's not written by the person that posts the

25  ad.  That's almost an automatic thing that can be selected.

```
 1   That's why I left it out.  In my mind, that's not part of the

 2   body of the ad.

 3   Q     Wait.  Let's back up.  You said you left it out?

 4   A     If I didn't say it -- I don't remember what I said and

 5   didn't say.  But if I did, it's because I don't -- when I

 6   look at that ad, that's not really part of the body of the

 7   ad.

 8   Q     Okay.  But yesterday when you read it, you read "CL"?

 9   A     Yes, ma'am.

10   Q     You read "Orlando"?

11   A     Yes, ma'am.

12   Q     You read "personals"?  You read "Casual Encounters"?

13   A     Yes, ma'am.

14   Q     Those aren't a part of the ad?

15   A     I was directed to by the -- by the prosecutor to start

16   at the top and read through the ad.

17   Q     Okay.  Those are not a part of the ad, correct?

18   A     Correct.  They're not part of the body of the ad, yes,

19   ma'am.

20   Q     Okay.  And you just testified that that is something

21   that someone would have to click on?

22   A     I believe so.  I don't post ads on Craigslist, so I'm

23   really not an expert on that; but that's more of an

24   administrative thing than what you write in the body of the

25   ad.
```

1    Q      Forgive me.  Is it administrative or does somebody have

2    to actually ask for it to be in their ad?

3    A      I don't know.

4    Q      Do you see it in every ad that is posted?

5    A      I don't remember.  I see it a lot, I know that.  But I

6    can't definitively say that I've seen it on every ad I've

7    ever seen because I just don't know the answer to that, but I

8    see it a lot over and over and it's the exact same sentence,

9    which tells me that it's nothing that the user puts in or

10   nothing that the user types because it's the exact same

11   sentence over and over and over.  Everybody has those -- has

12   that same sentence.

13   Q      Everybody?

14   A      The ones I remember.  Like I say, I can't testify that

15   100 percent of every ad I've every seen on Craigslist has

16   that.  I know I've seen that over and over and over again,

17   and it's always the same sentence.

18   Q      Okay.

19          MS. SCOTT:  You can take it down.  Thank you.

20   BY MS. SCOTT:

21   Q      But the part that is not routine, as you just stated,

22   would be "If you are all 18 and over, get back at me"?

23   A      That's correct.  That's something the defendant put in.

24   Q      Okay.  So you responded to the ad?

25   A      Correct.

1          MS. SCOTT:  And if you could, pull up number 0093

2    in Exhibit Number 2 or -- excuse me -- 3.

3          [Coughing]  Excuse me.  [Coughing]  Excuse me.

4    BY MS. SCOTT:

5    Q    In here, you testified that the reason you put ten-year-

6    old and 13-year-old was because of the ad; is that correct?

7    A    Yeah, I responded that I had children because of the

8    nature of the ad.

9    Q    Well, sir, you didn't just put "children"?

10   A    Uh-huh.  I gave the ages of my children because of the

11   nature of the ad.

12   Q    And the sex of your children?

13   A    Correct.

14   Q    Your fictitious children?

15   A    Correct.

16   Q    Okay.  You said that earlier you were -- you were

17   trained, you learned, you've gone through the years of your

18   -- 15 years doing this to not bring up sex first?

19   A    Correct.

20   Q    But Mr. Brooks didn't in fact -- he wasn't the first

21   person to bring up sex during this conversation?

22   A    No, ma'am.  His ad is completely indicative of sex acts

23   between fathers, sons, uncles, nephews and cousins.  Mr.

24   Brooks brought up sex from his ad.  I responded to Mr.

25   Brooks' ad.

1    Q       I understand that, Agent Hyre.   Let me be more specific.

2    A       Okay.

3    Q       Mr. Brooks posted an ad, correct?

4    A       Yes.

5    Q       The ad did not say "sex"?

6    A       It did not say the word "sex," correct.

7    Q       You --

8    A       It clearly indicated sex.

9    Q       You implied that that meant sex?

10            MS. RIVERA:   Objection, Your Honor; that's a

11   misstatement of the witness's testimony.

12            THE COURT:   Both of you, come up sidebar.

13            (Bench conference as follows.)

14            THE COURT:   Just to be clear, he told you that, in

15   his opinion, interpreting the first ad, he thought it was a

16   solicitation for sex.   It doesn't say "sex" in there.   You

17   can cross him on that; but if you are going to keep asking

18   him whether it says "sex" in there, he's going to say, "No.

19   Based on my training and experience, I thought it was sex."

20            You're not going to get anywhere with this.   His

21   response doesn't say the word "sex."   What he's trying to

22   tell you is that implicitly in what he put, he interpreted

23   that as looking for sex.   So you're not going to get anywhere

24   with this.

25            I'm going to overrule the objection, but you're

```
 1    chasing your tail on this.  I'm just letting you know.

 2              MS. SCOTT:  Okay.

 3              (In open court.)

 4              THE COURT:  All right.  I'm going to overrule the

 5    objection and allow Ms. Scott to continue with her cross-

 6    examination.

 7    BY MS. SCOTT:

 8    Q    Can you answer the question?

 9    A    I don't remember the question.

10    Q    I'll move.  The first time or -- excuse me.

11              MS. SCOTT:  If you can, pull up, Mr. Espiritu, page

12    94 in Exhibit Number 3.

13    BY MS. SCOTT:

14    Q    Mr. Brooks didn't mention sex here, correct?

15    A    Correct.

16              MS. SCOTT:  If you can, pull up page 96 in

17    Exhibit 3.

18    BY MS. SCOTT:

19    Q    Mr. Brooks didn't mention sex here?

20    A    Correct, although I took the capitalized UP as an

21    innuendo for sex.

22    Q    That's what you imply it to mean, based on your

23    testimony yesterday?

24    A    I think the word "imply" is wrong.

25              MS. RIVERA:  Objection, Your Honor; that's a
```

 1    misstatement of the witness's testimony as to the word

 2    "implied."

 3              THE COURT:  Do you mean that he inferred from the

 4    e-mail that it was sex, the word "up"?

 5              MS. SCOTT:  Yes.

 6              THE COURT:  Okay.  I understand.

 7              MS. SCOTT:  I can use the word "inferred."  I

 8    apologize.

 9              THE COURT:  No.  That's okay.

10              The objection will be sustained.  Feel free to

11    proceed.

12    BY MS. SCOTT:

13    Q    You inferred that "up" means sexual innuendo --

14    innuendo?

15    A    Yes, ma'am.

16    Q    But there is no word "sex" here?

17    A    That's correct.

18    Q    Okay.

19              MS. SCOTT:  If you could, turn to page 98 in

20    Exhibit 3.

21    BY MS. SCOTT:

22    Q    Mr. Brooks did not mention "sex" here?

23    A    No, ma'am.

24              MS. SCOTT:  If you could, turn to page 100 in

25    Exhibit 3.

1    BY MS. SCOTT:

2    Q     Mr. Brooks did not mention sex here?

3    A     I inferred him to be asking me what sex acts I take part

4    in with my children, but he did not say the word "sex."

5    Q     Okay.  So that's a no?

6           MS. RIVERA:  Your Honor, the witness has already

7    answered.

8           MS. SCOTT:  Then, Your Honor, I apologize.  If I

9    may respond?  If the witness can answer yes or no and then

10   explain his answer, that would be more helpful.

11          THE COURT:  Well, I'll let him give his own

12   answers, but the objection is going to be overruled.

13          If you want a yes-or-no answer, you're on cross,

14   you can lead him.  Ask him "Yes or no."

15          MS. SCOTT:  Thank you.

16          If you could, turn to page 102 of Defense Exhibit

17   -- excuse me -- of Exhibit 3.

18   BY MS. SCOTT:

19   Q     Agent Hyre, yes or no, did Mr. Brooks mention "sex"

20   here?

21   A     No.  May I expound?

22   Q     Yes.

23   A     When he said, "Definitely interested," I inferred that

24   to mean he was definitely interested in participating in a

25   sex act with my children or one or both of my children.

1   Q      Okay.

2              MS. SCOTT:   If you could, turn to page 104.

3   BY MS. SCOTT:

4   Q      Did you infer that "coming to hang out at a pool" meant

5   sex, too?

6   A      No.

7   Q      No.   And in this e-mail, there was no mention of sex?

8   A      No, but I inferred that this would be the first step.

9   This is how this works.   This is -- based on my training and

10  experience, people show up to get comfortable with the

11  situation and then they move on to what the ultimate goal is,

12  which was stated in the first ad by Mr. Brooks.

13  Q      Okay.   So basically all of these e-mails were colored

14  with your training and experience that Mr. Brooks meant sex?

15  A      There's absolutely no other reason for me and Mr. Brooks

16  to be having this conversation.   All 83 e-mails were about

17  Mr. Brooks negotiating with me to eventually have oral sex

18  with my ten-year-old son.

19  Q      I'm glad you state that.

20  A      That's what all of these e-mails were about.

21  Q      I'm glad you state that.

22             MS. SCOTT:   Can you turn to page 110 of Exhibit 3?

23  BY MS. SCOTT:

24  Q      Can you read that out loud for the jury?

25  A      "Just be loving as well, definitely nothing rough.   I

 1   would be into playing with you" -- I'm sorry.  "I would be

 2   into playing with you, and if you let him watch, that would

 3   be cool."

 4   Q     So your testimony just one moment ago was every

 5   communication here was about sex with a child?

 6   A     Yes, ma'am.

 7   Q     But here, it is clear that Mr. Brooks indicated -- the

 8   first time he indicated an interest in actually playing or

 9   sex, it says with an adult; is that correct?

10   A     I think he had already mentioned that he would be more

11   comfortable with just my ten-year-old being there, which I

12   took to being that the ten-year-old was what he was aiming

13   for; and I think I took this to mean that he would be -- he

14   wanted to have sex with me while my ten-year-old boy watched

15   inside the same room.

16   Q     Okay.  So this is about sex with -- then the answer is

17   yes, is that correct, that it was about sex with an adult

18   male?

19   A     In addition to having a ten-year-old boy in the room to

20   watch.  So no.  In my mind, this is all part of the same.

21   These communications are all part of the -- it's all the same

22   conversation.  It's one long six-day conversation.

23   Q     And all of this --

24   A     And this would have been one act in that six-day

25   conversation.  When he met me, we'd have sex in front of my

ten-year-old boy.  But this was after he already stated he

just wanted my ten-year-old boy and not my 13-year-old

daughter.

Q    Okay.  And this is all in your mind, correct?

          MS. RIVERA:  Objection, Your Honor; argumentative.

          THE COURT:  I'm going to let him answer that.  The

objection is overruled.

A    I can only see things that way, yes, ma'am.

Q    Okay.  So then let's turn back to page 93.

          MS. SCOTT:  If you could, pull up 93 in Exhibit

Number 3.

BY MS. SCOTT:

Q    So when you responded, your ad was colored with he

wanted to have sex with a minor?

A    I believe that to be the case at that point.  This was

my very first response.  So if -- and like I say, in my

investigations I've done before, sometimes when I respond

with the age of my children, the first thing I hear back is,

"Whoa, way too young.  No way," and they're gone.  They never

talk to me again.

          MS. SCOTT:  Can you pull up page 95.

BY MS. SCOTT:

Q    So when you put the word "up" and capitalized it, that

was because you were insinuating sexual interest?

A    Like I said yesterday, I was putting that out as a

1    feeler to see if this was actually the direction -- to make

2    sure in my mind this was actually the direction that Mr.

3    Brooks wanted to go in.  I figured if it was, he would

4    recognize the innuendo.  If it wasn't, he wouldn't recognize

5    the innuendo.

6    Q    I understand.  Agent Hyre, if you could, please answer

7    yes or no and then explain.

8    A    Okay.

9    Q    Okay.  Thank you.

10        You put "up" in there to insinuate sex?

11            MS. RIVERA:  Objection, Your Honor; asked and

12    answered.

13            THE COURT:  Yes or no?

14    A    To put the innuendo, yes.

15            THE COURT:  All right.  There's your answer.

16            MS. SCOTT:  If you could, turn --

17            THE COURT:  Hold on.

18            MS. SCOTT:  Oh, sorry.

19            THE COURT:  Give him specific instructions on what

20    you want him to do when you're asking the questions.

21            MS. SCOTT:  I will be more clear, Your Honor.

22            THE COURT:  Okay.  Go on ahead.

23            MS. SCOTT:  If you could, turn to page 97.

24    BY MS. SCOTT:

25    Q    I just want a yes-or-no answer, Agent Hyre.

1    A     Okay.

2    Q     When you put this, you were colored to see about sex.

3    So "Seeing new things" was meaning sex?

4    A     Yes.

5              MS. SCOTT:   Page 99.

6    BY MS. SCOTT:

7    Q     Yes or no, when you put "play with my kids," "play"

8    means have sex with my children?

9    A     Yes.

10              MS. SCOTT:   Page 101.

11   BY MS. SCOTT:

12   Q     Yes or no, Agent Hyre, when you put "We make each other

13   happy," your "happy" means having sex with your children?

14   A     Yes.   Can I expound?

15   Q     I don't think there's anything to expound on that.

16              MS. SCOTT:   Page 103.

17   BY MS. SCOTT:

18   Q     When you put -- excuse me.   Yes or no, when you put

19   "Very cool.   Let me know what you want to do," you meant what

20   Mr. Brooks wants to do as far as having sex with your

21   children; is that correct?

22   A     No.

23   Q     So then your statement earlier, Agent Hyre, about every

24   communication in this entire 63 pages was about sex with your

25   children --

1    A    May I expand?

2    Q    After I ask my question -- so your answer earlier about

3    every page in this e-mail communication was about sex with

4    your children, if you're answering no, then that answer

5    wasn't correct?

6              MS. RIVERA:  It's a confusing question, Your Honor.

7              THE COURT:  Is that an objection?

8              MS. RIVERA:  The objection is the question is

9    confusing as stated.

10             THE COURT:  All right.

11             Shorten the question.  I had a little trouble with

12   that one, too.  The objection is sustained.

13   BY MS. SCOTT:

14   Q    There is one e-mail in here, if your answer is no, that

15   it's not about sex with your children then?

16   A    You asked me if this was purely about sex, and what I

17   wrote had a twofold -- twofold, just like the innuendo with

18   the word "up" being capitalized.  When I said, "Let me know

19   what you want to do," he could have said -- he didn't have to

20   say sex.  So it was laid out.  It could possibly be that he

21   was going to answer sex.

22        I was asking a question there, "What do you want to do?"

23   My mind assumed he would respond with something sexual in

24   nature, but he also could have responded with "I don't want

25   to do anything."  So it wouldn't be fair for me to say that

1    that was completely about sex.  It could have been about sex.

2    Q    And his next response then to you was about coming to

3    hang out and if you have a pool?

4    A    I would assume so.  I'll take your word for it.  I don't

5    see the next e-mail, but I do remember that e-mail.

6    Q    But you know the e-mails?

7    A    Yeah.  I don't remember the exact order, but, yes,

8    ma'am.

9    Q    Okay.

10            MS. SCOTT:  If you could, turn to page 105.

11   BY MS. SCOTT:

12   Q    When -- yes or no, Agent Hyre, when you said, "Are you

13   interested in both kids being there or just one," you meant

14   sex?

15   A    Yes, ma'am.

16   Q    Okay.

17            MS. SCOTT:  If you could, turn to page 107.

18   BY MS. SCOTT:

19   Q    When you say -- yes or no -- "What do you want to do

20   with him," smiley face, you are meaning sex?

21   A    I'm asking him what he wants to do with him.  So for you

22   to say that I meant sex by that, I did not mean for him to

23   answer with something sexual.  I was asking him the question:

24   Is what you want to do with him something sexual?

25            I was looking for him to tell me what he wanted to do

1   with him.  I assumed his answer would be sexual.

2   Q    Is that a yes?

3   A    I don't know because of the way -- I can't answer yes to

4   that question.

5        "What do you want to do with him?"  It's a question.

6        Purely, you're right as far as -- was I expecting a

7   sexual answer or would I have been surprised to get a sexual

8   answer back?  No.  I was expecting that, but it's a question.

9        I wasn't saying -- I wasn't saying -- I was asking him

10  the question.  There again, my training is to leave exits all

11  along the way for the people we're talking to to get off of

12  this path and to not follow through with the path that

13  they're on.

14       In asking what do you want to do with him, it's not fair

15  to say that that question was, "Tell me which specific sex

16  acts you want to do with him," because he could have answered

17  absolutely nothing.

18  Q    You talked about exits.

19  A    Yes, ma'am.

20  Q    When Mr. Brooks said that he wanted to have sex with an

21  adult, would that have been an exit?

22  A    No, ma'am, because he did it in the context of my

23  ten-year-old boy being in the room and watching and had

24  already established the fact that he was interested in having

25  sex with my ten-year-old boy.

1    Q      But him establishing that he wanted to have sex with

2    you?

3    A      But he wanted to have sex with me in front of my

4    ten-year-old.

5    Q      Okay.  Nowhere in here did Mr. Brooks specifically say,

6    "I want to have sex with your ten-year-old"?

7    A      He never specifically said that, no, ma'am.

8    Q      Okay.  The only place where he specifically said it was

9    with an adult male with a ten-year-old boy in the room,

10   correct?

11   A      In the e-mails, correct.

12   Q      Okay.

13           MS. SCOTT:  And if we could, pull up 110 again.

14   BY MS. SCOTT:

15   Q      That last part of it says, "If you let him watch, that

16   would be cool," correct?

17   A      Correct.

18   Q      So I'm not saying that "I want your little boy to be

19   there," but, "If you let him be there, that's cool"?

20   A      Yes, ma'am, that's what it says.

21   Q      Okay.  And then you testified that you gave an out?

22           MS. SCOTT:  If you could, turn to page 110.

23   BY MS. SCOTT:

24   Q      This was Sunday, September 6 at 11:40 a.m., correct?

25   A      Yes, ma'am.

1   Q     And you said that you were not interested in adult

2   males?

3   A     Correct.

4   Q     You were directly responding to his interest in having

5   sex with you?

6   A     Correct.

7   Q     So then you did take it as though he wanted to have sex

8   with you?

9             MS. RIVERA:  That has been asked and answered, Your

10  Honor.

11            MS. SCOTT:  It has not been asked in this context,

12  Your Honor.  We're onto a new e-mail and his response on what

13  he meant it to be.

14            THE COURT:  All right.  I'm going to let you know

15  that he has answered that he wanted to have sex with this

16  gentleman three or four times.  This is a different e-mail.

17  So I'm going to overrule on that part, but take that for what

18  it's worth.  Feel free to continue.

19  BY MS. SCOTT:

20  Q     That's what you took it to mean?

21  A     That he wanted to have sex with me in front of my

22  ten-year-old son, yes, ma'am.

23  Q     Okay.

24            MS. SCOTT:  If you could, turn to page 115.

25  BY MS. SCOTT:

1    Q    If you could, review that.

2        You gave Mr. Brooks a date that you would be available,

3    correct?

4    A    Correct.

5    Q    You set a plan to say Tuesday would work, and that you

6    also went further to say -- or comfort Mr. Brooks by saying,

7    "If you're hesitant, that's cool.  It's not comfortable if

8    you get here and can't go through with it"?  That was to

9    comfort him into this, correct?

10   A    No.

11   Q    What was your purpose in laying all of that out?

12   A    When I said, "It's up to you.  You still seem hesitant,

13   and that's cool," was to tell him this is up to you.  If you

14   don't want to do this, that's cool.

15   Q    Okay.

16           MS. SCOTT:  And if you could, turn to page 116.

17   BY MS. SCOTT:

18   Q    He responded and said, "Tuesday works"?

19   A    Correct.

20           MS. SCOTT:  If you could, turn to page 120.

21   BY MS. SCOTT:

22   Q    That time is 12:18, yes or no?

23   A    Yes, ma'am.

24   Q    And that was Mr. Brooks' last response to you in the

25   afternoon, yes or no?

1    A    I'd have to see the totality of the e-mails.  I'll take

2    your word for it, but I don't remember if there was a later

3    e-mail on that day.

4    Q    Okay.

5    A    I'll take your word for it if you say that.

6    Q    I don't want you to take my word for anything, sir.

7    A    Okay.

8         MS. SCOTT:  May I approach the witness, Your Honor?

9         THE COURT:  If you don't have the entire exhibit,

10   presenting him two pages will not solve that.  Where is the

11   entire exhibit?

12        MS. RIVERA:  It's at the front.

13        THE COURT:  Feel free to come retrieve it, and he

14   can hold the physical exhibit while you cross him.

15        MS. SCOTT:  Thank you.

16   BY MS. SCOTT:

17   Q    Take your time to review it, and then let me know when

18   you're ready.

19        THE COURT:  Please direct him to the page he should

20   be at.

21        MS. SCOTT:  One twenty, Your Honor.

22        THE COURT:  Okay.

23   BY MS. SCOTT:

24   Q    Are you ready?

25   A    Yes, ma'am.

1  Q      That was the last e-mail that Mr. Brooks sent to you on

2  Sunday afternoon, correct?

3  A      He sent me an e-mail later that day at 8:41 p.m.

4  Q      You want to review that document?

5  A      On September 6th at 12:18 Mr. Brooks sent me an e-mail.

6         At 8:39 that night I replied, and then at 8:41 that

7  night he replied back to me.

8         So, no, the 12:18 is not the last e-mail of the day

9  between myself and Mr. Brooks.

10  Q      I'm going to restate my question.

11  A      Okay.

12  Q      At 12:18 p.m., on page 120, that was the last e-mail

13  that Mr. Brooks sent to you that afternoon?

14  A      That afternoon.

15  Q      Is that correct?

16  A      Yeah.   The next one was about eight hours later, yes,

17  ma'am.

18  Q      And the eight hours later -- if you can, turn to page

19  121 -- Mr. Brooks did not send you another e-mail?   You

20  initiated that contact with Mr. Brooks eight hours later,

21  correct?

22  A      Yes, ma'am.

23  Q      And that e-mail communication was "You would love being

24  here right now," smiley face?

25  A      Correct.

1    Q      So when you just testified that Mr. Brooks reached back

2    out, that was inaccurate?

3    A      I believe I read the flow of e-mails correctly, that he

4    e-mailed me at 12:18.  I e-mailed him back at 8:39.  He

5    e-mailed me back at 8:41.

6    Q      And your training tells you to not lead the

7    conversation, correct?

8    A      Correct.

9    Q      But you led it here?  You initiated it here?

10   A      No.  I testified to this yesterday, that I did this to

11   prove my bona fides as not a law enforcement officer by

12   checking in well after hours to, once again, like I say, just

13   prove myself to not be a LEO.

14   Q      I understand.  That was not my question, Agent Hyre.  I

15   apologize.  I did not ask you your reasoning for doing it.

16   A      Okay.

17   Q      My question was, you re-initiated contact; is that

18   accurate?

19   A      Yes, ma'am, I reached out to him at 8:39.

20   Q      Okay.  And in your e-mail, you also testified that you

21   meant sex by this e-mail, correct?

22   A      It was a clear reference or alluding to sex, yes, ma'am.

23   Q      Okay.

24          MS. SCOTT:  If you could, turn to page 122.

25   BY MS. SCOTT:

1   Q    Mr. Brooks' simple response was "I"?

2   A    "Why."

3   Q    Or "Why"?

4   A    "Why."

5   Q    Excuse me.

6   A    Yes, ma'am.

7         MS. SCOTT:   If you could, turn to page 123.

8  BY MS. SCOTT:

9   Q   You led the conversation further into sex by saying,

10  "All out talk.   Told him I might have a friend coming over,"

11  yes or no?

12   A   The conversation was already about sex.   I was

13  continuing it, yes, ma'am.

14   Q   Okay.   Is it accurate that you are the only person who

15  mentioned sex that evening?

16   A   "That evening" being after 8:00, yes, ma'am.

17   Q   Okay.   So you were leading the conversation, continuing

18  it about sex?

19   A   No, that's not how we would look at that because that

20  ground had already been crossed.   We had already entered into

21  a sexual conversation regarding children.   So at this point

22  I'm not leading the conversation.   I'm just taking part in

23  the conversation.

24   Q   By re-initiating contact?

25   A   By showing that I was not a law enforcement officer by

1    re-initiating at 8:39.

2    Q     Okay.

3              MS. SCOTT:  If you could, turn to page 124.

4    BY MS. SCOTT:

5    Q    His last response to you for the evening for Sunday,

6    September 6 at 9:21 was "Ah"?

7    A     Correct.

8    Q    He didn't respond by saying, oh, tell me what you did

9    with your son?

10   A     Correct.

11             MS. RIVERA:  Objection, Your Honor; assuming facts

12   not in evidence.  The evidence is what it is.

13             THE COURT:  You just read the e-mail verbatim and

14   then asked him, well, he didn't tell you in the e-mail.

15             I don't understand the point of the question.  The

16   objection is going to be sustained.  Everyone knows what that

17   e-mail says.  Implicitly, they know what it doesn't say.

18   Feel free to proceed.

19   BY MS. SCOTT:

20   Q    Mr. Brooks stopped communicating with you and on Tuesday

21   at 9:50 in the morning you initiated contact again?

22   A     Yes, ma'am.

23   Q     Tuesday was the day that you were supposed to set up a

24   meeting, correct?

25   A     We had alluded to meeting on Tuesday, yes, ma'am.

1    Q     Alluded or said?

2    A     We had talked.  I had mentioned that I was off on

3    Tuesday and I think he came back and said, "Sounds good."

4    He'll play it by ear.  So we were definitely looking at a

5    possible meeting on Tuesday.

6    Q     You agreed on Tuesday?

7              MS. RIVERA:  Objection, Your Honor; asked and

8    answered.

9              THE COURT:  Response.

10             MS. SCOTT:  The response, Your Honor, is -- I've

11   asked for a yes-or-no answer.

12             THE COURT:  Not every question can be answered yes

13   or no.

14             MS. SCOTT:  Then let me back state.

15             THE COURT:  Okay.  The objection will be sustained.

16   Please rephrase.

17   BY MS. SCOTT:

18   Q     Yes or no, you agreed to a meeting on Tuesday?

19   A     I'd have to go back and look.

20   Q     Go back and look.

21             THE COURT:  Would you please direct him on where to

22   look.

23   BY MS. SCOTT:

24   Q     Page 115 and 116.

25   A     No, there was no -- there was no agreement at this

1   point.

2   Q     So on page 116, when he said, "Tuesday works for me,"

3   that was not an agreement?

4   A     I didn't take it as this is definitely happening on

5   Tuesday.  I took it as at this point Tuesday looks good, but

6   it's definitely not an agreement.

7   Q     Okay.  But you testified yesterday that the reason you

8   reached back out was because if it were going to happen on

9   Tuesday, you needed to set up a team?

10  A     Correct.

11  Q     So then if Tuesday was not a definite date and Mr.

12  Brooks had not reached back out to you between Sunday and

13  Tuesday, then that shows a lack of interest?

14  A     No.  No.  We had talked about meeting on Tuesday, and

15  like I testified yesterday, I reached out to him to see is

16  this going to happen on Tuesday because I did not know for

17  sure it was going to happen on Tuesday.  So I was asking Mr.

18  Brooks is this going to happen on Tuesday.

19  Q     Okay.  And when you reached back out to Mr. Brooks, you

20  had communication, starting at page 125?

21  A     Yes, ma'am.

22  Q     Okay.  Starting at page 125, you asked, "How is it

23  going," correct?

24  A     Correct.

25  Q     You didn't mention any -- page 126.  Mr. Brooks didn't

1    mention anything about sex in this e-mail, correct?

2    A     Correct.

3    Q     He asked how was your holiday?

4    A     Correct.

5          MS. SCOTT:   Page 127.

6    BY MS. SCOTT:

7    Q     You responded?

8    A     Correct.

9    Q     Didn't mention anything about sex.

10         MS. SCOTT:   Page 128.

11   BY MS. SCOTT:

12   Q     Mr. Brooks responded to you and didn't mention anything

13   about sex in this e-mail, yes or no?

14   A     Correct.

15         MS. SCOTT:   Page 129.

16   BY MS. SCOTT:

17   Q     You brought up sex again, yes or no?

18   A     No.   The entire conversation, every one of these

19   e-mails, me and Mr. Brooks were not friends.   We're not

20   talking about -- the entire conversation is a negotiation for

21   Mr. Brooks to engage my son in oral sex, the entire

22   conversation.   This was me asking him, "So what were you

23   thinking as far as what we talked about?   If you changed your

24   mind, it's cool.   Just want to know where this is headed."

25   Q     So, Agent Hyre, I don't want to be slippery here.   You

1  testified that this entire conversation was about sex, just

2  now?

3  A    There's no other reason for me and Mr. Brooks to be

4  e-mailing each other.

5  Q    Yes or no?

6  A    Correct.

7  Q    And you just testified and you read e-mails that Mr.

8  Brooks asked, "How was your holiday," correct?

9  A    Correct.

10  Q    And you just testified that that was not about sex,

11  correct?  Yes or no?

12  A    Because you're giving me yes-or-no answers (sic).

13  Q    Is that yes or no?

14        THE COURT:  He's going to be permitted to expand on

15  that answer.

16  A    As I said, just like we're having a conversation right

17  now, but not every single word has been about Mr. Brooks.

18  But is this conversation about Mr. Brooks?  Yes, it is.

19      The same is true for these e-mails.  Not every single

20  e-mail do we spell out sex, but there's no other reason to be

21  having these e-mails.  It's a negotiation.  He's making me

22  comfortable with him.  He's -- he's -- he's talking to me.

23  There's no other reason for Mr. Brooks to be talking to me.

24  We're not friends.  We don't know each other.  This is all

25  about a goal.  So every one of these e-mails is about sex.

1              Does every e-mail specifically mention sex?  No, ma'am.

2      Q    That's how you feel about this conversation, correct?

3              MS. RIVERA:  Objection, Your Honor.  His feelings

4      are irrelevant.

5              MS. SCOTT:  His feelings are definitely relevant

6      because his feelings and how he conducts this investigation,

7      Your Honor, colors every conversation he has.

8              THE COURT:  He just said that that was his

9      interpretation of the body of e-mails.  So the answer to your

10     second question is yes.  That's his feeling.  That's his

11     interpretation.

12             You've asked the same question twice.  The

13     objection will be sustained.  Go on ahead and move on.

14     BY MS. SCOTT:

15     Q    But that's not -- you don't know if that was Mr. Brooks'

16     interpretation as to why he was talking to you?

17     A    My feeling, my strong feeling was that was his. . .

18     Q    Okay.  And you testified that you were trying to make

19     Mr. Brooks feel comfortable, too?

20     A    That I was not a law enforcement officer, yes, ma'am.

21     Q    Is it that you just weren't a law enforcement officer or

22     comfortable to come over, period?

23     A    I wanted to make him comfortable that I was a deviant

24     father that would provide my children for his sexual

25     exploitation.

1  Q     Okay.  So is that a yes?

2              MS. RIVERA:  Objection, Your Honor; asked and

3  answered.

4              THE COURT:  You know, if you ask someone if the sky

5  is blue and they say the sky is blue, that's the equivalent

6  of saying yes.  He answered that in the affirmative.

7              So the objection will be sustained.  Feel free to

8  proceed.

9              MS. SCOTT:  Page 133.

10 BY MS. SCOTT:

11 Q     You are the one who brought up having a conversation --

12 forgive me.  Yes or no, Agent Hyre, you are the one who

13 brought up having a conversation on the phone?

14 A     Yes, ma'am.

15 Q     Yes or no, Agent Hyre, you are the one who said you

16 wanted to clear all risk associated with coming over?

17 A     I said too much risk for me -- is this what you're

18 referring to?  Too much risk for me to invite you into my

19 home.  Is that what you're referring to?  Yes, ma'am.

20 Q     I'm referring to this e-mail.

21 A     Yes, ma'am.  I mentioned risk, yes, ma'am.

22 Q     Okay.  And you are the one -- yes or no, Agent Hyre.

23 You are the one who said you don't want any

24 misunderstandings?

25 A     Correct.

1    Q    Okay.  So then at this point it still was not clear what

2    was going to be done, correct?  Yes or no?

3    A    What was going to be done in the future?

4    Q    Correct.

5    A    I did not know what was going to be done in the future,

6    no, ma'am.

7    Q    Okay.  And you were the one who said, the same e-mail,

8    that you wanted Mr. Brooks to be clear, just as clear as you

9    have been with him, correct?

10   A    Correct.

11   Q    Because Mr. Brooks had not been clear, in your mind,

12   correct?

13   A    He was talking around it, yes, ma'am.

14   Q    Okay.  Let's move forward to the actual phone

15   conversation.  Do you need it to be replayed to refresh your

16   recollection?

17   A    I don't believe so but. . .

18   Q    Okay.  Because I'm going to ask you specific questions

19   about it.

20          MS. RIVERA:  We would prefer, Your Honor, that it

21   be played since it took some time to go over his testimony

22   yesterday.

23          MS. SCOTT:  Your Honor, the witness just said he

24   doesn't need it to be replayed.

25          THE COURT:  He said he didn't need it to be

1    replayed.

2            Do you have a transcript he can refer to during

3    your questioning?

4            MS. SCOTT:  I do, Your Honor.

5            THE COURT:  Then why don't you provide him with

6    that transcript and then we'll go on ahead and move forward.

7            MS. SCOTT:  Yes, Your Honor.

8            THE COURT:  He has a transcript.  I would invite

9    you to proceed.

10           MS. SCOTT:  Thank you, Your Honor.

11           If I could just have a moment so I can pull it up

12   on mine.

13           THE COURT:  All right.  I think it might be a good

14   opportunity to give the jurors a ten-minute break.

15           We're going to be back here in ten minutes and

16   we'll continue marching forward.  If you'll leave those pads

17   and pens facedown, we'll see you back in ten minutes.  Thank

18   you.

19           (Jury not present at 9:58 p.m.)

20           THE COURT:  Please be seated, everyone.

21           We're almost halfway through day two of a three-day

22   trial that we thought might finish in two and we're on the

23   cross-examination of the first witness.  You're going to have

24   to stop asking me "Can I have a moment to collect my

25   thoughts?"  We're going to have to limit the approaching

1  sidebar, and we're going to have to stop taking five-, ten-,

2  and 15-second breaks in between questions.

3           Both of you, you're going to have to start moving

4  forward more efficiently.  We're going to run out of time,

5  and the last thing I want to do is tell the jury they're

6  going to be here until Monday or they're going to have to

7  work on Saturday.  So if we have to, we will; but understand

8  that we need to move forward efficiently.

9           I'm not asking you to ask less questions or cut

10 your cross-examination off, but I can't keep offering the

11 indulgence of continued sidebars and a lot of time wasted in

12 between questions.  So just take that into consideration.

13          All right.  We're going to go on ahead and take our

14 ten-minute break.  I'll see you back in ten minutes.

15          Court's in recess.  Please be seated, everyone.

16          (Recess taken at 9:59 a.m.)

17          (Jury not present at 10:07 a.m.)

18          THE COURT:  See if they're ready, and so let's

19 bring them in.

20          We're going to bring the jury in.

21          For everyone's edification, the jurors asked via

22 the court security officer if they could bring coffee with

23 them.  I'm going to allow it.

24          (Jury present at 10:08 a.m.)

25          THE COURT:  Welcome back, ladies and gentlemen.

```
 1   Please feel free to be seated in your chairs and we're going

 2   to get started.

 3               Please be seated in the courtroom.

 4               The jury has returned into the courtroom.

 5               Ms. Scott, feel free to proceed.

 6               MS. SCOTT:   Thank you, Your Honor.

 7   BY MS. SCOTT:

 8   Q    Agent Hyre, yes or no, you led Mr. Brooks to talk about

 9   a past experience in the phone conversation?

10   A    Can you tell me what you're referring to, what line?

11   Q    The lines aren't marked.

12   A    They're marked by each page and then the number on the

13   page.

14   Q    If you could, look to page two --

15   A    Yes, ma'am.

16   Q    -- and I'll ask you a different question.

17   A    Okay.

18   Q    You gave Mr. Brooks your age first, correct?

19   A    Yes, ma'am.  I said I'm 40.

20   Q    He responded and answered with his age, correct?

21   A    Correct.

22   Q    Okay.  You then told Mr. Brooks that you -- no.  This --

23   I'm not going to do that.

24        Do you remember if you led the conversation -- because I

25   don't want you to look at that.  Forgive me.
```

1      If you remember, you remember.  If you don't, that's

2  fine to say, "I don't remember."  Okay?

3  A    Okay.

4  Q    Do you remember asking Mr. Brooks if he had any past

5  experiences?

6  A    I remember asking Mr. Brooks words to the effect of,

7  "Have you ever done this before?"

8  Q    Okay.  And Mr. Brooks answered your question, correct?

9  A    Yes, ma'am.

10 Q    Okay.  Mr. Brooks did not volunteer any information

11 during this conversation that was not asked from you; is that

12 accurate?

13 A    During the entire conversation?

14 Q    Yes.

15 A    Regarding if he had ever done this type of thing before?

16 Q    Or about anal sex with the kid or about oral sex with

17 the kid, those were all in response to your questions?

18 A    I believe Mr. Brooks brought up anal sex first.

19 Q    Okay.  Did Mr. Brooks say, "I'm not interested in anal

20 sex"?

21 A    He went back and forth about it, equivocated, and at one

22 point he did say that.

23 Q    Okay.

24      MS. SCOTT:  Maybe we should replay the audio for

25 the -- for the refreshing of Mr. -- Agent Hyre's memory.

1          THE COURT:  Why don't we do this:  Replay it with

2    the words on the screen that is playing, and you can pause it

3    when you have a question?  This should take about 20 minutes

4    to play it.

5          MS. SCOTT:  Yes, Your Honor.

6          THE COURT:  So go on ahead.

7          Is someone ready to play it at this time?

8          MS. SCOTT:  The words with the screen are from. . .

9          THE COURT:  All right.  So it'll be played by the

10   government's assistant.

11         Feel free to go on ahead and play it.

12         And have a signal ready for her if you want to stop

13   and ask a question when --

14         MS. SCOTT:  Thank you.

15         THE COURT:  And if you want to position yourself in

16   front of a screen so you can watch it as it's playing, feel

17   free to do so.

18         Okay.  Go on ahead.

19         (An excerpt from Government's Exhibit 4 played.

20   The excerpt is found on the corresponding transcript,

21   Government's Exhibit 5, at page one, line 0001:01, to page

22   one, line 0001:12.)

23   BY MS. SCOTT:

24   Q    So at that point you're asking the questions of Mr.

25   Brooks, correct?

1    A    I asked him where he's from.

2              MS. SCOTT:  Okay.

3              (The excerpt of Government's Exhibit 4 continued

4    playing.  The excerpt is found on the corresponding

5    transcript, Government's Exhibit 5, at page one, line

6    0001:13, to page one, line 0002:06.)

7              MS. SCOTT:  Pause it.

8    BY MS. SCOTT:

9    Q    Again, you reiterated no misunderstandings in the phone

10   call, correct?

11   A    Correct.

12   Q    So that everything would be clear?

13   A    Correct.

14             (The excerpt of Government's Exhibit 4 continued

15   playing.  The excerpt is found on the corresponding

16   transcript, Government's Exhibit 5, at page one, line

17   0002:07, to page one, line 0002:12.)

18   BY MS. SCOTT:

19   Q    Here, you ask, "Have you ever done anything like this

20   before?"

21   A    Yes, ma'am.

22   Q    Okay.  And then Mr. Brooks responds to your question?

23   A    Yes, ma'am.

24             (The excerpt of Government's Exhibit 4 continued

25   playing.  The excerpt is found on the corresponding

1    transcript, Government's Exhibit 5, at page one, line

2    0002:12, to page one, line 0002:16.)

3                MS. RIVERA:   May we increase the volume, Your

4    Honor?

5                (The excerpt of Government's Exhibit 4 continued

6    playing.   The excerpt is found on the corresponding

7    transcript, Government's Exhibit 5, at page one, line

8    0002:16, to page two, line 0003:01.)

9    BY MS. SCOTT:

10   Q    So that -- excuse me.   So that question right there,

11   again, he's responding to you; is that correct?

12   A    Correct.

13   Q    At this point in the conversation Mr. Brooks has not

14   asked one question, correct?

15   A    I don't believe so, no, ma'am.

16   Q    Okay.   So you're leading the conversation in asking?

17   A    I'm asking that question, yes, ma'am.

18   Q    Okay.

19                MS. SCOTT:   Continue on.

20                (The excerpt of Government's Exhibit 4 continued

21   playing.   The excerpt is found on the corresponding

22   transcript, Government's Exhibit 5, at page two, line

23   0003:10, to page two, line 0003:21.)

24   BY MS. SCOTT:

25   Q    Agent Hyre, at this point Mr. Brooks asked his first

1    question of you, "What's the protocol," correct?

2    A    Correct.

3    Q    That -- he's asking you to give him more information

4    about it and then you respond, correct?

5    A    He's asking me what the protocol is, yes, ma'am.

6    Q    And then you respond?

7    A    Yes, ma'am.

8            MS. SCOTT:   Okay.

9            (The excerpt of Government's Exhibit 4 continued

10   playing.  The excerpt is found on the corresponding

11   transcript, Government's Exhibit 5, at page two, line

12   0003:22, to page two, line 0004:01.)

13   BY MS. SCOTT:

14   Q    You asked that question -- you testified yesterday you

15   asked the question "What are you hoping to do?" so that you

16   can be clear to know what the target is looking for so

17   there's no misunderstandings?

18   A    Correct.

19   Q    And you asked that question here?

20   A    Correct.

21   Q    And Mr. Brooks did not give you a definite answer,

22   correct?

23   A    We went on to talk about anal and oral, but -- so, no.

24   He went on to talk about oral sex.

25   Q    Well, we'll get to there.  At this point Mr. Brooks is

1   not giving you a definite answer?

2   A     No.   I just asked the question.   So, no, he hasn't

3   answered yes.

4         (The excerpt of Government's Exhibit 4 continued

5   playing.   The excerpt is found on the corresponding

6   transcript, Government's Exhibit 5, at page two, line

7   0004:02, to page two, line 0004:05.)

8   BY MS. SCOTT:

9   Q     So at that point, when you're telling him you've done

10  everything, is to get him to explore anything that he may be

11  interested in, correct?

12  A     It's to put him at ease that I'm a bad father who will

13  make my child available for sexual exploitation.

14  Q     Okay.

15              MS. SCOTT:   Go ahead.

16              (The excerpt of Government's Exhibit 4 continued

17  playing.   The excerpt is found on the corresponding

18  transcript, Government's Exhibit 5, at page two, line

19  0004:06, to page two, line 0004:07.)

20  BY MS. SCOTT:

21  Q     So at this point, Agent Hyre, you just testified that he

22  went on to talk about anal, correct?

23  A     He did.

24  Q     But he told you what he's not interested in doing,

25  correct?

```
 1   A    But then he comes back later in the conversation and

 2   kind of equivocates about anal sex.

 3   Q    We'll get to that.  But at this point he --

 4   A    At this point he just said, "I'm not big into anal."

 5   Q    Okay.

 6             MS. SCOTT:  Go ahead.

 7             (The excerpt of Government's Exhibit 4 continued

 8   playing.  The excerpt is found on the corresponding

 9   transcript, Government's Exhibit 5, at page two, line

10   0004:08, to page two, line 0004:12.)

11   BY MS. SCOTT:

12   Q    Is this the time when he tells you equivocally what he

13   is interested in doing?

14   A    Not the totality of what he's interested in, but he does

15   mention some things that he's interested in doing.

16   Q    Okay.  This is the first time he told you what he is

17   interested in doing?

18   A    Yes, ma'am.

19             MS. RIVERA:  Asked and answered.

20   BY MS. SCOTT:

21   Q    Okay.  Thank you.

22             THE COURT:  I need you to stand when you make an

23   objection.

24             MS. RIVERA:  I'm sorry, Your Honor.  I apologize.

25             THE COURT:  All right.  We're through it.  The
```

1   objection is going to be overruled.

2            (The excerpt of Government's Exhibit 4 continued

3   playing.  The excerpt is found on the corresponding

4   transcript, Government's Exhibit 5, at page two, line

5   0004:13, to page three, line 0004:19.)

6   BY MS. SCOTT:

7   Q    So at that point you cut out "anal"?  He said he's not

8   interested, you said, "not doing anal...fine"?

9   A    That's correct.

10           (The excerpt of Government's Exhibit 4 continued

11  playing.  The excerpt is found on the corresponding

12  transcript, Government's Exhibit 5, at page three, line

13  0004:20, to page three, line 0004:24.)

14  BY MS. SCOTT:

15  Q    You asked the question, "What were you saying about

16  oral?"

17  A    Yes, ma'am.

18  Q    I need you to review the document from that point on and

19  tell me where in that conversation did Mr. Brooks mention

20  "oral."

21  A    He did not.

22  Q    He did not mention "oral"?

23  A    Correct.

24  Q    So that was suggested by you?

25  A    After him going back and forth about "anal," I would --

1   from my standpoint, I assumed anybody interested in anal sex

2   would also be interested in oral sex.

3   Q      Okay.

4          (The excerpt of Government's Exhibit 4 continued

5   playing.   The excerpt is found on the corresponding

6   transcript, Government's Exhibit 5, at page three, line

7   0004:25, to page three, line 0005:03.)

8   BY MS. SCOTT:

9   Q      Okay.  Agent Hyre. . .

10  A      Yes, ma'am.

11  Q      You told us earlier that you were trained not to lead

12  the conversation?

13  A      Correct.

14  Q      Here, you mentioned "oral," correct?

15  A      I did.

16  Q      Then you mentioned whether or not Mr. Brooks was going

17  to give or receive?

18  A      But I'm not leading this conversation.

19  Q      You're not leading this conversation?

20  A      No.   You're taking -- you're understanding that the

21  wrong way.

22         Leading the conversation -- this ground had already been

23  covered.   We were already talking about him engaging my boy

24  in sex acts.   So now I'm just being specific as to what the

25  sex acts are, but I'm not -- I'm not the one bringing up sex.

 1   That's already -- that is clearly what this conversation is

 2   about.  I'm just trying to identify exactly what Mr. Brooks

 3   was interested in.

 4   Q    Okay.  Help me be clear.  Help the jury to be clear.

 5   A    Okay.

 6   Q    You said that it had already been ground that's been

 7   established?

 8   A    Correct, in my mind.

 9   Q    In your mind?

10   A    Yes, ma'am.

11   Q    But yet you're trying to get a clear understanding of

12   what he wants to do?

13   A    Correct.

14   Q    And Mr. Brooks has not been clear to you about what he

15   wants to do, correct?

16   A    He's talked around it, yes, ma'am.

17   Q    And the only time he's been clear about what he wants to

18   do is when he said touching and holding up to this point,

19   correct?

20   A    Well, no.  We already covered the part where he said he

21   was into oral.  He just said, "I mean, if both happen, that's

22   cool," and he's talking about oral sex.

23   Q    Yes.  That was at your question about "What were you

24   saying about oral," correct?

25   A    Correct.

1    Q     That he had not mentioned before?

2              MS. RIVERA:  Objection, Your Honor; asked and

3    answered.

4              THE COURT:  Rather than narrating this, just play

5    it for the jury.

6              MS. SCOTT:  Okay.

7              THE COURT:  I mean, they can interpret what's on

8    here.  If you want to stop and ask a question about what he

9    meant, that's fine; but I would invite you to reconsider

10   asking him to repeat what was just said on the phone call.

11   But certainly I'm going to allow you to do your cross.  It's

12   going to be overruled.  But that might assist the jury

13   instead of just stopping so much.

14             MS. SCOTT:  I understand.

15   BY MS. SCOTT:

16   Q     So can you answer the question, Agent Hyre?

17   A     The question being?

18   Q     That that was at the direction of you mentioning "oral,"

19   the answer?

20   A     I asked for his specifics.  I asked for specifically

21   what he wanted to do.

22   Q     Okay.

23             MS. SCOTT:  Continue.

24             (The excerpt of Government's Exhibit 4 continued

25   playing.  The excerpt is found on the corresponding

1   transcript, Government's Exhibit 5, at page three, line

2   0005:04, to page three, line 0006:03.)

3   BY MS. SCOTT:

4   Q     Quick question.  Yes or no, you testified that you --

5   this was a negotiation?

6   A     Yes, ma'am.

7   Q     Okay.  And this conversation was a continuing part of

8   the negotiations?

9   A     Correct.

10  Q     Okay.  Between --

11          MS. SCOTT:  Okay.

12          (The excerpt of Government's Exhibit 4 continued

13  playing.  The excerpt is found on the corresponding

14  transcript, Government's Exhibit 5, at page three, line

15  0006:04, to page four, line 0006:21.)

16  BY MS. SCOTT:

17  Q     At any point during this conversation did Mr. Brooks try

18  to change your mind for something that you told him the kids

19  were not involved in?

20          MS. RIVERA:  Objection, Your Honor.  This is a

21  confusing question.

22          THE COURT:  Could you rephrase the question?  I'm

23  going to sustain it.  I've just read the question.  It's a

24  little unclear.  If you could shorten it, I'm sure he would

25  appreciate that.

1          MS. SCOTT:  Yes, Your Honor.

2    BY MS. SCOTT:

3    Q     Did Mr. Brooks during this conversation try to change

4    your mind about engaging in a sex act that the kids had not

5    already done?

6          MS. RIVERA:  Your Honor, I think she basically

7    asked the same question.

8          THE COURT:  No.  I understand it.  I understand it

9    now.

10          If the witness doesn't understand, he can say so.

11          I'm going to overrule the objection.

12   A     No.  I think I -- no, I don't recall Mr. Brooks talking

13   me out of anything I said that they wouldn't do.

14   Q     Okay.

15          (The excerpt of Government's Exhibit 4 continued

16   playing.  The excerpt is found on the corresponding

17   transcript, Government's Exhibit 5, at page four, line

18   0006:22, to page four, line 0007:10.)

19   BY MS. SCOTT:

20   Q     Would it be fair to say that Mr. Brooks exited out of

21   the idea of having pictures given to him?

22   A     Correct.  He didn't -- he didn't show any interest in

23   that.

24          (The excerpt of Government's Exhibit 4 continued

25   playing.  The excerpt is found on the corresponding

1    transcript, Government's Exhibit 5, at page four, line

2    0007:11, to page four, line 0007:21.)

3    BY MS. SCOTT:

4    Q     This conversation right now, this line of response is

5    from your direct questioning, correct?

6    A     I asked him if he had ever done this type of thing

7    before.

8    Q     Okay.

9          (The excerpt of Government's Exhibit 4 continued

10   playing.  The excerpt is found on the corresponding

11   transcript, Government's Exhibit 5, at page four, line

12   0007:21, to page five, line 0008:16.)

13   BY MS. SCOTT:

14   Q     Nothing was mentioned about sex with the twelve-year-old

15   in that conversation, that -- that line of questioning,

16   correct?

17   A     It was inferred, because it was the same type of -- I

18   asked him if he'd ever done this type of thing before, and

19   our conversation was about sex with a child, and he said he'd

20   tried to do it four years ago with a man he met on

21   Craigslist.

22   Q     You said it was inferred by you?

23   A     Yeah.  The word "sex" was not used.

24   Q     Okay.

25         (The excerpt of Government's Exhibit 4 continued

1  playing.  The excerpt is found on the corresponding

2  transcript, Government's Exhibit 5, at page five, line

3  0008:16, to page five, line 0009:04.)

4  BY MS. SCOTT:

5  Q    Agent Hyre, I'm a little confused.  You testified

6  earlier that you had already told Mr. Brooks that you were

7  off the table, correct?

8  A    Correct.

9  Q    And yet you were bringing it back around, talking about

10  anal sex?

11  A    Correct.

12  Q    And you were bringing yourself back around, talking

13  about anal sex?

14  A    To reiterate that this was not about a sex act with me,

15  just like I reiterate the ages of the kids throughout.

16  Q    I understand.  To make it clear?

17  A    To make it clear that this was not about meeting me to

18  have sex.

19  Q    Just in case it was unclear still to this point?

20  A    Yes, ma'am.

21  Q    Okay.

22      (The excerpt of Government's Exhibit 4 continued

23  playing.  The excerpt is found on the corresponding

24  transcript, Government's Exhibit 5, at page five, line

25  0009:04, to page five, line 0009:18.)

1   BY MS. SCOTT:

2   Q     What was your purpose of saying that?

3   A     Because he had told me he was more into giving than

4   receiving, and once -- just like the other thing, I was just

5   getting a final clarification as to what sex acts he wanted

6   to participate in.

7   Q     I'm sorry.  Forgive me.  What was your point in saying

8   "I'm not saying he wouldn't"?

9   A     I'm letting him know that under my rules, because he'd

10  asked me what my -- my -- I think what my limits were

11  earlier, that that was not outside of my limits.  So to give

12  Mr. Brooks the opportunity, if he wanted to, to put that on

13  the table.

14  Q     But he didn't put that on the table, though, did he?

15  A     I think we agreed -- I think we kind of let it lie, kind

16  of walked away and then let it lie.

17  Q     I don't know what "let it lie" means.

18  A     Well, I think if we go on down, we talk about it a

19  little bit more here; and then it's just something that

20  basically -- because words to the effect of "If he's not

21  comfortable with it, I don't want to do that."

22  Q     Oh, okay.

23        (The excerpt of Government's Exhibit 4 continued

24  playing.  The excerpt is found on the corresponding

25  transcript, Government's Exhibit 5, at page five, line

1   0009:18, to page six, line 00010:03.)

2   BY MS. SCOTT:

3   Q    If Mr. Brooks cut off the idea of it and said, "I'm not

4   going to go down that road at all," not trying to persuade

5   you or change your mind or his, why did you follow up with,

6   well, it's not going to be uncomfortable for me, and if

7   there's no pain, you know?  Why did you follow up with that?

8   A    He told me, "I don't want to do anything that would not

9   -- that would be uncomfortable for you and for him."  So I

10  told him it wouldn't be uncomfortable for me.  So I just was

11  pointing out it wouldn't be uncomfortable -- what I -- the

12  last answer that I gave you, basically, that it was within

13  the limits.

14  Q    Okay.

15       (The excerpt of Government's Exhibit 4 continued

16  playing.  The excerpt is found on the corresponding

17  transcript, Government's Exhibit 5, at page six, line

18  00010:04, to page six, line 00010:08.)

19       MS. SCOTT:  Your Honor, I'm done with the

20  questioning of the tape.

21       THE COURT:  Okay.  Go on ahead and stop the video,

22  then.

23  BY MS. SCOTT:

24  Q    You then set up the meeting for Thursday?

25  A    The meeting was then set for Thursday, yes, ma'am.

1    Q       Mr. Brooks showed up to the meeting, correct?

2    A       Correct.

3    Q       You arrested Mr. Brooks?

4    A       Correct.

5    Q       You then got permission to search all of Mr. Brooks'

6    phone, all of his e-mails, assume his identity, correct?

7    A       Correct.

8    Q       And you, along with other agents, did so?

9    A       Correct.

10   Q       You also reviewed his entire phone, correct?

11   A       Yes, ma'am.

12   Q       You did not find any child pornography inside of that

13   phone, correct?

14   A       No, ma'am.

15   Q       You found hundreds of pictures, correct?

16   A       Yes, ma'am.

17   Q       They were all of adult males?  Most were of adult males?

18   A       Most, yes.  I believe there was some grandchildren

19   pictures, but they were innocent pictures.

20   Q       Okay.  There were no other e-mails to anyone about

21   children?

22   A       Not that I -- not that I gathered, no, ma'am.  Not on

23   his phone.

24   Q       Not on his e-mails?

25   A       That's not true.

1    Q      That's not true?

2    A      No.   There's -- in his e-mail that he gave us permission

3    to search, I found other e-mails.

4    Q      You found other e-mails about children?

5    A      Yes, ma'am.

6    Q      What -- I'm sorry.   Were those e-mails from Craigslist

7    ads?

8    A      No, ma'am.   They were from Mr. Brooks' e-mail account.

9    Q      About sex with children?

10   A      Yes, ma'am.

11   Q      And these e-mails were turned over to the defense?

12   A      No, ma'am.

13   Q      No.   Okay.   So there are other e-mails about sex with

14   children that you found on his e-mail?

15   A      Yes, ma'am.

16             MS. RIVERA:   Your Honor, could we have a sidebar on

17   this matter?

18             THE COURT:   Yes, you may.

19             MS. RIVERA:   To explain.

20             (Bench conference as follows.)

21             MS. RIVERA:   In the process of our discovery, we

22   turned over the e-mails, the passcodes.   Remember, he gave

23   consent to search both his e-mail accounts and his passcodes.

24   Those, you had access to them.   I had access to them.

25             The agent reviewed everything.   This was an area

1    that we were going to stay away from and the door was opened

2    by you.

3            MS. SCOTT:  There are -- I haven't seen any e-mails

4    in this regard, and we've had an expert to look at this as

5    well.

6            MS. RIVERA:  We have the e-mails.  We have the

7    e-mails.  Actually, I had them ready for cross-examination or

8    rebuttal in case it was necessary.

9            MS. SCOTT:  I would like to see them.

10           THE COURT:  All right.

11           MS. RIVERA:  These are associated with his

12   Craigslist account as well, but they're on his e-mail.

13           MS. SCOTT:  The officer just testified

14   disingenuine.

15           No, these are not about children.

16           MS. RIVERA:  Yes, you just continue reading.

17           THE COURT:  Look at the ones she's got highlighted.

18           MS. RIVERA:  (Mumbling).

19           THE COURT REPORTER:  I'm not sure if she wants this

20   on the record.

21           THE COURT:  No.

22           All right.  So is there any request on the Court or

23   are we going to continue?

24           MS. RIVERA:  If they want more time maybe to review

25   this.

1          MS. SCOTT:  Yeah.  We need a recess because this

2     isn't even about children.

3          MS. RIVERA:  Well, just review it, because there is

4     information about children.

5          THE COURT:  I understand.  The whole match we've

6     had so far is that you -- your theory of the case is

7     different than the government's theory.  The government's

8     theory is that every one of these e-mails and the ones that

9     are admitted into evidence portray a pattern where sex was

10    advertised for and eventually an attempt to consummate.

11         Your theory is that most of these e-mails weren't

12    about sex at all, and any mention of sex was introduced by

13    the agent who was pulling him in.

14         So I don't expect you two to agree on what's on

15    there, but this is not a black-and-white issue.

16         If you want me to look at them, that's fine.  If

17    you want to cross him on them, that's fine.  But food for

18    thought:  Don't ask questions you don't know the answer to.

19    Don't get up there and say there was nothing at all found on

20    that phone that involved -- because you might not like what

21    you get.

22         MS. SCOTT:  I get that.

23         THE COURT:  How much of a break are you asking for?

24         MS. SCOTT:  A recess of at least --

25         THE COURT:  What time is it?

1          MS. SCOTT:  10:40.

2          THE COURT:  All right.  We'll send them for an

3     early lunch.

4          MS. RIVERA:  Your Honor, I believe with their

5     questioning, they're opening the door as to predisposition.

6     Of course they have.  And we would like to be able to play

7     the portion of the recording that pertains to --

8          THE COURT:  All right.  Well, let's wait.  Let's

9     let them go to lunch and we'll talk.

10         MS. RIVERA:  Okay.  Thank you.

11         (In open court.)

12         THE COURT:  Ladies and gentlemen of the jury, I

13    think this would be a good time to take a lunch break.  It'll

14    only be an hour.  We're not going to lose any time.

15         I apologize if this is a little early of a lunch

16    for you; but, again, it's my goal to use your time as

17    efficiently as possible.

18         We're not going to take a lunch, to make sure that

19    when you return, we're ready to continue marching forward.

20    As of now, we're doing fine on time; but this is part of that

21    sort of compromise I need to make sure we stay fine on time.

22         So it is -- we'll call it 10:45.  If you could

23    report back at 11:45, as soon as everyone is here and

24    accounted for, we'll get started.

25         Thank you for your patience on this.  Please leave

1    the pads and pens facedown.  We'll see you in an hour.

2                (Jury not present at 10:45 a.m.)

3                THE COURT:  Please be seated.

4            I'm going to give you about 45 minutes and we're

5    going to come back 15 minutes before they return.  But I'd

6    invite you to consider this old axiom someone told me a long

7    time ago:  Absence of evidence is not evidence of absence.

8            And when on cross-examination you attempt to

9    solicit testimony from a witness indicating that "Other than

10   what's on the phone, there's no evidence of anything else,"

11   you're potentially opening up a door and I think the

12   prosecutor is trying to barge through that door at this time.

13           I'll hear your arguments when we get back in 45

14   minutes, but I want you to take a chance to review what

15   they've turned over; and if you are going to request anything

16   from the Court, that's fine.  I'll hear you then, but I want

17   you to have your thoughts in order because we're very limited

18   on time at this point.  Okay?  So review the e-mails.

19           Do I need to have a copy of this, so if you're

20   going to refer to them in in any sort of request, I can have

21   already reviewed them?  Is there anything that I can look at

22   during the break?

23               MS. RIVERA:  If we can provide Your Honor with the

24   copy that I just provided the defense, I can make another

25   copy for them.

1          THE COURT:  Do you have a copy right now?

2          All right.  Let the defense -- you know what's on

3  there already.  So let the defense hold on.  You do what

4  you've got to do there.

5          Go on ahead and bring your copy up.  I'm going to

6  have my law clerk copy it right now and bring you yours back

7  right now.

8          But that also means that we are not going to be

9  able to have a charging conference over lunch today.  So I

10  would plan on a long day.

11          All right.  So how much time does the defense need?

12  Thirty or 45 minutes to review what you have there?

13          MS. SCOTT:  We would request 45 in case we need to

14  pull our expert as well into this.

15          THE COURT:  All right.  So I will see you back at

16  11:30 and we'll have a conversation about this before the

17  jury returns at 11:45.

18          Anything further from the government?

19          MS. RIVERA:  No, Your Honor.  At an appropriate

20  time we'll express our intention to bring evidence of

21  predisposition.

22          THE COURT:  I understand.  Let me just ask this

23  question.  The phone that's in evidence, has that been made

24  available to the defense and their expert?

25          MS. RIVERA:  Yes, Your Honor.  We have made the

1    evidence --

2              THE COURT:  Yes or no will do.

3              MS. RIVERA:  Yes, Your Honor.

4              THE COURT:  I'll ask my questions by opening up

5    "Yes or no only."

6              MS. RIVERA:  Yes, Your Honor.

7              THE COURT:  Okay.  I understand that.  That helps

8    me put everything into context.

9              All right.  I will see you in 45 minutes.  Thank

10   you.

11             Please be seated, everyone.  Court's in recess.

12             (Recess taken at 10:47 a.m.)

13             (Jury not present at 11:35 a.m.)

14             THE COURT:  All right.  Please be seated, everyone.

15             Anything from the defense before we begin moving

16   forward?

17             MS. SCOTT:  Yes, Your Honor.  We're going to move

18   for a mistrial for violation of Rule 16(e) of the

19   discovery --

20             THE COURT REPORTER:  I cannot hear you unless you

21   are near a microphone.

22             THE COURT:  You are invited to approach the podium.

23             MS. SCOTT:  Thank you, Your Honor.

24             Upon the defendant's request, the government must

25   permit the defendant to inspect and copy or photograph books,

1    papers, documents, data, photographs, tangible objects,

2    buildings or places or copies of -- or portions of any of

3    these items if the item is within the government's

4    possession, custody or control and the item is, I, material

5    to preparing the defense; the government -- II, the

6    government intends to use this item in a case in chief at

7    trial; or, III, the item was obtained from or belongs to the

8    defendant.

9         The government provided us in discovery with a

10   disclosure that Agent Hyre has testified to was made from Mr.

11   Brooks, allowing the F.B.I. to change all passwords to his

12   accounts and assume his identity, if necessary.

13        In that disclosure, which is -- we don't have a

14   copy.  We can produce it so that you can see it, if you'd

15   like, on your screen.  But in there it says that "I

16   understand that the F.B.I. will change the passwords to the

17   account so that I will no longer have access."

18        The government has indicated to us that they never

19   changed the password.  However, these documents, these

20   e-mails are not on Mr. Brooks' account that they provided to

21   us in discovery.  We have reviewed it thoroughly and in

22   detail.

23        THE COURT:  Wait a minute.  When you say they

24   provided you the account in discovery, I don't know what that

25   means.  They made the phone available to you?  What exactly

1    does that mean?

2           MS. SCOTT:  The phone was made available and along

3    with it is a data access CD that has all of the documents

4    that would be on the phone.  So just as though you were

5    viewing the phone itself and able to go into any of the

6    e-mails that were associated with that phone, any of the text

7    messages that were associated with that phone.  Any document

8    that is in the physical phone was included in a report that

9    was provided to us.

10          We have reviewed that report in full.  The

11   documents that have been provided to us now appears to have

12   come from an e-mail account that is associated with Mr.

13   Brooks, however, were not necessarily included on that phone

14   in that report that was given to us and made available.

15          We made appointments to go to the F.B.I. office in

16   Maitland, sat down with Agent Healy, Agent Hyre and A.U.S.A.

17   Rivera, and discussed exactly what was in this phone.  And

18   the fact that we were unable to open some of the items

19   because they were encrypted, to where they then produce

20   another CD for us, we asked for all of these items.

21          The information that they're giving now, it

22   appears, was pulled off of Mr. Brooks' AOL account that the

23   government informed Mr. Brooks they will change his password,

24   he will no longer have access to it, and did not inform the

25   defense that, oh, we did not change his password.  You can

1    access that if you would like.  You can review all of his

2    e-mails if you would like.

3          None of that information was provided to us.  So

4    there was no "made available" for us to inspect, if we would

5    like to, to prepare for our defense.

6          And when they are presenting this today in an

7    attempt to ambush the trial --

8          THE COURT:  Well, hold on.  You were the side that

9    made -- that objected to use of terms like that.  As far as I

10   can tell, the government didn't elicit any of that testimony

11   from this witness.  You asked an open-ended question on cross

12   that you didn't know the answer to, and that's what happens

13   when you do that.

14         Now, this is a different issue.  You're telling me

15   that you had no manner in which you could have accessed that

16   information and they had a duty to turn it over, correct?

17         MS. SCOTT:  That is correct.

18         THE COURT:  Okay.  That's under the rule you've

19   cited?

20         MS. SCOTT:  Yes.  And, Your Honor, I apologize.

21   The question that I asked on cross-examination was in

22   reference to the phone and to the discovery that they have

23   provided to us.  I did not elicit testimony about any other

24   open e-mail that may have been in the -- of Mr. Brooks.  I

25   was referencing specifically to the phone and the e-mails

1    that we have access to.

2            And I understand the Court's concern.  Don't ask a

3    question you don't know the answer to, as the golden rule.  I

4    get that.

5            THE COURT:  But I thought his response -- you asked

6    him a question and his response, probably not beneficial to

7    your client, was responsive to the question you asked.  I

8    mean, I can pull it up if you want to go over that again; but

9    I don't think that's where your beef is.

10           Your concern is that he referenced material that

11   was never provided to you, should have been provided to you,

12   and you had no way of discovering in the manner in which it

13   was turned over to you?

14           MS. SCOTT:  That is correct.

15           THE COURT:  All right.  I understand.

16           And I'd like to hear what the government's response

17   is.  And this is an ore tenus motion for a mistrial by the

18   defense?

19           MS. RIVERA:  Yes, Your Honor.

20           THE COURT:  Come on up to the microphone, please,

21   before you start speaking.

22           MS. RIVERA:  Yes, Your Honor.

23           THE COURT:  Now, they -- just so we set the table

24   here, they admit that they had access to the phone; but the

25   manner in which the phone was treated prevented them from

 1   having any opportunity to access -- and I have the e-mails

 2   here, the e-mails that you presented at sidebar prior to the

 3   break.

 4              MS. RIVERA:  Your Honor --

 5              THE COURT:  So go on ahead.

 6              MS. RIVERA:  Yes.  We -- we gave them access to the

 7   phone.  We gave them access to the e-mails.

 8              The e-mails actually were identified in different

 9   locations, one on the phone, his Orlmassageformen@aol.com.

10              In the form that he gave consent for the agents to

11   search, assume his online identity, he gave the agents the

12   passcode.  The agents actually never changed that passcode.

13              But we made that evidence available to them for

14   inspection at the F.B.I.'s office.  They could have

15   subpoenaed not only this e-mail account, but other e-mail

16   accounts that we didn't subpoena.

17              I was definitely not intending to go there, but my

18   agent has an obligation to answer truthfully to the questions

19   that are being posed.

20              I didn't know that it was going to go that way.

21              As far as us making the evidence available, we did

22   make the e-mails, the forensic available to the defense and

23   they had ample time to review this at the F.B.I.'s office on

24   their own.  We actually left her alone with James Skuthan

25   reviewing the evidence.  They didn't ask for additional

1    disclosures of evidence.  We know what the limits are.

2            This is incriminating information, not exculpatory

3    information, but we didn't intend to use that.  It pertains

4    to some other ads, to some other ads with men, about engaging

5    those men in sexual activity; and then there's one specific

6    that talks about the age of a minor, one that talks about a

7    14-year-old girl.  There are others that talk about boys and

8    nephews, but we don't know the ages there.

9            So I think the agent was starting to be forthcoming

10   in his reply, but this was not evidence that the government

11   in any way intended to produce.

12           We have many e-mails that I have reviewed, and they

13   all pertain to solicitation of sex, that we know that we are

14   not presenting in this case, but they have been made

15   available to the defense.  And if they so wanted to go into

16   each one of these e-mail accounts, they could have as well

17   subpoenaed the records.  They have subpoenaed witnesses in

18   this case.  They could have subpoenaed that information, Your

19   Honor.

20           And to be honest, the answer is responsive and

21   relevant to the testimony because basically they're trying to

22   show that there's absolutely no predisposition in this case

23   and he was induced into committing this offense when we know

24   that he's had a sex interest in little boys for many, many

25   years.

1          THE COURT:  How would you respond specifically to

2     Ms. Scott's assertion that you apparently turned over some

3     sheet or a checklist with a list of everything that was on

4     the phone that didn't include the information you've just

5     disclosed to the Court?

6          MS. RIVERA:  We turned over a disk that apparently

7     they had problems opening.  Like some of the items, I asked

8     them to itemize exactly what was it that they couldn't have

9     access to.  Instead of itemizing that, they chose to inspect

10    the evidence themselves at the F.B.I.'s office, and we

11    provided access to that information as well as the consent

12    forms with the passcodes.  And they had the e-mail addresses

13    of the defendant, again, which they could have subpoenaed.

14         In this case we did subpoena some of the

15    information and we provided -- we provided that information,

16    the Craigslist ads and whatnot; but this was not anything

17    that we intended to present in this case.  It's not -- it's

18    definitely not --

19         THE COURT:  Well, let's get beyond what you intend

20    to present in this case.  But you state unequivocally,

21    without reservation, that the e-mail accounts to which these

22    come from, the disclosures that you provided the Court with

23    copies of prior to the break, that those e-mail addresses had

24    been provided to the defense?

25         MS. RIVERA:  Well, the e-mail addresses were

1   provided to the defense, yes, Your Honor.

2            THE COURT:  Thank you.

3            MS. RIVERA:  And the passcodes.

4            THE COURT:  Ms. Scott, would you like to respond to

5   that, tell me if you disagree with that?  They said they gave

6   you all of these e-mail addresses.

7            MS. SCOTT:  I disagree with the fact that they

8   provided the consent from Mr. Brooks on the day that he was

9   arrested with the e-mail addresses listed, and then

10  specifically said that they were changing those passwords and

11  never informed the defense that the passwords were not

12  changed, had remained the same, and that we could inspect

13  them.

14           THE COURT:  So let me ask you this.  It sounds to

15  me like you did have the e-mail addresses, but it's your

16  position that you couldn't -- you didn't believe you could

17  access them?

18           MS. SCOTT:  We did not believe we could access

19  them.  And I specifically asked -- and when we met with the

20  agents and the government at the F.B.I.'s office, they were

21  intrigued at the fact that I was going to sit there and go

22  through each of the documents, detailed documents piece by

23  piece, and that that was going to take an exorbitant amount

24  of time; and I indicated to them that, yes, it was necessary

25  for me to go through each and every one of them because I

1 needed each piece of information that the government had

2 available to them.

3          And at that time no information was provided to us

4 that we had not changed the passwords.  You have access to

5 that as well.

6          They copied a disk, gave that disk to us, to which

7 I myself went through it and also had an expert go through

8 it.

9          It is a violation of the discovery rule that they

10 did not let us know that it was made available when they told

11 Mr. Brooks that it was specifically -- that they will change

12 the passwords.  He will no longer have access to that and did

13 not inform us that we could have access to it.

14          THE COURT:  All right.  They told you they were

15 going to change the passwords.  So it's your understanding

16 you couldn't get in.

17          So here's the question:  Did you try to assess

18 those e-mails?

19          MS. SCOTT:  No.

20          THE COURT:  Okay.  I appreciate your candor on

21 that.  I mean, hindsight is 20/20.  But you knew the e-mail

22 addresses.

23          I know there was some confusion as to what the

24 passwords were; but before you asked the question on cross-

25 examination as to whether or not any other e-mails had gone

1   from the defendant to another person soliciting or even

2   ambiguously soliciting sex from a minor, if you knew the

3   e-mail addresses, you should have told me that you didn't

4   have access to them, alleging that prior to trial.

5           So at this time the motion for mistrial is not

6   going to be granted.  It's going to be denied.  I do not find

7   a discovery violation.

8           Do you want a chance to talk to your co-counsel

9   about how you're going to proceed with your cross-

10  examination?  Because they're about ready to come back.  I'm

11  sure you've had that discussion.  Do you want another moment

12  to collect your thoughts?  Are you going to be asking for a

13  limiting instruction of any sort?

14          MS. SCOTT:  That -- that was going to be my next

15  request, Your Honor.  I would ask for a curative instruction

16  or a limiting instruction for the evidence that has been

17  presented.

18          I believe that the information that the government

19  has or -- excuse me.  The information that Agent Hyre has

20  provided in his testimony -- that, yes, there are other

21  e-mails -- is sufficient in regards to allowing this

22  information to come in.

23          I would ask, the e-mails specifically, that the

24  e-mails not be allowed to come into evidence and that we

25  close the door on that chapter of the cross-examination.

1        But if I may have a moment to --

2            THE COURT:  Sure.  Take that moment.  I'm beginning

3    to draft something.

4            Does the government want to be heard on this?

5            MS. RIVERA:  I'm just not sure I understood.

6            THE COURT:  They're asking me to backtrack.  They

7    want me to tell the jury not to consider the response that

8    they heard with regard to the e-mails unrelated to this case

9    referencing communications from the defendant soliciting sex

10   from minors, and she wants to move on with her cross-

11   examination.

12           MS. RIVERA:  Well, Your Honor, I think that

13   information is relevant.  In this case the line of

14   questioning posed by the defense is to the effect, well, you

15   were leading.  You were the one inducing.  My client didn't

16   have the intent to commit this offense.  And there was

17   government inducement.  This actually goes to show

18   predisposition as well as the evidence that is coming in.

19           We actually have the burden -- once the defendant

20   has adduced, has made a prima facie case of inducement, the

21   government has the burden of proving beyond a reasonable

22   doubt predisposition, and we do so by establishing how

23   readily he availed himself of the opportunity to have sex

24   with a minor; but he also opens the door to 404(b) evidence,

25   and that is -- I'm not making this up.  That is the case law

1    on entrapment, and I have those cases available for the

2    Court.

3              THE COURT:  I think that's the purpose of your 414

4    evidence, isn't it?

5              MS. RIVERA:  I'm sorry, Your Honor?

6              THE COURT:  That was the purpose of your 414

7    evidence?

8              MS. RIVERA:  414 evidence can be used for -- not in

9    the context of 404(b).

10             THE COURT:  Look, I don't disagree with you, but my

11   point is I have to make a decision about when enough is

12   enough, when an avalanche of extrinsic 404(b) or 414 evidence

13   is going to be admitted or not admitted based on how the

14   trial is proceeding.

15             MS. RIVERA:  But I think, Your Honor, there's no

16   avalanche here of prior bad acts.  What we have is an ad --

17   e-mails that are all inextricably intertwined in the context

18   of communication involving the possibility of engaging a

19   minor in oral sex.  We have seen that there is a lot of use

20   of the coded language.

21             THE COURT:  But you weren't even going to use this

22   before and now it's inextricably intertwined?

23             MS. RIVERA:  Your Honor, I'm saying that there's no

24   need for a curative instruction.

25             THE COURT:  So you're saying -- all right.  I

1    understand.  I thought you wanted to go into this.  You're

2    saying let sleeping dogs lie.  I understand.

3          The defense is looking for a curative instruction.

4    I'm going to think about that for a moment as I draft

5    something and I'll let you know where I'm at.

6          Ms. Scott, once you finish talking to Mr. Skuthan,

7    I'm going to invite you back to the podium.

8          Ms. Scott, I'm sure you've heard the whole axiom of

9    re-ringing the bell.  If I were to give an instruction, this

10   is what it would be, and I'm not saying I would.  I want you

11   to listen to it and think about whether or not you really

12   want this read to the jury rather than just quietly moving

13   on.

14          "Prior to the break, you heard references to

15   e-mails unrelated to this case sent by defendant soliciting

16   sex from minors other than the fictitious minor referenced in

17   this case.  You are to disregard that evidence during your

18   deliberations."

19          Do you really want something like that read to the

20   jury?  I mean, that's exactly what he said, that the -- you

21   asked him -- in a leading question, you said, well, these

22   are -- the only e-mails coming from the defendant were in

23   this particular circumstance involving an attempt to solicit

24   sex, allegedly, from this particular fictitious defendant?

25          And he goes, no, there were other e-mails.  There

1  were other e-mails looking for sex -- seeking sex from

2  children.  That was his answer.

3          Is it still your request that you want a curative

4  instruction?

5          MS. SCOTT:  If that -- may I have a moment?

6          THE COURT:  Sure.

7          (Discussion off the record between Ms. Scott and

8  Mr. Skuthan.)

9          MS. SCOTT:  Your Honor, I don't believe that the

10  instruction -- I would like an instruction, yes.  Let me say

11  that first.  But I don't believe that that instruction would

12  be --

13          THE COURT:  What instruction would you like?

14          MS. SCOTT:  If I were to draft an instruction, then

15  my instruction would say something along the lines of "Ladies

16  and gentlemen, prior to the break you heard testimony from

17  Agent Hyre regarding previous e-mails.  You are to disregard

18  that testimony," and leave it at that.

19          But in an abundance of caution, I understand the

20  Court's concern in that.  So what I'm saying is if there is

21  no -- if the instruction would not be given in the way that I

22  was just stating, then I would not say that any instruction

23  be given.

24          THE COURT:  All right.  So here's what I'm going to

25  do.  The instruction I just read -- because it has to be

1    specific to the exact e-mails you referenced, because this

2    case involves a lot of e-mails and that would inject

3    ambiguity.

4              You're requesting a curative instruction.  Here's a

5    curative instruction I'm willing to give that I just read

6    into the record.  Do you object to my curative instruction?

7              MS. SCOTT:  Yes, Your Honor.

8              THE COURT:  And in your objection, rather than have

9    my curative instruction, you want to leave your objection

10   standing, and therefore if I'm going to give that curative

11   instruction, it's your concern that's more damaging to your

12   client.  So, therefore, I'm leaving you in a position where

13   you can request no curative instruction, correct?

14             MS. SCOTT:  That is correct.

15             THE COURT:  All right.  That's preserved for the

16   record.  No curative instruction.  The response stands.

17             MS. SCOTT:  Your Honor, the only other matter that

18   I would like to take up is I just want to make sure that the

19   government does not reference -- even though no curative

20   instruction is going to be given, that the government not

21   reference or say that the door was open.  If we were going to

22   give a curative instruction and they were not to regard that

23   testimony, then that testimony is not to be regarded and it's

24   not to be brought up by the government.

25             THE COURT:  What's the government's position on

1    that?

2              MS. RIVERA:  I think we -- I believe they have

3    already opened the door, Your Honor, for us to move for the

4    entire audio to come in with his statement regarding the

5    youngest child.

6              THE COURT:  But that's not what this request is

7    about.  I mean, this request is about they don't want you

8    referencing the fact that they found other e-mails in the

9    phone soliciting sex from other minors.  That's what they're

10   asking.

11             MS. RIVERA:  I don't have to go that way.

12             THE COURT:  Do you oppose their request?

13             MS. RIVERA:  But in my closing statement, I would

14   like to consider the possibility of addressing that with the

15   jury.

16             THE COURT:  Okay.

17             I'm going to grant the defense's request.  You can

18   ask -- remember, this is a -- this is an evolving situation.

19   I don't know what the case is going to look like when it's

20   time to close.

21             As of now, the Court's decision is I'm not giving

22   the curative instruction, but the government is specifically

23   instructed not to reference any answer given by this witness

24   with regard to e-mails sent -- other e-mails sent to other

25   minors soliciting sex.

1          If you want the Court to reconsider that ruling

2    prior to your final argument, you're welcome to bring that up

3    to the Court at that time; but as of now, no mention of that

4    moving forward.

5          All right.  Anything further from the government?

6          MS. RIVERA:  Nothing further, Your Honor.

7          THE COURT:  Defense?

8          MS. SCOTT:  No, Your Honor.

9          THE COURT:  Is your next witness standing by,

10   assuming that we're able to finish with this witness today?

11         MS. RIVERA:  Yes, Your Honor.  And the next

12   witnesses, they are all going to be fairly brief, Your Honor.

13   That is our purpose.

14         THE COURT:  Well, I've completely lost my concept

15   of what "fairly brief" is.  So I'll be ready for anything.

16         Thank you both.

17         Let's bring the jury in.

18         (Jury present at 11:47 a.m.)

19         THE COURT:  Welcome back, ladies and gentlemen.  I

20   hope you had an enjoyable lunch.  Feel free to be seated.

21         We're ready to get started.

22         Ms. Scott, feel free to proceed.

23         MS. SCOTT:  Thank you, Your Honor.

24   BY MS. SCOTT:

25   Q    Agent Hyre, yes or no, yesterday you testified that you

1    arrested Mr. Brooks at Gander Mountain?

2    A     Yes, ma'am.

3    Q     And yes or no, Agent Brooks (sic), you testified that

4    when you arrested him, you were not alone?

5    A     Correct.

6    Q     There were at least two other officers present?

7    A     Yes, ma'am.

8    Q     And you testified yesterday that you had your cell phone

9    with you when you arrested Mr. Brooks, correct?

10   A     Yes, ma'am.

11   Q     Okay.  You testified that -- yes or no, that the

12   interview took about 30 minutes?

13   A     Yes, ma'am.

14   Q     Okay.  And Gander Mountain -- first, where is the F.B.I.

15   headquarters located?

16   A     The resident agency here in Orland- -- it's actually in

17   Maitland by the RDV, if you're familiar with that.

18   Q     Okay.

19   A     I'm sorry.  About -- about seven or eight miles north of

20   where we're sitting right now.

21   Q     How far is that from Gander Mountain?

22   A     Approximately, depending on traffic, a 15- to 20-minute

23   drive.

24   Q     Okay.  You testified that you had to get the team ready

25   to go from that location to Gander Mountain, correct?

1    A    Correct.

2    Q    Okay.  And then you were trained that -- we talked

3    earlier about your training in collecting evidence, correct?

4    A    Yes, ma'am.

5    Q    Okay.  And you were trained that in order to collect

6    evidence, it's for a jury ultimately?

7    A    Correct.

8    Q    Well, on this day when you interviewed Mr. Brooks, you

9    interviewed him in the parking lot, correct?

10   A    Correct.

11   Q    Which was only 15 to 20 minutes from the office?

12   A    Correct.

13   Q    You didn't take him back to the office?

14   A    No, ma'am.

15   Q    You didn't tape-record this interview?

16   A    No, ma'am.

17   Q    And your training says that you don't have to

18   tape-record every interview that you have, correct?

19   A    Specifically, I'm not supposed to tape-record field

20   interviews.

21   Q    Okay.  The -- so not everyone is going to be recorded,

22   but that's because there could be dangerous situations; is

23   that correct?

24   A    No, ma'am, that's not the reason.

25   Q    Okay.  You are trained not to tape-record field

1    interviews?

2    A    Correct.

3    Q    But you could have taken Mr. Brooks back to the F.B.I.

4    headquarters that was only 15 to 20 minutes down the road?

5    A    Yes, ma'am.

6    Q    And you chose not to?

7    A    Correct.

8    Q    Okay.  We talked a little bit about. . .

9         MS. SCOTT:  If you could, pull up Exhibit 3, page

10   146 -- no.  Excuse me.  Yes, 146.

11   A    Yes, ma'am.

12   Q    You said Mr. Brooks in that question asked what did you

13   do with them?

14   A    On page 146, he says, "Just your son for now."  That's

15   Mr. Brooks talking.

16   Q    Correct.  You said Mr. Brooks -- you testified that Mr.

17   Brooks -- this is what he wrote?

18   A    Yes.  I'm sorry.  I misunderstood.

19        Mr. Brooks wrote, yes, ma'am, "Just your son for now.

20   What did you do last night?"

21   Q    Okay.

22        MS. SCOTT:  If you could, pull up 147.

23   BY MS. SCOTT:

24   Q    And your response was "Oral on her" -- well, you read

25   it.

1   A      "Oral on her, light anal on him.  So hot.  She watched

2   and she liked" -- I'm sorry.   "She watched and liked it."

3   Q      Okay.  Nobody instructed you on saying that?

4   A      No, ma'am.

5   Q      That was created from your mind?

6   A      Yes.  That was my undercover bad dad persona, yes,

7   ma'am.

8   Q      Okay.

9          MS. SCOTT:  If you could, move to 138 in that same

10  exhibit.

11  BY MS. SCOTT:

12  Q      Okay.  You talked about this e-mail yesterday, about Mr.

13  Brooks wanting to shave -- trim his pubes and chest hair and

14  shave his scrotum, correct?

15  A      Yes, ma'am.

16  Q      And then you said that you -- you testified yesterday

17  that you asked him this same question when he was arrested?

18  A      I asked him if he had shaved himself.  During the

19  interview I asked him if he had shaved himself.

20  Q      Okay.  And he answered in the affirmative, correct?

21  A      Yes, ma'am.

22  Q      You said that this was just one more indicator of what

23  he was trying to do to groom himself?

24  A      It was just linking together our previous conversations

25  with the reason he was in the parking lot that morning, yes,

1   ma'am.

2   Q    Okay.  Yes or no, if you know the answer, does Mr.

3   Brooks regularly trim his pubes?

4   A    I don't know the answer if he regularly trims.

5   Q    But you said you have reviewed the information in this

6   case, correct?

7   A    Yes, ma'am.

8   Q    Did you review any Craigslist postings where he

9   requested --

10  A    Yes, ma'am.

11  Q    -- trimming his pubes?

12  A    Yes, ma'am.

13  Q    And shaving his scrotum?

14  A    Yes, ma'am.

15  Q    Okay.  Specifically on June 4, 2014, did you have an

16  opportunity to see where he made that request on Craigslist?

17  A    I don't have it in front of me, but I've seen those --

18  I've seen where Mr. Brooks has made those requests on

19  Craigslist about having his chest, pubic hair and scrotum

20  shaved.

21  Q    Okay.  So if I were to say that on June 4th he did that,

22  you wouldn't have any reason to dispute it?

23  A    I would have no reason.

24  Q    If I said that he did it on July 11, 2014, you would

25  have no reason to dispute that?

1    A    No, ma'am.

2    Q    Okay.  If I said he did it on July 13, 2014, would you

3    have any reason to dispute that?

4    A    No, ma'am.

5    Q    I'm sorry?

6    A    No, ma'am.

7    Q    If I said he did it on September 4, 2014, would you have

8    any reason to dispute that?

9    A    No reason, no, ma'am.

10   Q    If I said he did it on September 7, 2014, would you have

11   any reason to dispute that?

12   A    No, ma'am.

13   Q    If I said he did it on November 9, 2014, would you

14   have any reason to dispute that?

15   A    No, ma'am.

16   Q    If I said he made that same posting on December 5, 2014,

17   would you have any reason to dispute that?

18   A    No, ma'am.

19   Q    If I said he did it on December 27, 2014, would you have

20   any reason to dispute that?

21   A    No, ma'am.

22   Q    If I said he made this same post on January 28, 2015,

23   would you have any reason to dispute that?

24   A    January 28th of 2015?

25   Q    Correct.

1    A    That was after the time he was arrested?

2    Q    No, sir.

3    A    I'm sorry.  I'm sorry.  No, ma'am.  You're right.  No,

4    I'd have no reason to.  I'd have no reason to dispute that.

5    Q    Okay.  If I said he made that same post on March 5,

6    2015, would you have any reason to dispute that?

7    A    No, ma'am.

8    Q    If I said he made that same or similar post on April 7,

9    2015, would you have any reason to dispute that?

10    A    No, ma'am.

11    Q    If I said that he made a similar post on April 5th,

12    2015, would you have any reason to dispute that?

13    A    No, ma'am.

14    Q    So then it's fair to say that the post that you saw or

15    that -- excuse me -- that the post that you saw seemed to be

16    a course of action for him?

17    A    Yeah.  In my mind, as I remember looking through those

18    posts, it seemed to me about ten or twelve times I'd seen

19    that post.  So, yeah, it wasn't like a one-time occurrence.

20    I know that.  It was about ten or twelve times.

21    Q    Okay.

22    A    Roughly.  That's a rough estimate.

23    Q    Okay.  So it wasn't -- and then let me speak

24    specifically.  So if I said he did it on September 7, 2015 --

25    A    I remember that one.

1    Q    You remember that one?

2    A    Yes, ma'am.

3    Q    Okay.  Look at that e-mail again.

4    A    Which one?

5    Q    The one that's right in front of you that we were

6    referencing on 138.

7    A    Yes, ma'am.

8    Q    What is that date?

9    A    September 8th.

10   Q    And what is that time?

11   A    5:59 p.m.

12   Q    And you said that the post that you saw, you remember it

13   being from September 7?

14   A    I remember a September 7th post, yes, ma'am.

15   Q    Would that have been Monday?

16   A    Yes, ma'am.

17   Q    And would that have been during the time that he had no

18   communications with you?

19   A    On Monday, yes, ma'am.

20   Q    Okay.

21        MS. SCOTT:  I have nothing further, Your Honor.

22        THE COURT:  Thank you, Ms. Scott.

23        Redirect?

24        MS. RIVERA:  Yes, Your Honor.

25                    REDIRECT EXAMINATION

1   BY MS. RIVERA:

2   Q     Special Agent Hyre, after the defendant was arrested at

3   Gander Mountain, you said that you had -- that you didn't

4   take him back to the F.B.I. office for an interview.  What

5   are you required to do with the defendant after arrest, once

6   you've done the preliminary searches?

7   A     I'm not required to take him back to my office.  I do an

8   interview of the subject.

9   Q     Where are you supposed so take him after arrest?

10  A     After arrest and after the interview, I took him here to

11  this building and turned him over to the United States

12  Marshals.

13  Q     Are you required to take him before the Court without

14  reasonable -- unreasonable delay?

15  A     Yes, ma'am.

16  Q     Going back to your training which was discussed here

17  during cross-examination, specifically online investigations,

18  undercover online investigations of this nature for

19  enticement cases, what do they typically entail?

20  A     Going to places where people that it's known to law

21  enforcement engage in searches for children to sexually

22  exploit.  We try to --

23  Q     The training?

24  A     The training tells us -- tells us to basically go to

25  those places and to try to find those people.

1  Q    Are you trained as far as, like, using specific words or

2  terms in your communications with these individuals, like

3  you're supposed to use very specific terms?

4  A    No, ma'am.  This is -- I think I mentioned earlier this

5  is not like math.  This is --

6  Q    Why so?

7  A    Because I'm -- my training is to portray myself as,

8  obviously, not a law enforcement officer and as a father who

9  would actually let somebody engage in sex with their

10  children.  That's my -- that's my training, to make myself

11  appear to be like the people that I'm talking to, and so

12  that's what I do.

13  Q    And the context of these communications, these e-mail

14  communications, you talked about an ad that was posted on

15  September 5, what did you understand by that posting as far

16  as any connotations?

17  A    My clear understanding was that the Family Play Time ad

18  was about a man who was seeking to join in a family where the

19  family had sex within the family unit, father, sons, uncles,

20  nephews, cousins; and I understood that to likely mean

21  children.

22  Q    And when you use these innuendos and you suggest that

23  you're involved in this type of dynamic with your children,

24  is there something improper in your training about doing

25  that?

A       Absolutely not.  That's how without, saying exposing --

without saying, "Hey, I'm a police officer.  And do you

really want to do this?" that's my way of seeing if the

person is actually interested in a child for sex.

Q       And we see it over and over in these e-mail

communications that you say, "It's up to you.  You don't have

to do this."  Why do you do that?  After you have even

confirmed what his intent is, why do you do that?  Why do you

continue saying, "It's up to you.  You don't have to do this,

if you don't change your mind"?

A       Part of my training, there again, is to allow the person

I'm talking to the opportunity to break the chain of events,

to walk away from this; and I do that also to satisfy myself

that this is a person who is dead set on doing -- on taking

this action.  And so that's why over and over throughout,

this one in particular and in all of my cases, I put those --

I put those exits in, so that they can break this chain and

walk away.

Q       And we know he didn't take an exit, and how do you

corroborate in this case that he didn't take an exit?

A       Because he showed up at the Gander Mountain parking lot

shortly before 11:00 in the morning and during the interview

told me that he was there to engage my boy in oral sex.

Q       Did he tell you during your interview anything to the

contrary as far as not being there to engage your child in

1    oral sex?

2    A     No, ma'am.

3    Q     Did he tell you that he had reported this to the police?

4    A     No.   I specifically asked him if he had -- if he had

5    thought of doing that.   He told me he'd thought of doing it

6    but hadn't done that, but that's something that almost

7    everybody I talk to tells me.

8    Q     And what did he say specifically about these fantasies

9    of sex with children?

10              MS. SCOTT:   Objection, Your Honor; this is going

11   beyond the scope of my cross-examination.   I didn't get into

12   what Agent Hyre questioned Mr. Brooks on during his

13   interview.

14              THE COURT:   Response.

15              MS. RIVERA:   Your Honor, without going into too

16   much detail, the agent's intent and the propriety of his

17   questioning of the defendant has been questioned.

18              THE COURT:   All right.   I'm going to allow you to

19   briefly go into this.   The phone call was played, and during

20   the course of the phone call, that was referenced; but this

21   has been gone over on direct extensively.   So continue

22   moving.   The objection is overruled with instructions to

23   counsel to keep moving through your redirect.

24   BY MS. RIVERA:

25   Q     Okay.

A      Yes, if I remember the question, it was about. . .

Q      About his fantasies.

A      Yeah, that this had first crossed his mind approximately two years prior, when he had read stories on the Internet about -- about engaging children in sex and that it had been a fantasy of his over the last two years.

Q      And after you -- after that conversation, the communication and the e-mails were shown to you, why do you continue then, after having talked to him on the phone, to re-engage the defendant about the possibility of meeting for what was said here in court?

A      Because I identified a person that wanted to sexually exploit a minor and they wanted to sexually exploit my notional ten-year-old child, and so I re-engaged in order to see if he actually wanted to do this.

Q      In the context of these investigations or the investigation in this case, why are you given so much leeway as far as what you can say and how to respond to these ads as far as your training is concerned?

A      I have to say a lot of -- in order not to look like a law enforcement officer, I say a lot of very bad things that I would never say as myself, but in order to portray myself as not a law enforcement officer, but somebody that would actually make their children available for sex.  So I'll curse.  I'll misspell words.  I'll just try to make myself

1    look like somebody that I'm not.

2    Q    And this ad was shown to you, Exhibit 1, in the caveat

3    there regarding the age, "If you are all 18 or older, respond

4    to this ad," something to that effect, why did you respond to

5    the ad, even with that caveat?  What do you know in your

6    training and experience?

7    A    I've had numerous past cases where the folks have also

8    showed up where they have the same caveat in their ad, and

9    like I said, based on my training and experience, if you post

10   an ad that is so clearly indicative of involving children and

11   sex, the only way to keep that ad from being almost

12   immediately flagged and therefore taken down off Craigslist

13   would be to try to put that caveat in there.

14   Q    When Mr. Brooks during his communications with you asked

15   what was the protocol, what did you understand by that?

16            MS. SCOTT:  Objection, Your Honor.  I believe this

17   has been extensively covered in the direct examination,

18   specifically the government went through piece by piece

19   e-mails and asked what he expected it to mean or what did he

20   interpret it to mean.

21            THE COURT:  I understand your --

22            MS. RIVERA:  Your Honor, this is the audio

23   recording.

24            THE COURT:  Hold on.  Hold on.

25            Asked and answered doesn't extend from direct to

1   redirect.   The objection you're trying to make is not within

2   the scope, if there is one; but the issue of protocol did

3   come up on cross-examination.   So for that reason, the

4   objection is going to be overruled.   You can ask your

5   question.

6   BY MS. RIVERA:

7   Q    In this, we're talking about Exhibit 4, the audio.   And

8   you have the transcript.   And there was a point when you --

9   when he asked, "What's the protocol?"   When he asked you that

10  question, what do you understand by that that?

11  A    He wanted to -- I understood him to mean what are my

12  rules?   What are my limitations?   What will I allow him to do

13  to my kids?

14  Q    Regarding the defendant's arrest and his consent for you

15  to conduct searches, what did that extend to?   What did he

16  consent to?

17  A    He gave his consent to search, I believe, three

18  different e-mail accounts, to search his phone, to search his

19  vehicle.   I believe that's it.

20  Q    Now, I believe --

21           MS. RIVERA:   Your Honor, if I may have a moment?

22           THE COURT:   You may have a moment.

23           MS. RIVERA:   I think I'm pretty much done here.

24           We have no further questions, Your Honor.

25           THE COURT:   Thank you.

```
1              Special Agent Hyre, please be seated at counsel
2       table.
3              Is the government prepared to call their next
4       witness?
5              MS. RIVERA:  Yes, Your Honor.  The government calls
6       Special Agent Scott Spruill.
7              THE COURT:  If either counsel have any admitted
8       evidence at their desk, please make sure you return it to
9       Miss Darley at this time.  She needs to safeguard all of
10      that.
11             MS. RIVERA:  Yes, Your Honor.
12             THE COURTROOM DEPUTY:  Please come forward and be
13      sworn.  Raise your right hand.
14             Do you solemnly swear or affirm under the penalty
15      of perjury that the testimony you will give will be the
16      truth, the whole truth and nothing but the truth?
17             MR. SPRUILL:  Yes, ma'am.
18             SCOTT SPRUILL, PLAINTIFF'S WITNESS, SWORN
19             THE COURTROOM DEPUTY:  Have a seat there, please.
20             THE COURT:  Once seated, please arrange the chair
21      so that you're comfortable with the chair's proximity to the
22      microphone, and then state your full name for the record,
23      spelling your last name.
24             THE WITNESS:  Yes, sir.  Special Agent Scott
25      Spruill.  Last name is S-p-r-u-i-l-l.
```

1              THE COURT:  Your witness, counsel.

2              MS. RIVERA:  Thank you, Your Honor.

3                        DIRECT EXAMINATION

4    BY MS. RIVERA:

5    Q    Sir, where do you work?

6    A    The Federal Bureau of Investigation.

7    Q    In what capacity?

8    A    A special agent.

9    Q    Do you have a unit of assignment?

10   A    Yes, ma'am, Safe Streets Task Force.

11   Q    For how long have you worked with the F.B.I.?

12   A    Since June 2014.

13   Q    And with the Safe Streets Task Force, for how long have

14   you worked with that unit?

15   A    Since November 2014.

16   Q    And what are your duties within the unit?

17   A    Gang violence, drug trafficking, violent crimes.

18   Q    Do you investigate those cases?

19   A    Yes, ma'am.

20   Q    Do you provide any assistance to the Child Exploitation

21   unit or the Innocent Images Task Force unit?

22   A    Yes, ma'am.

23   Q    Now, prior to working for the F.B.I., where did you

24   work?

25   A    Boynton Beach Police Department.

1    Q      In what capacity?

2    A      Police officer.

3    Q      And what were your duties back then?

4    A      During my tenure there I was a police officer.  I was an

5    agent in narcotics.  I was a SWAT team member.  I was a

6    D.E.A. task force officer for three years as well as an

7    F.B.I. task force officer.

8    Q      Did you also work on conducting undercover

9    investigations?

10   A      Yes, ma'am.

11   Q      And for how long did you work as a police officer?

12   A      I was there from 2001 to 2014.

13   Q      Now directing your attention to September 10, 2015,

14   around 10:51 in the morning, 11:00 in the morning, what

15   happened on that date as relevant to this case?

16   A      In the morning I was approached by Special Agent Hyre,

17   who advised that he had a person that he was investigating

18   that may be traveling to the area to solicit a child for

19   sexual contact.

20       I was dressed down during the day in jeans and a shirt,

21   and he asked if I'd be able to assist.

22   Q      And did you actually assist in the arrest of the

23   defendant?

24   A      Yes, ma'am.

25   Q      Do you see that person here in court today?

1    A    Yes, ma'am.

2    Q    Can you please identify him for the ladies and gentlemen

3    of the jury?

4    A    Yes.  He looks like this gentleman right here.

5    Q    And can you please explain to the members of the jury if

6    there's any particular difference as to why your demeanor in

7    court?

8    A    Yes, ma'am.  The gentleman I saw was heavier set.  He

9    had black facial hair and I believe he was bald.

10   Q    Now let me ask you, what was your involvement in placing

11   the defendant under arrest?

12   A    I was asked to be a decoy of a father who would play the

13   role of the part of being at the location to meet a person by

14   the name of Gary to provide my ten-year-old son for sexual

15   contact.

16   Q    Now, the -- and what did you do, based on the

17   instructions that you received?

18   A    I pulled into a parking lot at Gander Mountain.  I

19   parked in the center part of the parking lot.

20        Special Agent Hyre had communications with me through an

21   open telephone line.  He was placed on speaker phone, and

22   that's how I communicated with Special Agent Hyre.

23   Q    Where exactly were you located in the parking lot at

24   Gander Mountain?

25   A    In the center of the parking lot.

1    Q     And while you were there where was Special Agent Hyre

2    and the other agents, if you recall?

3    A     I don't recall what their locations were.

4    Q     Were they close to you in proximity or far away in some

5    other location?

6    A     No, ma'am.  They were close to me.

7    Q     In the parking lot?

8    A     Yes, ma'am.

9    Q     Okay.  Now, let me ask you, what happened after you

10   arrived to the location as far as the arrest of the

11   defendant?  How did it evolve?

12   A     When I pulled into the parking lot, Special Agent Hyre

13   advised that there was a car that was in the parking lot that

14   was occupied by a single occupant.  It appeared that the

15   person was inside the vehicle waiting, and they appeared to

16   be looking towards my vehicle.

17         He instructed me to get out of the vehicle and stand

18   towards the front, near the hood of the car, on the driver's

19   side.

20         I got out of the vehicle.  He advised that the car had

21   repositioned inside the parking lot.

22   Q     Who advised you of that?

23   A     Special Agent Hyre.

24   Q     Okay.

25   A     Repositioned themselves inside the parking lot, still

1   watching me.  While I was in communication with him, he

2   advised that the occupant of the vehicle exited the vehicle

3   and was approaching my vehicle from the rear.

4   Q    And what did you do at that point?

5   A    At that point in time I continued looking forward so

6   that I didn't draw attention to the fact that I was speaking

7   on the phone with someone, until I could hear footsteps

8   coming from behind me.  At that point in time I turned around

9   and was greeted by Mr. Gary.

10  Q    And when you say "Gary," why do you use that name?

11  A    That was the name that I was told that the person that I

12  was coming to meet had given online.

13  Q    Do you know that person's real name?

14  A    Mr. Brooks, I think, is his last name.

15  Q    Okay.  Now, other than being used as a decoy to

16  effectuate the arrest of the defendant, did you have any

17  other role in the case?

18  A    No, ma'am.

19  Q    Okay.  So after -- did you introduce yourself with any

20  alias to the defendant?

21  A    Yes, ma'am.  I advised -- we introduced ourselves to

22  each other, shook each other's hands.  He identified himself

23  as Gary and I identified myself as Pappy.

24  Q    And once that point arrived in time, what happened

25  immediately thereafter?

1   A       Immediately once we made contact with each other, agents

2   started moving in.  They were there very quickly.  As soon as

3   agents started exiting and approaching us, he stated, "I knew

4   this was going to happen."

5   Q    Now, and was he then placed under arrest and escorted

6   out of the location at some point?

7   A       Yes, ma'am, he was placed under arrest.  I'm not sure

8   where he was moved to.

9   Q    Now, let me ask you, when he introduced himself as Gary,

10  what was his demeanor?

11              MR. SKUTHAN:  Objection, Your Honor; speculation.

12              MS. RIVERA:  If he recalls.

13              THE COURT:  I don't really understand the question.

14  I'm going to sustain the objection and allow you an

15  opportunity to rephrase that question.  I don't know what you

16  are asking for with "demeanor."

17              MS. RIVERA:  Okay.

18  BY MS. RIVERA:

19  Q    What was the defendant's appearance when he introduced

20  himself as Gary?

21  A       He was smiling --

22              MR. SKUTHAN:  Speculation.  It's not relevant

23  either.

24              THE COURT:  All right.  I'm going to overrule that.

25              The question was:  What was his appearance?  You

1    can answer that.

2    A      He was smiling and calm.   He appeared happy.

3            MS. RIVERA:   No further questions, Your Honor.

4            THE COURT:   Cross-examination?

5                        CROSS-EXAMINATION

6    BY MR. SKUTHAN:

7    Q      Did Mr. Brooks ever attempt to run away?

8    A      No, sir.

9    Q      Did he resist?

10   A      No, sir.

11   Q      Was he cooperative with you and the other agents?

12   A      I didn't have any contact with him after he was taken

13   into custody, but he gave me no problems.

14   Q      And he was cooperative with you?

15   A      Yes, sir.

16   Q      Thank you.

17           THE COURT:   Thank you.

18           Redirect?

19           MS. RIVERA:   No questions, Your Honor.

20           THE COURT:   May this witness be excused?

21           MS. RIVERA:   Yes, Your Honor.

22           THE COURT:   Will he be subject to recall?

23           MS. RIVERA:   I don't expect --

24           THE COURT:   Might he be called as a witness again

25   in this case?

 1          MS. RIVERA:  No, Your Honor.

 2          THE COURT:  All right.

 3          Feel free to go about your private affairs.  You

 4   have a good day.

 5          THE WITNESS:  Thank you, sir.

 6          THE COURT:  I would invite the government to call

 7   their next witness.

 8          MS. RIVERA:  Yes, Your Honor.  The government calls

 9   F.B.I. Task Force Officer Debra Healy.

10          THE COURT:  Feel free to come forward and retrieve

11   the exhibits that you will require.

12          MS. RIVERA:  Thank you, Your Honor.

13          THE COURTROOM DEPUTY:  Please come forward and be

14   sworn.  Raise your right hand.

15          Do you solemnly swear or affirm under penalty of

16   perjury that the testimony you will give will be the truth,

17   the whole truth and nothing but the truth?

18          MS. HEALY:  I do.

19          DEBRA HEALY, PLAINTIFF'S WITNESS, SWORN

20          THE COURTROOM DEPUTY:  Have a seat there, please.

21          THE COURT:  And, ma'am, once seated, please arrange

22   the chair so that you're comfortable with the chair's

23   proximity to the microphone, and then state your full name

24   into that microphone, spelling your last name.

25          THE WITNESS:  My name is Debra Diane Healy,

1    H-e-a-l-y.

2              THE COURT:   Your witness, counsel.

3              MS. RIVERA:   Thank you, Your Honor.

4                      DIRECT EXAMINATION

5    BY MS. RIVERA:

6    Q    Ma'am, where do you work?

7    A    I am an investigator at the Seminole County Sheriff's

8    Office, assigned full time to the F.B.I. Task Force Violent

9    Crimes Against Children.

10   Q    So you work for both the Seminole County Sheriff's

11   Office and the F.B.I. task force?

12   A    I am assigned as an F.B.I. task force agent, yes.

13   Q    Let me ask you, what is your position within the

14   Seminole County Sheriff's Office?

15   A    I am an investigator in the digital forensics unit.

16   Q    For how long have you worked with the Seminole County

17   Sheriff's Office?

18   A    I've been at the sheriff's office for 15 years.

19   Q    And let me ask you, for how long have you worked with

20   the F.B.I.?

21   A    For six years.

22   Q    And within the F.B.I., what is your unit of assignment?

23   A    I am primarily a digital forensics examiner, but I'm

24   assigned as a task agent.  So I have the roles and

25   responsibility as a task force agent as well.

1    Q      Meaning what?

2    A      Meaning that I act as an agent.  I do surveillance.  I

3    write search warrants.  I'm out on arrests, that kind of

4    thing.

5    Q      Let me ask you, for how long have you been a digital

6    forensic examiner?

7    A      For ten years.

8    Q      And before we go any further, can you please tell the

9    members of the jury, did you actually identify the unit of

10   assignment as to the Violent Crimes Against Children Task

11   Force?

12   A      Yes.

13   Q      Okay.  I'm sorry, then.  What are your duties, then, and

14   responsibilities as a digital forensic examiner?

15   A      As a digital forensics examiner, I examine and analyze

16   and create reports for any type of digital media.  That would

17   include cell phones, computers, tablets, anything that holds

18   information in a digital format.

19   Q      Now, have you had training to qualify you as a digital

20   forensic examiner?

21   A      Yes, I have.

22   Q      Can you please tell the members of the jury about your

23   training?

24   A      Over the course of the last ten years I've been to

25   numerous beginning, intermediate and advanced-level classes.

1   I have attended countless trainings and have become certified

2   in the software that we use in the forensic industry.

3   Q      Does that software include the Cellebrite Mobile

4   Synchronization System?

5   A      Yes, it does.

6   Q      Okay.  Your certification to conduct forensic

7   examinations includes different types of digital media in

8   cell phones and computers, correct?

9   A      That's correct.

10  Q      What organization certifies you?

11  A      Initially, in order for me to become an examiner with

12  the Seminole County Sheriff's Office, there's an organization

13  by the name of IACIS, which is the International Association

14  of Computer Investigative Specialists, that you attend a

15  course, and then there's a nine-month certification process

16  at which time at the end you receive what's considered an

17  industry standard certification in digital forensics.

18  Q      Okay.  Now, have you taught any classes?

19  A      I have taught several classes.

20  Q      In what subjects?

21  A      Digital evidence collection, digital forensics, that

22  kind of thing.

23  Q      And where at?

24  A      Local law enforcement academies, civilian academies,

25  other law enforcement agencies, and internally.

1  Q     Now, about how many pieces of computer media, including,

2  I mean, cell phones, have you examined that have been

3  involved in child exploitation cases?

4  A     In child exploitation, I -- I don't know a specific

5  number.

6  Q     And in overall computer media?

7  A     Overall, since I've been an examiner I've conducted over

8  500 investigations and examined more than 3300 pieces of

9  evidence.

10  Q     And have you testified in court about your examinations

11  of cell phones and computer media?

12  A     Yes, I have.

13  Q     And have you been qualified as an expert in digital

14  forensic examination in federal court?

15  A     Yes, I have.

16  Q     About how many times have you been certified?

17  A     Approximately 16 times.

18         MS. RIVERA:  Your Honor, we now move that the task

19  force officer be qualified as an expert in the field of

20  digital forensic examination, be allowed to testify as an

21  expert in that field.

22         MS. SCOTT:  No objection, Your Honor.

23         THE COURT:  All right.  She is permitted to -- you

24  are permitted to elicit opinion testimony from this witness.

25  Feel free to proceed.

1    BY MS. RIVERA:

2    Q     Now let me ask you, starting with your definition or

3    according to your training and experience, what is a cell

4    phone as far as how it operates?

5    A     It's a mobile communication device.

6    Q     Okay.  And for all intents and purposes, is it a

7    computer?

8    A     It is considered a hand-held computer, yes.

9    Q     Now, in this case, you analyzed a -- what type of

10   computer media?

11   A     It was a cellular telephone, a Samsung Galaxy.

12   Q     Thank you.  And I'm going to show you then what has been

13   marked as Government Exhibit 8 for identification.

14             MS. RIVERA:  I'm approaching the witness, Your

15   Honor.

16             THE COURT:  Did you say A, as in alpha, or 8, as in

17   a number?

18             MS. RIVERA:  8, Your Honor.  I'm sorry.

19             THE COURT:  All right.

20   BY MS. RIVERA:

21   Q     Now, do you recognize Government Exhibit 8 for

22   identification?

23   A     Yes, I do.

24   Q     How do you recognize it?

25   A     It is the evidence packaging where I put the defendant's

1  cell phone.

2  Q    And how do you know that?

3  A    Because it's marked with the case number, the suspect's

4  name, and it has my initials on the packaging and my initials

5  alone.

6  Q    Let me ask you a question.  In this case were you

7  involved in obtaining this piece of media at the time of the

8  defendant's arrest?

9  A    I was present during the defendant's arrest.  The cell

10  phone was taken off of the defendant and handed to me in my

11  presence.

12  Q    Okay.  Now, let me ask you, if you see the defendant

13  here in court today, please identify him for the record.

14  A    Yes, ma'am, he's sitting right there.

15  Q    By who?

16  A    By Mr. Skuthan.

17        MS. RIVERA:  Your Honor, let the record reflect

18  that the witness has identified the defendant.

19        THE COURT:  The record will so reflect.

20  BY MS. RIVERA:

21  Q    Now, can you please then proceed to open this envelope.

22  Do you recognize this item?

23  A    Yes, I do.

24  Q    Now --

25        MS. RIVERA:  Your Honor, at this point --

1  BY MS. RIVERA:

2  Q    Well, let me ask you, does it look in substantially the

3  same condition as when it was obtained from the defendant?

4  A    Yes, it does.

5  Q    Okay.  Is this the item that you analyzed in the case?

6  A    Yes, it is.

7         MS. RIVERA:  Your Honor, we now move that

8  Government Exhibit 8 for identification be admitted into

9  evidence.

10        THE COURT:  Is there any objection from the

11 defense?

12        MS. SCOTT:  To the physical object being admitted,

13 no, Your Honor, there's no objection to that.

14        THE COURT:  All right.

15        What's been previously marked as Government Exhibit

16 8 will be admitted without objection and marked as such.

17 Feel free to proceed with your examination.

18        MS. RIVERA:  Thank you, Your Honor.

19 BY MS. RIVERA:

20 Q    Now, can you just raise it briefly so that the ladies

21 and gentlemen of the jury can see it?

22 A    (Witness complies.)

23 Q    Thank you.  Now, Government Exhibits 9 and 10, what are

24 those, the envelopes that are located to your right?

25 A    Nine and 10 are pictures that I took, digital

1   photographs that I took at my lab.

2   Q    And let me ask you then to explain in this case, what is

3   the process where you examine this cell phone?  And before

4   you go there, under what authority do you search the

5   defendant's phone in this case?

6   A    In this case, when the cell phone was given to me,

7   signed consent had been obtained from the defendant.

8   Q    And how do you know that he consented to the search of

9   his phone?

10  A    I was present when he signed the consent form.

11  Q    Now --

12          MS. RIVERA:  Your Honor, if I may approach --

13          THE COURT:  You may.

14          MS. RIVERA:  -- the witness?

15  BY MS. RIVERA:

16  Q    I'm showing you Government Exhibit 7 for identification.

17  Do you recognize it?

18  A    I do.

19  Q    How do you recognize it?

20  A    That is the consent form that was obtained at the scene.

21  Q    You said that you witnessed as the defendant sign this

22  consent form?

23  A    Yes, I did.

24          MS. RIVERA:  Now, Your Honor, we're moving this

25  document, Government Exhibit 7, for identification be

1    admitted in evidence.

2            THE COURT:  Any objection?

3            MS. SCOTT:  No objection.

4            THE COURT:  What's been previously marked as

5    Government's Exhibit 7 will be admitted without objection and

6    marked as such.  You may proceed.

7            MS. RIVERA:  Thank you, Your Honor.

8    BY MS. RIVERA:

9    Q    Can you now please explain to the members of the jury

10   the process that you follow to examine this phone, from the

11   initial stages?

12   A    Once the phone was turned over to me by Agent Hyre, I

13   placed the phone into airplane mode.  I then powered the

14   phone off.  I personally then transported the phone to the

15   Seminole County Sheriff's Office Digital Forensics Lab.

16       Once at the lab, it was secured until such time as I

17   could examine the phone using a Cellebrite UFED Touch and

18   then a Cellebrite Physical Analyzer, where I created a

19   report.

20   Q    Let me go back for a second.  When you said that you --

21   as soon as you received the phone, you placed it on airplane

22   mode.  Can you please explain to the members of the jury, why

23   did you do that?

24   A    When you place a device into airplane mode, you remove

25   it from access to the network so that it doesn't get or

receive calls.  It can't be given a remote wipe signal or

anything like that.

Q     So, basically, it's supposed to preserve the data on the

phone?

A     Basically, it removes it from the network, correct.

Q     Okay.  And what effect does that have, basically, as far

as your report?

A     It doesn't have any effect on the report at all.

Q     Okay.  Now, let me ask you, after -- you said that you

attached this device, this cell phone to a Cellebrite.  What

is the name of the actual software?

A     It's called a UFED Touch, which is a Universal Forensic

Extraction Device.

Q     UFED Touch?

A     Correct.

Q     What is this?

A     It's a combination of hardware and software that

basically is one of the industry standards for extracting

data from mobile devices.

Q     And when it extracts the data, in what format is it

extracted?  The UFED, when it extracts the data, what do you

obtain as an output?

A     Basically, you obtain the information, depending on the

type of extraction.  In this case I got a file system

extraction, which has some of the file system information as

1   well as some of the user-attributable data, and that

2   information is then put into a folder, and a physical

3   analyzer then puts that into a readable format and then

4   allows us to create a report.

5   Q    What is user-attributable information?

6   A    That could be contacts, call logs, text messages,

7   whatever that particular phone, the software can extract from

8   it.

9   Q    And does that assist in identifying the user of the

10  phone?

11  A    (No response.)

12  Q    Does it assist in identifying a possible user of the

13  phone?

14  A    It could, yes, ma'am.

15  Q    Did you obtain a file system extraction?

16  A    That is correct.

17  Q    Okay.  Now, by doing this, does that process modify or

18  alter the information contained in the phone?

19  A    It does not alter the data.

20  Q    And how do you know that?

21  A    Both -- like I said, it's an industry standard; but I've

22  also personally tested and validated that it doesn't alter

23  anything that it's extracting off of the phone.

24  Q    Okay.  What happened with that file system extraction

25  that was generated?

1  A    What happens is it's stored on my server and then I use

2  the software Cellebrite Physical Analyzer to then look at

3  that data and create a report.

4  Q    So, basically, the Cellebrite physical analyzer that you

5  use would sit in a readable format?

6  A    Correct.

7  Q    Okay.  And this report that is generated, it's generated

8  in what format?

9  A    It can be generated in numerous type of formats.  The

10  one that I created for Agent Hyre was in a PDF-type format.

11  Q    Okay.  And did you have an opportunity to review that

12  report for evidence of an evidentiary value?

13  A    Agent Hyre asked me to review it for certain

14  information.

15  Q    Okay.  For what type of information did you review this

16  report?

17  A    I reviewed the report for the presence of the e-mail

18  communications between Agent Hyre and the defendant, and I

19  also reviewed it for any type of contraband graphics or

20  movies.

21  Q    Okay.  Now, let me ask you, what evidence of relevance

22  to this case did you find in the phone?

23  A    I found e-mail communications.

24  Q    Okay.  Did you find the entirety of the e-mail

25  communications?

1    A    In going through the details specifically, there was

2    four communications that I was provided by Agent Hyre that I

3    did not locate on the phone.

4    Q    Okay.  Do you know which ones are those?

5    A    I do.

6    Q    Okay.  Let me --

7              MS. RIVERA:  Your Honor, if I may have Exhibit

8    Number 3?

9              THE COURT:  Feel free to come forward and retrieve.

10   BY MS. RIVERA:

11   Q    Do you know which pages were missing?

12             THE COURT:  Please indicate what you just handed

13   the witness.

14             MS. RIVERA:  I handed her Exhibit Number 3 and a

15   note from the -- that she had generated.

16             THE COURT:  I understand.  Thank you.

17   A    In Exhibit 3, page 134, page 137, page 148 --

18   Q    Do you have an explanation for why those particular

19   e-mails were missing from the defendant's cell phone?

20   A    No.

21   Q    Okay.

22   A    -- and page 161 -- I'm sorry -- those are the four that

23   I was provided by Agent Hyre that I could not locate on the

24   phone.

25   Q    So basically what you're saying is that Agent Hyre

1    provided you a printout of the undercover e-mails and you

2    compared them with the extraction that you performed?

3    A    With information that I obtained during the extraction,

4    yes.

5    Q    Okay.  And there are four missing e-mails?

6    A    There are four that he provided that I could not find on

7    the phone.

8    Q    Okay.  Now, other than the e-mails that the defendant

9    exchanged with Agent Hyre, you're saying most of them were

10   there on the phone?

11   A    Correct.

12   Q    Is there a possibility that these four e-mails could

13   have been deleted by the defendant?

14           MS. SCOTT:  Objection, Your Honor; speculation.

15           MS. RIVERA:  In her opinion, Your Honor.

16           THE COURT:  She's giving an opinion.  The objection

17   is overruled.

18   A    They could have been, yes, ma'am.

19   Q    Now, in addition to that, did you find any reference to

20   the defendant's alias as Gary?

21   A    I did do a keyword search for Gary and that name wasn't

22   in the communications.

23   Q    Now, did you find any reference to the ad in this case

24   of "Family Play Time"?

25   A    Again, in doing a keyword search, that was present on

1    the device.

2    Q     And during your search as well did you find any

3    reference to defendant's phone number XXX-XXX-1042?

4    A     Yes, I did.

5    Q     In addition to that, let me clarify, in these e-mails

6    that you found during your extraction, what was the e-mail

7    address the defendant used to communicate with the undercover

8    officer, if you were able to find that?

9    A     It was an e-mail address Orlmassage4men@aol.com.

10   Q     As far as user-attributable information, did you find

11   anything else, pictures of the defendant or any evidence of

12   that sort, user attributable?

13   A     There was pictures on the phone of the defendant, yes.

14   Q     And did you also find any evidence concerning any other

15   possible e-mail addresses?

16   A     There were other e-mail addresses attributed to that

17   phone.

18   Q     And how about bank account information, other

19   information that might be attributed to the defendant as

20   well?

21   A     There was things in the history showing that that phone

22   had been used to log into bank accounts, to PayPal accounts,

23   that kind of thing.

24   Q     Under the defendant's real name George Adrien Brooks,

25   George Brooks?

1  A     I -- I don't know at this point.  I'm sorry.

2  Q     Okay.  Now, the items that you found, what did you do

3  with that output, with the report?

4  A     I create a report and then I present it to Agent Hyre.

5  Q     Looking at Government Exhibit Number 3, with the

6  exception of those four e-mails, all the other e-mails, is

7  that the content of the e-mails that you found on the

8  defendant's phone?

9  A     Yes.

10  Q     And do you recognize those e-mails by any post ID

11  number?  What is the post ID number on those e-mails?

12  A     There is a Craigslist post ID number.  Do you want me to

13  read it?

14  Q     Yes, ma'am.

15  A     It's 5189536886.

16  Q     What do you do with the phone once you finish your

17  analysis?

18  A     Once the extraction has been completed, then I

19  personally package the phone and it's submitted into property

20  and evidence.

21  Q     Thank you.

22          MS. RIVERA:  Your Honor, may I have a moment?

23          THE COURT:  You may.

24  BY MS. RIVERA:

25  Q     And you did indicate that you found the defendant's

1    alias Gary on that phone?

2    A    Yes.

3    Q    And I know that you have identified the phone for the

4    record, but can you please tell us, what is the phone make

5    and model?

6    A    It is a Samsung Galaxy SM-G860P.

7    Q    Thank you.

8         MS. RIVERA:  We have no further questions, Your

9    Honor.

10        THE COURT:  Cross-examination?

11        MS. SCOTT:  Yes, Your Honor.  Your Honor, I'm going

12   to be asking Mr. Espiritu to pull up some of the e-mails.

13        THE COURT:  Are these items already admitted into

14   evidence?

15        MS. SCOTT:  They are, Your Honor.

16        THE COURT:  All right.  Feel free to do so freely.

17        MS. SCOTT:  Thank you.

18                    CROSS-EXAMINATION

19   BY MS. SCOTT:

20   Q    Agent Healy, you said that there were four e-mails that

21   were missing from the phone that you found, correct?

22   A    That I could not locate on the phone, correct.

23   Q    Okay.  And it's your opinion that they could have been

24   deleted?

25   A    It could be.

1    Q      But then is it also your opinion that something else

2    could have happened to those?

3    A      There's any number of things that could have happened,

4    yes.

5    Q      Okay.  And what are any number of those things that

6    could have happened?

7    A      It could have been that the transmission didn't go

8    through or that he used a different device or that he logged

9    in from another location and sent those e-mails.

10   Q      Okay.  And you said that the first e-mail was 134?

11   A      Yes.

12           MS. SCOTT:  Can you pull up 134.

13   BY MS. SCOTT:

14   Q      You've had an opportunity to review these e-mails,

15   though, correct?

16   A      That's correct.

17   Q      Okay.  And what does that e-mail say?

18   A      It says, "We can talk on the phone.  Would be easier

19   than typing away.  Gary here.  XXX-XXX-1042.  I have a

20   massage client from 12:00 to 1:00.  So can either talk now or

21   after."

22   Q      Okay.  You said the next one was 137?

23   A      Correct.

24           MS. SCOTT:  Can you pull up 137.

25   BY MS. SCOTT:

1    Q    Can you read that e-mail?

2    A    "Just called you back and you hung up on me."

3    Q    Okay.  What was the next e-mail that you said was

4    missing?  I'm sorry.  I didn't catch that number.

5    A    148.

6         MS. SCOTT:  148, can you pull that up, Mr.

7    Espiritu.

8    BY MS. SCOTT:

9    Q    What does the body of that text say?

10   A    "Nice."

11   Q    Okay.  And what was the last one?

12   A    The last one was 161.

13        MS. SCOTT:  161, can you pull that up, please, Mr.

14   Espiritu.

15   BY MS. SCOTT:

16   Q    Can you tell us what the body of that e-mail says?

17   A    "Gotcha."

18   Q    Okay.  And those were the only four that were missing

19   from the phone that you were able to see, the e-mails?

20   A    Of the list that was provided, yes.

21   Q    Okay.

22        MS. SCOTT:  Thank you.

23   BY MS. SCOTT:

24   Q    You said that there were other e-mails on the phone, but

25   the one you examined and found these e-mails was

1  Orlmassage4men@aol.com?

2  A    Correct.

3  Q    And through those e-mails there were different folders,

4  correct?

5  A    Correct.

6  Q    There's a folder for spam?

7  A    Correct.

8  Q    For spam mail, correct?

9  A    Yes.

10 Q    There's a folder for an inbox; is that correct?

11 A    Correct.

12 Q    An outbox e-mail, correct?

13 A    Correct.

14 Q    And a deleted box e-mail, correct?

15 A    I believe so.

16 Q    Okay.  And were you able to search the deleted e-mails

17 as well?

18 A    I did not go in and specifically search them.

19 Q    Okay.  So if it had been in fact deleted, it could have

20 been in the deleted box as well, though, correct?

21 A    It would have shown up had I done a keyword search.

22 Q    Okay.  You testified that you also searched for any -- I

23 can't recall your words.  I think you said something like

24 inappropriate or --

25 A    Contraband.

1    Q      Contraband.  Okay.  For photos and videos?

2    A      Correct.

3    Q      And you didn't find any?

4    A      Correct.

5    Q      Or you would have turned it over to Agent Hyre?

6    A      Correct.

7    Q      Okay.  Nothing further.

8           THE COURT:  Redirect?

9           MS. RIVERA:  Nothing further, Your Honor.

10          THE COURT:  May this witness be excused?

11          MS. RIVERA:  Yes, Your Honor.

12          THE COURT:  Will she be subject to recall?

13          MS. RIVERA:  No, Your Honor.

14          THE COURT:  All right.

15          Ma'am, you have a good day.

16          THE WITNESS:  Thank you.

17          THE COURT:  Feel free to just leave the items up

18   there on the stand.  They'll be retrieved for you.  Thank

19   you.

20          I would invite the government to call their next

21   witness.

22          MS. RIVERA:  Yes, Your Honor.  The government calls

23   Mr. John Gopoian.

24          THE COURT:  All right.  As Mr. Gopoian is entering

25   the courtroom, please approach sidebar, counsel.

1          MS. RIVERA:  Yes, Your Honor.

2          (Bench conference as follows.)

3          THE COURT:  I have already made my decision; but

4    rather than do this in front of the jury, if you want to

5    renew your objection contemporaneous to this witness being

6    called, feel free to do so.

7          MR. SKUTHAN:  Yes, Your Honor.  We would renew our

8    objection as to the admissibility of this evidence under 414,

9    and we want to specifically incorporate the argument we made

10   yesterday morning as to the fact that the instant offense

11   charge is not a child molestation offense as that term is

12   defined under 414.  And we think the Courtright case supports

13   it, which is persuasive authority from the Seventh Circuit.

14          We think the court case that the Court gave us

15   yesterday in the Eleventh Circuit unpublished opinion, that

16   issue was not raised in the appellate court.  The appellate

17   court did not address the issue.

18          And the case that the government cited is not

19   applicable because that was dealing with the previous

20   conviction.

21          THE COURT:  And you're referring to Levinson, the

22   case the government --

23          MR. SKUTHAN:  That's correct, the unpublished

24   decision.

25          THE COURT:  Okay.

1          MR. SKUTHAN:  We also would move under 404 -- I'm

2     sorry -- under 403 to exclude this evidence based on the fact

3     that the probative value is very little and the prejudicial

4     value greatly outweighs any probative value, especially with

5     regard to temporal proximity.

6          The Court graciously gave us additional time to

7     look into Mr. Gopoian, and we've been able to use that time

8     well; but no amount of time could prepare us for addressing

9     these allegations, given the length of time since they

10    allegedly occurred.

11         Finally, it's my understanding that the Court is

12    letting this in under 414.  Is that correct?

13         THE COURT:  That's correct.

14         MR. SKUTHAN:  And no other basis?

15         THE COURT:  That's correct.

16         MR. SKUTHAN:  Okay.

17         THE COURT:  And I indicated when I made my initial

18    ruling that my determination that it was admissible under 414

19    removed the need to address a 404(b) issue.  So this is

20    coming under the 414.

21         Is the government going to stand behind their

22    previous arguments on this?

23         MS. RIVERA:  Yes, Your Honor, both Levinson and

24    Worsham, even though they're --

25         THE COURT:  If you're going to stand behind your

1   previous arguments, that means you've already won this.   I'm

2   ruling in your favor.

3             MS. RIVERA:  Oh, yes.

4             THE COURT:  So your previous arguments are noted.

5   I just want to give them a chance to make a contemporaneous

6   objection, because in fairness to them, I don't want someone

7   to say that they sat on their hands when the witness was

8   called.

9             MS. RIVERA:  Oh, I understand.

10            THE COURT:  So it's been preserved.  Thank you.

11            MS. RIVERA:  I understand.

12            MR. SKUTHAN:  And any other 414 arguments we made

13   before yesterday, we also re-incorporate those.

14            The other thing I was going to ask the Court --

15   this, evidently, is the government's last witness; is that

16   correct?

17            MS. RIVERA:  Pretty much, yes.

18            MR. SKUTHAN:  Okay.

19            So you had indicated we would have some time after

20   the direct examination.  I know we talked about overnight.  I

21   don't think we need overnight, but I do think we need a

22   recess before we proceed.

23            THE COURT:  I can give you some time.  We're not

24   going to end for the day, but I can give you some time.  I'm

25   going to need to go over your client's rights with regard to

 1    testifying.  I'm sure you're going to have a legal argument

 2    to make.  I can give them some time.

 3            MS. RIVERA:  But, Your Honor, I think, based on the

 4    testimony and how it's going to be very brief, succinct, to

 5    the point, I don't think it's necessary.

 6            THE COURT:  We're getting close to break time,

 7    anyway.  I'm not giving them two hours, but I will entertain

 8    your request and give the jury a break, and we'll see how

 9    long that's going to go, okay?

10            MS. RIVERA:  Okay.  Thank you.

11            (In open court.)

12            THE COURTROOM DEPUTY:  Please come forward and be

13    sworn.  Raise your right hand.

14            Do you solemnly swear or affirm under the penalty

15    of perjury that the testimony you will give will be the

16    truth, the whole truth and nothing but the truth?

17            MR. GOPOIAN:  Yes.

18            JOHN GOPOIAN, PLAINTIFF'S WITNESS, SWORN

19            THE COURTROOM DEPUTY:  Have a seat there, please.

20            THE COURT:  And, sir, once seated, please arrange

21    the chair so that you're comfortable with the chair's

22    proximity to the microphone, and then state your full name

23    into that microphone, spelling your last name.

24            THE WITNESS:  My name is John Gopoian, J-o-h-n,

25    Meyer, M-e-y-e-r, Gopoian, G-o-p-o-i-a-n.

1          THE COURT:  Your witness, counsel.

2          MS. RIVERA:  Thank you, Your Honor.

3                    DIRECT EXAMINATION

4  BY MS. RIVERA:

5  Q    Sir, how old are you?

6  A    Fifty-one.

7  Q    And where do you work?

8  A    I work for an ambulance service in Meriden, Connecticut,

9  a private ambulance service.

10 Q    In what capacity do you work with this private ambulance

11 service?

12 A    I'm a facility manager and also I do a variety of

13 things, but I'm also a licensed paramedic.

14 Q    And so before -- for how long have you worked with this?

15 A    Thirty-one years.

16 Q    Thirty-one years.  So before becoming a facility

17 manager, what did you do?

18 A    A paramedic.  I'm also a licensed security officer, and

19 I worked the ambulance for half that 31 years.

20 Q    Do you have any children?

21 A    Four:  two girls and two boys.

22 Q    Two girls and two boys, and how old are they?

23          MR. SKUTHAN:  Objection; relevance.

24          THE COURT:  The objection is relevance.

25          MS. RIVERA:  Your Honor, this is just for some

1    background in context.

2              THE COURT:  All right.  I'm going to overrule the

3    objection, but let's move through the background and get to

4    the substance.

5              MS. RIVERA:  Yes, Your Honor.

6    BY MS. RIVERA:

7    Q    How old are your children?

8    A    Thirty-one --

9    Q    And -- I'm sorry.

10   A    Thirty-one, 26, 23 and 25.

11   Q    Now, do you know a person by the name of George Adrien

12   Brooks?

13   A    Yes.  He was my uncle.

14   Q    Why do you say he was your uncle?

15   A    He's not been part of the family for quite a long time.

16   Q    Okay.  How was he related to you?

17   A    He married my aunt, who was the sister of my mother.

18   Q    And let me ask you, if you see him here in court today,

19   can you please identify him for the members of the jury?

20   A    The gentleman here to my right.

21             MS. RIVERA:  Your Honor, may the record reflect

22   that the witness has identified the defendant?

23             THE COURT:  The record will so reflect.

24   BY MS. RIVERA:

25   Q    Now, when was the last time you saw the defendant?

```
 1   A      Approximately ten years ago at my cousin's wedding.

 2   Q      And you said he was married to your aunt.  What is her

 3   name?

 4   A      Mary.  Mary Brooks.

 5   Q      And what is the extent of your relationship with Mary

 6   Brooks?

 7   A      She's my aunt.  She's my godmother.

 8   Q      Do you have a close relationship with her?

 9   A      Pretty close, yeah.

10   Q      Now, going back about 44 years, how old were you at the

11   time?

12   A      About six or seven.

13   Q      Okay.  Now, right around that time, six or seven years

14   of age, how old --

15             MR. SKUTHAN:  Objection as to leading, Your Honor.

16   BY MS. RIVERA:

17   Q      -- how old --

18             THE COURT:  All right.  Let me hear the entire

19   question and then I'll make a ruling.

20   BY MS. RIVERA:

21   Q      -- how old was the defendant back then?

22             THE COURT:  All right.  I'm going to overrule based

23   on that specific question.

24             So how old was the defendant back then when this

25   witness was six or seven?
```

1    BY MS. RIVERA:

2    Q    Approximately?

3           THE COURT:  Sir, you can answer that question.

4    A    Honestly, I don't know.  I don't know how old he was.

5    Q    Would it be fair to say approximately 28 years of age?

6           MR. SKUTHAN:  Objection.

7           THE COURT:  That's going to be sustained.  That is

8    leading.  So he's not to answer that.  Move on to your next

9    question.  He said he didn't know how old the defendant was.

10   BY MS. RIVERA:

11   Q    And now let me ask you, what was the relationship --

12   when you were six or seven years of age, what was the

13   relationship between the defendant and Ms. Brooks?

14   A    Husband and wife.

15   Q    Husband and wife?

16   A    Uh-huh.

17   Q    Okay.  Now, was he an adult?

18   A    Yes.

19   Q    Let me ask you, what was -- could you describe to the

20   members of the jury, how was your relationship with the

21   defendant back then?

22   A    Your typical uncle.  I mean, we were very close, very

23   close and, you know, we have a very close family and, you

24   know, he was an uncle, someone I looked up to.

25   Q    Now, where did the defendant reside at the time?

A       Cromwell, Connecticut.

Q       And how close did you reside to him at that time?

A       Probably 15 minutes, two towns away.

Q       And did you used to spend the night at the defendant's house?

A       I did.

Q       Okay.  How often would you do that?

A       Common throughout the year.  Like any family, you know, holidays and things of that nature.  But himself and his wife, they, you know -- we had -- as a child, I had great uncles and aunts, and we did a lot of things together  and, you know, we would sleep over.

Q       Did you ever go on camping trips with the defendant?

A       Uh-huh.  Yes, many times.

Q       Okay.  Now, when you would spend the night at the defendant's house, where would you sleep?

A       They had a guest bedroom upstairs on the second floor.

Q       And where would you shower when you stayed at the defendant's residence?

A       The second floor bathroom.

Q       When you were around six or seven years of age did you used to shower with the defendant?

            MR. SKUTHAN:  Objection as to leading.

            MS. RIVERA:  Your Honor, we're trying not to go into other things and be very specific.

1    THE COURT:  All right.  The question was:  When you

2  were around six or seven years of age did you used to shower

3  with the defendant?

4    A leading question implies the answer.  I think

5  that's open-ended enough.  I'm going to overrule and allow

6  that question.

7  A    Yes, I did.

8  Q    And can you describe why so?

9  A    I really -- we just did.  I mean, you know, I didn't

10  feel as though -- as anything was wrong or -- you know, but

11  growing up, I just did.

12  Q    Were you ever -- did you ever shower with Mrs. Brooks at

13  the time?

14  A    No.

15  Q    Let me ask you, during the time that you showered with

16  the defendant, did you notice anything in particular about

17  his appearance?

18  A    He's uncircumcised.

19  Q    Now, let me ask you, can you please tell the members of

20  the jury what happened approximately 44 years ago as you

21  slept over at the defendant's house, as pertinent to this

22  case?

23    MR. SKUTHAN:  Objection again as to leading, Your

24  Honor.

25  A    The reason I'm here --

1      THE COURT:  Well, hold on.  If there's an

2  objection, I need to rule on it, sir.

3      What's the response to the objection as to leading?

4      MS. RIVERA:  Your Honor, this is just to establish

5  the context of the very particular communications -- the

6  context of the very particular situation for which he's here.

7      THE COURT:  I understand.  I'm going to overrule it

8  and you can answer the question.

9  A    Can you repeat the question?

10 Q    Yes.  Sure.  Can you please tell us what happened, if

11 anything, one night as you slept over at the defendant's

12 house as it may be pertinent to this case?

13 A    I was sexually molested, violated.

14     MR. SKUTHAN:  Your Honor, I'll object.  It's

15 unresponsive.

16 A    I can --

17     THE COURT:  Hold on.

18     I'm going to overrule the objection.  He can give

19 his answer.

20 A    While sleeping there on a few occasions, two or three, I

21 was violated and sexually assaulted and molested while I was

22 sleeping.

23 Q    Can you please tell the members of the jury

24 specifically, without necessarily going into all the details,

25 but what was it that he did specifically that you say that

1   was molestation?

2   A    The last time it was done to me, I was awokened by him

3   performing oral sex on me.   I recall myself pushing myself

4   away, so much so that I fell off the bed, and that instant --

5   incident was what has been most vivid in my mind, but that's

6   what occurred.

7   Q    Now, is it your testimony that this happened on at least

8   two or three occasions?

9   A    That's correct.

10             MR. SKUTHAN:   Objection; leading.

11             MS. RIVERA:   We're trying to basically go from --

12             THE COURT:   Now, look, you're telling me that it

13   happened on two or three occasions is leading.   How many

14   times, if any, did it happen beyond that is open-ended.

15             MS. RIVERA:   Okay.

16             THE COURT:   Look, the answer has been given; but

17   I'm going to step in sua sponte if there are any further

18   leading questions.   They need to be open-ended.

19             MS. RIVERA:   Okay, Your Honor.

20             THE COURT:   So the objection is sustained.   The

21   answer can be considered.

22             MS. RIVERA:   Thank you, Your Honor.

23   BY MS. RIVERA:

24   Q    What was the time spent between each one of these

25   incidents?

1   A      They all occurred in about a one-year period of time.

2   Q      And did you ever do anything about what happened to you?

3   A      I told my mother about it.

4   Q      Who did you tell?

5   A      My mother.

6   Q      And what did, if anything, happen after you disclosed to

7   your mother?

8   A      My mother went to Adrian's wife and told her and

9   informed her about it.

10           MR. SKUTHAN:   Objection, Your Honor; that's

11   hearsay.

12           MS. RIVERA:   It's just an action he's describing.

13           THE COURT:   The objection is hearsay.   I'm going to

14   sustain it.

15           MS. RIVERA:   Okay.

16   BY MS. RIVERA:

17   Q      Now, you said you disclosed to your mother?

18   A      Correct.

19   Q      As far as disclosing to the police authorities, was

20   there any follow-up?

21   A      No.   It was swept under the carpet.

22   Q      How did you learn about this case?

23   A      My aunt called me approximately four weeks ago or so and

24   informed me about what had occurred down here in Florida.

25   Q      Now, and how did you get in contact with Special Agent

1    Hyre?

2    A    I happened to be at my mother's house and Elisha, Mary

3    or Adrian's daughter, called me -- or called my mother and I

4    picked up the phone and answered it and I spoke to her, and

5    she informed me of some of the specifics and also had some

6    paperwork with Agent Hyre's name on it, who a few days later

7    I contacted personally and informed him who I was.

8    Q    And why did you contact Special Agent Hyre?  Why are you

9    here today?

10   A    (No response.)

11              MR. SKUTHAN:  Your Honor, I would object as to

12   relevance.

13              MS. RIVERA:  Your Honor, they're going to question

14   his motive.

15              THE COURT:  Why don't you both approach sidebar.

16              (Bench conference as follows.)

17              THE COURT:  You're standing on the edge of a cliff.

18   What is he going to say?

19              MS. RIVERA:  This is the last question.

20              THE COURT:  Why is he here?  What is he going to

21   say?

22              MS. RIVERA:  As I remember, he just wanted to be

23   able to tell his story --

24              THE COURT:  This is more of testimony --

25              MS. RIVERA:  -- and seek justice.

1           THE COURT:  Right.  This is more of a statement at

2    sentencing.  So I'm going to sustain the objection.

3           MS. RIVERA:  Okay.

4           (In open court.)

5           THE COURT:  All right.  That objection is going to

6    be sustained.  Any further questions from the government?

7           MS. RIVERA:  Your Honor, if I may have a moment?

8           THE COURT:  You may.

9           MS. RIVERA:  If I may.

10   BY MS. RIVERA:

11   Q    Now, when -- these instances that you've described, when

12   this occurred to you, do you recall what were the color of

13   the bed sheets that you were sleeping in or what you were

14   wearing on that night?

15   A    No.

16   Q    Or what the defendant was wearing on that night?

17   A    No idea.

18   Q    Do you remember what the defendant did after he

19   performed oral sex on you?

20   A    It was a long time ago.  I don't recall.

21   Q    However, you're certain that this happened on two or

22   three occasions back then?

23   A    Absolutely.

24           MR. SKUTHAN:  Objection.

25           THE COURT:  That's a leading question.  Let's wrap

1    this up.

2              MS. RIVERA:  Your Honor, I have no further

3    questions.

4              THE COURT:  All right.

5              Is the defense prepared for cross?

6              MR. SKUTHAN:  Your Honor, we would ask for a brief

7    recess.

8              THE COURT:  Okay.

9              We're going to take a recess at this time.  Ladies

10   and gentlemen of the jury, just to give you sort of an

11   overhead view, I think we're ahead of schedule now.  So I

12   think we're doing very good on time.  I don't want you to

13   worry about that.

14             We're going to take no more than 30 minutes.  If

15   we're ready prior to that, I'm going to have our court

16   security officer ask you if you're ready, and if you are,

17   we'll start; but we're going to be at your schedule.

18             So if there's anything you need in the jury room to

19   make you more comfortable, let me know; but, otherwise, I'll

20   see you in no more than 30 minutes.  Thank you.  Please leave

21   the pads and pens facedown in your chairs.  Thank you.

22             (Jury not present at 1:06 p.m.)

23             THE COURT:  Please be seated, everyone.

24             Mr. Skuthan, would you and Ms. Scott be kind enough

25   to accompany Mr. Brooks to the podium.  I just want to take

1     up a brief matter.

2              MR. SKUTHAN:   Your Honor, could we do this outside

3     the presence of Mr. Gopoian?

4              THE COURT:   Absolutely.

5              Mr. Gopoian, if you would be kind enough to go on

6     ahead and head back into the waiting room, we'll call you

7     back up; and feel free to enjoy this 30-minute break.   The

8     government will come looking for you if they need you.

9              All right.   Mr. Brooks, I don't need any commitment

10    or statement from you at this time, but I want to go over a

11    very important issue that I'm going to invite you to discuss

12    with your attorneys, as I'm sure your very capable counsel

13    have been discussing with you throughout the course of trial

14    preparation and during trial.   There's a very important

15    decision that you're going to need to make once the

16    government rests their case and that's whether or not you're

17    going to chose to become a witness in this case.

18              The decision is yours entirely, but I would invite

19    you to make sure that any decision you make is made with the

20    advice of counsel.   I just need to ensure that whatever

21    decision you make is knowing and intelligent, with the advice

22    of counsel.

23              So I don't need a response or even a comment from

24    you at this time, but I want to invite you to think about

25    this issue, because when the point arrives where the defense

1    is either going to present evidence or rest, at some point I

2    will need your decision as to whether or not you are going to

3    make a decision to become a witness in this case.

4           So no need to say anything now, but I would invite

5    you to think about that because the time is coming where I'm

6    going to ask you what your decision is going to be, in light

7    of your discussions with counsel; and when I ask you that, I

8    won't want to hear anything that you've talked to counsel

9    about, just what your decision is.  Do you understand that,

10   sir?

11          THE DEFENDANT:  Yes, Your Honor.

12          THE COURT:  All right.  Mr. Brooks, feel free to be

13   seated at counsel table.

14          Starting with the government, is there anything to

15   take up before we begin our break?

16          MS. RIVERA:  Your Honor, the only remaining matter,

17   I believe, is whether the Court would reconsider the previous

18   ruling on the motion in limine regarding the statement as to

19   the 16-year-old.

20          THE COURT:  Your request is that I reconsider the

21   statements as to the 16-year-old on your argument that in the

22   cross-examination of Special Agent Hyre, the defense opened

23   the door?

24          MS. RIVERA:  Yes, Your Honor.  They did.  There was

25   more to this conversation, but they emphasized these

1    instances where he said he had never done this in the past,

2    when he actually had indicated around the beginning of the

3    conversation that he had someone as young as 16 years of age

4    in the context of a sexual dynamic.

5            THE COURT:  I understand your request, because one

6    could reasonably argue that the defense did open the door.

7    However, I think the information about prior activity that

8    you're alluding to has already been admitted with regard to

9    the statements of the twelve-year-old that occurred during

10   the phone call.

11           My initial ruling was I was concerned that this was

12   moderately relevant, and part of the reason I thought it was

13   moderately relevant is because this part of the conversation

14   was more led by Agent Hyre than the defendant, and that that

15   moderate relevance was going to be unduly prejudicial towards

16   the defendant.

17           I understand your argument.  Your concerns are

18   preserved, but I have reconsidered, based on your request,

19   and I'm not changing my view on that.  It will not be

20   admitted.

21           MS. RIVERA:  Yes, Your Honor.  Our only other

22   argument was on the predisposition argument, that we have to

23   prove beyond a reasonable doubt that the defendant was

24   predisposed, and that comes in the form of basically some of

25   the 404(b) or prior acts of the defendant of a similar

1 nature.

2              THE COURT:  I understand.  The ruling stands.

3              All right.  I'm going to have Miss Darleen in about

4 20 minutes check on you to see how you're doing.  This is

5 mainly time for the defense to prepare for cross-examination;

6 and if you're not ready in 20, then I'll just come back in

7 after the 30 have expired.

8              So it is now 1:12.  We'll be back here -- at 1:40

9 will be the end of the 30 minutes.  So at 1:30 Miss Darleen

10 will be asking how you're doing.

11             And I guess you'll be the spokesman for the

12 defense, Ms. Scott?  Your co-counsel is preparing for this

13 cross?

14             MS. SCOTT:  Yes, Your Honor.

15             THE COURT:  All right.

16             I'll see you in 20 or 30 minutes.  Court's in

17 recess.

18             (Recess taken at 1:12 p.m.)

19             (Jury not present at 1:36 p.m.)

20             THE COURT:  Is the government ready to proceed?

21             MS. RIVERA:  Yes, Your Honor.

22             THE COURT:  Mr. Skuthan, are you ready to proceed

23 on behalf of your client?

24             MR. SKUTHAN:  Yes, Your Honor.

25             THE COURT:  All right.

```
 1                 Let's bring the jury in.

 2                 (Jury present at 1:36 p.m.)

 3                 THE COURT:  Welcome back, ladies and gentlemen.

 4    Feel free to be seated in your chairs once you arrive there.

 5                 As soon as you're comfortable, we'll get started.

 6                 Mr. Skuthan, are you ready to conduct your

 7    cross-examination?

 8                 MR. SKUTHAN:  Yes, Your Honor.  Thank you.

 9                 THE COURT:  Feel free to proceed.

10                        CROSS-EXAMINATION

11    BY MR. SKUTHAN:

12    Q     Good afternoon, Mr. Gopoian.

13    A     Hello.

14    Q     Now, you've identified your mother as being Margaret

15    Meyers?

16    A     Correct.

17    Q     And then you have an uncle, your mother's brother?

18    A     That's correct.

19    Q     What's his name?

20    A     Robert.

21    Q     And then your aunt?

22    A     Mary.

23    Q     And Mary was married to George Brooks?

24    A     Correct.

25    Q     For 27 years?
```

```
1    A      I don't know exactly.

2    Q      A long time?

3    A      I don't know exactly.

4    Q      Now, during the investigation of this case you were

5    contacted by an investigator from our office to see if you

6    would discuss your testimony here today, correct?

7    A      That's correct.

8              MS. RIVERA:  Objection, Your Honor; relevance.

9              THE COURT:  Overruled.  You can continue.

10   BY MR. SKUTHAN:

11   Q      And you refused to speak with her?

12   A      That's correct.

13   Q      Now, on direct examination you indicated that when you

14   were young, you went on camping trips with Mr. Brooks,

15   meaning George Brooks, and his wife, your aunt, Mary Brooks?

16   A      Correct.

17   Q      And that was when you were approximately five or six

18   years old?

19   A      Yes, but longer than that.  We had gone on camping trips

20   multiple times.

21   Q      And did you ever go on any camping trips with your

22   father and your mother?

23   A      Yes.

24   Q      But --

25   A      With them or separately?
```

1    Q      Separately.

2    A      No, I don't recall ever going camping with my parents.

3    Q      As a matter of fact, George Brooks and Mary Brooks, when

4    they were married, took you and your sisters on a camping

5    trip out to the Midwest?

6    A      Correct.

7    Q      And they took you to Chicago?

8    A      Quite a few places.

9    Q      And during these trips your sisters were with you?

10   A      Correct.

11   Q      And how old -- you know how old they are.  Are they

12   older than you?

13   A      One to two years older.

14   Q      Okay.  And you're the youngest?

15   A      Correct.

16   Q      And when you went on these camping trips at the

17   campgrounds, there were public restrooms in the campground?

18   A      Yes.

19   Q      And Mr. Brooks was asked by Mrs. Brooks to take you into

20   the showers?

21          MS. RIVERA:  Objection, Your Honor; relevance.

22   A      I don't remember that.

23   Q      Okay.  You don't remember?

24          THE COURT:  Hold on.  There's an objection to

25   relevance.  It will be overruled.  You can move forward.

1    BY MR. SKUTHAN:

2    Q    And your answer is you don't remember that?

3    A    I don't.

4    Q    And that's because that was a long time ago?

5    A    Correct, sir.

6    Q    Then you haven't indicated that there was anything

7    inappropriate done during any of the camping trips that you

8    went on with Mr. Brooks and his wife?

9    A    To be honest, sir, I couldn't swear on that.  I could

10   not tell you a thousand percent that nothing ever happened

11   outside of the times that I recall happening.

12   Q    Because it was a long time ago?

13   A    Correct.

14   Q    And it's hard to remember that far back, correct?

15   A    Yes, sir.

16   Q    All right.  Now, you told the F.B.I. that when you would

17   sleep over at Mr. Brooks' house with his wife, sometimes you

18   slept in the bed with both Mr. Brooks and his wife?

19   A    I may have.  I remember specifically sleeping in the

20   guest room.

21   Q    But you may have --

22   A    And I've slept with -- you know, I slept with Mr. Brooks

23   in the same bed before.  I do recall that.

24   Q    And you told the F.B.I. you slept in the same bed with

25   Mr. and Mrs. Brooks before?

1    A    I don't recall that.  I don't recall saying that nor do

2    I recall doing that.  I may have.  I don't know.

3    Q    And on direct examination you indicated that on the

4    incident you spoke about, you can't remember what Mr. Brooks

5    was wearing, correct?

6    A    Correct.

7    Q    You can't remember what the bed sheets looked like?

8    A    No.

9    Q    You can't remember anything about that particular room?

10   A    No, sir.  No.  Specifically about the room, I could

11   remember the position of the bed, what way it was facing, how

12   I fell off the bed, things of those, that --

13   Q    You were born in 1967?

14   A    '64, sir.

15   Q    What was the month?  I don't need to know your birthday

16   just the month.

17   A    October.

18   Q    And you told the F.B.I. this may have happened when you

19   were six, it may have happened when you were seven?

20   A    Correct.

21   Q    So you're not sure of the month of when this happened?

22   A    No.  No, I don't.

23   Q    And you're not sure of the season, whether it was the

24   summer or the fall, winter?

25   A    I don't.  I don't remember.

1   Q     And you don't remember the year that it occurred?

2   A     Specifically, no, I don't.

3   Q     So it could have been sometime within that two-plus-year

4   period when you were six or seven years old?

5   A     I believe in 1970 to 1971ish.

6   Q     It could have been 1969?

7   A     I believe it was '70, '71, that area.

8   Q     Again, you're not sure?

9   A     No, sir.

10  Q     On direct examination you indicated that something

11  happened between you and Mr. Brooks, and you said on two

12  occasions and you were asleep?

13  A     On two or three occasions I was awoken from my sleep.

14  Q     You testified, I believe, that you specifically remember

15  one occasion?

16  A     The last one.

17  Q     And that's the only one you specifically remember?

18          MS. RIVERA:  Objection, Your Honor; misstatement of

19  the witness's testimony.

20          THE COURT:  Overruled.  He can answer.

21  A     The question?  I remember specifically the last, but I

22  recall on two or three occasions being awokened by

23  having. . .

24  Q     All right.  Now, you testified on direct examination

25  that you told your mother?

1    A       Correct.

2    Q       Okay.  And that your Aunt Mary knew?

3    A       My mother then called.  If I can say, I spoke to my

4    mother last evening, actually, and --

5    Q       Well, I don't want to hear about what happened last

6    evening.

7    A       Well, it was related to your question.

8    Q       We can call your mother as a witness if we need to.

9    A       I told my mother following that last incident.  She

10   immediately contacted Mary Brooks.

11   Q       Is that what your mother told you last night?

12   A       Correct.

13   Q       So you don't have an independent memory before yesterday

14   of your mother contacting Mary Brooks?

15   A       I do.  I do.  I specifically remember telling my mother

16   of the incident.

17   Q       And did your mother tell your father?

18   A       That, I don't know.  I asked my father the other

19   evening, actually, or the other day if he recalls the

20   incident.

21   Q       And he did not?

22   A       He -- he -- he vaguely did.  He vaguely did.  And I

23   asked --

24   Q       Your dad's a pretty big guy, isn't he?

25   A       He is.

1  Q    And at the time you were a young boy, he was pretty

2  physical, wasn't he?

3  A    He was a firefighter.  So. . .

4  Q    In fact, if your dad had known about this, knowing your

5  dad, he would have confronted Mr. Brooks, correct?

6            MS. RIVERA:  Objection, Your Honor; calls for

7  speculation as to what the dad would have done.

8            THE COURT:  Response.

9            MR. SKUTHAN:  I think it's a fair question, given

10  who he reported to -- who he says he reported to.

11            THE COURT:  I think -- I'm going to sustain the

12  objection.  That's a guess, at best.

13            MR. SKUTHAN:  Okay.

14  BY MR. SKUTHAN:

15  Q    Now, at the time you say -- at the time you were six or

16  seven or eight years old, in that time frame, 1969 to 1972,

17  did George Brooks and Mary Brooks have any children?

18  A    Not yet, no.  I don't believe so.  They were married in

19  1970, because I was in the wedding.  So that specifically,

20  no, they had not.  Roger -- their first son was born in 1974,

21  I believe.

22  Q    Okay.  And you testified earlier it could have been when

23  you were six, it could have been when you were seven, so it

24  could have been in 1970, it could have been in 1971?

25            MS. RIVERA:  Asked and answered, Your Honor.

1  A     It was a long time ago, sir.

2            THE COURT:  Hold on.  When you hear an objection, I

3  need you to stop so I can rule on it.

4            I'm going to overrule the objection and allow the

5  answer to this question.

6  BY MR. SKUTHAN:

7  Q     I think you said it was a long time ago.  Is that your

8  answer?

9  A     Yes, sir.

10  Q     That's fair.  Then you just indicated that you were in

11  Mary Brooks and George Brooks' wedding?

12  A     Correct.

13  Q     Okay.  What was your role in the wedding?

14  A     I was the ring bearer.

15  Q     And isn't it true that Mr. Brooks and Mrs. Brooks were

16  not married until after you turned six years old?

17  A     It was 1970.  So I was six years old in 1970.

18  Q     Okay.  Now, do you know who Roger Brooks is?

19  A     Who he is?

20  Q     Yes.

21  A     He's my cousin.

22  Q     He's your cousin.  And when these things that you say

23  happened, Roger Brooks was not born?

24  A     Correct.

25  Q     And you said that after this happened, your Aunt Mary

1    knew about what happened?

2    A    Correct.

3    Q    Okay.  And then after that, she gave birth to a baby

4    boy?

5    A    Correct.

6    Q    After this alleged assault happened?

7    A    Correct.

8    Q    And that was Roger Brooks?

9    A    Correct.

10   Q    And he's your cousin?

11   A    Absolutely.

12   Q    You've never heard any information that the defendant

13   molested Roger Brooks, have you?

14            MS. RIVERA:  Objection, Your Honor; relevance,

15   outside the scope.

16            THE COURT:  What's the response to the objection,

17   please?

18            MR. SKUTHAN:  I just want to know if he knows, Your

19   Honor.  I think it is relevant.

20            MS. RIVERA:  It's not pertinent, Your Honor, other

21   acts outside the context of this case.

22            THE COURT:  I'm going to sustain the objection.

23   BY MR. SKUTHAN:

24   Q    And then after Roger Brooks was born, George and Mary

25   Brooks had another child, correct?

1    A      Yes.

2             MS. RIVERA:  Objection, Your Honor; relevance,

3    outside the scope.

4             THE COURT:  That one will be overruled.  You can

5    ask these questions.

6    Q      And that was Elisha Brooks?

7    A      Correct.

8    Q      And she was born in 1979?

9    A      I don't know her date of birth.

10   Q      Fair enough.  She's younger than Roger?

11   A      Correct.

12   Q      So Mr. and Mrs. Brooks had two children after this

13   alleged incident occurred?

14   A      Uh-huh.

15   Q      You have to say yes or no.

16   A      Yes.  I'm sorry.

17   Q      So Mr. Brooks and Mrs. Brooks were married in 1970?

18   A      Uh-huh.

19   Q      And they stayed married until approximately 1997?

20   A      Again, I don't recall the day, date or year.

21   Q      Okay.  But at some point they divorced?

22   A      Correct.

23   Q      Now, did your grandparents own a restaurant called The

24   Yankee Silversmith Inn?

25   A      That's correct.

1   Q      All right.  And that was a family business?

2   A      Yes.

3   Q      That was started by your grandfather?

4          MS. RIVERA:  Objection, Your Honor; way outside the

5   scope of the direct examination.

6          THE COURT:  All right.  Both of you approach

7   sidebar, please.

8          (Bench conference as follows.)

9          THE COURT:  I want to tell you what my thinking is

10  with regard to this, because I think it's fair that both of

11  you know, in all fairness to the defense, this witness made

12  the affirmative decision not to in any way make himself

13  available for an interview or any other type of discussion

14  with the defense.

15          Theoretically, he could just call him on their case

16  in chief, and if they went this way, just have him declared a

17  hostile witness, and we can go from there.

18          For the purposes of judicial economy, with some

19  limits, I'm going to give him some leeway.  That's what I'm

20  doing and I want you to understand that, because this is a

21  cold cross.  All right?

22          MS. RIVERA:  I think he's answering the questions,

23  not as a hostile witness.

24          THE COURT:  No, no.

25          MS. RIVERA:  He's being very responsive.

 1              THE COURT:  Well, I don't know about that.  He

 2   doesn't seem to remember a whole lot other than what he

 3   testified to on direct.

 4              MS. RIVERA:  Well, Your Honor, this happened 44

 5   years ago, when he was six or seven years of age.  I think

 6   that is --

 7              THE COURT:  Do you understand the dichotomy of

 8   them?  I know what they're getting at; that he remembers

 9   everything that happened, the way the bed was facing, that he

10   fell down.  I know what your argument is that it's a

11   traumatic event.  But when he's asking -- this is a technique

12   on cross.  He's asking him for circumstances surrounding the

13   event to test his memory, and I'm going to allow him that

14   opportunity on a limited basis.  So that's what we're doing.

15   The objection is overruled.

16              MR. SKUTHAN:  Thank you.

17              (In open court.)

18              THE COURT:  Mr. Skuthan, the jury has relayed that

19   they're having a bit of trouble hearing you.

20              MR. SKUTHAN:  I'm sorry.

21              THE COURT:  If you could speak directly into the

22   microphone, that would assist them greatly.  Thank you.

23              MR. SKUTHAN:  Thank you.

24   BY MR. SKUTHAN:

25   Q    Okay.  Mr. Gopoian, now, you indicated that your

1   grandparents owned a family business, a restaurant called The

2   Yankee Silversmith Inn?

3   A    Correct.

4   Q    And where was that located?

5   A    Wallingford, Connecticut.

6   Q    Okay.  And isn't it true that Mr. George Brooks worked

7   there for a period of time as a wedding planner?

8   A    Yes, it is.

9   Q    And as a wedding planner, he would have planned weddings

10   and been around children?

11           MS. RIVERA:  Objection, Your Honor; outside the

12   scope, relevance, prior instances of good conduct.

13           MR. SKUTHAN:  It goes to bias and motive, Your

14   Honor.

15           THE COURT:  I'm going to allow this line of

16   questioning.  Feel free to proceed.  Overruled.

17   BY MR. SKUTHAN:

18   Q    I'm sorry, Mr. Brooks.  Your answer was yes?

19   A    Yes.

20   Q    And you've been at weddings at the restaurant?

21   A    Yes.

22   Q    And at those --

23   A    Well, no, I don't think I've ever been to a wedding

24   there; but I understand your question.

25   Q    And there's children present?

1    A      Sure.  Yes.

2    Q      And the family allowed Mr. Brooks to be the wedding

3    planner for that restaurant?

4    A      Yes.

5    Q      And that was for a long period of time?

6    A      That, I don't know.  I don't know what the duration of

7    that was.

8    Q      Okay.  Fair enough.  Now, in 2009 your cousin Roger

9    Brooks was married; is that correct?

10   A      No.

11   Q      Okay.  Did I get the year wrong?

12   A      Yes.

13   Q      Okay.

14   A      2009, no.

15   Q      But he was married?

16   A      Yes.

17   Q      Do you know what year it was?

18   A      Approximately ten years ago, I believe.  It was

19   somewhere close to that.

20   Q      Okay.  And at that wedding, George Brooks was there?

21   A      Yes.

22   Q      And you were there?

23   A      Yes.

24   Q      And your mother was there?

25   A      Was my mother there?  I think so.  I -- I can't

1  remember.

2  Q      And your Aunt Mary was there?

3  A      Yes.

4  Q      And you exchanged pleasantries with Mr. Brooks?

5  A      I did.

6  Q      Okay.  And prior to your grandparents passing away, they

7  had a considerable estate; did they not?

8  A      They did.

9  Q      Okay.  And isn't it true that your grandmother, prior to

10 passing away, she made Mr. Brooks the executor of her estate?

11 A      That's correct.

12 Q      Okay.  So she didn't make your aunt the executor,

13 correct?

14 A      Correct.

15 Q      She didn't make your mother the executor?

16 A      Correct.

17 Q      And she didn't make your uncle the executor?

18 A      Correct.

19 Q      And at some point in early -- in the early 1990s your

20 grandmother passed away?

21 A      '92, I believe it was.

22 Q      And Mr. Brooks was still married to your aunt?

23 A      Yes.

24 Q      And Mr. Brooks became the executor of the estate once

25 your grandmother passed away?

1    A    For a period of time, yes.

2    Q    And that was a considerable estate?

3    A    Correct.

4    Q    And then approximately in 1997 Mr. Brooks and Mary

5    Brooks got divorced?

6    A    Correct.

7    Q    Now, do you remember specifically that date or is

8    that. . .

9    A    Do I specifically remember the divorce date?

10   Q    Yes.

11   A    No.

12   Q    Sometime in the '90s?

13   A    Yes.

14   Q    Okay.  Is it fair to say they were married for over 20

15   years?

16   A    Yes.

17   Q    And that was 20 years after this alleged incident took

18   place?

19   A    Uh-huh.

20   Q    I'm sorry.  You have to answer verbally.

21   A    Yes.  I'm sorry.

22   Q    Thank you.  And isn't it true that it was a contentious

23   divorce?

24   A    I'd say yes.

25   Q    Okay.  And one of the reasons for the divorce was that

1    Mr. Brooks had come out as gay?

2    A    I believe so, was part of it.

3    Q    And that he wanted to start a new life?

4    A    I believe so, yes.

5    Q    And your aunt was upset and humiliated that he had come

6    out as a gay person?

7    A    I can't say yes to that.  I don't know what her -- I

8    can't say, you know.  I wasn't involved in that.

9    Q    Fair enough.  And at some point after that, Mr. Brooks

10   asked to be relieved as the executor of the estate?

11   A    My understanding is no, that's not correct.

12   Q    Okay.  But at some point he was no longer the executor

13   of the estate?

14   A    To my understanding, he abandoned the estate and fled to

15   Florida.

16   Q    Okay.  So you would say that he no longer was the

17   executor of the estate?

18   A    Due to fleeing, yes.

19   Q    Okay.  And you became the executor of the estate?

20   A    I elected to, yes.

21   Q    Okay.  And you believe that Mr. Brooks did not handle

22   the estate properly?

23   A    No.  The government didn't think he held -- you know,

24   dealt with the estate properly.

25   Q    And you were upset at Mr. Brooks?

1    A    For that?  Sure.

2    Q    The whole family was upset with Mr. Brooks?

3    A    Absolutely.  Sure.

4    Q    As a matter of fact, you were angry at Mr. Brooks?

5    A    I've been angry at Mr. Brooks for quite a long time.

6    Q    But for this particular incident, you were married --

7    you were angry at Mr. Brooks regarding the estate?

8    A    Disappointed is a better word.

9    Q    Okay.  And your Aunt Mary was angry?

10   A    Correct.  Yes.

11   Q    All right.  As a matter of fact, you sent Mr. Brooks a

12   letter when he came to Florida; did you not?

13   A    Most likely.  I probably -- as the executor of the

14   estate at that time, I know I did.  I could have sent him

15   more than one related to the estate and needing his

16   cooperation in getting it finished.

17   Q    And at some point you sent him a letter demanding

18   $50,000 because you felt like he owed the estate $50,000?

19   A    I couldn't tell you what the sum was.  Well, it wasn't

20   $50,000.

21   Q    But it was an amount of money?

22   A    It was because that's what he misappropriated.

23   Q    And it was a considerable amount of money?

24   A    Thirty-seven thousand, approximately.

25   Q    All right.  Now, did you ever hire a lawyer to sue Mr.

1   Brooks to get this money back?

2   A    No.  I called the surety bond on Mr. Brooks and received

3   $25,000 back from the insurance company that was bonded on

4   his head for the estate.  Then I redisbursed it to the family

5   beneficiaries.

6   Q    Okay.  So in answer to the question, you sent a letter

7   to Mr. Brooks asking that he send you money?

8   A    I don't specifically remember that, but it might have

9   been included.

10  Q    And this would have happened in the late 1990s?

11  A    Mid-'90s, approximately.

12  Q    And you can't remember a lot about what happened in the

13  late 1990s?

14  A    No.  I mean, no.  I believe it was the mid-'90s,

15  somewhere in there.

16  Q    And then Mr. Brooks went to Florida and he lived his

17  life, correct?

18  A    Correct.

19  Q    But his wife, Aunt Mary, was still very angry with Mr.

20  Brooks for the divorce?

21  A    I don't -- I couldn't say that.  I mean, it wasn't

22  something that was always brought up or discussed, you know.

23  She's not really an angry person.

24  Q    Okay.  All right.  How did you first find out that Mr.

25  Brooks was charged in this case?

```
 1   A      Mary Brooks contacted me approximately a month ago to

 2   inform me that it occurred and she thought it was important

 3   that I knew it occurred.

 4   Q      So Mary Brooks, the same woman that had a contentious

 5   divorce with Mr. Brooks --

 6               MS. RIVERA:  Objection, Your Honor; argumentative.

 7               MR. SKUTHAN:  I'll rephrase it.

 8               THE COURT:  Sustained.

 9   BY MR. SKUTHAN:

10   Q      So Mary Brooks, the wife of George Brooks, contacted you

11   what?  About a month ago?

12   A      Somewhere in that area, yes.

13   Q      Do you know when it was specifically?

14   A      I don't have my phone.  I could tell you, because I did

15   get a text because she apologized for calling me so late to

16   tell me about it.

17   Q      Would it be fair to say it was January 28th that she

18   contacted you?

19   A      It could have been, sir.

20   Q      Okay.  And she told you that Mr. Brooks had been charged

21   with this offense?

22   A      Correct.  That was the first time I heard about it.

23   Q      Okay.  And then she -- did she tell you to call Elisha

24   Brooks, who's Mr. Brooks' daughter, with details?

25   A      She told me to -- if I wanted any further information
```

1    about it, if there was anything I wanted to pursue or look

2    into, to contact Elisha.  She had more information on it.  I

3    didn't.

4        I happened to be at my mother's house.  Elisha called my

5    mother to say hi.  I answered the phone and that's how I

6    brought up the discussion, and she had told me about --

7    Q    Okay.  Well, we don't want to talk about what she told

8    you, but I'm trying to get the time period.

9    A    Again, I have it on my phone.

10   Q    I'm sorry.  Go ahead.

11   A    I had it on my phone because she texted me to contact --

12   Agent Hyre's name on a text the same day that I talked to

13   her.

14   Q    The same day you talked to Elisha?

15   A    Correct.

16   Q    Okay.  So just so I have the time period correct, Mary

17   Brooks contacted you by phone in late January and you're not

18   sure of the date?

19   A    No, I mean, without looking at something.

20        MR. SKUTHAN:  Your Honor, if I can hand Mr. Gopoian

21   Defense Exhibit Number 1?

22        THE COURT:  You may.

23   A    That's a copy of the e-mail or text that she sent me.

24   Q    Okay.  And could you look at the date at the top?

25   A    January 29th.

1   Q    Of 2016?

2   A    2016.

3   Q    It's first thing in the morning?

4   A    Yes.

5   Q    Okay.  Does that document refresh your recollection?

6   A    Absolutely, yes.

7   Q    So what was the date that you talked to her on the

8   phone?

9   A    The day before, the 28th.

10  Q    Thank you very much.  Now, when did you talk to Elisha

11  Brooks?  You said the same day?

12  A    No.  I think it was a week later.  I believe so,

13  because, like I said, I was at my mother's house.  Elisha

14  called to stay hi to my mother.  I answered the phone and

15  brought it up in discussion, you know.

16  Q    Okay.  And then at some point you exchanged, I believe,

17  a text message or an e-mail with Elisha Brooks about who to

18  contact?

19  A    Actually, she only sent me Agent Hyre's name.  So I

20  started doing some research to see if I could track down

21  where he was and I eventually did and then I contacted him

22  personally.

23  Q    Now I'm going to hand you what's been marked as Defense

24  Exhibit Number 2.  If you could, take a look at this.

25       MR. SKUTHAN:  Actually, could we pull this up.

```
 1   A     This is also a text message.

 2              THE COURT:  Is this admitted into evidence at this

 3   point?

 4              MR. SKUTHAN:  I'm sorry, Your Honor.  Yes, I'd like

 5   to admit it into evidence.

 6              THE COURT:  All right.  The defense -- well, you're

 7   on cross-examination at this point.  I don't have a copy of

 8   the document that you're showing him.

 9              MR. SKUTHAN:  If I could just publish it to

10   the. . .

11              THE COURT:  Certainly.

12              All right.  The defense is seeking to admit this

13   exhibit on cross-examination.  Have you had a chance to look

14   at it, from the government's perspective?

15              MS. RIVERA:  Yes, Your Honor.  We disclosed this to

16   the defense.

17              THE COURT:  Do you have any objection to it coming

18   in at this time?

19              MS. RIVERA:  No, Your Honor.

20              THE COURT:  All right.

21              What exhibit number is this, again?

22              MR. SKUTHAN:  Your Honor, the other exhibit was

23   Exhibit 1.  It's just to refresh his recollection, so we

24   could probably make this Exhibit 1.

25              THE COURT:  What is this going to be, Miss Darleen?
```

```
 1              MR. SKUTHAN:  Actually, Exhibit Number 2.

 2              THE COURT:  All right.  Defense Exhibit Number 2,

 3    on motion of the defense, without objection from the

 4    government, will be admitted and marked as such.

 5              MS. RIVERA:  Your Honor, I believe Exhibit 1 was

 6    actually addressed substantively; and if they're moving

 7    Exhibit 2, we should have Exhibit 1 as part of it.  It

 8    completes this story.

 9              THE COURT:  Well, I'll let him move the Court on

10    what he wants to do.

11              So without objection, Exhibit 2 as presented to the

12    Court has been admitted.  You can publish that exhibit now.

13              This is my exhibit now.

14              MR. SKUTHAN:  I understand.

15              THE COURT:  So this becomes the official copy.

16              MR. SKUTHAN:  I understand.

17              THE COURT:  Okay.  Feel free to proceed.

18    BY MR. SKUTHAN:

19    Q    Sir, this will also be on the screen in front of you.

20    It's the same document.  Okay.  This is a text message

21    between who?

22    A    Elisha Brooks and myself.

23    Q    Okay.  And could you tell us the date?

24    A    I don't see the date.

25    Q    Okay.  Do you recognize this as the. . .
```

1    A     This is a text message from her and my reply back, and

2    back and forth twice.

3    Q     And this is after Mary Brooks had contacted you?

4    A     I think it was approximately a week or something like

5    that.

6    Q     And when it says at the top Rod Hyre was the F.B.I.

7    agent, was that coming from Elisha Brooks?

8    A     It is.

9    Q     And then your response, could you read that for the

10   jury?

11   A     It says, "You're awesome.  Thirsty Thursday in reason.

12   And maybe I'll see ya."

13   Q     What was Thirsty Thursday?

14   A     It was a Thursday.

15   Q     What is the significance of Thirsty Thursday?

16   A     It's just a common phrase, a saying that people drink on

17   Thursdays, I guess.

18   Q     Okay.  Then she says, "I'm driving towards my wine"?

19   A     Uh-huh.  I think she's on her way home.

20   Q     So that was the context of the conversation that you had

21   in contacting Agent Hyre?

22   A     Correct.  I had gotten off the phone earlier in that

23   evening with her and she was just following up because she

24   had told me that she was going to forward me, then contact

25   me.

1    Q      Okay.  So even though you spoke to Mary Brooks on the

2    28th of January, you didn't talk to Elisha Brooks until

3    approximately ten days or 14 days later?

4    A      Correct.

5    Q      Okay.  Now, you work as a paramedic?

6    A      I don't.  I'm licensed as a paramedic now.  I haven't

7    worked on the street, on the road since approximately 2001.

8    My capacity is a facility manager right now.

9    Q      Okay.  But you still have your license?

10   A      I do.

11   Q      And as a paramedic, you're a mandatory reporter?

12   A      A mandatory reporter?

13   Q      Yes.

14   A      When I have a duty to act in the field, sure.

15   Q      Okay.  Not that you would have in this particular

16   instance, but did you ever think about reporting this

17   incident once you became an adult?

18   A      Me personally?

19   Q      The incident regarding Mr. Brooks?

20   A      Absolutely.

21   Q      Did you ever report it?

22   A      I did not.

23   Q      Okay.

24   A      I thought of it a lot of times.

25   Q      Did you ever seek any counseling for this?

1   A      Emotional, mental?

2   Q      Yes.

3   A      I've discussed it during therapy, periods of my life.

4   Q      Okay.  But you never went to the police and filed

5   anything once you became of age and became a mandatory

6   reporter?

7   A      No.

8   Q      Okay.

9              MR. SKUTHAN:  If I can have a moment, Your Honor?

10             THE COURT:  You may.

11   BY MR. SKUTHAN:

12   Q      Thank you, Mr. Gopoian.

13             THE COURT:  Redirect examination?

14             MS. RIVERA:  No, Your Honor.

15             THE COURT:  All right.  May this witness be

16   excused?

17             MS. RIVERA:  Thank you.  Yes, Your Honor.

18             THE COURT:  Will he be subject to recall?

19             MS. RIVERA:  No, Your Honor.

20             THE COURT:  Mr. Gopoian, you have a good day.  Feel

21   free to leave everything that was taken up there.  We'll

22   clean up after you.  Have a good day, sir.

23             Is the government prepared to call their next

24   witness?

25             MS. RIVERA:  Your Honor, we -- at this point we

1    rest.

2                    THE COURT:  All right.

3                    Ladies and gentlemen of the jury, the government

4    has rested the presentation of their entire case.   There are

5    some legal matters I need to tend to in your absence.   The

6    break won't be as long as the previous one was; but if you

7    could give us 15 minutes, I'll have a better idea in what

8    direction we're heading; but in terms of time, I feel

9    confident in telling you that we're doing very well on time.

10                   If you could leave those pad and pens facedown,

11   I'll see you back in here in 15 minutes.   Thank you.

12                   (Jury not present at 2:05 p.m.)

13                   THE COURT:  Will the defense be making any legal

14   arguments at this time?

15                   MS. SCOTT:  Yes, Your Honor.   At this time we would

16   move for judgment of acquittal pursuant to Rule 29 of the

17   Federal Rules of Criminal Procedure; and in addition to

18   making oral arguments, I have for the Court's consideration a

19   Memorandum, and I'll now hand that to the government and I

20   have the original for the Court.

21                   THE COURT:  All right.   I need five minutes to get

22   through this Memorandum.

23                   MS. SCOTT:  Your Honor, may I approach your law

24   clerk?   I have a copy for him as well.

25                   THE COURT:  Please.   He would appreciate that.

1    All right.  I would invite you to make your

2  argument.

3    MS. SCOTT:  Thank you, Your Honor.  The charge here

4  is under 18, United States Code, 2422, which charges Mr.

5  Brooks with knowingly attempting to persuade, induce or

6  entice a minor to engage in a sexual act.

7    There has been no evidence presented from the

8  government in its case in chief that Mr. Brooks ever intended

9  to or did knowingly persuade, induce or entice a minor.  The

10  only evidence that has been presented to this Court is that

11  Mr. Brooks actually wanted to have sex with a ten-year-old

12  fictitious minor boy and that he spoke with Agent Hyre in an

13  effort to effectuate this.

14    The language that is in Murrell says it has to be

15  caused -- or to stimulate the occurrence of or to cause.

16  However, when that opinion came out, it specifically

17  clarified that there is a distinction between the actual

18  sexual act with a minor and causing the assent of the minor

19  or making -- causing the minor to want to have sex through an

20  adult intermediary, and those are two separate charges.

21    And prior to that, the Eleventh Circuit was viewing

22  the crime of wanting to have sex with a minor as the same

23  charge as persuading, inducing or enticing a minor to have

24  sex.

25    The Eleventh Circuit further clarified in 2010 in

1    United States versus Lee at 603 F.3d 904 that with regard to

2    intent, the government must prove that the defendant intended

3    to cause assent on the part of the minor.  That is a

4    necessary element for this crime charged.

5           There is a whole separate charge for just wanting

6    to have sex with a minor or traveling to have sex with a

7    minor.  And the only information that they put forth here is

8    that he wanted to have sex with a minor.

9           When asked specific questions about did Mr. Brooks

10   ever try to change your mind or try to tell you to change the

11   child's mind, the agent answered no.

12          Whenever there was something brought up about the

13   children have never engaged in this type of activity, Mr.

14   Brooks exited from that type of conversation.

15          It was clear throughout the e-mails that there was

16   no clear intent on what Mr. Brooks wanted to do, if he even

17   wanted to engage in a sexual act at all, and that was the

18   reason why Agent Hyre had the conversation with Mr. Brooks

19   via phone, was because he didn't know what his clear intent

20   was, because he was going around the issue is what Agent Hyre

21   testified to, and was not being direct.

22          And so even through the phone conversation, this

23   case is distinguishable even if we can say, okay.  Well, the

24   initiation happened from Agent Hyre, but then Mr. Brooks

25   wanted to pass something along to the child, which we're not

conceding that happened here at all because Mr. Brooks did

not ask for any information to be passed along to the child.

     But even if that is construed here, during the

phone conversation, we have to look at it in the light of the

conversation from Agent Hyre asking all of the questions.

Agent Hyre elicited the information about what Mr. Brooks

even wanted to do with the fictitious minor, whether he

wanted to have anal sex, whether he wanted to have oral sex;

and even then, Mr. Brooks was unsure of what he wanted to do

and said on numerous occasions, "We can meet and see how

things go from that point.  If then I'm comfortable with you,

if you're comfortable with me, we can see where it'll go from

that point."

     And the reason why it's important that that's after

the meeting took place is because this crime has to take

place via a means of interstate commerce being the Internet,

a phone, some sort of those communications that happened

prior to the meeting.

     And here, there is nothing in the communications

that would suggest that Mr. Brooks ever intended to overcome

the will of the minor or even overcome the will of the adult

intermediary.  There was no overcoming of the will of anyone

during these communications, and that's why we feel that it

is -- that a Rule 29 judgment of acquittal is warranted in

this case, is because there's no evidence in this case.

1        Additionally, in the Height case, and I understand

2   this is persuasive authority to the Court because it is a

3   D.C. circuit court, but it says that in Height the ordinary

4   meanings of the verbs persuade, induce, entice and coerce

5   demonstrate that 2422(b) is intended to prohibit acts that

6   seek to transform or overcome the will of the minor.  That is

7   consistent with what Lee described in 2010.  It is more than

8   just to stimulate the occurrence of or to cause.

9        You have to -- 2422(b) criminalizes an intentional

10  -- a knowingly intentional attempt to achieve a mental state.

11       The crime is complete upon the mental state being

12  transformed, and thus if law enforcement -- a law enforcement

13  agency wanted to effectuate an arrest on an individual, they

14  could do so purely from the communications that take place

15  through a means of interstate commerce.

16       I believe that there's not sufficient evidence here

17  for the Court to consider.  The arranging of the meeting took

18  place through Agent Hyre's suggestion.  The leading of the

19  conversation about sex took place through Agent Hyre's

20  suggestions.

21       What Mr. Brooks did is merely acquiesce to the

22  suggestions of Agent Hyre to engage in some type of sexual

23  act with a minor while the fictitious father was present, if

24  he did anything.

25       And, again, when -- Mr. Brooks, through his

1    communications, he stated, "We can wait until we meet, see

2    how things go, get comfortable, hang out, and we'll go from

3    there."

4         We would ask that the Court also find that there

5    was no substantial step, because, again, the government has

6    charged Mr. Brooks with an attempt because there was a

7    fictitious minor.  There's no real minor that could have

8    potentially been persuaded, induced or enticed in this case.

9         So a part of attempt is that there is the intent to

10   do the underlying substantive offense in addition to there

11   being a substantial step taken to cause that act to occur.

12        There has been no evidence that a substantial step

13   has been presented here.  There's been no information that

14   Mr. Brooks did more than just to discuss the possibility of

15   mere sex.

16        In an attempt to, I guess, anticipate the

17   government's argument that traveling is a substantial step,

18   is a substantial step towards causing the assent of the

19   minor, that is irrelevant in this case.

20        And I know there are prior cases that say traveling

21   can be an element to consider for intent.  However, when

22   taken into context, it has to be that the person travels with

23   some sort of lubricant, condoms, gifts for the kids, books,

24   something to give to the child so that the child then feels

25   more comfortable to then want to engage in that sexual act.

1  But it also goes back to the prior communications.  The

2  traveling references back to the prior communications, saying

3  that the person is attempting to overcome the will of the

4  minor.

5       I believe there's a case that says, "Well, I'll

6  take it easy on the little girl.  My genitalia is not so big

7  that she would not be uncomfortable.  So I'll ease into it to

8  not make her uncomfortable."  We don't have that here.

9       There's a case that says, "I'm going to give gifts

10  to the little girl.  Can you pass these pictures to the

11  child?"  There's nothing here of the sort.

12       So this case is distinguishable from every other

13  case that has been presented.  They're all laid out inside of

14  the Memorandum that will be in the record that the Court has

15  just reviewed.

16       However, under a totality of the circumstances, it

17  is clear Mr. Brooks did not take a substantial step to

18  overcome the will of the minor or to overcome the will of the

19  adult intermediary.

20       We would find that -- ask that the Court find that

21  a Rule 29 judgment of acquittal is appropriate given the

22  facts of this case and the evidence as it has come out that

23  Mr. Brooks is not guilty of knowingly intending to persuade,

24  induce or entice a minor through an adult intermediary to

25  have sex.

1          THE COURT:  Would the government like to respond?

2          MS. RIVERA:  Yes, Your Honor.  We have copies of

3     some of the cases, I believe two of the cases that the

4     defense alluded to.

5          THE COURT:  I'm reading Murrell right now.  So go

6     on ahead with your argument.

7          MS. RIVERA:  Yes, Your Honor.  We also have a copy

8     of United States versus Lee and United States versus

9     Hornaday.

10          However, this case, I believe, pretty much falls

11     squarely within the Murrell case, where the court actually

12     found that a person who had been in communication with an

13     adult intermediary in an attempt to influence the father of

14     the notional minor into engaging in sexual activity, that

15     that was actually -- constituted inducement to try to

16     influence a father, a person who has authority or control

17     over a minor, to cause a meeting with the minor where the

18     defendant is going to influence the minor into engaging in

19     unlawful sexual activity, satisfies the requirements of

20     Section 2422(b).

21          And in that case the Eleventh Circuit actually

22     stated the term "induce" in Section 2422 is not ambiguous and

23     has a plain and ordinary meaning.  "'Induce' can be defined

24     in two ways; it can be defined as to lead or move by

25     influence or persuasion, to prevail upon, or, alternatively,

1    to stimulate the occurrence of, to cause.

2         "We must construe the word to avoid making 2422

3    superfluous.  To that end, we disfavor the former

4    interpretation of 'induce,' which is essentially synonymous

5    with the word 'persuade' --

6         THE COURT:  I need you to slow down.

7         MS. RIVERA:  "To that end, we disfavor the former

8    interpretation of 'induce,' which is essentially synonymous

9    with the word 'persuade.'

10        "By negotiating with the purported father of a

11   minor, Murrell attempted to stimulate or to cause the minor

12   to engage in sexual activity with him.  Consequently,

13   Murrell's conduct fits squarely within the definition of

14   'induce.'"

15        And in this case, I believe what we see, as opposed

16   to some other cases, the defendant actually did engage in a

17   grooming behavior with Special Agent Hyre.  He saw -- he had

18   posted a sex ad that alluded to incestuous relations of

19   fathers and sons.  He got someone that actually hinted that

20   he was involved in that relationship with his children.  That

21   was Special Agent Hyre.

22        And we know -- it doesn't take a rocket scientist

23   to see what these e-mails, all those communications were

24   about.  It was about exploring what the limits were, where

25   can I go with this?  It was the same with the audio

recording, and then he went further as the defendant felt
more comfortable.

But he made sure -- I don't think this is just
inducement.  I believe there's persuasion involved here,
because the way he's representing himself is that he's into
family play time, into family fun, into "We're not going to
do anything that's going to be uncomfortable or rough for the
child," and that's the way he was attempting to persuade or
influence the father into allowing this meeting.  It was more
of a passive but assertive mode into making this encounter
happen.

When the agent actually pushed back regarding --
this is an example -- regarding the female, the daughter, he
suggested, "I've been thinking about it.  Maybe it would be
cool if the daughter is also present," the agent actually
pushed back in an attempt to legitimize himself not to be a
police officer, and the agent, "Okay.  We'll just start with
your boy."

So he was trying to make the situation seem as one
that this is going to be a comfortable setting.  It's going
to be fun.  I'm into kissing and holding.  So he represented
himself as being a non-aggressive person, one who would
please another person; and in this case the object of his
desire was a child.

Once he understood -- because initially he said

something, "I've been to having -- into doing something with

you of a sexual nature and letting him watch."  Once he

understood that Agent Hyre was not for grabs, even though he

mentioned that he wanted the child to be present during the

sexual activity with Agent Hyre, he could have stopped.  He

was given plenty of ways out.

We're talking about inducement, that this agent was

the one that persuaded, that the agent was the one that

induced the defendant.  But what we see from the evidence,

because it's no mention as to this, is that this Rule 414

evidence has a purpose and it shows, for whatever weight the

jury is going to give to this, that he was predisposed to

commit this offense.

He had a sexual interest in young, very young boys.

He acted on this 44 years ago, and then he continued

reminiscing about the sexual abuse.

When you look at Exhibit 1, he says, "I could be

your long-lost uncle."  It's full circle.  He had this sexual

interest in little boys, but in particular, in incestuous

relationships of close family members because of what he did

to his nephew 44 years ago.  Exhibit Number 1, "I could be

your long-lost uncle," that's exactly the type of dynamic he

was looking for.

The defendant's argument here is from the position

that there was absolutely -- that he was innocent, that there

1    was absolutely no inclination for him to commit this offense

2    other than by the fact that the agent somehow persuaded him

3    into doing this.  That's not the case.

4         The evidence shows that he did this before in the

5    context of four years ago, according to him, when he tried to

6    entice the father -- a twelve-year-old minor through the

7    father.  He did it in the past.  He said, "I replied to a

8    similar ad on Craigslist, a father involving a twelve-year-

9    old boy," and his intent was to engage that child in sexual

10   activity, and it didn't happen because the father of the

11   minor stopped communicating.

12        So we know from that evidence, we know from the ad

13   that he posted, from John Gopoian's testimony that there is a

14   context to this case, that he was predisposed to commit this

15   offense, that his will didn't have to be overcome.

16        And we don't have to show -- there's something

17   erroneous as well about this argument.  We don't have to show

18   that a minor was persuaded, induced or enticed or that the

19   father of the minor was induced or enticed or persuaded.

20        What we have to prove here is that the defendant

21   had the intent.  This is an attempt case.  That the intent to

22   commit the violation of 2422, that he had the intent to

23   persuade, induce or entice a minor to engage in unlawful

24   sexual activity, and that he took certain steps that were

25   substantial in nature in order to accomplish that objective.

1              The Eleventh Circuit has recognized that travel is

2    not even necessary in the context of these cases.   The

3    Eleventh Circuit has recognized that most of these cases,

4    what they involve is e-mail communications between

5    individuals like the defendant who are willing to have sex

6    with children and communicate with sexual predators online.

7    In this case it just so happened it was an undercover agent.

8              The Eleventh Circuit has not indicated or stated

9    that other than the travel, other than -- it hasn't actually

10   narrowed down the steps, what are substantial steps.   That is

11   up to interpretation; but it has recognized, for example, in

12   Murrell's case that the negotiation --

13             THE COURT:   I'm reading Murrell.   Let's go on ahead

14   and wrap up your argument.

15             I've been reading the cases you're citing.

16             MS. RIVERA:   Yes, Your Honor.

17             THE COURT:   So I know what they say.

18             MS. RIVERA:   Well, the cases do not require that

19   the defendant bring books or condoms or anything of that

20   nature.

21             In addition to that, they indicate that there's no

22   substantial steps that were taken in this case, and that is

23   incorrect.

24             Once a defendant, according to the case law,

25   engages in communications with the father about illicit

1    sexual conduct and coordinates, starts taking those steps to

2    coordinate a meeting with the minor and then travels, that is

3    a substantial step in furtherance of the commission of the

4    offense.

5            The law does not require an actual minor, and that

6    has been recognized as well.

7            As I indicated before --

8            THE COURT:  If you've indicated before, you don't

9    need to tell me again.  Let's wrap up.

10           MS. RIVERA:  Yes, Your Honor.  That the only

11   reservation in this case the defendant had was that he might

12   be walking into a police sting, that he was concerned that

13   this might be a police operation, but that didn't deter him

14   from traveling.

15           And then he confirmed this.  His own words are the

16   most powerful.  It's the strongest evidence in this case

17   because he corroborated everything as to what was his intent,

18   his purpose.  And basically, Your Honor, that is our

19   submission.  If the Court needs additional argument, we would

20   be willing to elaborate as well.

21           THE COURT:  I've had more than enough argument on

22   this issue.  I've had a chance to review the brief filed by

23   the defense, and I've been reading the cases as I've been

24   listening to the arguments.

25           I do not agree with the defense's interpretations

1  of these cases, specifically Murrell.  I think there is

2  adequate evidence on each of the elements of this offense to

3  allow it to go to a jury.  The defense's motion is denied.

4         The evidence as has been presented to the Court

5  speaks for itself.

6         At this time if the defendant and counsel would be

7  kind enough to approach the podium, I have a matter I need to

8  take up with you, sir.

9         MS. SCOTT:  Yes, Your Honor.  There is one more

10  matter that --

11         THE COURT REPORTER:  I need you to speak into the

12  microphone, please.

13         MS. SCOTT:  Yes.

14         There is one more matter that Mr. Skuthan would

15  like to present to the Court, a motion.  So I'll turn the mic

16  over to him.

17         THE COURT:  Sure.

18         MR. SKUTHAN:  Your Honor, just very briefly, we

19  would ask the Court to strike the testimony of John Gopoian,

20  and renew our previous motion to exclude under 414 and 403.

21  The reason why is clearly in his testimony, Mr. Gopoian did

22  indicate that something of a sexual nature had happened to

23  him at some point in the past by the defendant, but at some

24  point he said it could have been 1970.  That would have been

25  46 years ago.

1          In his F.B.I. 302, he said he was six or seven.  He

2     said it was 44 years ago.  So that's a two-year, perhaps even

3     a three-year time span.

4          The Court was gracious enough to give us time to

5     investigate these claims between the original trial date and

6     this trial date.  We did so.  We found out a lot of

7     information about Mr. Gopoian that we used on impeachment,

8     but no amount of time can allow us to go back and determine

9     if Mr. Brooks was even in that location.  I mean, he may have

10    been out of the country.  He may have been out of the state.

11    There's no way for us to rebut the claim without knowing more

12    specificity, and he could not identify the month.  He could

13    not identify the season.  He could not even identify the

14    year, which is understandable.

15         And then he also said, "It's a long time ago.  I

16    don't remember much."  So I think that plays into the 414

17    argument, more importantly the 403 argument, especially with

18    respect to temporal proximity, because we're dealing with

19    something that's so old.

20         So we'd ask that the Court strike the testimony of

21    Mr. Gopoian based on those reasons, because no amount of time

22    that we could have to further prepare would enable us to

23    adequately cross-examine him, and therefore there's no way to

24    do a confrontation of him and therefore it's a violation of

25    also 403, but also the right to confront under the United

1   States Constitution.   Thank you very much.

2                  THE COURT:   Thank you for your argument.

3                  Would you like to respond?

4                  MS. RIVERA:   Yes, Your Honor.

5                  THE COURT:   Let's limit the response to one thing.

6   I did not allow that evidence in under a 404(b).   So the

7   temporal proximity is not a point you need to address.   I

8   simply need to hear what your counter is to the 414.

9                  MS. RIVERA:   Yes, Your Honor.   No amount of time

10  can erase what happened to Mr. Gopoian as a child 44 years

11  ago.   Of course, and I think the jury can reasonably

12  understand and anyone in his position, that he will remember

13  the most traumatic event in his childhood as it happened.

14  That he was performing oral sex, that the defendant was

15  performing oral sex on him and that this happened on two or

16  three occasions, Your Honor, that he remembers vividly.

17            I think the rest of the cross-examination as to his

18  ability to recollect other events surrounding that, I think,

19  goes to the weight of the evidence, and it's not really

20  something that outweighs the probative value of the

21  testimony.

22            And the fact that he was able to recall, for

23  example, that this defendant is uncircumcised, I mean, those

24  are things that to a child are striking; and the fact that

25  this defendant was performing oral sex on him, that's

1  striking.

2         It is reasonable for him not to remember other

3  details surrounding that; but what he does remember, the fact

4  that this defendant was performing oral sex on him as a child

5  is just so closely related to the facts in this case and to

6  the ad that he posted, "I could be your long-lost uncle," it

7  makes it all relevant, Your Honor, because it shows he had

8  the intent and the motive to commit the offense.

9         And because they have shown evidence of inducement,

10  they have brought that up in their cross-examination, we have

11  to prove beyond a reasonable doubt that he was predisposed;

12  and basically the Court then, the Eleventh Circuit, allows

13  this evidence to come in for that same purpose as well.

14         THE COURT:  I understand.  And I thank you both for

15  your argument.

16         I think the defense's beef is generally with 414.

17  I understand what their concerns are, matters, I'm sure,

18  they'll address on final argument.

19         But I will be denying the defense's motion to

20  strike the testimony of Mr. Gopoian.

21         So at this time if the defendant and counsel would

22  please approach the podium, we have one more matter to take

23  up before we bring the jury back.

24         What are the defense's intentions at this point?  I

25  mean, the government has rested.  Their case is closed.  Are

1    you intending on calling witnesses this afternoon?

2                MS. SCOTT:  No, Your Honor.

3                THE COURT:  All right.

4           Have you had an opportunity to discuss with your

5    attorneys the decision that I discussed with you previously,

6    and that's whether or not you're going to choose to become a

7    witness in this case?

8                THE DEFENDANT:  Briefly.

9                THE COURT:  You only briefly discussed it?

10               THE DEFENDANT:  Well, the decision is no.

11               THE COURT:  All right.  Well, let me ask you this,

12   because this is a very important procedure for everyone

13   involved and you specifically.  I'm not going to rush you to

14   any decision.

15          The modifier "briefly" you used in describing your

16   ability to discuss this with your attorneys gives me some

17   alarm.  So I need to know -- and I don't mind giving you more

18   time -- do you need more time to talk to your attorneys about

19   this decision?

20               THE DEFENDANT:  I would like it.

21               THE COURT:  Okay.  I'll give you that time.  Go on

22   ahead and have a seat.

23          I need to talk to the attorneys, though.  So here's

24   what we're looking at.  It's about 2:40.  And we still have a

25   full charging conference to handle.

1          If it's the defense's intent to come in and rest

2   and present no further evidence, that obviously removes the

3   government's ability to present any rebuttal.  That would

4   mean the only thing left to do is to have our charging

5   conference, have the final instructions ready, and then move

6   on to final argument.

7          So approximately -- let me know how much time

8   you're requesting to discuss this with your client.

9          MS. SCOTT:  Twenty minutes.

10          THE COURT:  Okay.

11          Please let the jury know that we're going to be

12   another 20 minutes, and please offer them my apologies.

13          At 3:00 we'll bring them back in.  At that point --

14   what I'm concerned with is we're reaching the end of the day

15   and I don't know if we're going to be able to actually have

16   me instruct them on the law and move into final argument.  I

17   think we might have to start first thing tomorrow morning,

18   but let's see how this unfolds and what your decision is in

19   20 minutes.  So I'll see you back here at 3:00.

20          Court's in recess.

21          (Recess taken at 2:37 p.m.)

22          (Jury not present at 2:58 p.m.)

23          THE COURT:  Mr. Sarlo is going to bring you a

24   modified version of instruction 16 on the proposed jury

25   instructions.  Based on how matters unfolded, you can see

1    there was no transcript admitted into the record.  So that's

2    a different instruction.

3         MS. RIVERA:  Well, Your Honor, we had laid the

4    foundation for this and we believe it should have been

5    included in the deliberation process, and that we had

6    admitted -- we had moved to have it admitted into evidence.

7    I believe the Court was willing to reconsider that option.

8    I'm not sure if the Court would allow it.

9         We actually brought case law to that effect, the

10   case of United States versus Nixon.

11        THE COURT:  Why don't you hand me the case.  I'll

12   take a look at it.

13        MS. RIVERA:  Yes, Your Honor.

14        THE COURT:  And if you would be so kind to make a

15   copy of that available to Ms. Scott.

16        MS. RIVERA:  Yes, Your Honor, we will right now.

17        THE COURT:  All right.  Just give me a moment.

18        What is the exhibit marked as?

19        MS. RIVERA:  I believe, Your Honor, it's Exhibit

20   Number 5 for identification.

21        THE COURT:  All right.

22        Is the defense objecting to -- they've laid the

23   predicate on it.  I've already made that determination.

24   They're seeking the admission of the transcript.

25        MS. SCOTT:  We have previously laid our objection

1   to the best evidence, the actual audio recording itself, and

2   the government has provided that in Exhibit Number 4.  I

3   believe that is sufficient for the jury.

4           If they would like to take time during their

5   deliberations to hear the audio again, I believe the Court

6   can provide them with that time that's necessary.

7           And if they need that aid during that time to

8   listen while they're listening to the audio recording, to

9   view the words as they are played along with the audio, I

10  think that is appropriate.

11          The issue that we have as it being listed as an

12  exhibit and going back into the deliberation room is that

13  they may then give that piece of evidence more weight and

14  more credibility than any other piece of evidence.

15          Even when we talk about notetaking, when someone is

16  actually giving verbal evidence from the stand, they are not

17  to rely on their notes.  They are to rely on their memories.

18  They are to rely on the evidence as it is presented in Court,

19  and I think that that is the same rule that should apply to

20  this audio recording.

21          THE COURT:  There's case law, and specifically a

22  pattern instruction, addressing this issue.  They did lay the

23  predicate and I gave them this opportunity to renew this.

24          It will be admitted into evidence, and I will have

25  the pattern jury instruction instructing them that the

1    primary evidence is the recording; and if they hear a

2    distinction between the recording and the actual words that

3    they see, the recording is the evidence.

4           All right.  So here's where we're at.  It's going

5    to take about 30 minutes or more to have a charging

6    conference.  It would take me about 20 to 25 minutes to

7    charge the jury, and each of you would probably be seeking 30

8    minutes, roughly -- and I'm not going to pin you to that --

9    for final argument.  We simply can't finish today.

10           That being the case, let's go on ahead and start

11    where we left off.  If the defendant would be kind enough to

12    approach the podium with counsel.

13           Have you had an opportunity to discuss your

14    decision as to whether or not to become a witness with your

15    attorneys?

16           THE DEFENDANT:  Yes, I have.

17           THE COURT:  Do you need more time to have a

18    discussion with them?

19           THE DEFENDANT:  No.

20           THE COURT:  And what is that decision?

21           THE DEFENDANT:  I'm not going to be a witness.

22           THE COURT:  All right.  Thank you, sir.  Feel free

23    to be seated at counsel table.

24           And at this time, Ms. Scott, I would imagine as

25    lead counsel, would you please indicate to the Court what you

1    intend to do at this time.

2              MS. SCOTT:  We intend to rest.

3              THE COURT:  All right.  So when the jury returns,

4    I'm going to ask the defense if they are ready to proceed;

5    and if you'd just stand up, come to the podium and say the

6    defense rests, I'll excuse them for the day.

7              I'm going to have them here at 8:30 time tomorrow

8    morning.  We're going to stay to iron out all the issues with

9    the jury instructions and we'll have plenty of time to do

10   that.

11             When we return in the morning, I will charge the

12   jury and then as soon as I'm finished charging the jury,

13   of course, we'll move right into final argument.

14             What is the -- how is final argument going to

15   proceed for the defense?  Who's going to be making argument?

16             MS. SCOTT:  Myself.

17             THE COURT:  Okay.  Do you at this point have any

18   idea how much time you're going to be requesting for final

19   argument?

20             MS. SCOTT:  One hour.

21             THE COURT:  How about the government?

22             MS. RIVERA:  Your Honor, I think an hour would be

23   sufficient as well.

24             THE COURT:  And how do you plan on splitting it up

25   for argument and rebuttal?

1              MS. RIVERA:  Probably 40 minutes.

2              THE COURT:  Forty and 20?

3              MS. RIVERA:  Yes.

4              THE COURT:  With five-minute warnings?

5              MS. RIVERA:  That's sufficient time, Your Honor.

6              THE COURT:  All right.

7              Let's bring the jury back.

8              Thank you both.

9              (Jury present at 3:06 p.m.)

10              THE COURT:  Welcome back, ladies and gentlemen.

11   Feel free to be seated; and once you are all seated and

12   comfortable, we'll continue moving forward.

13              Is the defense ready to proceed?

14              MS. SCOTT:  Yes, Your Honor.  The defense rests.

15              THE COURT:  All right.

16              Ladies and gentlemen of the jury, that's all the

17   evidence you're going to be hearing in this case.  Both sides

18   have rested their cases.

19              What's going to happen now is we're going to end

20   the day, and after you depart, I'm going to prepare your

21   final instructions on the law, take care of some legal

22   matters with the attorneys.  I think we're going to be here

23   for some time.

24              I'm going to invite you to report in tomorrow at

25   8:30.  As soon as everyone is here and they let me know, I

1    will read you your final instructions on the law right after

2    you walk in through the door.  It's probably going to take me

3    about 20 to 25 minutes, maybe less.  I tend to talk quickly.

4         And as soon as I finish with those instructions,

5    each side will have an opportunity to make their final

6    argument.  As soon as you hear their final arguments, you

7    will retire to the jury deliberation room and you will begin

8    your deliberations on the final verdict.

9         I think we'll get this case to you pretty early

10   tomorrow morning.  So thank you again for your time and

11   patience here.  Everything is moving as planned.  I'll make

12   sure that we have everything in order for you today so that

13   when you walk in the door tomorrow morning, we immediately

14   move into the proceedings and use as little of your time as

15   we need.

16        So if you would put those pad and pens facedown in

17   your chairs, I wish you a good evening and I will see you

18   tomorrow morning at 8:30.  Thank you.

19             (Jury not present at 3:07 p.m.)

20             THE COURT:  All right.  Please be seated.

21        Let's go through the jury instructions.  First of

22   all, will the government be requesting any special jury

23   instructions?

24             MS. RIVERA:  Well, Your Honor, regarding the

25   instruction of enticement, we would just like to add the

1    definition of the term "computer."  We brought copies of --

2              THE COURT:  What instruction are we're at?

3              MS. RIVERA:  Yes, Your Honor.

4              THE COURT:  I think you're talking about

5    instruction eleven.  Do you want modified?

6              MS. RIVERA:  One of our first concerns as to the

7    way it reads, Your Honor, is that --

8              THE COURT:  I need to -- you have to answer my

9    questions.  Are we talking about instruction eleven?

10             MS. RIVERA:  Yes, Your Honor.

11             THE COURT:  Okay.  And I know that we had kind of a

12   back and forth on whether a cell phone was a computer.

13   That's your concern, right?

14             MS. RIVERA:  Yes, Your Honor.

15             THE COURT:  All right.  So tell me what language

16   you want to add and where.

17             MS. RIVERA:  We have the term "computer."  We have

18   a proposed language.

19             THE COURT:  If you want to bring that, please

20   provide it to your opposing counsel and bring one forward.  I

21   certainly would like to take a look at that.

22             MS. RIVERA:  Yes, Your Honor.

23             THE COURT:  If you have any case law you want to

24   submit with it, you're certainly welcome to do that.

25             MS. RIVERA:  Yes, Your Honor.

1    THE COURT:  And because I need a chance to review

2  what you're handing me, I'll take it under advisement and

3  I'll draft it according to my ruling and I'll indicate what

4  that is tomorrow morning.

5    MS. RIVERA:  Yes, Your Honor.

6    THE COURT:  Is this the only modification you're

7  requesting?

8    MS. RIVERA:  No, Your Honor.  Our first request

9  concerns the definition of the term "computer," which we

10  actually obtained from the instruction on child pornography,

11  which is 083.4(a).  That Eleventh pattern -- Eleventh Circuit

12  pattern jury instruction contains the definition of the term

13  "computer."

14    And we also are providing to the Court a case,

15  United States versus Mathis, where it states that a

16  defendant's use of a phone to call and sent text messages

17  constitutes the use of a computer.  And in that case in

18  particular the defendant used a cell phone to place calls and

19  send text messages and access the Internet to entice a minor

20  to engage in sexually explicit conduct for purposes of

21  producing sexually explicit material, and the court concluded

22  that the defendant's use in that case constituted the use of

23  a computer, and also indicated a computer is a cell phone

24  within the meaning of Title 18, United States Code, Section

25  1030(e)(1).

1        We think that this would aid the jury in

2   understanding the evidence in the case; and we also had

3   evidence that was introduced by the expert to the effect that

4   a cell phone constitutes a computer, based on her knowledge

5   and training and experience in analyzing cell phones.

6            THE COURT:  All right.

7            Would the defense like to respond to that now or do

8   you want to wait until tomorrow morning?

9            MR. KAHN:  Your Honor, I'm prepared to respond to

10  that.  I'll be handling the charging conference.

11           THE COURT:  All right.  Come on forward.

12           MR. KAHN:  Okay.

13           THE COURT:  So if you're opposing this -- it's a

14  special jury instruction.  So the analysis here is that the

15  pattern jury instructions don't adequately cover the issue,

16  A, and, B, that what they're proposing is consistent with the

17  state of the law.

18           So are you in opposition of the government's

19  request to modify the pattern instruction with this

20  definition?

21           MR. KAHN:  Yes, Your Honor.

22           THE COURT:  All right.  Feel free to proceed.

23           MR. KAHN:  First of all, Your Honor, clearly the

24  Eleventh Circuit committee on charging instructions and

25  drafting them was aware of this definition and they chose not

1   to include it in the pattern instruction for 2422(b).  So

2   that's an indication alone that the Eleventh Circuit didn't

3   want this type of definition used for this offense.

4        THE COURT:  All right.  Let me ask you this

5   question.  As we were beginning the process of opening up

6   this trial and I was reading the statement of the case, which

7   I have right here, your co-counsel asked that -- it read like

8   this:  "The United States alleges that from on or about

9   September 5, 2015, to on or about September 10, 2015, in

10  Orange and Seminole Counties, in the Middle District of

11  Florida, Defendant George Adrien Brooks, using the Internet,

12  a computer or a cell phone."  That's what I had in there

13  initially.

14        On the defense request, I removed the term "cell

15  phone."  And it seems to me that what the defense is going to

16  be arguing on closing is that a cell phone is not a computer.

17  Are you going to be arguing that?

18        MR. KAHN:  I can't say with certainty that that's

19  what we're going to argue, either way; but I can say that our

20  position is that this is an inappropriate definition for the

21  instruction.  The first reason is, for what I just stated,

22  the Eleventh Circuit expressly didn't include it when it was

23  in other instructions.

24        THE COURT:  But if the Eleventh Circuit expressly

25  says that the term "computer" includes any high-speed data-

1   processing device that can perform logical, and they go on

2   with that -- you have what was submitted --

3            MR. KAHN:  Yes.

4            THE COURT:  -- and in the Mathis case, they said a

5   defendant's use of a cell phone to call and send text

6   messages constitutes the use of a computer, and someone gets

7   up on final argument and argues that a cell phone is not a

8   computer, I'm not really sure I'm comfortable ethically with

9   that argument, in light of the status of the law here.

10           So if you're going to argue that a cell phone is

11  not a computer, you are walking into the wind right now.

12           MR. KAHN:  Your Honor, we are not going to be

13  arguing that.

14           THE COURT:  Okay.

15           MR. KAHN:  However, we still think it's an

16  inappropriate instruction for some other reasons.  If I may

17  continue?

18           THE COURT:  Sure.

19           MR. KAHN:  Mathis is not on point, Your Honor.  In

20  that case, they were defining the term "computer" for

21  purposes of 2G2.1 of the sentencing guidelines.  That

22  guideline cites to United States Code, 1030(e), which

23  provides a statutory definition for the term "computer."

24           There's no statutory definition for the term

25  "computer" here.  We have an interstate commerce, and to that

point, Your Honor, as was alleged in the beginning of the

trial, the government had the opportunity to draft the

Indictment and craft the Indictment in any way it wanted to.

It said specifically "computer" and the "Internet."  It could

have said "computer, cell phone and the Internet," but it

chose not to.

And, furthermore, the government's position is that

a cell phone is a computer.  If that is in fact the case,

then the term "computer" sufficiently covers their concern.

THE COURT:  All right.  Thank you for that

response.

MS. RIVERA:  Your Honor, may I?  And this is a term

that we have commonly used in crafting our indictments, and I

never had an issue with the defendant not accepting that a

cell phone is a computer for Internet purposes.  This is just

to aid the jury in their deliberation process.

The Eleventh Circuit pattern jury instructions as

drafted, there is -- it's not like -- they're not set in

stone.  They provide guidance based on the case law.  But

this particular instruction on what the term "computer"

means, that is from another pattern jury instruction and it

is the context of a child pornography case.  It's in the

context of a child pornography offense, which typically

involves the use of a computer.

Enticement of a minor, it so happens as well

1    nowadays they typically involve the use of a computer and,

2    more specifically in many of these cases currently, cell

3    phones; and that's why in the case of United States versus

4    Mathis, in the context of a child exploitation case, the

5    Eleventh Circuit recognized that the use of a cell phone

6    constitutes the use of a computer.

7            I think our submission is because we believe it

8    will aid the jury in their examination of the evidence and

9    there's nothing misleading or erroneous about the proposed

10   amendment to the jury instruction, Your Honor.  We're just

11   basing this on the case law and the pattern jury

12   instructions.

13           MR. KAHN:  Your Honor, may I briefly respond?

14           THE COURT:  You may.

15           MR. KAHN:  Just to summarize very briefly, the

16   cases I've cited to, as I've explained, are not on point.  We

17   are simply asking that the government be held to the language

18   it used in its Indictment.  It's a reasonable request, I

19   submit.

20           And if the government's position is that a cell

21   phone is a computer and the way they crafted it in their

22   Indictment and the way that the charging instruction reads is

23   sufficient.

24           THE COURT:  All right.  Thank you for the argument.

25           Will the government be requesting any further

1    specific jury instructions, special jury instructions?

2              MS. RIVERA:  Yes, Your Honor.  In the context of

3    the enticement, the same instruction number eleven, the way

4    it reads, it does not include, I think, an accurate

5    representation of the case because it's not -- this case is

6    not a completed offense and there is no real minor involved.

7    It says the defendant knowingly persuaded, induced or enticed

8    an individual.

9              Well, we know that an actual individual was not

10   persuaded, induced or enticed.  I would just ask that the

11   Court consider the government's recommendation in this case

12   as to attempt, the defendant knowingly attempted to persuade,

13   induce or entice.

14             THE COURT:  Well, how would you respond to the fact

15   that on page 13 of 22, on the instructions it says, "The

16   defendant need not communicate directly with an individual

17   under 18 years of age.  It is sufficient if the defendant

18   induces the individual to engage in unlawful sexual activity

19   by communicating with an adult intermediary for that

20   purpose"?

21             MS. RIVERA:  I think that is actually appropriate.

22   It's the law.

23             THE COURT:  I guess what I'm saying is, it seems to

24   me that this covers what you want covered.

25             MS. RIVERA:  My only concern is whether the jury is

1   going to be confused about the way this first portion of the

2   -- because, actually, it includes the elements of the

3   offense.  And when it says "knowingly persuaded, induced or

4   enticed," they may actually be led to believe that an

5   individual had to be persuaded, induced or enticed.  And the

6   way we have used this in the past is by just modifying it to

7   include -- to reflect attempt, the attempt to induce,

8   persuade or entice.

9        And the Eleventh Circuit, I haven't seen a case

10   where they have rejected this modification to the jury

11   instruction.

12        THE COURT:  Do you have a case where they approved,

13   affirmed this modification?

14        MS. RIVERA:  Your Honor, we're not aware of a case

15   on point accepting this modification.  I wouldn't represent

16   that to the Court.

17        THE COURT:  I have to tell you I don't think it's

18   that confusing, and I think that I wouldn't have any problem

19   leaving it in your capable hands to make that a point on

20   closing argument.  I'm certainly not going to let anyone

21   argue in a manner that's inconsistent with the clear

22   application of the law.

23        But before a decision is made on this matter, would

24   the defense like to be heard on this issue?

25        MR. KAHN:  Your Honor, I think that you've

1    sufficiently said the gist of what my concern would be.  It's

2    sufficiently covered.

3         Specifically, when you look at element number

4    three, which is immediately following it, it also says it in

5    the first paragraph after the elements.  The government is

6    not required to prove that it was -- I'm sorry.  It's not

7    necessary for the government to prove that an individual was

8    in fact less than 18.  At the end of that paragraph, it is

9    sufficient that the defendant believed an individual under

10   the age of 18 was involved.  It says it, I think, three times

11   in this instruction, Your Honor, which I would submit is two

12   times too many.  So I would object to the government's

13   request to modify the first element.

14        THE COURT:  Well, your articulated disagreement

15   with the pattern jury instructions mentioning two times sort

16   of weakens your argument on the computer language on your

17   first argument.  So we're in agreement that the pattern jury

18   instructions aren't always absolutely as they should be.

19        MR. KAHN:  Well, the difference on my first

20   argument with the computer is I'm only asking that the

21   government be held to their elements of commerce that they

22   alleged in the Indictment, and I further support that by

23   distinguishing their case law and submitting that their

24   proposed instruction lends an inference that the Eleventh

25   Circuit knew about this definition and rejected it anyways,

1   at least as far as the computer definition goes.

2           MS. RIVERA:  Your Honor, there's no rejection of

3   this language.  I'm not sure whether there's actually a

4   citation or a case where it states on point that Congress or

5   the Eleventh Circuit has rejected the use of the definition

6   of the term "computer."

7           We don't have any problem being held to our

8   Indictment.  I actually agree completely with your statement

9   to that effect.

10          However, a cell phone is a computer as defined by

11  law, and there's actually nothing inappropriate with the

12  definition.

13          THE COURT:  Actually, I was just asking some

14  questions on the first one because I felt like his second

15  argument, critical of the pattern instructions, was

16  inconsistent with his vehement defense of the pattern

17  instructions with regard to the first one.  I wasn't looking

18  to revisit that issue, but I understand what your argument is

19  and I appreciate it.

20          Does the government have any further special

21  instructions they're going to be requesting?

22          MS. RIVERA:  We were in the process, and if the

23  Court would allow us to continue to review the instructions,

24  we -- I believe the instruction on attempt, we would like

25  that to be included; and we would just like to note that the

1    way it reads right now -- that's instruction twelve, with

2    "attempting to coerce or entice," we would like to have that

3    modified to actually read "persuade, induce or entice,"

4    because we didn't charge coercion in this case.  It's a

5    prong, but it was not charged.

6           The same thing with the first element, where it

7    says the defendant intended to commit the crime of coercing

8    or enticing a minor.  I think it should track the language of

9    the statute, the Indictment, "persuading, inducing or

10   enticing a minor."

11          THE COURT:  All right.

12          What's the defense's position on that?

13          MR. KAHN:  Your Honor, we --

14          THE COURT:  If it's going to track the language,

15   then "the defendant knowingly persuaded, induced or entice an

16   individual"?  That's what you want on the first element of

17   that?

18          MS. RIVERA:  Yes, Your Honor.  Just to eliminate

19   the word "coercion."

20          THE COURT:  Actually, "the defendant intended to

21   knowingly persuade, induce or entice."  So you want the

22   instruction twelve to track the language in instruction

23   eleven on the first element, correct?

24          MS. RIVERA:  That is correct, Your Honor.

25          THE COURT:  I understand.

1        What's the defense's position on that?

2        MR. KAHN:  Your Honor, we would agree with the

3  government that it should track the Indictment in that

4  alleges inducement, persuasion and enticement and not

5  coercion.

6        THE COURT:  Well, coercion is in instruction

7  eleven, which she said was persuaded, induced or enticed.

8  She's asking that the first count in instruction twelve track

9  the language in Count One of instruction eleven.

10       Okay.  So you don't want the word "coerced"?

11       MR. KAHN:  Correct, Your Honor.

12       THE COURT:  I understand.

13       So anything else from the government?

14       MS. RIVERA:  May we have a moment, Your Honor?

15       THE COURT:  Yes, you may have a moment.

16       Will the defense be making any request for

17  modifications?

18       MR. KAHN:  Yes, Your Honor.  To be frank, we have a

19  few -- more than a few.

20       THE COURT:  Is "a few" two or 13?

21       MR. KAHN:  I haven't counted them, but it's more

22  than two or three.

23       THE COURT:  All right.

24       MS. RIVERA:  Your Honor, regarding instruction

25  number five, that we would submit that it's not necessary.

1   However, we understand that the defense would probably want

2   that.

3          THE COURT:   I'm going to take you through that.   I

4   mean, all I want to know now is whether or not you want any

5   special instructions other than what the pattern is.   I'm

6   going to walk you one instruction at a time and see if

7   there's an objection.

8          MS. RIVERA:   That's helpful, Your Honor.

9          And then as to the instructions, the ones that we

10  were talking about, eleven and twelve, I would eliminate any

11  reference to "coercion."   I see it again at the top in the

12  title.

13         THE COURT:   I think we're in agreement on that.

14  The defense has agreed that "coercion" be removed from the

15  instructions.

16         Is that correct from the defense's perspective?

17         MR. KAHN:   Yes, Your Honor.

18         THE COURT:   All right.

19         We have agreement on that.   Let me highlight that.

20  That'll make -- the term "coercion" from all instructions,

21  I'll remove it.

22         Okay.   Anything else from the government before we

23  get to the defense's list?

24         MS. RIVERA:   No, Your Honor, just those two

25  instructions.

1          THE COURT:  All right.  Just to make sure, you want

2     the word "computer" inserted in instruction eleven on element

3     two, and you're also seeking to have instruction twelve,

4     first element track the language from instruction eleven.

5          MS. RIVERA:  And if the Court were in context -- we

6     agree, Your Honor.

7          In the context of instruction number eleven, we

8     would ask that the Court at the sentence, "The defendant's

9     use of a cell phone to call and send text messages

10     constitutes the use of a computer."

11          THE COURT:  Well, I don't think you're going to get

12     that customized an instruction.  I mean, I don't blame -- you

13     have to understand that you're more likely to get some sort

14     of relief on a request for an instruction if the proposed

15     language isn't incredibly one-sided and blatantly supportive

16     of one theory of the case.

17          I think that -- you requested the word "computer"

18     be defined and inserted.  I think you've presented an

19     adequate case for that.  I certainly will consider that.  I

20     think you're probably on steady ground there.

21          With regard to instruction twelve tracking the

22     language of instruction eleven, the defense has indicated

23     that they have no issue with that so long as the "coercion"

24     language is removed.

25          And with regard to your request, you had one more

1    request where you wanted -- you were concerned about the

2    substantive charge in instruction eleven.  And on page 13 of

3    22, where I indicated that I thought the first paragraph

4    there, "The defendant need not communicate directly with an

5    individual under 18," was adequate --

6              MS. RIVERA:  Yes.

7              THE COURT:  -- the defense agrees with my view on

8    that, but you nonetheless want the additional language added

9    on the first part of this instruction.

10             MS. RIVERA:  And to that effect, Your Honor, I

11   believe that this sentence, where it indicates "the Internet

12   is a facility of interstate commerce," that it should state

13   "the Internet and a computer are facilities of interstate

14   commerce."

15             THE COURT:  Tell me what that language is you're

16   asking.

17             MS. RIVERA:  We submitted --

18             THE COURT:  I understand.  Well, look, I mean, that

19   makes sense.  That's intuitive.  If I were to grant you

20   relief and put the term "computer" on the second element on

21   instruction eleven, that it certainly goes without saying

22   that it would be counterintuitive not to include it on the

23   second page where you've just requested.  So it's an all-or-

24   nothing-type situation.  I understand.

25             From the defense's perspective, let's hear what

1    your recommended modifications are.

2              MR. KAHN:  Sure, Your Honor.

3              THE COURT:  And if you could start by helping me

4    out, just point me to the actual instruction number and we'll

5    move on from there.

6              MR. KAHN:  Yes, Your Honor.  And you're not asking

7    about our position on the inclusion of instructions at all,

8    just modifications as they're currently written?

9              THE COURT:  Right.  I'm going to ask you -- yeah,

10   and those are good instincts.

11             There are a lot of instructions that I just put in

12   here.  I don't know if an expert's going to testify.  I don't

13   know if the defendant's going to testify.  I'll go down the

14   list and ask you in or out on those.  I just need to know now

15   if you're asking for either special instructions or

16   modification of pattern instructions.

17             MR. KAHN:  Just to be clear, Your Honor, when you

18   say if we're asking for special instructions, do you mean

19   instructions that are not included in here?

20             THE COURT:  Either not included or you want to

21   build on what's included by changing the language, like the

22   government just requested on instruction eleven adding the

23   term "computer."

24             MR. KAHN:  I understand.

25             THE COURT:  All right.  So go on ahead.

1          MR. KAHN:  Starting with instruction number ten,

2    Your Honor, ultimately we will be objecting to the inclusion

3    of this; but just dealing with the language, in an abundance

4    of caution, that you'd rule the other way, it does say

5    "coerce" in there.  So just to bring that to the Court's

6    attention.

7          THE COURT:  All right.  Okay.

8          MR. KAHN:  It should just track the language of the

9    Indictment, we would request.

10          THE COURT:  All right.  Your problem with ten is

11    you don't want the word -- you don't want the entire

12    instruction, but you don't want "coerce" either, correct?

13          MR. KAHN:  Correct, Your Honor.

14          THE COURT:  Let me read this real quick.

15          Well, if that were to stay, then all the language

16    needs to be tracked consistently; but you don't want it at

17    all.  So tell me why you don't want this instruction.

18          MR. KAHN:  Your Honor, this instruction is

19    typically used -- and I think we objected to this in our

20    proposed instructions.  This type of instruction is usually

21    used in a multi-count indictment.  It's not really intended

22    for single-count indictments.  And I believe it's

23    sufficiently covered by both your preliminary instruction and

24    your first instruction.

25          THE COURT:  I mean, this is -- this instruction is

1   -- I don't think your request is that unreasonable.  I mean,

2   this instruction really doesn't amount to anything.  It's

3   just introductory language.

4           What's the government's position on this?

5           MS. RIVERA:  We don't feel one way or another about

6   it, Your Honor.

7           THE COURT:  All right.  So you got what you

8   requested.  It's out.

9           I mean, again, I don't have any issue with it.  I

10  think it's just an introductory paragraph.  It doesn't amount

11  to a whole lot.

12          What's your next instruction?

13          MR. KAHN:  Instruction eleven, Your Honor --

14          THE COURT:  All right.

15          MR. KAHN:  -- back to the substantive offense.

16  Beginning with element number four, Your Honor, the last

17  language of element number four says, "Under the law of

18  Florida."  We would ask that it track the language of the

19  Indictment.

20          They said that if this offense would be committed,

21  it would constitutes a sexual battery under Florida Statute

22  794.011, I believe was the statute.

23          THE COURT:  That was testified to at trial, that

24  exact statute.

25          Let me ask you this question, because it seems to

1    be a theme of the defense permeating throughout this charging

2    conference.  Are you saying that if they don't allege it in

3    the Indictment but it's included in the elements on the

4    pattern instructions or it comes out in terms of testimony at

5    trial, that I'm absolutely bound to only the language in the

6    Indictment?

7           MR. KAHN:  Well, Your Honor, typically using this

8    as an example, if it would -- if the instruction would

9    broaden the possible bases for a conviction, it would

10   constitute a constructive amendment.  And I have a case on

11   point and I believe it's United States versus Narog.  I might

12   be pronouncing that wrong.  I'll give you a citation.

13          THE COURT:  I understand where you're coming from.

14   But you're telling me that giving the pattern instruction,

15   where that detail doesn't exist in the Indictment, is an

16   expansion of the offense?  I mean, actually giving the

17   verbatim pattern instruction?

18          MR. KAHN:  Yes, Your Honor, because their

19   Indictment, they choose how to craft it.  They want to limit

20   it to certain elements or certain facts.  That's what they're

21   charging our client with.

22          THE COURT:  I'd like to see your case, because I'm

23   having a little trouble with that, with this argument.

24          MR. KAHN:  Sure.  And I believe the case I'm going

25   to provide the Court, which is Narog, they limited the

1    statutory elements and they found that when they tried to

2    include a jury instruction, broader language that would have

3    normally come within the statute, that was a constructive

4    amendment because the indictment limited the statutory

5    elements.

6              THE COURT:  I understand.  I'd love to see that.

7              MR. KAHN:  I will give that to Your Honor right

8    now.  I apologize in advance for my cases being highlighted.

9              MS. RIVERA:  And if the defense can share that case

10   with me, that would be great.

11             MR. KAHN:  I have copies of any cases for all

12   parties.

13             THE COURT:  I appreciate that.  And I don't mind

14   you highlighting as long as you never highlight case notes,

15   which I don't read.  And you highlighted case notes --

16   headnotes.

17             MR. KAHN:  For the record, that's 372 F.3d 1243.

18             THE COURT:  All right.  If you want to make your

19   argument, feel free to do so.

20             MR. KAHN:  Well, Your Honor, it's essentially what

21   I've just stated and that is that element four should be

22   limited to the language of the Indictment.  Although they

23   could have charged it as under the laws of Florida, they

24   limited it to a narrow subset of Florida crimes.  And to

25   broaden the possible bases of conviction through the jury

1    instruction would constitute a constructive amendment, and I

2    think Narog is on point for that proposition.

3              THE COURT:  All right.  Thank you for that

4    argument.

5              Would the government like to be heard on this

6    particular issue?

7              MS. RIVERA:  Yes, Your Honor.  I don't think that

8    the jury instructions here are somehow making this more broad

9    than it should be, because after setting forth the elements

10   in page 13 of 22, the Court actually defines what is Florida

11   law in this case in particular:  sexual battery by a person

12   18 years of age or older.  And it continues, Your Honor,

13   actually tracking the language of the Florida statute that we

14   have cited in the Indictment.

15             So in that regard, I'm not sure that there is an

16   issue here, because the jury instruction actually defines the

17   conduct that he could have been charged with had he engaged a

18   minor in sexual activity.

19             Let me look on my jury instructions.  The way we

20   had it in our proposed jury instruction, actually at the end,

21   cites Florida Statute, Section 794.011; but I don't have an

22   objection to the instruction as it reads right now.

23             THE COURT:  But you're in opposition of the

24   request, though, correct?

25             MS. RIVERA:  Well, Your Honor, I don't think

1    that --

2              THE COURT:  Are you in opposition of the request?

3              MS. RIVERA:  Yes, Your Honor.

4              THE COURT:  Okay.  Because I recall that your

5    witness testified -- did testify at trial as to 794.0111, but

6    you want it to say Florida law, not limited to that statute?

7              MS. RIVERA:  We can add the sentence, I mean, if

8    this would remedy their concern.

9              THE COURT:  It's not going to remedy their concern.

10   They want it specific to that statute number.  I mean,

11   they're trying to limit exposure here, which I don't blame

12   them for doing; but I need to read a little more closely the

13   case that was provided.

14             MS. RIVERA:  We have not presented evidence to any

15   other violation of Florida law, and the jury will be

16   instructed that they're only to consider the evidence

17   presented in the case and to follow the instructions as

18   provided by the Court.

19             I'm not sure that these instructions -- even more

20   so because it specifically describes the conduct.  It tracks

21   the language in that section, Florida Statute, Section

22   794.011, that there is a problem as it reads.  We can add

23   that sentence at the end where it states, "Florida Statute,

24   Section 794.011."  And I think that addresses -- that would

25   address their concern, if they have any concern to that.

1          THE COURT:  They won't be happy with that.

2          So you're in opposition.  You want it to read

3  Florida law?

4          MS. RIVERA:  Florida law with the caveat as is

5  stated in page 13 of 22, where it defines what the crimes are

6  under Florida law:  sexual battery by a person 18 years of

7  age or older, et cetera.  And at the end we can add the

8  sentence "Florida Statute, Section 794.011."

9          MR. KAHN:  May I briefly respond, Your Honor?

10          THE COURT:  Yes.

11          MR. KAHN:  Your Honor, this portion of the

12  instruction is where they list the elements they must find.

13  It is, for all intents and purposes, the most important part

14  of the instruction.

15          And the government is saying it's okay that it says

16  that if he did it, he could have been convicted under any law

17  in Florida, if the jury finds that, even though they limit it

18  in their Indictment.

19          We are simply asking that the government be held to

20  the Indictment it crafted.  It's not an unreasonable request.

21  It's been the theme of our charging conference thus far.  I

22  think the case law I provided is on point.

23          THE COURT:  I'd be careful about using that term.

24  We're talking about a drug case, very different than what we

25  have here.  You're trying to apply parallel principles here

1   in very different factual circumstances.

2          I understand what your request is, but I'd like an

3   opportunity to review your case before I make a final

4   decision.

5          MS. RIVERA:  Your Honor, from our standpoint, we're

6   not going to attempt to mislead the jury.  As officers of the

7   court, we wouldn't do -- we wouldn't state to the jury that

8   he could be convicted because he must have violated a Florida

9   law.

10         THE COURT:  Let's look at it from the defense

11  perspective, just playing devil's advocate here.  In your

12  Indictment, as they indicate, you specify what Florida

13  statute he would have violated.  During the testimony of

14  Special Agent Hyre, he didn't say Florida law.  He didn't say

15  Florida statute.  He said Florida Statute 794.0111.  That is

16  his testimony on the record.

17         So in the Indictment, in the direct testimony, and

18  now in the instruction, what he's asking is that they all be

19  consistent across the board.

20         Other than your request for the pattern jury

21  instructions, which I don't think is an unreasonable request,

22  no one has used the term "Florida statute," only the pattern

23  instructions have.  Your Indictment, the testimony on the

24  record, Florida Statute 794.0111.

25         MS. RIVERA:  And we believe that, Your Honor, it

1    could be included in the jury instruction.

2              THE COURT:  You want both, though.  You want under

3    Florida law, specifically Florida Statute 794.0111.

4              MS. RIVERA:  No, Your Honor.  We can actually

5    include a reference to the particular statute.

6              THE COURT:  He wants the reference to be limited to

7    the statute.  So here's how he would have it read:  If the

8    sexual activity had occurred, the defendant could have been

9    charged with a criminal offense under Florida Statute,

10   Section 794.0111.  That's what he wants it to read like.

11             Is that correct from the defense perspective?

12             MR. KAHN:  Your Honor, we'd be willing to stipulate

13   to have it read just like the Indictment:  That if the

14   criminal offense, that is, sexual battery, a violation of

15   Florida Statute, Section 794.011, occurred, or something to

16   that effect.

17             MS. RIVERA:  Your Honor, the way the Eleventh

18   Circuit pattern jury instructions provide is that this is

19   basically that the elements and the statement that, as to the

20   violation, that it would be either Florida law, state law,

21   and then the second page it concisely describes the conduct

22   at issue.

23             THE COURT:  I've got it.  I know what your

24   arguments are.  I don't need to hear any more argument.

25   You're not in agreement on this.  So continue past eleven,

1    please.

2            MR. KAHN:  If I can just briefly comment, Your

3    Honor.  I apologize if I said the case is on point, then, if

4    I insinuated that they were factually similar.

5            THE COURT:  This is a bit of practical advice, and

6    I don't like to give a lot of it:  Nothing's ever on point.

7            MR. KAHN:  I appreciate the advice, Your Honor.

8            THE COURT:  That's fine.  And I don't think you

9    tried to mislead me in any way.

10           MR. KAHN:  Thank you, Your Honor.

11           THE COURT:  Go on ahead.

12           MR. KAHN:  I alluded to this earlier when the

13   government was requesting their modifications to the

14   substantive offense, instruction eleven.

15           THE COURT REPORTER:  I need you to please slow down

16   and begin that again.

17           MR. KAHN:  I apologize.  I will slow down.

18           THE COURT REPORTER:  Thank you.

19           MR. KAHN:  I alluded to this earlier, Your Honor,

20   in instruction eleven, when the government was requesting its

21   modifications.  It states that it's sufficient that the

22   defendant believed an individual under the age of 18 was

23   involved rather than an actual individual under 18.  It says

24   this three times in this instruction.  I think that's two

25   times too many.

1          I think the fact that it says it in the element in

2  plain language that the defendant, believing the individual

3  was less than 18 years old, that's clear.  I don't think we

4  need to reiterate it two more times in the subsequent

5  paragraphs after the elements.

6          THE COURT:  So tell me what -- look, your analysis

7  is the pattern instructions don't adequately address the

8  issue and the proposed modification is legal or consistent

9  with appellate case law.  So tell me what your basis is for

10 wanting to change the pattern instruction.  Do you think it's

11 confusing?

12         MR. KAHN:  I don't think it's confusing.  I think

13 it's unnecessary and it's redundant.  And if I were to

14 propose a modification, it would be to simply omit the

15 following language:  In the paragraph following the elements,

16 I would omit the language starting with "but it is necessary

17 for the government to prove that the defendant believes such

18 an individual to be under that age."

19         THE COURT:  So you don't like the one, two, three

20 references to the defendant believing the individual was

21 under the age of 18?

22         MR. KAHN:  It's not that I don't like it, Your

23 Honor.  I just think that it's redundant and it's

24 sufficiently covered by element number three as plain

25 language.  At a minimum, one of them should be taken out.  It

1  becomes the focal point of the instruction, when you have it

2  three times.

3  THE COURT:  I mean, using your theme from

4  previously, if the Eleventh Circuit thought it was

5  unnecessary, why didn't they just draft it without it being

6  included?

7  MR. KAHN:  Well, Your Honor, that was different.

8  They're asking for parts of a different instruction to be

9  included as a definition in this instruction.

10  THE COURT:  I understand.

11  MS. RIVERA:  I think it actually clarifies, Your

12  Honor, that element.  We don't have to prove that the

13  individual was in fact less than 18 years old objectively but

14  that the defendant believed, and I think thus it puts it in

15  context.

16  THE COURT:  Well, I mean, his argument isn't that

17  it doesn't put it in context.  I think he acknowledges that

18  the language is necessary and appropriate.

19  They just don't want it mentioned three times

20  within three paragraphs.  That's what their request is, to

21  remove one.

22  MS. RIVERA:  One, Your Honor, it goes to the fact

23  that we don't need to prove that there is a real minor.

24  Another one to the fact that we have to prove that the

25  defendant believed there was a real minor.  And the way it

1    reads, it seems perfectly fine and consistent with the

2    Eleventh Circuit case law.  I don't think it's redundant.

3                THE COURT:  Okay.  We have a difference of an

4    opinion.  I appreciate both of your positions on instruction

5    eleven, which we are absolutely eviscerating here.

6                What's your next request?

7                MR. KAHN:  We're still on instruction eleven, Your

8    Honor.

9                THE COURT:  All right.

10               MR. KAHN:  The next page, the first paragraph, page

11   13, that is, I would request that at the end of that

12   sentence, the first paragraph, when it says, "unlawful sexual

13   activity by communicating with an adult intermediary for that

14   purpose," I think that the communication should be limited to

15   the computer or the Internet, as per the Indictment.  So I

16   would --

17               THE COURT:  Read it to me how you want it to read.

18               MR. KAHN:  So I would propose that it say, "The

19   defendant need not communicate directly with an individual

20   under 18 years of age.  It is sufficient if the defendant

21   induces the individual to engage in unlawful sexual activity

22   by communicating with an adult intermediary through the use

23   of the computer or the Internet for that purpose."

24               THE COURT:  Does the government want to be heard on

25   that?

1          MS. RIVERA:  I think that what they're asking is --

2    it would be redundant.  I mean, they know that the elements

3    are stated that we have to prove that a means of

4    communication was used, meaning effecting interstate commerce

5    here; but that's not the only way whereby this defendant

6    communicated with the undercover, and it may be confusing as

7    far as limiting what they can consider in the case.

8          THE COURT:  Of course.  Of course, they want to

9    limit it.  Strategically, it's in their benefit.  They're

10   presenting legal argument with authority.  They want it as

11   limited and as strict as possible; and from your perspective,

12   you want it as broad and generally applicable as possible.

13        I don't blame either of you for making these

14   arguments.  I just have to weigh what you're requesting and

15   make my decision accordingly.

16        So in the previous argument, you were very

17   comfortable with the redundancy of three paragraphs having

18   the same 18-year-old information, but now redundancy is a

19   problem.

20        MS. RIVERA:  I just don't think it's redundant, the

21   way it reads, because it explains different things.  One,

22   that they don't have -- the statement that we don't have --

23        THE COURT:  I understand; but on this one, you're

24   saying it would be redundant to add "by communicating," and

25   then the information limiting it to a computer or to a

1  computer and the Internet.

2          MS. RIVERA:  And then potentially misleading as

3  well, because these communications can happen in other

4  contexts, and it doesn't mean that the defendant is not

5  acting in furtherance or with the intent to commit a

6  violation of the law in this case.

7          MR. KAHN:  And, Your Honor --

8          THE COURT:  I have to say, though, I mean, I'm not

9  an overly suspicious person, I don't think, but there's a

10  consistency in the direction you're trying to take me, and I

11  understand.  But you're consistently asking me to limit the

12  application of the device used for Internet -- or for

13  interstate commerce to a computer or the Internet.  I'm just

14  having a hard time understanding why strategically you would

15  be so strident in your pursuit of that but for the fact that

16  you are indeed -- someone is indeed planning on arguing that

17  a cell phone is not a computer --

18          MR. KAHN:  Your Honor, we have indicated that we

19  are not arguing that.

20          THE COURT:  -- or hoping that without addressing

21  that issue, the jury might conclude that a cell phone is not

22  a computer and therefore that's a basis of an acquittal.

23          MR. KAHN:  Your Honor, we're merely holding the

24  government to the Indictment they crafted.

25          THE COURT:  I understand; but it's a little more

1   complicated than that because -- I guess the foundation of

2   your argument is on the case you presented, where it's your

3   position that -- and I think this is applicable to several of

4   your arguments; that if I don't hold them to the language of

5   the Indictment, then I'm allowing your client to -- I'm

6   allowing the jury to find your client guilty for something

7   that he was never charged with.  I understand.

8       MS. RIVERA:  Your Honor, what we have -- we've

9   provided notice, but they have to follow the law and this is

10  the law.  The Court is explaining the law.

11      If our Indictment doesn't meet the elements of the

12  offense, they have to acquit.  What this is informing the

13  jury is not about the Indictment.  It's about what the

14  elements are, to prove an offense under Section 2422(b).  So

15  what we should be looking at is the statute and the case law.

16      THE COURT:  I understand, and that's what I'm

17  looking at.  I mean, the premise that the defense started

18  with, I reject, that if the language of the instructions have

19  to track verbatim the language of the Indictment.  I don't

20  think that's what the state of the law is, and that's why I

21  want to see the case.

22      But moving in a little bit closer and looking at

23  the nuance here, that isn't ultimately what their argument

24  is.  They're arguing that this particular modification, from

25  indictment to instruction, violates the legal principle in

1    the case they provided the Court.  That's their argument, and

2    that's a determination I have to make.

3            I haven't read the case yet.  I mean, I know what

4    this case is -- I generally have an idea of what this case is

5    about, and this is the Narog case, where -- and it wasn't

6    really a jury instruction issue.  It was the judge answering

7    a question posed by the jury subsequent to the giving of the

8    instructions that expanded the definition of the offense

9    considerably.  So it's a little bit different in that regard,

10   but I understand what their theory is.  This is too much of a

11   change from indictment to instruction, and therefore unfair

12   to their client.

13           MS. RIVERA:  Yes, and I think we should all -- I

14   mean, we are all in agreement.  This -- the Eleventh Circuit

15   pattern jury instructions, they're an aid to the jury.

16   They're not to be taken as like scriptures that cannot be

17   modified to conform to a particular case, of course, within

18   the boundaries of the law.  And I don't think there's

19   anything wrong with the way it reads in the context of the

20   case as applicable to this case.

21           THE COURT:  I understand your argument.  I

22   understand both your arguments.  I just need a chance to

23   absorb the information.

24           And I will tell you, so you know where I'm coming

25   from, you're going to need to make very strong and succinct

1    arguments to move me off pattern instructions, okay?

2          MR. KAHN:  I understand.

3          THE COURT:  So I understand your argument.  I

4    appreciate the work you've put into making the argument.

5          So let's move on.  Right now you've stated three

6    objections as to instruction eleven, all three of them:

7          Number one, under the laws of Florida versus

8    Florida Statute 794.0111;

9          Your second objection is that you want the less-

10   than-18-year-old language removed on the last reference to

11   it;

12         And your third request is on the first paragraph on

13   page 13, that's instruction eleven, you want to extend that

14   sentence to limit the communication to the computer and the

15   Internet.

16         Let's go with your next request.  All right.  So

17   we're beyond a couple now.  I hope we're not going to be

18   approaching 13 when we wrap up.

19         MR. KAHN:  I have not counted, Your Honor, but I

20   will do my best to be succinct.

21         THE COURT:  All right.  Let's go.

22         MR. KAHN:  The next paragraph in that instruction,

23   instruction eleven on page 13 --

24         THE COURT:  All right.

25         MR. KAHN:  -- this is not from the Indictment, but

1   it may be one of the most important instructions we request,

2   and that has to do with adding language at the end of the

3   word "cause."  And it says, "Inducements to stimulate the

4   occurrence of or to cause."  We wanted to include "the assent

5   of a minor to engage in unlawful sexual activity."

6          That is consistent with the state of the law in the

7   Eleventh Circuit, specifically from the Lee case.  And I have

8   that for the Court and I will cite it.

9          THE COURT:  Yeah, if you could, bring the case up.

10  Please make sure your opposing counsel has a copy of that.

11          MR. KAHN:  Yes, Your Honor.

12          THE COURT:  As an aside, have any of you tried to

13  dig through Westlaw or through the CM/ECF cite and determine

14  what the jury instructions were in either Worsham or

15  Levinson?

16          MR. KAHN:  I have not, Your Honor.

17          THE COURT:  Has the government?

18          MS. RIVERA:  No, Your Honor.  We can do so, though.

19          THE COURT:  I'm going to do so.  I just wondered if

20  any of you have looked that up.

21          MR. KAHN:  With that in mind, Your Honor, I would

22  also point out, consistent with what you just said, there was

23  a case, Matthew Howard, that was the same charge, and the

24  instruction I'm requesting right now about adding onto the

25  language of assent was included in that case.

1          MS. RIVERA:  I didn't recall that, and I was the

2     prosecutor in that case, but I --

3          THE COURT:  Oh, you were?  Well, that's very

4     helpful, then.  Why don't you give me the -- you don't have

5     the case number, do you?

6          MS. RIVERA:  No, Your Honor.

7          MR. KAHN:  In fact, Your Honor, I believe Ms.

8     Rivera agreed to that instruction in that case.

9          THE COURT:  Well. . .

10         MS. RIVERA:  I don't recall --

11         THE COURT:  Cases are like snowflakes:  No two are

12    alike.

13         What's the last name of the defendant in that case?

14         MS. RIVERA:  Howard.

15         THE COURT:  Do you have a first name?

16         MS. RIVERA:  Matthew Howard.

17         THE COURT:  All right.

18         MS. RIVERA:  We would have to see the transcript,

19    Your Honor, as well of that trial to determine whether we

20    actually agreed to that, although I really doubt it because

21    the Eleventh Circuit pattern jury instruction on this matter

22    is just that.  And that is based on Murrell, United States

23    versus Murrell, not on United States versus Lee.

24         MR. KAHN:  However, Your Honor, Lee came after

25    Murrell, and it clarified it's not just to cause anything

1   under the sun.  This is a crime about causing the assent of a

2   minor to engage in unlawful sexual activity.  It's about a

3   mental state and the change of a mental state, and Lee

4   clarified Murrell.  It's not inconsistent with Murrell.

5        MS. RIVERA:  However, this case falls squarely

6   within United States versus Murrell.

7        MR. KAHN:  And so does the instruction we're

8   requesting, because Murrell actually says that this crime is

9   about the mental state.  It says someone would be convicted

10  under 2422(b) if they induce someone and never even carried

11  out the actual traveling -- I'm sorry -- the actual sexual

12  act.

13        And I have the case number for Howard, Your Honor.

14        THE COURT:  Give me just a moment.

15        (Discussion held off the record between the Court

16  and the courtroom deputy.)

17        MS. RIVERA:  We also participated, Your Honor, in

18  the case of United States versus Wilkerson.

19        THE COURT:  All right.  Give me just a second.

20        It's interesting.  On the Indictment -- on the

21  Indictment, they don't mention the term "computer" in the

22  Howard case, and they specify the exact Florida statute, yet

23  on the jury instructions, they put "computer, a cell phone or

24  the Internet."

25        MR. KAHN:  Your Honor, I don't know that they

1    presented the objections I'm presenting.

2              THE COURT:  No, the objections don't drive the

3    decision, although they assist the Court.  It doesn't seem to

4    be inconsistent with the law, though.

5              MR. KAHN:  It's not inconsistent with the --

6              THE COURT:  I'm not going to get too far into this

7    because I do believe every case is like a snowflake:  No two

8    are alike.

9              But as this case is the one that you are the one

10   that cited, it might assist you on this one issue because the

11   language that you indicated is in here.  The flip side of

12   that is that it sort of deflates your other arguments.

13             MR. KAHN:  Well, Your Honor, I would just

14   respectfully respond that it's not that it's inconsistent

15   with the law; it's that it's inconsistent with the

16   Indictment.

17             THE COURT:  It was in that case, too.

18             MR. KAHN:  But no one objected on that basis.

19             THE COURT:  Well, you're assuming that no one

20   objected on that basis.  You might want to take a look at the

21   transcript that's here.

22             MS. RIVERA:  Well, Your Honor, we don't want to

23   retry United States versus Howard.  It was actually affirmed

24   by the Eleventh Circuit --

25             THE COURT:  Actually, I was just trying to make a

1   point.

2          MS. RIVERA:  -- and it involved an undercover

3   acting as a minor in that case.  Here, we have an undercover

4   officer acting as the father of a minor.

5          I believe the Eleventh Circuit jury instructions as

6   they are, the definition actually tracks United States versus

7   Murrell exactly, and it shouldn't be modified, Your Honor.

8          THE COURT:  In the future, you probably might not

9   want to unsheathe this as your sword, because as I'm looking

10  through the instructions, the instructions on this Howard

11  case are eviscerating just about every one of the requests

12  you're making.  The introductory paragraph is in there.  The

13  language referring to the 18-year-old is there three times

14  under the substantive instruction.  Computer, Internet or

15  cell phone is there notwithstanding the fact that it's not in

16  the Indictment.

17         The only part of your argument that it helps you

18  with is the one you've cited.  So a word to the wise.  This

19  case -- assuming that I go with your parallel that it was

20  done in this case and she agreed to it, that deflates every

21  one of your other arguments.

22         MR. KAHN:  I would just maintain my response, Your

23  Honor.

24         THE COURT:  I understand.  Feel free to proceed.

25         MR. KAHN:  Your Honor, we would also request that

1    the language in the final paragraph, that under Florida law,

2    sexual battery by a person 18 years of age or older upon a

3    person --

4              THE COURT:  So we're still on eleven?

5              MR. KAHN:  Yes, Your Honor.  My apologies.

6              THE COURT:  No, no.  That's okay.

7              Okay.  So the final paragraph of instruction

8    eleven.

9              All right.  Feel free to proceed.

10             MR. KAHN:  We would request that the language

11   stating that the following acts are common to Florida law,

12   "Sexual battery by a person 18 years of age or older upon a

13   person less than twelve years of age," be removed in the

14   Indictment.  They cite 794.011 in its entirety.  They don't

15   cite to a specific subsection, and we think it would be

16   unfair for them to be able to pinpoint certain subsections

17   now, at the conclusion of the trial, for the bases of his

18   conviction.  He should cite all of the statute or none of it.

19             In the alternative, if you're going to cite a

20   specific subsection, like subsection 2(a), you should cite

21   the language of that subsection in its entirety.

22             THE COURT:  What's the government's position on

23   that?

24             MS. RIVERA:  Yes, Your Honor.  Basically, what

25   we're asking here is for the definition of sexual battery,

1   and it basically includes both the acts that can be

2   perpetrated and what the Court is citing here.

3           It is -- the law is what it is.  We have cited that

4   portion, the 794.011; but what we establish here, of course,

5   is that it was a person who was less than ten years of age by

6   an adult who was older than 18 years of age.

7           There is nothing misleading about this statement.

8   Yes, it is broad; but when you read Section 794.011, it

9   includes the definition of sexual battery that's applicable

10  to this case.

11          The only thing I would add there would be Florida

12  Statute, Section 794.011.  And it's fine as it reads.

13          MR. KAHN:  Your Honor --

14          THE COURT:  So tell me how you want it to read

15  again.

16          MR. KAHN:  We have no objection to the definition

17  of sexual battery.  That's what they allege in their

18  Indictment.  But we think that the first part of that

19  paragraph, where it says, "Sexual battery by a person 18

20  years of age or older upon a person less than twelve years of

21  age," should be omitted.

22          It says, "As a matter" it should say -- we propose

23  it should say, "As a matter of law, the following act is a

24  crime under Florida law:  Sexual battery, which is," and then

25  proceed to the definition.

1            MS. RIVERA:  That's part of the statute, Your

2      Honor.

3            MR. KAHN:  And they allege a sexual battery; but

4      that statute, if you look at it, talks about numerous forms

5      of sexual battery, and they want to pinpoint one specific

6      form under the statute.

7            MS. RIVERA:  And that's one of them, Your Honor.

8      And the definition of sexual battery --

9            THE COURT:  Doesn't the sexual battery part cover

10     what it is that you've alleged was attempted to occur in this

11     case?  Sexual battery is not limited to -- actually, sexual

12     battery by a person over the age of 18 performed on a person

13     less than twelve years of age is capital sexual battery in

14     Florida.

15           MR. KAHN:  That's correct, Your Honor.

16           THE COURT:  I'm just saying I think the "sexual

17     battery" means the oral, anal and vaginal.  I mean, this is

18     one of those converse arguments where the defense is actually

19     asking for a broader instruction that covers more behavior.

20     So you're not limited to anything other than the general

21     definition.

22           So you're in opposition of this request, correct?

23     Is that the government's position?

24           Again, here's what they want it to read as:  "As a

25     matter of law, the following acts are crimes under Florida

1    law:  Sexual battery means the oral, anal or vaginal

2    penetration by or union with the sexual organ of another or

3    the anal or vaginal penetration of another by any other

4    object.  However, sexual battery does not include an act done

5    for bona fide medical purpose."

6            So it's not limiting you to any ages; it's just

7    saying the attempt to.  You're arguing there was attempt of

8    oral, anal or vaginal penetration or union with.

9            So what you've alleged occurred during the course

10   of your case, that he was attempting to either perform or

11   receive oral sex from the fictitious ten-year-old, would

12   fall -- I mean, if the jury believes that testimony, would

13   fall under this definition of sexual battery.

14            MS. RIVERA:  I tend to agree, Your Honor.  I agree

15   with that.

16            THE COURT:  All right.

17            Move on to your next objection.  I mean, I guess

18   you've run out of paragraphs on eleven.

19            MR. KAHN:  Yes, Your Honor.

20            THE COURT:  All right.

21            MR. KAHN:  We're on number twelve now, Your Honor.

22            THE COURT:  All right.

23            MR. KAHN:  I think the government already alluded

24   to this, but it mentions "coerce" twice.

25            THE COURT:  Coerce?  Yeah, I think both of you are

1    in agreement that "coerce" is removed.

2           MR. KAHN:  The next modification we propose is on

3    the first element.

4           THE COURT:  All right.  Give me just a second.  I

5    want to type this out.  I'm typing out your objections one at

6    a time so they can be addressed in order.

7           All right.  "Coerced" removed from the entire set

8    of instructions.

9           All right.  Next.

10          MR. KAHN:  On the first element, Your Honor, we

11   would ask that it conform with the pattern instruction

12   insofar as the word "knowing" be in front of the word

13   "intended."

14          THE COURT:  All right.  But she wanted to track

15   that language anyway.  So. . .

16          MR. KAHN:  However, Your Honor, there's a slight

17   difference in that the pattern talks about the intent

18   required to commit.  An attempt must be knowingly intended.

19   There's -- the actual substantive offense also includes a

20   knowing intent.  So there's two knowing intents that are

21   required here.  It's a knowing intent under the first element

22   of attempt and the knowing intent under the substantive

23   offense.

24          THE COURT:  All right.  So the substantive offense

25   reads -- and you're looking at element one -- "The defendant

1  knowingly persuaded, induced or enticed an individual to

2  engage in sexual activity as charged," correct?

3          MR. KAHN:  Uh-huh.

4          THE COURT:  And then what you're looking for on

5  instruction twelve is for it to read:  The defendant

6  knowingly intended to commit a crime.

7          Of course, "coercing" comes out because the rest of

8  it's going to track -- you just want "knowingly" between

9  "defendant" and "intended," correct?

10         MR. KAHN:  Yes.

11         THE COURT:  All right.  What's the government's

12 position on that?  That really essentially tracks the

13 language.

14         MS. RIVERA:  Yes, Your Honor, it would appear to

15 track the language of the pattern jury instruction.

16         THE COURT:  All right.  Well, that would be

17 tracking the language.  So I think we have some -- okay.

18 Give me just a second.

19         All right.  So we have agreement on that.

20         Instruction twelve, the first sentence will read:

21 "The defendant knowingly intended to commit the crime of."

22 And from that point, it'll track the language in the first

23 prong of instruction eleven.

24         All right.  Anything else?

25         MR. KAHN:  Yes, Your Honor.  The same instruction,

1   number twelve, we would request the last two sentences be

2   included from our proposed instruction, and what that says is

3   it says, "In determining whether the defendant has taken a

4   substantial step, consider only the defendant's objective

5   acts.  Those acts, taken as a whole, must strongly and

6   unequivocally suggest that the defendant intended to commit

7   the crime."

8           That's from the case of McDowell, 705 F.2d 426.  I

9   have copies of that for the Court.

10           THE COURT:  I would appreciate that.

11           MR. KAHN:  Your Honor, we asked for this

12   instruction because it clarifies how to determine whether

13   something is substantially corroborated or whether an act

14   substantially corroborates a defendant's intent, because that

15   by itself is a bit vague.

16           And this case tells you we're looking objectively

17   at the defendant's acts, and we have to look at them and they

18   must strongly and unequivocally suggest that the defendant

19   intended to commit the crime, and that's how we know if

20   something is strongly corroborated.

21           THE COURT:  You mention it, so I keep going back to

22   it.  Do you care to guess whether this language was included

23   in the Howard case you mentioned earlier?

24           MR. KAHN:  I imagine it was not, Your Honor.

25           THE COURT:  It was not.

1          MS. RIVERA:  I don't think there's anything

2     ambiguous about the way it reads, Your Honor.  I understand

3     the case law.  I have not had an opportunity to review this

4     case and see if there are any other cases that might allude

5     to the use of this language in the jury instructions.

6          But that's not the context here.  This was the

7     context in which the Eleventh Circuit analyzed this case.

8     What we're looking at here is the jury instructions, and I

9     don't think there's anything ambiguous about the way they

10    currently read.  And we definitely oppose this language which

11    somehow expand the definition of substantial step, based on

12    this one case.

13          MR. KAHN:  Your Honor.

14          THE COURT:  Sure.

15          MR. KAHN:  Barring a line of argument from my

16    opposing counsel, this merely clarifies.  It clarifies what

17    it means to strongly corroborate.  It doesn't expand on it.

18    It makes it clear.  How do you evaluate this?

19          We're telling the jury that an act must strongly

20    corroborate.  Well, how do they know if something is strongly

21    corroborated?  This helps them to make that determination,

22    and it's well supported by the case I just provided.

23          MS. RIVERA:  Your Honor, I think that the jury is

24    very capable, using their common sense and the Court's

25    instructions, to determine whether, based on the evidence,

1  the defendant took a step that was substantial in nature

2  toward the commission of the offense.

3          There is no requirement for it to be explained any

4  further.  The language here is pretty clear that it states

5  it's an important action leading up to committing an offense,

6  not just an inconsequential act.  It must be more than simply

7  preparing.  It must be an act that would normally result in

8  the commission of the offense.  That is a sufficient

9  explanation.  And we don't have an opportunity to further

10 look into this.  I would definitely strongly object to the

11 inclusion of this language.

12         THE COURT:  I understand.

13         I'm not sure that there are -- that either of you

14 are wrong.  I just think that there are many different

15 answers for this dilemma.

16         But I applaud your candor in providing me with the

17 Howard case, but it's tearing down all your arguments.  I

18 mean, I know that's a different set of circumstances, but

19 nothing's on point and everything's by comparison.

20         So the real analysis here is whether I make a

21 determination that the language as you're proposing is really

22 helpful or if I agree with the government that the pattern

23 instruction adequately addresses the issue.

24         MR. KAHN:  Well, Your Honor, I would just simply

25 say we weren't the attorneys in Howard.  We didn't make the

1  same objections.  Had those objections been made, perhaps

2  they would have ruled the way we are requesting now.

3          THE COURT:  But you also weren't the attorneys in

4  705 F.2d 426, and you are very comfortable in relying on that

5  determination.  I mean, that's the dilemma.  I mean, it is

6  what it is.

7          I'm not criticizing you for making these arguments.

8  You're walking a very difficult tightrope at that point, and

9  I guess the moral of the story here is there are a lot of

10  different ways to do something correctly.

11          MR. KAHN:  Well, Your Honor, if Howard is really

12  what's brings us down, I would just rely on the law in Lee

13  for the requested instruction on what it means to cause, and

14  I would rely on all the other law that we provided so far.

15  Those are binding Eleventh Circuit decisions.

16          Howard was something that happened in this court;

17  and while it's persuasive authority, I think for all the

18  propositions and instruction we've requested, they are well

19  supported by the Eleventh Circuit case law.

20          THE COURT:  And I understand that, but, you see,

21  the dilemma here is -- I know that when you're making legal

22  arguments, you couch them in terms of we're correct and

23  they're not.

24          The problem here is that I'm not sure either of you

25  are entirely wrong on our positions or that either of you are

1   entirely right, and that's why I want to make it clear that

2   the pattern instructions sort of serve as a default for that.

3           I have listened to your arguments.  I'm taking

4   notes on the specific requests you're making, but ultimately

5   it comes down to:  Are the pattern instructions adequate?

6   And do the modifications you request offer a higher level of

7   clarity, consistent with the application of appellate case

8   law?

9           You've done well to give me the case law, but I

10  think ultimately it comes down to a judgment call; and I'm

11  not sure it's either right or wrong in either way.  I just

12  have to make my best decision based on how this case has

13  unfolded.

14          All right.  So moving on to -- do you have another

15  request?

16          MR. KAHN:  Yes, Your Honor.

17          THE COURT:  You've made eight so far.  This'll be

18  number nine.  What's your ninth request?

19          MR. KAHN:  Moving to the entrapment instruction,

20  Your Honor.

21          THE COURT:  All right.  Now, the entrapment

22  instruction is a pattern instruction, if I'm not mistaken.

23  Is that correct?

24          MR. KAHN:  It is, Your Honor.

25          THE COURT:  Okay.

1              MR. KAHN:  And we had proposed a 2003 version of

2    the instruction in our proposed instructions.  And the cases

3    relied on by the Eleventh Circuit pattern jury instruction

4    committee for the 2013 version versus the 2010 version of the

5    same.  They don't rely on any different cases.

6              The reason we requested the 2003 version is because

7    it's much more clear about a very important distinction, and

8    that distinction is that the predisposition must be existent

9    in the defendant prior to the government's initiation of

10   contact.  This instruction doesn't make that clear, where the

11   2003 does.

12             And I have the Supreme Court's case of Jacobson,

13   which talks about that distinction at length, and it says

14   that the predisposition must be in existence prior to the

15   government's initiation of contact.

16             THE COURT:  The first paragraph of 14 reads as

17   follows:  Entrapment occurs when law enforcement officers or

18   others under their direction persuade a defendant to commit a

19   crime that the defendant had no previous intent to commit.

20             MR. KAHN:  I'm sorry.

21             THE COURT:  That's the first paragraph of

22   instruction 14.  Why doesn't that cover what you want

23   covered?

24             MR. KAHN:  Because I think it should be clearer

25   that the defendant did not have the intent to commit this

1    prior to contact with the government agent.

2              THE COURT:  Intent with a modifier previous seems

3    to indicate that rather clearly in the first paragraph, "A

4    crime that the defendant had no previous intent to commit."

5              MR. KAHN:  Previous to what, Your Honor, is what I

6    would respond?  I would say it would be previous to contact

7    with the government agent.

8              THE COURT:  "Entrapment occurs when law enforcement

9    officers or others under their direction persuade" -- that's

10   your marker on the timeline -- and persuade, based on how the

11   evidence unfolded, would have been when Special Agent Hyre

12   responded to the Craigslist account -- "persuade a defendant

13   to commit a crime the defendant had no previous intent."

14             So prior -- that seems to indicate if the defendant

15   didn't have the intent to commit the crime prior to Special

16   Agent Hyre persuading him or contacting him, that would be

17   it.

18             All right.  I understand what your argument is.

19   You think the other one's less ambiguous or clearer?

20             MR. KAHN:  Yes, Your Honor.

21             THE COURT:  All right.

22             Does the government want to be heard on that?

23             MS. RIVERA:  Your Honor, these instructions are

24   revised for a reason.

25             THE COURT:  Help me out.  You oppose it, right?

1          MS. RIVERA:  Yes, Your Honor.

2          THE COURT:  All right.  Go on ahead.

3          MS. RIVERA:  The instructions are revised for a

4   reason.  And in drafting these instructions, the Eleventh

5   Circuit basically is trying to make this more current to the

6   case law.  And I believe the instruction as it reads is clear

7   as to what "entrapment" means and what the government has to

8   prove in this case.

9          I know they want to -- it seems like they want to

10  make everything more restrictive to somehow heighten our

11  burden or just basically advance the theory of their case,

12  but they're going to have an opportunity to address the jury

13  and explain their arguments and how they see that they should

14  apply the law to the case, but the way this reads is in

15  accordance with the law and is the most recent version of the

16  definition of "entrapment."

17          THE COURT:  All right.

18          Any further request from the defense?

19          MR. KAHN:  Two more, Your Honor.

20          THE COURT:  All right.  What's the next one?

21          MR. KAHN:  They're for supplemental instructions.

22  The first one is on a version of an instruction we requested

23  initially in our proposed jury instruction, and that's an

24  instruction on deliberate ignorance as proof of knowledge.

25          The pattern instruction does have this example

1    about a controlled substance offense, which I think can be

2    omitted, but I think it is an important instruction insofar

3    as knowledge as an element not only of attempt but of the

4    substantive offense.  And because we have two knowledge

5    elements at play here, I think deliberate ignorance is proof

6    of knowledge is an appropriate instruction, as knowledge is

7    an element.

8             And the way I would suggest it reads, and only two

9    sentences, Your Honor --

10            THE COURT:  It's only a brand new instruction?

11            MR. KAHN:  Well, we submitted a deliberate

12   ignorance instruction with our joint --

13            THE COURT:  You don't want it added to anything

14   else?  It's its own stand-alone?

15            MR. KAHN:  Yes, Your Honor.

16            THE COURT:  Okay.  Go on ahead and read it.

17            MR. KAHN:  "If a defendant's knowledge of a fact is

18   an essential part of a crime, it's enough that the defendant

19   was aware of a high probability that the fact existed unless

20   a defendant actually believed the fact didn't exist.  But I

21   must emphasize that negligence, carelessness or foolishness

22   isn't enough to prove that the defendant had knowledge."

23            THE COURT:  Would the government like to respond?

24            MS. RIVERA:  Is that what you --

25            MR. KAHN:  It's the first paragraph.

1  (Discussion off the record between Mr. Kahn and Ms.

2  Rivera.)

3  MS. RIVERA:  I think -- well, you took out the last

4  one.

5  I'm not clear as to what exactly -- I'm sorry --

6  that you're proposing.

7  "If a defendant's knowledge of a fact is an

8  essential element -- an essential part of a crime, it's

9  enough that the defendant was aware of a high probability

10  that the fact existed unless a defendant actually believed

11  the fact didn't exist," this is really confusing.  I'm not

12  sure how this would be applied to this case.

13  MR. KAHN:  Your Honor, I prepared a proposed

14  instruction because I thought it might be confusing.

15  THE COURT REPORTER:  I need counsel to please speak

16  one at a time.

17  THE COURT:  Thank you.

18  MR. KAHN:  I'm sorry.

19  THE COURT:  We'll slow down a little bit.

20  Why don't you please bring the proposed instruction

21  up.

22  Although you didn't mention it, the pattern

23  instruction number 13 seems to be what you're building on

24  here, because that's where the term "knowingly" is defined

25  within the pattern instruction.

1          MS. RIVERA:  I don't understand how this is

2   applicable to this case, Your Honor, at all.  There's no

3   basis in the evidence for these instructions.

4          THE COURT:  Okay.  I understand the government's

5   argument on the deliberate --

6          MR. KAHN:  Your Honor, may I --

7          THE COURT:  -- ignorance supplemental instruction.

8          MR. KAHN:  May I briefly respond to the

9   government's point?

10         THE COURT:  Sure.

11         MR. KAHN:  It's relevant, because part of our

12  position is that a defendant did not believe he was inducing,

13  persuading or enticing a minor.  If that fact is in dispute

14  and knowledge is an element, then I believe this is an

15  appropriate instruction.

16         MS. RIVERA:  Your Honor, there's no evidence of

17  negligence, carelessness or foolishness in this case.  And

18  the way this reads can be really confusing to the jury; and

19  if it's a stand-alone instruction, even more so.

20         THE COURT:  Well, just consider this food for

21  thought.  I'm not inviting further argument on this.  On

22  instruction 13, the last sentence:  "The word 'knowingly'

23  means that an act was done voluntarily and intentionally and

24  not because of a mistake or by accident."  So you're saying

25  that's inadequate?

1          MR. KAHN:  Well, I think that gets lost in the

2     first paragraph and the title of the instruction, but I

3     understand your point, Your Honor.

4          THE COURT:  Thank you for that argument.  You have

5     another supplemental instruction you're going to be

6     requesting, correct?

7          MR. KAHN:  I do, Your Honor.  It's a theory of the

8     defense instruction, and I have copies for opposing counsel.

9          THE COURT:  I would appreciate that.  And this is a

10    stand-alone, not in addition to another instruction?

11         MR. KAHN:  Yes, Your Honor.

12         THE COURT:  Okay.

13         MR. KAHN:  Your Honor --

14         THE COURT:  Give me just a moment to read it.  I

15    think I've seen this, but let me read it.

16         You do understand that in the first paragraph of

17    your instruction you don't specify Florida statute?  So are

18    we back to Florida law now?

19         MR. KAHN:  That was a mistake on my part, Your

20    Honor.

21         THE COURT:  Okay.  Go on ahead and make your

22    argument.

23         MR. KAHN:  Your Honor, I have copies of the Ruiz

24    case I cited, if you'd like.

25         THE COURT:  No.  I gave him the case.  He's looking

1    it up now.  Go on ahead.

2              Oh, you have copies of it?

3              MR. KAHN:  Yes.

4              THE COURT:  Oh, please bring it up.

5              MR. KAHN:  I apologize.  Again, Your Honor, that's

6    the case of Ruiz.  The citation is 59 F.3d 1151 from the

7    Eleventh Circuit.

8              Your Honor, quoting Ruiz, "A criminal defendant has

9    the right to have a jury instructed on his or her theory of

10   the defense separate and apart from instructions given on the

11   charged -- on elements of the charged offense.

12             "A trial court may not refuse to charge the jury on

13   a specific defense theory where the proposed instruction

14   presents a valid defense and where there has been some

15   evidence adduced at trial relevant to that defense."

16             Skipping ahead a sentence, "The threshold burden is

17   extremely low.  The defendant is entitled to have presented

18   instructions relating to a theory of defense for which there

19   is any foundation in the evidence."  And the words "any

20   foundation" are italicized for emphasis.

21             "In deciding whether a defendant has met his

22   burden, the court is obliged to view the evidence in the

23   light most favorable to the accused."

24             THE COURT:  Read the next sentence.

25             MR. KAHN:  "Ruiz testified in her own behalf to

1   prove her belief that she was assisting the government

2   through Santana, who was, as far as she knew, also a

3   government informant.   She thus met the evidentiary burden."

4           THE COURT:   It seems to me that she met the

5   evidentiary burden by testifying as to what her theory of the

6   case was.   What parallel in this case do we have to that?

7           MR. KAHN:   Your Honor, our theory of the defense is

8   that the government did not present any evidence showing that

9   our client changed the mental state of a minor.   That has

10  been our defense the whole time.   And that looking at that

11  evidence in the light most favorable to Mr. Brooks --

12          THE COURT:   What evidence is there on the record of

13  that theory of the case?

14          MR. KAHN:   Our Rule 29 motion.

15          THE COURT:   That's not evidence.   What testimony or

16  evidence has been -- I mean, it's pretty clear that Ruiz in

17  that case testified under oath that that's what she thought

18  was going on and was entitled to that instruction.   If I'm

19  not mistaken, the defense put on no evidence in this case.

20          MR. KAHN:   I think if you look at the evidence that

21  is admitted, the chats where we have sufficiently set forth

22  that Mr. Brooks was not the individual who initiated contact

23  about sex with minors, that Agent Hyre persistently

24  controlled and led the conversation, that he re-initiated

25  conversation on two different occasions, that he

1    consistently, which is consistent with his training and

2    expertise, allayed the concerns of Mr. Brooks, looking at all

3    that evidence in the light most favorable to Mr. Brooks and

4    consistent with the position that the evidence viewed in the

5    light most favorable to Mr. Brooks and that there's any

6    foundation in the evidence for this instruction and that the

7    burden is low sufficiently satisfies Mr. Brooks' request.

8             MS. RIVERA:   The burden is low, Your Honor.   There

9    is a burden, and in this case that was not their theory of

10   defense.

11            From what I heard on cross-examination, and I think

12   that their concern and the theory of their case is that this

13   defendant was entrapped.   And I have not even objected at

14   this point to the use of the instruction, to the 2015 version

15   or the current instruction on entrapment because there --

16   they were -- because I think the prima facie case was made,

17   I'm not objecting to the use of the current entrapment

18   instruction; but this is going further than that.

19            There was absolutely no evidence to that effect,

20   and this is not about him trying to cause the assent of a

21   minor.   This misstates the law and it misstates the evidence

22   presented in this case.   This is a case involving the

23   attempt.

24            We didn't have to prove that the defendant

25   persuaded, enticed or induced a minor, but that the defendant

1    had the intent to commit the attempt of that offense, attempt

2    to induce, persuade or entice.  It's not that he intended to

3    change the mental state of a minor.

4            MR. KAHN:  Your Honor, opposing counsel has

5    misstated our theory of the defense.  Our defense is that he

6    did not commit this crime; and if he did, he was entrapped.

7    They're not mutually exclusive.

8            THE COURT:  Let me ask you this question.  I know

9    what your defense is.  But just reading on this case, Ruiz,

10   "The pattern instruction as given failed to recognize that a

11   series of unlawful acts may be intentionally, willfully,

12   purposefully and voluntarily committed without criminal

13   intent.  The jury should have been instructed on what form as

14   a matter of law a lawful end or lawful means might take under

15   the defendant's interpretation of the facts.

16           "The government disingenuously argues that the

17   denial of the instruction was harmless error because counsel

18   was allowed to present the defense theory in closing

19   argument.  The jurors were instructed to be guided solely by

20   the evidence and the Court's instructions and not by

21   counsel's argument.

22           "The failure to give the requested instruction

23   seriously impaired the defense because Ruiz's beliefs were

24   critical to her entire theory.  With no instruction on the

25   legal effect of the erroneous belief that she was acting

lawfully in light of her admission to acting willfully, the
jury was left with no legitimate and lawful alternative
explanation for her conduct."

All right.  In the context of that, here's your
jury instruction.  Mr. Brooks denies that by using -- or Mr.
Brooks denies using the Internet and a computer, he knowingly
attempted to persuade, induce or entice any person he
believed was under the age of 18.

Moving on to the third paragraph, Mr. Brooks
maintains that he is not guilty of the charged offense
because he did not knowingly intend to cause a minor to
assent to unlawful sexual actively nor did he take a
substantial step to that end.

Tell me a single piece of defense evidence during
this trial that would support the contention that he either
denied this very specific theory or that he maintains a
special -- a very specific theory.

MR. KAHN:  Your Honor, we didn't put on any
evidence, but --

THE COURT:  Ruiz did, which I think is the major
distinction between this case and Ruiz.

MR. KAHN:  It's a factual distinction, Your Honor,
but our client has a right not to put on any evidence.  It's
their burden.  And we have to look at the evidence in the
case and his -- the most favored.

1        The case doesn't say that --

2        THE COURT:  But you have a right not to testify,

3    but you can't assert an alibi defense.  Look, there are a lot

4    of affirmative defenses that necessarily require a defendant

5    to testify.  That's what I'm saying.

6        He didn't need to testify.  It will not be held

7    against him, but you have to acknowledge that a significant

8    distinction between this and Ruiz is the theory asserted by

9    Ruiz as a defense theory came from testimony presented by the

10   defendant.

11       There is no defense evidence of record here; and

12   your questions on cross, unless agreed to by the parties on

13   the stand, are not evidence.

14       MR. KAHN:  Your Honor, I agree.  But looking at the

15   evidence in our favor -- and Ruiz doesn't say that we have to

16   put on a case to get a theory of the defense instruction.  It

17   just says we have to look at the evidence in the light most

18   favorable to Mr. Brooks.

19       And this isn't an affirmative defense.  This is

20   just our defense that we did not commit this crime, and it's

21   a very technical defense and it's a very subtle distinction

22   and it's going to greatly aid the jury in making this

23   distinction.

24       And I submit that viewing the evidence in the light

25   most favorable to Mr. Brooks, we have met that burden.  And

1    there's no case law that says we have to put on a case to get

2    a theory of defense instruction that we did not commit the

3    charged offense.

4              THE COURT:  All right.  Assuming I accept your

5    theory, and I don't think it's -- I think it's well worded

6    that you don't have to put on a defense in order to -- as a

7    prerequisite to having the instruction read.

8              The reason I read you two paragraphs of your

9    instructions is because your instruction specifically

10   attributes positions and specific statements and positions to

11   Mr. Brooks, who never testified.  It's built entirely on the

12   assertion that Mr. Brooks denies -- a very specific denial,

13   and that Mr. Brooks maintains -- maintaining a very specific

14   position.  He hasn't done any of that.

15             MR. KAHN:  If Your Honor would prefer, I would

16   propose a modification to the theory of the defense

17   instruction, then.  Instead of saying that Mr. Brooks

18   maintains that he's not guilty, it can simply say, "If you

19   find that Mr. Brooks did not knowingly intend to cause the

20   assent of a minor to assent to unlawful activity nor took a

21   substantial -- or did not take a substantial step, you must

22   find him not guilty."

23             MS. RIVERA:  Your Honor, but this is -- I'm sorry.

24             THE COURT:  So the next question would be, how is

25   that not the inverse of the offense instruction?  I mean, if

that's going to be your modification, then isn't that already covered by the pattern instruction?

MR. KAHN:  Ruiz says we are entitled to have the jury instructed on her theory of the defense separate and apart from the instructions on the elements of the charged offense.

I understand Your Honor's position, but I would simply say that this is a subtle distinction and it's the crux of this case in many re- --

THE COURT:  It seems to me that your proposed modification now -- and it's kind of unfair to ask you to do it from the hip here, because I'm sure that you've sat down and brainstormed and thought about this before you came in here with it.  So thinking on your feet isn't always a fair thing for me to request from you.

But it seems to me like the proposed modification is I would read the elements of the substantive offense. However, if you find that the government has not proven beyond a reasonable doubt that he, and list the elements, then you must find him not guilty.  It seems like you're just asking now for the inverse of what's already the pattern instruction on the substantive offense.

MR. KAHN:  We're asking for our theory of why he's not guilty and why he's not committed the elements of the defense be presented; and I think under Ruiz and Eleventh

1    Circuit law, that we are entitled to this instruction.

2              THE COURT:  I think you might be entitled to an

3    instruction.  I'm not convinced you're entitled to this

4    instruction.

5              MR. KAHN:  Well, Your Honor, we would certainly

6    agree to modify it to omit that it's our position or that we

7    maintain that he is not guilty.

8              THE COURT:  But the fact that the attorneys

9    representing the defendant maintain a position is not what

10   was contemplated in Ruiz.  Again, I mean -- and I don't blame

11   you.  I think you're arguing to underplay the importance of

12   Ruiz testifying and offering -- and your client didn't have

13   to testify.  But, remember, it wasn't that he didn't testify;

14   it's that there was no evidence presented at all by the

15   defense as to what your theory was, only your arguing by

16   piecing together parts of, I guess, cross-examinations as to

17   what your theory is.

18             MR. KAHN:  I think if you look at the evidence in

19   the light most favorable to Mr. Brooks, it supports our

20   theory.  And I think that there's -- looking at the evidence

21   in the light most favorable to Mr. Brooks and that

22   recognizing that the burden is, quote, "extremely low," I

23   think we have sufficient grounds for an instruction.

24             MS. RIVERA:  Your Honor, this instruction is

25   also -- I mean, it's adding or supplementing their own, yes,

1    theory of the case, but it has to be supported by the law and

2    it -- and it shouldn't be misleading or confusing to the

3    jury.

4         To change the mental state of a minor is adding

5    those words.  It also implies again everywhere that the

6    defendant somehow has testified or has said anything, and he

7    has not.

8         THE COURT:  Changing the mental state of a minor is

9    them extrapolating that language from induce, entice or --

10   that's an extrapolation.

11        MS. RIVERA:  Yes, Your Honor.  There are different

12   definitions to those.  Inducement is completely different,

13   and it's defined:  Stimulating the occurrence of, to cause.

14        That's why they also want to modify that

15   instruction on causing the assent of the minor, to basically

16   tie it with this.

17        I believe, Your Honor, that these elements, at

18   best, are covered in the offense instruction.  Their theory

19   of the case, basically, the defense that I believe has been

20   presented here is one of entrapment, and they are getting

21   that instruction.

22        To add to that this confusing basically closing

23   argument from the defense would be unfair to the government,

24   confusing and misleading.  And we have not had an opportunity

25   to address this.  I mean, I know that the Court didn't want

1  to put him in the position to shoot from the hip, but we

2  haven't had an opportunity to look at this case as well or

3  any other cases which might actually stand for a different

4  proposition and limit the scope of what he's asking for right

5  now.

6          THE COURT:  Okay.

7          Was that your last request for a modification?

8          MR. KAHN:  It is.  May I briefly respond?

9          THE COURT:  Sure.

10         MR. KAHN:  Your Honor, we couldn't know whether we

11  were going to introduce this instruction until the evidence

12  all came out.  But I would propose that this does not confuse

13  the issues; this clarifies what is required to convict Mr.

14  Brooks.  This aids the jury.  It does not confuse them.

15         I understand Ruiz isn't exactly on point, as Your

16  Honor expressed.  That was a mistake-of-fact case, but some

17  of the legal proposition cited therein do support us.

18         And I think if you look at the evidence such as Mr.

19  Brooks stating to Agent Hyre, "I want to have sex with you,

20  Agent Hyre; and if you want to let your kid stay in the room,

21  that's fine," and the persistent re-initiation of contact and

22  the allaying of Mr. Brooks' concerns and the leading the

23  conversation on the phone call, these all are evidence that,

24  viewed in the light most favorable to Mr. Brooks, supports

25  our theory of the defense.

1          THE COURT:  All right.  Here's what we're going to

2  do.  I'm going to review the cases.

3          I'm not going to have any trouble with requested

4  modifications one through 13(a).

5          I'm going to need a little bit more on your theory

6  of defense.  Here's what I would recommend that you do, both

7  of you.  Go on ahead and read the case.  I'll hear from you

8  tomorrow morning.  We're going to start at 8:15 to give us a

9  half hour before the jury is arriving.  That's going to be

10  the last issue pending, and we'll resolve it in the morning.

11          The government's argument in opposition to what you

12  are requesting is that your theory of defense is entrapment,

13  and the entrapment instruction adequately covers what you're

14  requesting.

15          You obviously disagree, but I'm telling you now

16  that you have attributed specific statements and positions to

17  your client that he simply hasn't made.  So it might be

18  incumbent upon you to take another look at what you're

19  requesting and clean it up.  I would recommend that you clean

20  it up -- consider the entrapment defense as you're drafting

21  whatever you're going to ask me to consider in the morning.

22          Now, this is an attempt at collegiality here.  It

23  would be unfair just to drop this on the prosecutor tomorrow

24  morning at 8:15.  So it would be nice if you could have her

25  e-mail address, personal or working, and when you finish

1   whatever it is you're going to put together tonight, e-mail

2   it to her.  I'll be fine with looking at it for the first

3   time at 8:15 tomorrow morning, but she needs to know what it

4   is you're going to be requesting.  And I'll hear brief,

5   emphasis on "brief," argument on this tomorrow morning and,

6   hopefully, by 8:45 we're ready to go.

7            MS. RIVERA:  Yes, Your Honor.

8            MR. KAHN:  Yes, Your Honor.

9            THE COURT:  All right.  So I will take into

10  consideration these 14 requests on modifications, and you'll

11  have definitive responses on one through 13.  Fourteen, I'm

12  going to hear argument on in the morning.

13           Anything further from the government?

14           MS. RIVERA:  Nothing further at this point, Your

15  Honor.  Thank you.

16           And if we can get whatever they're submitting as

17  early in the evening as possible.  I was here until midnight

18  yesterday.  I would like to be able to go home at some point

19  tonight, because I need to use the office to do my research

20  and print documents.

21           THE COURT:  Sure.

22           We don't need to have it to her by midnight, do we,

23  from the defense perspective?

24           (No response.)

25           THE COURT:  I mean, it's before 5:00.  So let's do

1    everything we can to get that to her.

2              All right.  Ms. Scott, you have something else you

3    want to address with the Court?

4              MS. SCOTT:  I do.  There is a Verdict form that

5    needs to be addressed.

6              THE COURT:  All right.  I have the Verdict form.

7              MR. KAHN:  Your Honor, I made a mistake.  There's

8    one more instruction.

9              THE COURT:  All right.

10             MR. KAHN:  I apologize.

11             THE COURT:  One more supplemental instruction?

12             MR. KAHN:  One more supplemental.

13             THE COURT:  All right.  What is it?

14             MR. KAHN:  It's a proposed limiting instruction on

15   the 414 evidence of John Gopoian.

16             MS. RIVERA:  And, Your Honor, I thought we were

17   going over the instructions today.  I did have an objection

18   to the use of -- or maybe just concern about the use of this

19   instruction on similar acts evidence.

20             THE COURT:  "Because of the age of the allegation

21   and the fact that said allegation was not reported to the

22   authorities, you should view this evidence with extreme

23   caution," do you have any legal authority on this or is this

24   just drafted from scratch?

25             MR. KAHN:  Your Honor, this was drafted from

1    scratch, but these are particular circumstances.  When you

2    have an allegation that's so divorced in time and it's not

3    substantiated by anything but the witness's testimony and it

4    has the potential to be very, very prejudicial and there's an

5    extreme -- there's a substantial danger to that prejudice,

6    and we would just respectfully request a limiting instruction

7    to the evidence, at least somewhat put in proper context.

8              MS. RIVERA:  There's no authority for this, Your

9    Honor.  They can argue all of this to the jury; but to

10   include this in a jury instruction specifically targeting one

11   witness and how they should analyze that witness's testimony

12   with extreme caution, it goes beyond what's already there for

13   credibility of witnesses, which is sufficient.

14             There's absolutely no legal authority for this, and

15   it would lead -- basically, he's trying to advance their

16   theory and have the jury take it back with them in the jury

17   room.

18             MR. KAHN:  Your Honor, when there's a cooperating

19   witness, there is an instruction that says that testimony

20   should be viewed with extreme caution.

21             There's no conviction regarding this allegation,

22   and it prevents significant concerns.  Even in the typical

23   414 scenario, there's significant concerns here.

24             THE COURT:  Have you looked at any typical limiting

25   instructions from other 414 cases that have been reviewed by

1   the appellate courts?

2          MR. KAHN:  No, Your Honor.

3          THE COURT:  All right.

4          MS. RIVERA:  The rule is so broad as to what that

5   evidence might be considered for.  I don't think this is what

6   Congress had in mind when they enacted Rule 414 and basically

7   allowed the jury to use it for any purpose which might be

8   relevant to the cause.

9          They have not cited one legal proposition; and he

10  doesn't sit in the same position as a cooperating defendant,

11  expecting some benefit from the government.  So I don't think

12  that they're equally situated and that this is proper

13  argument as a basis for this instruction.

14         MR. KAHN:  And we're not arguing that the

15  government cannot use the evidence for the purposes outlined

16  in 414.  We're just simply asking that the jury be allowed to

17  put it in some context.

18         MS. RIVERA:  They'll have the context.  They have

19  the instruction on the credibility of witnesses, Your Honor.

20  And his testimony should be weighed like any other witness;

21  and based on his recollection and the cross-examination,

22  they'll decide what weight to give to that testimony.

23         THE COURT:  Okay.  I understand the argument.

24         Let's go through it page by page now and just do

25  the general.

1              Well, hold on.

2              Ms. Scott, I'll heard hear you on the Verdict form

3      and then we'll wrap up.  Go on ahead.  Verdict form.

4              MS. SCOTT:  Thank you, Your Honor.  The Verdict

5      form that I see presented from the Court says that as to

6      Count One of the Indictment, charging Defendant George Adrien

7      Brooks with attempting to coerce or entice a minor to engage

8      in sexual activity --

9              THE COURT:  "Coerce" has to come out of that?

10             MS. SCOTT:  Well, yes, Your Honor.  "In violation

11     of subsection 2422(b), we," and then it goes on.

12             The proposal that we would make is that if it -- it

13     either tracks the language of the statute specifically,

14     meaning that the defendant did knowingly intend to persuade,

15     induce or entice a minor, because those are the elements, or

16     that it just says, "As to Count One of the Indictment,

17     charging Defendant Adrian Brooks, in violation of Subsection

18     2422(b), we, the members of the jury, find the defendant."

19     So either track the language of the statute specifically or

20     remove it all.

21             THE COURT:  All right.  So one of two options for

22     the government is what they're requesting.  It would read,

23     the simplified version:  "As to Count One of the Indictment,

24     charging Defendant George Adrien Brooks with a violation of

25     Subsection 2422(b) of Title 18, U.S. Code, we, the members of

1   the jury, do hereby find the defendant guilty or not guilty,"

2   or if we're going to include any of the language of the --

3   of -- I'm not going to track it with the -- what's ultimately

4   going to be applicable here is the language of the

5   substantive offense within the jury instruction.

6          I actually think your idea about simplifying makes

7   a lot of sense.  Before I make a decision, I'd like to hear

8   from the government.

9          MS. RIVERA:  I don't have any problem with that,

10  Your Honor.

11         THE COURT:  "So as to Count One of the Indictment

12  charging Defendant George Adrien Brooks with a violation of

13  Subsection 2422(b) of Title 18 of the United States Code, we,

14  the members of the jury, do hereby find defendant," that's

15  how it'll read.

16         MS. SCOTT:  Thank you, Your Honor.

17         THE COURT:  So we don't need to take that up

18  tomorrow.  I'll give you a hard copy of this form and you can

19  make sure it reads correctly in the morning.

20         MS. SCOTT:  Thank you, Your Honor.

21         MR. KAHN:  Your Honor, if I could briefly correct

22  something I just said?

23         THE COURT:  Sure.

24         MR. KAHN:  You asked me if there was ever a 414

25  limiting instruction that I knew of.  I was just made aware

1    that there's recently a 414 limiting instruction in this

2    courthouse in a case in front of Judge Byron, and that was

3    Ashley Bishop --

4              THE COURT:  Is Judge Byron mandatory or persuasive

5    authority for me?

6              MR. KAHN:  Persuasive.  I just wanted to bring it

7    to the Court's attention.

8              THE COURT:  He is three days senior to me.  So

9    maybe it is mandatory.

10             MS. RIVERA:  I was also the prosecutor in that

11   case, Your Honor.

12             THE COURT:  You're the prosecutor in every case.

13   So why don't you give me the -- it's okay.  I mean that as a

14   compliment.

15             So if you would be kind enough to provide me -- do

16   you have a printout of what you're requesting?

17             MR. KAHN:  I don't, Your Honor.

18             THE COURT:  All right.  Let's take a look at it.

19   What's the. . .

20             MS. RIVERA:  Ashley Bishop.  I don't have the

21   citation for that case, Your Honor.

22             THE COURT:  Yeah, but I can find it with the name

23   Ashley Bishop.  B-i-s-h-o-p?

24             MS. RIVERA:  Yes, Your Honor.

25             THE COURT:  All right.  This wasn't the same

1  charge.  It just included 414 evidence, correct?

2           MR. KAHN:  I believe so, Your Honor.

3           THE COURT:  Okay.

4           MS. RIVERA:  It was a child pornography offense,

5  Your Honor, where the defendant had been convicted of an

6  offense of child molestation, and we actually objected to

7  that instruction; and I believe, yes, that it was given to

8  the jury, but I'm not sure how it reads at this point.  I

9  don't remember the wording.

10          THE COURT:  I'm looking for it.

11          MR. KAHN:  Your Honor, we can tailor the

12 instruction, if necessary.

13          THE COURT:  I don't think your request is

14 unreasonable, but I think the problem is that you just have

15 to be careful about the language.  I just need to find what

16 number instruction.

17          All right.  Here we go.  Jury instruction number

18 13.  Good number.  "There has been evidence received during

19 the trial that defendant engaged in other conduct that was

20 similar in nature to the acts charged in the Indictment.  In

21 a criminal case in which the defendant is accused of

22 possession or receipt of child pornography, evidence of the

23 defendant's commission of other offenses is admissible and

24 may be considered for its bearing on whether the defendant

25 committed the offense for which he is charged in the

1  Indictment.  However, evidence of another offense on its own

2  is not sufficient to prove the defendant is guilty of the

3  crimes charged in the Indictment.

4          "As you consider the evidence, bear in mind at all

5  times that the government has the burden of proving that the

6  defendant committed each of the elements of the offense in

7  the Indictment as I have explained them to you.  I remind you

8  that the defendant is not on trial for any act, conduct or

9  offense not charged in the Indictment."

10          Is that what you're asking for?

11          MR. KAHN:  Yes, Your Honor.

12          MS. RIVERA:  Your Honor, I would like to definitely

13  have a printout of that.  However, the jury -- Rule 414

14  allows the government to use this evidence, even to argue

15  propensity to the jury, according to the law.

16          I don't believe the jury needs to be reminded again

17  about the burden of proof, the presumption of innocence.

18  Those are all instructions that have been included in the

19  jury instructions as we have them right now.

20          THE COURT:  Was this a 414 limiting instruction or

21  a 404(b) limiting instruction?

22          MS. RIVERA:  And that was -- I believe that was my

23  objection, because I think it came in under Rule 414; but it

24  would appear by the instruction that it was limiting the

25  purpose for which it could be used when the rule actually

1    allows it to be used for any relevant purpose to the cause,

2    even to infer propensity.

3            THE COURT:  I'm with you on that.  I don't think

4    anyone is going to argue that 414 doesn't allow them to use

5    it to infer propensity, but I think their concern is that

6    they don't want them to use the commission of the offense on

7    Mr. Gopoian as a basis to find him guilty of the pending

8    elements.  That's the one way where you couldn't use that.

9    Because he did it to him, he definitely did it here.

10           They can consider it for the purposes of

11   propensity, but the elements have -- that's a tough one.

12           I don't think their request for a limiting

13   instruction is unreasonable.  I think what the actual

14   limiting instruction would look like is what's going to be

15   difficult.

16           MS. RIVERA:  Because I think we can -- I mean, the

17   case law actually says that we can argue that because he did

18   it again, it's likely that he did it in this case; but it's

19   just one piece of the evidence.  It doesn't basically -- it

20   doesn't remove our burden to prove each element.

21           THE COURT:  I don't think you can say because he

22   did it before, he did it again.  Is that what your argument

23   is?

24           MS. RIVERA:  No, Your Honor.

25           THE COURT:  Okay.

1          MS. RIVERA:  Our focus -- our focus as to that

2     piece of evidence is not squarely like this case.  If it was

3     another enticement using the Internet, I would understand;

4     but that evidence of sexual molestation again goes to show

5     his sexual interest in minor boys and his predilection for

6     oral sex and incestuous relations.  That's basically, Your

7     Honor, the relevance, I believe, of that evidence, as I see

8     it right now.

9          I am concerned about how to craft a limiting

10    instruction that, again, doesn't continue to, like,

11    re-emphasize what our burden is.  They were instructed at the

12    beginning of the case.  They'll be instructed again, and they

13    don't need to be reminded over and over.

14         I'm sure this jury can understand the instructions

15    to follow the law.

16         THE COURT:  But just intuitively, I mean, I think

17    it's generally understood that it doesn't mean it's not

18    admissible, but 404(b) evidence and 414 evidence, even if

19    it's not unduly prejudicial, generally, it's extremely

20    damaging to a defendant.  You'd agree with that, right?

21         MS. RIVERA:  Yes, Your Honor.

22         THE COURT:  All right.  So think of it in these

23    terms.  If -- there is a pattern jury instruction for 404(b)

24    evidence, right?  It seems to me that as damaging as 414

25    evidence is, it seems counterintuitive to me that there's not

1  some sort of instruction guiding them on the use of that

2  evidence, because you did agree with me that they can't

3  simply say, "Well, he did it 41 years ago.  That definitely

4  means he did it here."

5          MS. RIVERA:  I think --

6          THE COURT:  They have to find that the evidence

7  here supports a conviction.

8          MS. RIVERA:  And I don't think I can argue that in

9  that way.  I mean, it's another piece of evidence, because

10  it's not exactly the same type of crime; but the 404(b), even

11  though it's a rule of inclusion, usually that evidence comes

12  in as an exception to the rule of propensity.

13          Here, this evidence comes in as evidence of

14  propensity.  So I can understand why there is no limiting

15  instruction as to Rule 414, but there's one applicable to

16  404(b), because 404(b), when the evidence does come in, has

17  to be for these particular purposes:  either intent or motive

18  or knowledge, absence of mistake or accident.

19          There's no such limit under Rule 414.  So if we

20  were to craft a limiting instruction, I think we have to be

21  very careful in the wording, because the purpose of that rule

22  is exactly to allow the jury to use it for any relevant

23  purpose.

24          MR. KAHN:  Your Honor, I don't dispute what the

25  government is saying.  414 evidence can come in for

1    propensity.

2          However, I think Your Honor was on point when he

3    said -- or when you said this -- because it comes in for

4    propensity, it can be extremely damaging.  The prejudice is

5    great, especially in a circumstance such as the one presented

6    by Mr. Gopoian's testimony and especially considering the

7    context of his testimony about what happened 44 years ago,

8    about how there's no independent evidence aside from his

9    testimony.

10          Without a limiting instruction, that prejudice

11   could subsume the case.  It could swallow everything else.

12   It could -- the danger that he will be convicted based solely

13   on allegations of what happened 44 years ago is great.

14          A limiting instruction, we believe, is reasonable.

15   We're not telling the government they can't use it for

16   propensity and we're not suggesting the instructions say

17   anything to that effect.  We just want something that puts

18   the evidence in the proper context.

19          MS. RIVERA:  They have not suggested a specific

20   instruction for this case.  I mean, they're referring to

21   another case, but I haven't seen what it is exactly that

22   they're trying to do.

23          But if that instruction, for example, doesn't

24   really track the language in Rule 414, that this evidence may

25   be considered on any matter to which it is relevant.

1    And I believe as it was given to the jury is not

2  entirely accurate.  I mean, I would have to look into it

3  again.  I don't have a proposed jury instruction right now

4  from the defense.  I understand their concerns on that

5  matter.

6              MR. KAHN:  Didn't we give you the 414 limiting one?

7              MS. RIVERA:  I don't have a 414.

8              MR. KAHN:  I thought we submitted it.

9              MS. RIVERA:  The 414?

10              MR. KAHN:  Yeah.  I thought I gave it to you.

11              THE COURTROOM DEPUTY:  You might have given it to

12  the Judge.

13              MR. KAHN:  Oops.

14              I apologize.  Let me find it.

15              MS. RIVERA:  Oh, no, this is not it.  You're

16  talking a 414 instruction.

17              (Discussion held off the record between Mr. Kahn

18  and Ms. Rivera.)

19              MS. RIVERA:  I'm sorry.  I misunderstood.  I

20  thought they were submitting a separate 414 instruction.

21              MR. KAHN:  Are we?  No.  This is it.  It's a

22  limiting instruction as far as Mr. Gopoian's testimony.

23              MS. RIVERA:  Oh, no.  I object to this instruction.

24  This particular one, as to -- that they are to consider his

25  testimony with extreme caution, I believe --

1    THE COURT:  You don't need to argue that.  I'm not

2    giving that instruction.

3    MR. KAHN:  Your Honor, we are aware of 414

4    instructions from other circuits that we can provide to

5    opposing counsel.

6    THE COURT:  Give me just a moment.

7    All right.  From the government's perspective,

8    there was some very important language -- language you

9    described as very important that you -- if there's a 414

10   limiting instruction, it needs to be in there, and you were

11   tracking the language in 414.  Would you mind reading that to

12   me again?

13   MS. RIVERA:  Yes, Your Honor.  Rule 414(a),

14   permitted uses in a criminal case in which the defendant is

15   accused of child molestation, the court may admit evidence

16   that the defendant committed --

17   THE COURT:  In the microphone and a little slower.

18   MS. RIVERA:  I'm so sorry.

19   "In a criminal case in which a defendant is accused

20   of child molestation, the court may admit evidence that a

21   defendant committed any other child molestation.  The

22   evidence may be considered on any matter to which it is

23   relevant."

24   THE COURT:  "Considered on any matter to which it

25   is relevant," that's the operative language that you want.  I

1    understand.

2              Anything further?

3              MR. KAHN:  No, Your Honor.

4              THE COURT:  All right.  Let's head to the finish

5    line.  Get out your packet for the draft jury instructions.

6    I just want to go over this specifically.

7              Page one of 22, Court's instructions to the jury,

8    that's a standard page.  Any objection from the government?

9              MS. RIVERA:  No, Your Honor.

10             THE COURT:  Defense?

11             MR. KAHN:  No, Your Honor.

12             THE COURT:  Instruction one, pattern instruction,

13   any objection from the government?

14             MS. RIVERA:  No, Your Honor.

15             THE COURT:  Defense?

16             MR. KAHN:  No, Your Honor.

17             THE COURT:  Reasonable doubt, instruction -- page

18   three, instruction two, any objection from the government?

19             MS. RIVERA:  No, Your Honor.

20             THE COURT:  Defense?

21             MR. KAHN:  No, Your Honor.

22             THE COURT:  All right.  Instruction three, any

23   objection from the government?

24             MS. RIVERA:  No, Your Honor.

25             THE COURT:  Defense?

1              MR. KAHN:  No, Your Honor.

2              THE COURT:  Okay.  Instruction four, pattern

3    instruction on credibility of the witnesses, any objection

4    from the government?

5              MS. RIVERA:  No, Your Honor.

6              THE COURT:  Defense?

7              MR. KAHN:  No, Your Honor.

8              THE COURT:  All right.  Impeachment of witnesses

9    because of inconsistent statements -- this is driven by how

10   the evidence unfolds -- will the government be requesting

11   this particular instruction?

12             MS. RIVERA:  No, Your Honor, we're not requesting

13   this instruction.

14             THE COURT:  Defense?

15             MR. KAHN:  Your Honor, we would request this

16   instruction.

17             THE COURT:  All right.  Give me an idea of some

18   evidence that occurred at trial that you think makes this

19   applicable.

20             MR. KAHN:  Your Honor, there was a lot of testimony

21   about whether certain statements on cross-examination were

22   fully truthful.  While there was no prior inconsistent

23   statements admitted, I think it will help the jury to

24   understand the testimony in the proper context.

25             MS. RIVERA:  Your Honor, they recognize that there

1   were no prior inconsistent statements presented during the

2   trial.   Thus, I believe this is not justified.

3          Actually, the instruction on credibility of

4   witnesses, I believe, would cover as to the way they have to

5   look at the testimony of these witnesses.

6          THE COURT:  Actually, I think you're focused on the

7   wrong witness.  I think you're both battling over whether or

8   not there were inconsistent statements during Agent Hyre's

9   testimony, correct?  I don't think that's where this would

10  apply.

11         I'm recalling the cross-examination of Mr. Gopoian.

12         MS. RIVERA:  I'm looking at the whole case, Your

13  Honor.

14         THE COURT:  All right.  But I'm just letting you

15  know I'm comfortable enough that there were enough

16  disagreements as to what happened 41 years ago, that for the

17  purposes of that cross-examination, I'm going to allow this

18  instruction to be read.

19         So moving on to number six, expert witnesses, any

20  objection from the government?

21         MS. RIVERA:  No, Your Honor.

22         THE COURT:  Defense?

23         MR. KAHN:  No, Your Honor.

24         THE COURT:  Confession or statement of a single

25  defendant.  Statements from the defendant.  The defendant

1    gave post-Miranda -- actually, prespontaneous post --

2    actually, pre the communications telephonically and on the

3    computer, spontaneous subsequent to being taken into custody,

4    and then post-Miranda were made.

5              Will the defense be requesting this instruction?

6              MR. KAHN:  Yes, Your Honor.

7              THE COURT:  Does the government want to be heard on

8    this?

9              MS. RIVERA:  No objection.

10             THE COURT:  All right.  Similar acts evidence.

11   And, by the way, this is the instruction that collides with

12   your 414 limiting instruction.

13             MS. RIVERA:  My concern with this instruction, Your

14   Honor, is that --

15             THE COURT:  Do you mean eight?  You're talking

16   about eight?

17             MS. RIVERA:  Yes.

18             THE COURT:  Okay.  Go on ahead.

19             MS. RIVERA:  My concern with this instruction is

20   that it doesn't -- there's no context to it and evidence of

21   acts, other acts might be any other act performed by the

22   defendant.

23             THE COURT:  It seems to me that what would make

24   sense, then, is to completely remove instruction eight and

25   replace it with a modified instruction from your other case

1   on 414.

2        MS. RIVERA:  This is haunting me.

3        THE COURT:  That makes more sense.

4        MS. RIVERA:  We would object to the use of this

5   because I don't believe -- yes, I don't believe there's

6   404(b) evidence.  So the issue would be whether a 414

7   limiting instruction is appropriate in this case.

8        THE COURT:  Well, if I take out instruction eight,

9   then I think 414 slides in there, the one that we've been

10  debating.

11       What's the defense's position on that?

12       MR. KAHN:  Your Honor, the evidence as to twelve-

13  year-old, the evidence as to post-Miranda statements, those

14  came in under 404, not 414.

15       MS. RIVERA:  That is not correct, Your Honor.  The

16  Court admitted those statements as inextricably intertwined.

17  They didn't come in as 404(b).  They're intrinsic to the

18  case.  They establish motive, intent, context, and that was

19  the ruling of the Court, not that it was 404(b) evidence.

20       MR. KAHN:  That was, I believe, the ruling only on

21  the twelve-year-old, not the post-Miranda statements.

22       Am I correct on that?

23       MS. SCOTT:  I apologize that I may be speaking out

24  of turn since I'm not the attorney that's arguing on the jury

25  instructions, Your Honor.  However, I think that the ruling

1  from the Court on the post-Miranda statements were not ruled

2  upon under inextricably intertwined or 414 evidence.  It was

3  ruled on at the time of trial.

4          THE COURT:  Actually, on your motion, the only

5  thing I ruled on was the exchanges that occurred during the

6  recorded telephone call.

7          MS. SCOTT:  Correct.

8          MS. RIVERA:  There was no objection.

9          MS. SCOTT:  There was an objection sidebar.  We did

10  come up at sidebar and the objection was made on the post-

11  Miranda statements.

12          MS. RIVERA:  Oh, there was an objection that the

13  confession was objectionable.  There was nothing articulated

14  as to --

15          THE COURT:  Well, do you agree with the proposition

16  that any acts similar to which a defendant is currently

17  charged cannot be considered to decide whether he engaged in

18  the activity alleged in the Indictment?

19          That's an accurate statement.  I mean, I'm having

20  trouble understanding why you're having such a problem with

21  that.  I mean, maybe redundancy is your issue with this in

22  the 414 limiting instruction, but I think this is. . .

23          MS. RIVERA:  That's one thing.  This evidence

24  didn't come in under 404(b).  There was actually no 404(b)

25  objection.  This is a confession of a defendant as to the

1   state of mind, as to their admissions of a party opponent,

2   statements against interest in this case that go specifically

3   to address his intent as to when he made those statements to

4   the officer.  He actually corroborates the statements that he

5   made to the officer.

6           THE COURT:  But is this instruction only limited to

7   404(b) circumstances?

8           (No response.)

9           THE COURT:  You can only give this instruction when

10  there's 404(b) evidence?

11          MS. RIVERA:  I'm considering the Court's position,

12  Your Honor.

13          THE COURT:  Think about that.  I mean, we're going

14  to move on on this one.  I'll keep that in mind; but there

15  were similar acts, specifically on the phone call references

16  to the twelve-year-old and the dad and then subsequent to

17  Miranda being given, re-affirmation of, you know, the

18  twelve-year-old situation with the other dad.

19          MS. RIVERA:  Your Honor, I think that evidence as

20  it came in was to basically corroborate.  It corroborates

21  what he told the officer during that audio recording.  The

22  statements about the twelve-year-old came in as inextricably

23  intertwined.

24          THE COURT:  I understand.

25          MS. RIVERA:  And this confession corroborates that.

1           As far as this instruction, I think it may be

2   confusing with a -- if you give a 414 instruction or even if

3   you don't give it, because they might think that there's a

4   limited -- that this is a limiting instruction as to how to

5   consider Mr. Gopoian's testimony as well.

6           THE COURT:  Well, I think -- I understand.  I mean,

7   I'm sympathetic to the complaint that this is redundant with

8   414; but there may be a way to combine the two.

9           So if you don't have any -- and, you know, I don't

10  expect you to just pop it out right now, but I'm not

11  convinced that the similar acts evidence is limited only in

12  circumstances where there's 404(b) notice and evidence

13  submitted.  So I'm not pulling that out for now.  We can talk

14  about that one in the morning.

15          All right.  Instruction nine, notetaking, objection

16  from the government?

17          MS. RIVERA:  No, Your Honor.

18          THE COURT:  Objection from the defense?

19          MR. KAHN:  No, Your Honor.

20          THE COURT:  Instruction ten is gone, and that's

21  been stipulated to.

22          Instruction eleven, we're not going to go over any

23  more today.  I have all your arguments on that.

24          Instruction twelve, the same.  We don't need to go

25  over that any further.

1          Next, we're on instruction twelve.  We don't need

2    to go over that any further.

3          Thirteen, on or about a particular date, knowingly.

4    Is there any objection from the government as to that

5    instruction?

6          MS. RIVERA:  No, Your Honor.

7          THE COURT:  Defense?

8          MR. KAHN:  No, Your Honor.

9          THE COURT:  All right.  Fourteen, entrapment, we've

10   already gone over the issues presented with that.

11         Instruction 15, basic conjunctive charge, any

12   objection from the defense?

13         MR. KAHN:  No, Your Honor.

14         THE COURT:  Government?

15         MS. RIVERA:  No, Your Honor.

16         THE COURT:  Sixteen, explanatory instruction,

17   transcript, tape-recorded conversation.  I would invite you

18   to read that because -- well, the one I submitted is no

19   longer going to be applicable because I did admit the other

20   one, but I've admitted it and it says I've admitted the

21   transcript "for the limited and secondary purpose of helping

22   you follow the content of the conversation."  They're advised

23   to go with ears, not eyes.

24         Any objection from the government on the pattern

25   instruction, not the one I drafted from scratch?

1          MS. RIVERA:  The pattern instruction, no objection,

2     Your Honor.

3          THE COURT:  Defense?

4          MR. KAHN:  No objection, Your Honor.

5          THE COURT:  All right.  Instruction 17, the

6     cautionary punishment instruction, any objection from the

7     government?

8          MS. RIVERA:  No objection, Your Honor.

9          THE COURT:  Defense?

10         MR. KAHN:  No objection, Your Honor.

11         THE COURT:  All right.  Closing argument, that's my

12    instruction, and I do that because I read them the

13    instructions -- I stop after this one and you will close at

14    that point.  Any objection from the government?

15         MS. RIVERA:  No, Your Honor.

16         THE COURT:  Defense?

17         MR. KAHN:  No, Your Honor.

18         THE COURT:  All right.  Duty to deliberate,

19    instruction 19, any objection from the government?

20         MS. RIVERA:  No, Your Honor.

21         THE COURT:  Defense?

22         MR. KAHN:  No, Your Honor.

23         THE COURT:  And, finally, instruction 20, the

24    Verdict, and its in the middle of this that I'll read the

25    Verdict form to them as we've agreed it will be modified.

1    Any objection from the government?

2              MS. RIVERA:  No, Your Honor.

3              THE COURT:  Defense?

4              MR. KAHN:  No, Your Honor.

5              THE COURT:  All right.  That wraps it up.  Have a

6    good evening.

7              MS. RIVERA:  Thank you, Your Honor.

8              THE COURT:  Court's in recess.  Feel free to be

9    seated, everyone.  Thank you.

10             Remember, 8:15 everyone.  Have a good night.

11             (Proceedings adjourned at 5:20 p.m.)

12                    - - - - - - - -

13                  Reporter's Certification

14   I certify that the foregoing is a correct transcript from the

15   record of proceedings in the above-entitled matter.

16                             s/Diane Peede, RMR, CRR
                               Official Court Reporter
17                             United States District Court
     Date:  May 3, 2016        Middle District of Florida
18

19

20

21

22

23

24

25