1
2

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

3

UNITED STATES OF AMERICA,        )
4                                )
            Plaintiff,           )        Case Number
5                                )
                v.               )        6:15-cr-219-Orl-41TBS
6                                )
GEORGE ADRIEN BROOKS,            )
7                                )
            Defendant.           )
8    _____)

9

10                        Volume IV

11           Transcript of the jury trial (day three)

12           before the Honorable Carlos E. Mendoza

13                   March 4, 2016; 8:15 a.m.

14                       Orlando, Florida

15

16

Appearances:
17
Counsel for Plaintiff:  Ilianys Rivera Miranda
18

19   Counsel for Defendant:  Alisha Marie Scott
                             James Skuthan
20

21
        Proceedings recorded by mechanical stenography,
22   transcript produced by computer.

23   _____

                     Diane Peede, RMR, CRR
24            Federal Official Court Reporter
           401 West Central Boulevard, Suite 4600
25                Orlando, Florida  32801

**Index of transcript**

                                                        Page

**Jury charge conference**                                 3

**Jury charged**                                          31

**Closing arguments**
**By Ms. Rivera**                                    43, 73
**By Ms. Scott**                                         59

**Verdict**                                              96

- - - - - - - -

1              P R O C E E D I N G S

2          (Jury not present at 8:15 a.m.)

3          THE COURT:  All right.  Please be seated, everyone.

4          First things first.  Did the defense draft another

5     theory-of-defense instruction?

6          MR. KAHN:  Yes, Your Honor.

7          THE COURT:  All right.  Go on ahead and bring it

8     forward.  Please make a copy available to your opposing

9     counsel.

10         All right.  Would you like to supplement your

11    offering with any argument before I hear from the government?

12         MR. KAHN:  Just to reiterate, Your Honor, briefly,

13    that this is the crux of our defense; and while it relates to

14    the substantive offense, it's a subtle distinction; and as we

15    explained in our Rule 29 motion, this distinction is so

16    subtle, that certain courts of appeal have confused this

17    distinction.  And if learned jurists are having trouble with

18    this distinction, a jury may as well.

19         And because it's so critical to our defense, we

20    believe a stand-alone instruction on our theory is

21    appropriate, especially considering that the evidence that

22    has been submitted should be viewed in our favor and that it

23    is a light burden and the defense we are proposing is

24    consistent with the law in this circuit.

25         That's all, Your Honor.

1          THE COURT:  I think this is confusing.

2          MR. KAHN:  Do you?

3          THE COURT:  I do.  And the first paragraph, I'm

4   fine with.

5          The second paragraph, "To be convicted of the

6   charged offense, the government must prove, among other

7   things, that Mr. Brooks knowingly intended to change the

8   mental state of a minor, that is, cause the assent of a minor

9   to engage in unlawful sexual activity," this is exactly why

10   the government wanted an instruction on -- they wanted an

11   expanded intermediary language instruction.  I mean, this is

12   not only confusing, but it flies in the face of my denying

13   the government their request to have additional intermediary

14   language.

15          I understand.  Maybe we can clean this up, but I'd

16   like to hear from the government.

17          MS. RIVERA:  Okay.

18          May I use the podium?

19          MR. KAHN:  I'm sorry.

20          MS. RIVERA:  I have authority that I brought for

21   the Court.  I just provided a copy as well to defense counsel

22   around 8:00 yesterday, and we were able to do some research.

23          Basically, the case that they've cited, that is not

24   the last word on this subject matter, United States versus

25   Ruiz.  There is a following case to that where the Eleventh

1   Circuit recognized that it has not been --

2           THE COURT:  Which case are you --

3           MS. RIVERA:  It's United States versus Alvarado --

4           THE COURT:  Okay.

5           MS. RIVERA:  -- 808 F.3d 474, where the Eleventh

6   Circuit recognizes that it has not been consistent in the

7   standard that should be used for evaluating this type of

8   request.  The Court actually in this case said that when the

9   defendant requested an instruction on a defense, there is a

10  burden that they should meet every element, that they should

11  have offered evidence sufficient to prove each element of

12  that defense.

13          And it basically states that because a defendant

14  must first produce sufficient evidence to prove the essential

15  elements of an affirmative defense and defendant failed to do

16  so -- that's one of the cases cited here -- the district

17  court properly disallowed the affirmative defense in this

18  case of necessity.

19          The court recognized that we have also described

20  the standard as requiring an instruction if there is any

21  foundation in the evidence.  And sometimes we have

22  articulated both standards in the same opinion, and actually

23  went on to cite another case, Middleton, and it states,

24  "Noting that a defendant who has produced some evidence

25  should receive an instruction on his proposed defense, but

1    also quoting with approval language, indicating that the

2    proffered evidence must be legally sufficient to render the

3    accused innocent."

4             So the court recognized that there's some conflict

5    in the standard that they have articulated as to when a

6    theory of defense instruction should be given, as to what is

7    sufficient evidence to meet that standard.

8             Even if we assume, the court said, some tension

9    between these two standards and also assume that any

10   foundation, some evidence iteration poses an easier test for

11   a defendant to meet, there is no need to try to harmonize

12   those standards in this case, because the defendant failed to

13   offer any evidence that a law enforcement official authorized

14   his criminal conduct.

15            He failed to meet either standard, meaning that he

16   was not entitled to a jury instruction concerning the public

17   authority defense.

18            So we believe that the statements here, the

19   representations that there is some low standard that they've

20   met in this case is a misrepresentation of the current state

21   of the law, even more so considering that, I mean, this is a

22   binding opinion by the Eleventh Circuit.  It's not an

23   unpublished opinion.  It was a published opinion.

24            They didn't affirmatively state which standard

25   should be met, but we also, looking at some of the other

1  cases that we found --

2          THE COURT:  Let me do this.  We're short on time.

3  We're marking up the cases you gave me.  I'm going to make my

4  rulings on the other issues.

5          Let me read these cases and I'll come back in and

6  wrap up.

7          MS. RIVERA:  Well, Your Honor, as to our argument,

8  we are concerned that -- I mean, the Court has discretion to

9  provide jury instructions and to instruct the jury on the

10  law, but the law shouldn't be misstated.  It shouldn't be

11  confusing to the jury.

12          And in this case, we're concerned that this is not

13  a theory-of-defense instruction.  It is a misleading attempt

14  to have the jury focus on one of several prongs.

15          THE COURT:  Let me ask you this.  Do you want to

16  comment on this after I have a chance to read the cases?

17  Because if I hear your argument now, I'm not going to hear

18  any more argument.  We're short on time.  I need to read the

19  cases first.  That's why I said that.

20          MS. RIVERA:  If the Court prefers that, then --

21          THE COURT:  The Court prefers that.

22          So let me go over what the rulings are with regard

23  to the other issues.  The only outstanding issue for me is

24  the theory of defense, which I will hear from you both

25  briefly as soon as -- I have to leave the courtroom and read

1   these cases.

2          MS. RIVERA:  We have some other matters, Your

3   Honor, we want to bring to the Court regarding the jury

4   instruction number eleven.  We just read what the Court

5   provided to us, and it omits the portion referring to the

6   fact that it involves what we had suggested --

7          THE COURT:  What part are you objecting to?

8          MS. RIVERA:  The non-inclusion of part of the

9   description of the conduct at issue.  As a matter of law, the

10  following crimes -- this is what we're proposing here.  As a

11  matter of law, the following crimes are crimes under Florida

12  Statute, Section 794.011:  Sexual battery by a person 18

13  years of age or older upon a person less than twelve years of

14  age, and then the definition of sexual battery.

15          We're leaving out a portion of the offense conduct.

16          THE COURT:  I understand that.

17          MS. RIVERA:  The Indictment, Your Honor, provides

18  notice.  There was no issue here that it didn't provide

19  sufficient notice.  The issue is not about notice.

20          THE COURT:  I may be confused, but we went over

21  this yesterday and you -- I mean, it might be different than

22  what you saw, but you didn't object to this yesterday.

23          MS. RIVERA:  Your Honor, we did.  And not only

24  that, the defense came here for the first time with some case

25  law and propositions that we didn't have time to study or

1   address until after we recessed.  They've come up with

2   numerous supplemental instructions as I'm here trying to

3   basically advise the Court on the fly without having the

4   benefit of a paralegal sitting in the back doing additional

5   research for me.

6            So I believe it is unfair for me to be able to

7   articulate --

8            THE COURT:  I understand.

9            MS. RIVERA:  -- additional grounds.

10           THE COURT:  Does the defense want to respond to

11  that?

12           MR. KAHN:  Yes, Your Honor.

13           THE COURT:  I may have been mistaken -- I apologize

14  if I was -- but I thought that when I read it over, that you

15  had agreed that that language was going to be removed.  So I

16  just took it out, thinking it was agreed upon by the parties.

17           Their objection was in the Indictment you put

18  794.0111 without any subsections.  So they didn't know what

19  subsection you were referring to.

20           MS. RIVERA:  Yes.  And they refer to a case and we

21  read the case --

22           THE COURT:  I got it.  I mean, I know what your

23  argument is.

24           MS. RIVERA:  And we're not expanding, Your Honor,

25  on the --

1        THE COURT:  You have to stop talking and let them

2   respond.  We don't have time and I have a lot to do before we

3   get started.  I know you want it back in there.  I was

4   mistaken in your argument.  You've corrected that.

5        What is the defense's position on that?

6        Now I know there's a dispute on this, and I

7   proceeded forward yesterday, assuming there wasn't.  I was

8   wrong on that.

9        What's the defense's position?  The same?

10       MR. KAHN:  The same, Your Honor.  Just real

11  briefly, if I can address one other thing, is that in the

12  definition of induce, we would just respectfully request the

13  Court reconsider putting the language "to cause the assent of

14  a minor to engage in unlawful sexual activity."  It's

15  consistent with the Eleventh Circuit case law.  It's been

16  done in previous cases in this courthouse, and it's critical

17  to our case.

18       THE COURT:  I understand.

19       Here are my rulings, and I will not be entertaining

20  any argument after these rulings.  And I want to be clear on

21  this.  There are two issues pending:  The issue that the

22  prosecutor just brought to me with regard to the specific

23  language of sexual battery -- I'm going to reconsider that

24  because I thought there was an agreement when there wasn't --

25  and specifically the theory on defense instruction.

1    I reviewed your cases.  I considered your

2    arguments, and I deliberated over these matters.  So

3    here's -- let's get started.

4    Number one, the word "computer" will be inserted.

5    The government's request for the word "computer" to be

6    inserted in instruction eleven and consistently throughout

7    will be granted.

8    MS. RIVERA:  Your Honor, there is no definition of

9    the term "computer" in instruction eleven.

10   THE COURT:  You didn't ask for a definition of

11   "computer."

12   MS. RIVERA:  Well, Your Honor, yes, we did.  We

13   provided this document to the Court and to the parties.  The

14   term "computer" includes "any high-speed data processing."

15   We suggested that this definition be included as

16   well as what the Court has already included in the

17   instructions.

18   THE COURT:  What's the defense's position on that?

19   MR. KAHN:  Your Honor, we object to that, for the

20   same reasons we stated yesterday.  That instruction is not

21   part of the pattern instruction.

22   THE COURT:  It says here, "A computer, cell phone

23   and the Internet are each facilities of interstate commerce,"

24   is the definition under the language.  And you're saying

25   that's inadequate?

1      MS. RIVERA:  Your Honor, no.  I'm saying that is an

2 accurate statement, but I believe that the definition of

3 "computer" should be included because the testimony here in

4 court presented by the expert was to the effect that a cell

5 phone is a computer.

6      The charge in the Indictment alleges "computer and

7 Internet."  And I believe this definition will aid the jury

8 in evaluating whether a cell phone is indeed a computer.

9      THE COURT:  The element of the offense indicates

10 that the defendant used a computer, cell phone or the

11 Internet to do so on the second element of the charge, and

12 then indicates in the explanation, "A computer, cell phone

13 and the Internet are each facilities of interstate commerce."

14      I don't understand what the confusion would be

15 here.

16      MS. RIVERA:  We are recommending that the

17 definition of the term "computer" be included because we

18 believe, Your Honor, again, that it would aid the jury in

19 evaluating whether the expert testimony regarding that a cell

20 phone is a computer is indeed accurate.

21      THE COURT:  I understand.  And I understand the

22 defense's position.  It will remain as drafted.

23      Instruction twelve --

24      MS. RIVERA:  Your Honor, there's one thing in

25 instruction eleven.  We noticed it still includes "coercion"

1    in the title, "coercion and enticement of a minor."

2              THE COURT:  Instruction eleven, I understand.  And

3    it will read just "enticement of a minor."  Thank you for

4    that correction.

5              Moving forward, the government made a request for

6    intermediary language to be added to instruction eleven in

7    addition to the intermediary language that's already in

8    there.  That request will be denied.

9              On the defense's request, I'm going to reconsider

10   the 794.0111 based on the government's argument this morning.

11   I know the defense's position is that they didn't specify --

12   and, by the way, in the other cases that we're using as a

13   point of reference on the Indictment, they did specify the

14   subsections.  That doesn't mean you don't get it, but that's

15   just the way this is.

16             MS. RIVERA:  Yes, Your Honor.  And we actually

17   agree with the way it reads as far as Florida Statute,

18   Section 794.0111, but the statute in the definitions includes

19   what we are asking here.

20             THE COURT:  I understand.  I mean, I've heard your

21   argument.

22             Look, I'm telling you what my decision is.  I don't

23   need commentary after I make every one of my decisions.

24             All right.  So the defense wanted -- indicated that

25   they thought -- this was the fifth point of contention, that

1    it was unnecessary to use the language "less than 18 years

2    old" three times in instruction eleven, and you wanted one

3    removed.  That request is denied.

4         The first paragraph on page 13, instruction eleven,

5    the defense requested that I extend to describe communication

6    to limit it to the computer and the Internet.  That was sort

7    of tied into the decision on the government wanted "computer"

8    inserted.  That request is denied.

9         The second paragraph on page 13, instruction

10   eleven, the defense in that particular request wanted to add

11   specific language they read to the Court to the last

12   paragraph.  Do you recall that?

13              MR. KAHN:  Which paragraph are you referring to?

14              THE COURT:  The last paragraph on instruction

15   twelve, and you gave me case number -- case cited 705 F.2d

16   426.  You wanted specific language added to the last

17   paragraph.  That request will be denied.

18         Instruction 14, pattern instruction, you propose

19   the 2003 version of the entrapment defense.  I've had a

20   chance to compare the two, and that request is going to be

21   denied.  We're going to go with the current entrapment

22   defense instruction.

23         You've also made a request for a supplemental

24   instruction on deliberate ignorance and you supplied the

25   Court with that proposed supplemental instruction.  I found

1  it to be confusing; and I think that although the language

2  isn't probably as specific and in-depth as you'd like,

3  instruction 13, the last paragraph, covers that adequately,

4  in my view.

5          I'm going to consider your theory-of-the-defense

6  request once I've had a chance to read the cases submitted by

7  the government.

8          And on your 414 limiting instruction, I've stated

9  clearly what my concerns were.  I think there's potential

10  confusion there.  You're arguing that there is other acts

11  evidence that has been admitted in this case which is

12  separate from the 414.  So you can see I made sure that any

13  414 instruction was specifically limited to Mr. Gopoian's

14  testimony, and it's pretty standard language.

15          Now I'll hear from the government on this

16  particular issue and I'll hear from the defense briefly, and

17  that's on instruction nine.

18          MS. RIVERA:  Your Honor, regarding this matter, we

19  actually attempted to obtain jury instructions for the

20  Levinson and Worsham case to determine whether there were any

21  instructions on Rule 414.  I believe the only instruction

22  given in Levinson was regarding the 404(b) aspect of that

23  case.  There was no 414 instruction.

24          We did find one case, the case of United States

25  versus Rivera -- Your Honor, if I may approach?

1          THE COURT:  Please.

2          MS. RIVERA:  -- where the district court here in

3   the Middle District of Florida in a case involving an offense

4   of sex trafficking of a minor declined, denied an instruction

5   requested by the defense.  He requested an instruction that

6   the jury be specifically instructed that you should not find

7   the defendant guilty of the charges in the Indictment based

8   solely upon this evidence -- and it was the Rule 414

9   evidence -- if the government has not proven the charges in

10  the Indictment beyond a reasonable doubt.

11          The district court rejected giving the instruction

12  and the Eleventh Circuit upheld that decision, finding that

13  the district court had properly instructed the jury as to the

14  elements of the offense and that they were there to evaluate

15  whether the government had met its burden as to each one of

16  the prongs charged in the Indictment, and the Court found

17  that that was sufficient, that it made clear that he was on

18  trial for the specific offenses alleged in the Indictment;

19  and it also highlighted the necessary facts for conviction.

20          And in that regard, the Court found that there was

21  absolutely no error in the court not providing --

22          THE COURT:  I understand.

23          MS. RIVERA:  -- that Rule 414 instruction.

24          In my case, Your Honor, I think that right now we

25  have two instructions on the matter of similar acts, and this

1   may be confusing to the jury as to how they may properly

2   evaluate the evidence.

3           THE COURT:  Let me ask you this.  If I only give

4   the first similar act instruction, which is the pattern

5   instruction, you would agree with me that the way they view

6   the evidence with regard to Gopoian -- and I put the specific

7   language in 414 -- is different than they're permitted to

8   view the similar act evidence generally?

9           So it seems to me if you're going to have one, you

10   need both.  Is it your request to have neither?

11           MS. RIVERA:  No, Your Honor.  I think the Court --

12   the Court's assessment on this, if we're going to have one,

13   we should have both, so that they understand how they are to

14   evaluate.

15           THE COURT:  Because I think you've made it clear

16   throughout the course of this trial that it's your position

17   that the 414 evidence can be used much more broadly than

18   any -- and I think this prevents confusion and I think

19   prevents error on the record.

20           I mean, the Gopoian evidence -- of course, 414 is

21   much more wide open than 404(b).  And what I tried to do in

22   these instructions is make it clear, using the language of

23   414, that while you're limited in the way you can use 404(b),

24   you're considerably less limited in 414.  That's the purpose

25   of that.

1          MS. RIVERA:  I understand, Your Honor.  And in that

2     regard, I don't think there's anything inaccurate, and I

3     understand that the Court is addressing the concerns here.

4          As to evidence of other acts, I just don't know

5     what other acts outside Gopoian's testimony were presented

6     here that would be 404(b), because we did not --

7          THE COURT:  I understand.  I think there is at

8     least enough evidence to give me concern on that.  We don't

9     need to debate that.  I mean, the defense made a good point

10    yesterday.

11         The similar act instruction will remain; and I

12    think to keep it separate from Mr. Gopoian's testimony, the

13    other instruction will remain.

14         Does defense want to be heard on this?  They're

15    both staying.  Does the defense need to be heard on this?

16         MR. KAHN:  No, Your Honor.

17         THE COURT:  Okay.  I need to read these cases.

18         Is there anything else to take up before -- and

19    thank you, Ms. Rivera, for the corrections.  I appreciate

20    that.

21         Is there anything else you want to be heard on

22    before I take a break to read these cases?

23         MS. RIVERA:  Well, no, Your Honor.  After the Court

24    considers the defendant's theory of defense, if we might have

25    an opportunity to present brief argument on that?

1        THE COURT:  Sure.

2        MS. RIVERA:  And then our position that the jury

3    should be instructed as to 794.011, including the offense

4    conduct for which we actually presented --

5        THE COURT:  Those are the only two pending.  I'll

6    consider that.

7        Anything else from the defense?

8        MR. KAHN:  Just two things, Your Honor.  First,

9    just to briefly bring up a point, yesterday Mr. Skuthan

10   renewed an objection to striking Mr. Gopoian's testimony; and

11   just for the record, we just want to preserve that we are

12   objecting based on due process as well.

13       And, also, we also want to preserve for the record

14   our continuing objections to any rulings against our proposed

15   jury instructions.

16       THE COURT:  I understand.  And they are preserved.

17   I appreciate you restating that on behalf of your client.

18       All right.  I'll see you in just a few minutes.

19   Court's in recess.

20       (Recess taken at 8:40 a.m.)

21       (Jury not present at 8:50 a.m.)

22       THE COURT:  Come on forward from the defense

23   perspective.  Have you had a chance to review -- and I would

24   say the discussion needs to be focused on Alvarado.

25       Let me ask the first simple question.  Was this

1    morning the first time you've seen Alvarado?

2              MR. KAHN:  Yes, Your Honor.

3              THE COURT:  Okay.  That's fair enough.

4              I would invite you to make your argument at this

5    time.

6              MR. KAHN:  Your Honor, we would just simply state

7    that Alvarado is about an affirmative defense and this case

8    is not about an affirmative defense.  This is about the

9    elements that are required to prove Mr. Brooks guilty.

10             We still believe we meet the standard required as

11   there is a foundation in the evidence for this.  It is a

12   light burden.  It should be viewed in our favor.

13             The evidence and -- alternatively, we would suggest

14   if the Court's not inclined to give a stand-alone

15   instruction, we would alternatively request, because it's so

16   important and because it is part of the substantive offense,

17   that a short sentence be included in the substantive offense

18   merely distinguishing that this is a crime about causing

19   assent versus a crime about engaging in sexual activity.

20             THE COURT:  Thank you for your argument.

21             All right.  Let me tell you where I'm at here.  I

22   hereby find that the defendant, while in that case produced

23   some evidence, in this case has produced no evidence,

24   producing no evidence that could be considered legally

25   sufficient to render the accused innocent as is the standard

1  here.

2         In the case presented to the Court by the

3  government, there was some evidence presented in that case

4  and that evidence did not address a specific issue, and

5  you're correct.  That was an affirmative defense.  And the

6  Court made a finding that because the defendant failed to

7  offer any evidence that a law enforcement official authorized

8  his criminal conduct, he failed to meet either standard, and

9  they made a determination it doesn't matter which applicable

10  standard here.  The defendant in that case met neither.  No

11  evidence has been presented in this case.

12         And while I commend you for making the arguments

13  and submitting the proposed language, I think the proposed

14  language is essentially the inverse of what the offense

15  instruction is to begin with.

16         So I understand that I'm on a precipice with regard

17  to this determination; but based on the case law that's been

18  provided to the Court, I'm not going to be giving a defense

19  theory instruction.  So that request has been denied.

20         And having considered the arguments of counsel and

21  reconsidering my mistake in view that on instruction eleven,

22  which would be page 13 of 22 of your instructions, I removed

23  language thinking it was stipulated upon by counsel.

24         I understand that the defense's position is that

25  unequivocally that when the government cited the Florida

statute in the Indictment, they only put the main section and not the subsection.  I'm considering that and considering the arguments of counsel prior to trial.  I think everyone was well aware of what this specifically entailed.

I don't think anyone has been caught off guard.  I don't think this is unfair; and I think in making this decision, I'm comfortable leaving the language in there.

So notwithstanding defense's objection, which is preserved for the record, that language will be re-inserted on page 13 of the jury instructions.

So before we bring the jury back in, is there anything further from the government?

And the word "coerce" -- you want to check -- that was taken off at the title per the government's request.

MS. RIVERA:  Thank you, Your Honor.  That's what we're verifying at this point.

THE COURT:  And what I did was -- that word didn't pop up, but we did a "coerce" word check for the entire document and that was somehow missed.  I don't know why.  Maybe it's because it's in all caps.  But the word "coerce" should not be in there.

Yes, sir.

MR. KAHN:  Our last request, Your Honor, we would just simply request that the Court reconsider in the substantive offense to include in the definition of "induce"

1    at the end, "to cause the assent of a minor to engage in

2    unlawful sexual activity," which we believe is consistent

3    with both Lee and Murrell.

4              THE COURT:  I don't think what you're asking for is

5    legally flawed; but I think in the context of this case, with

6    the battle over the intermediary argument, I think it's

7    confusing, based on how this has unfolded.

8              Your request is denied, but I would imagine that

9    you're objecting to the request being denied.  Correct?

10             MR. KAHN:  Yes, Your Honor.

11             THE COURT:  All right.  And that objection is noted

12   for the record.

13             MS. RIVERA:  Yes, Your Honor, basically, we would

14   agree with the Court that the instructions as they read are

15   appropriate under United States versus Murrell.

16             The definition as given by the Eleventh Circuit is

17   what is --

18             THE COURT:  Why don't you give the case cite so

19   that can be of record, of Murrell?

20             MS. RIVERA:  Yes, Your Honor.  368 F.3d 1283.  It's

21   a 2004 Eleventh Circuit case.  Basically, Your Honor --

22             THE COURT:  You don't need to explain it to me, but

23   I wanted to preserve the record.  That is the case upon which

24   the government's argument is built?

25             MS. RIVERA:  Yes, and the three prongs.  There are

1    three prongs.

2            THE COURT:  I understand.  Gift horse mouth.

3    You've won this one.

4            MS. RIVERA:  Thank you.

5            THE COURT:  Is there anything from the defense

6    before we get started?

7            MS. SCOTT:  Yes, Your Honor.  The only matter is I

8    intend to use a demonstrative evidence to describe reasonable

9    doubt for the benefit of the jury and my opinion of what

10   reasonable doubt is.

11           THE COURT:  Your opinion of what reasonable doubt

12   is is not the standard.  So I need to see what it is you

13   intend to produce.

14           MS. SCOTT:  Yes, Your Honor.

15           MS. RIVERA:  We have not seen that.

16           THE COURT:  Well, we're going to see it right now.

17           MS. SCOTT:  Would you me to --

18           THE COURT:  I would, if you'd be so kind.

19           MS. SCOTT:  Yes, Your Honor.  It's just

20   demonstrative for purposes of my argument.

21           THE COURT:  I don't mind a demonstrative exhibit,

22   but it has to be -- again, it can't be confusing and it has

23   to be consist- -- I've seen this before and not permitted its

24   use.

25           You're telling me that "Guilt beyond a reasonable

1    doubt" would not encompass "Guilt highly likely"?  What is

2    "Guilt highly likely" percentagewise, in your view?

3              MS. SCOTT:  I'm not using percentages, not to a

4    mathematical certainty.  I'm not asking them to think that

5    it's to a mathematical certainty.

6              The only thing that I am arguing in this is that if

7    they believe that it's highly likely but they still have

8    doubt, that is not beyond a reasonable doubt.  And the

9    standard is beyond a reasonable doubt.

10             And I have reviewed it consistent with the pattern

11   jury instruction that the Court is going to give, and it says

12   that --

13             THE COURT:  Let me ask you this question.  Here's

14   the legal definition of reasonable doubt:  A "reasonable

15   doubt" is a real doubt based on your reason and common sense

16   after you've carefully and impartially considered all of the

17   evidence in the case.  "Proof beyond a reasonable doubt" is

18   proof so convincing that you would be willing to rely and act

19   on it without hesitation in the most important of your own

20   affairs.

21             So would you rely on information that's highly

22   likely in making decisions in your own personal affairs?

23             MS. SCOTT:  Are you asking me personally?

24             THE COURT:  Yes.

25             MS. SCOTT:  Not if I have doubt.

1      THE COURT:  Well, but that's not the question.  The

2  question is:  Would you rely on evidence or information

3  that's highly likely in making important decisions in your

4  own personal affairs?

5      MS. SCOTT:  And that's what I'm telling the Court.

6  No, if I have a reason to doubt.

7      THE COURT:  I would.

8      MS. SCOTT:  And that's why it is demonstrative and

9  it is not inconsistent with what --

10      THE COURT:  I don't think "guilt beyond a

11  reasonable doubt" is higher than "guilt highly likely," is

12  what I'm telling you.

13      MS. SCOTT:  Okay.  Then that's fair, if that's what

14  the Court believes.

15      THE COURT:  Do you have any -- look, I think it's

16  very smart what you're doing here, and I've disallowed it

17  before.  I disallowed it because I had the same "guilt highly

18  likely."

19      Do you have any legal authority in support of your

20  using this document?

21      MS. SCOTT:  Not in support of using this document.

22  I know that there is the -- and I don't have legal authority

23  because I wasn't -- I didn't know I needed legal authority

24  for providing a demonstrative evidence to the --

25      THE COURT:  Well, when you're trying to help them

1    -- when you're trying to elaborate on what I mean by the

2    definition of "reasonable doubt," the most critical component

3    of this trial, it would be safe to have that.

4              By the way, where does this come from?

5              MS. SCOTT:   This is -- I actually used this all the

6    time before.   It's something that is standard in defense.   I

7    mean, I don't know who created it.   I can't provide that to

8    the Court.

9              THE COURT:   Yeah, a private defense counsel -- I

10   don't think it was a member of your office.   I think it was

11   someone in private practice produced this same document, and

12   I'm just wondering because it's obviously --

13             MS. SCOTT:   But this is not just used in the Middle

14   District of Florida.   I used this in Georgia as well.   So I'm

15   saying it is not something that is -- that is unique or

16   germane to the Middle District of Florida or private counsel

17   in the Middle District of Florida.   It's something that's

18   being used across the world as well, with my colleagues

19   across the defense bar and across the world.

20             The only thing that I would argue, Your Honor, is

21   that during our closing arguments I am sure that the

22   government is going to present what they believe "reasonable

23   doubt" is to the jury as well as we are.

24             And something that I am going to say, even if not

25   allowed -- I mean, I would like the demonstrative evidence;

1    but that if they have a doubt, that is not beyond a

2    reasonable doubt.  And it's not to mathematical certainty.

3    I'm not saying that it's excluding all doubt; but if they

4    have a reason to attach to it and they believe that it's

5    highly likely, then it tips to the favor of the defendant.

6                THE COURT:  I understand that.

7                All right.  What's the government's position on

8    this?

9                MS. RIVERA:  Well, I know they're stating that this

10   is commonly used, but I've never seen this before.  I believe

11   it misstates the standard of the evidence.

12               Whatever her opinion is as to what "reasonable

13   doubt" is, it's not evidence in this case.

14               THE COURT:  But it can be used as argument, though.

15               Bluntly, my problem is "guilt highly likely."  I'm

16   not really sure what that means and I'm not sure what that

17   means in comparison to the actual definition.  Bluntly,

18   that's what I'm uncomfortable with.

19               MS. RIVERA:  And this is -- and if I'm a member of

20   the jury, I'll be looking at this and asking for a definition

21   of all of these terms.  What is "guilt highly likely"?  What

22   is "guilt likely"?  What is "probably guilty"?

23               They don't need that.  They need a definition of

24   what is "proof beyond a reasonable doubt," and they need to

25   make the decision on the facts and the evidence that was

 1    presented and the law.

 2              THE COURT:  What if she argues what's on here

 3    orally?  Are you going to object to it?

 4              MS. RIVERA:  Well, if it's a misstatement of the

 5    law or the evidence presented during this trial, we will

 6    object.

 7              THE COURT:  But if she on her closing argument

 8    said, "Guilt likely isn't enough.  It has to be beyond a

 9    reasonable doubt, as the Court defined for you"?

10              MS. RIVERA:  That is fair.

11              THE COURT:  Well, if that's fair, then, again, my

12    issue -- and I'll tell you bluntly anecdotally.  I allowed

13    this to be used in the other trial, but they had to redact

14    the term "guilt highly likely."

15              MS. SCOTT:  Okay.

16              MS. RIVERA:  Your Honor, one thing is to provide

17    argument.  That is not evidence.  Another thing is to

18    basically use this demonstrative evidence as somehow of an

19    innuendo of how high the government's burden is in this case

20    when they have a jury instruction that properly defines this.

21              This is not assisting the jury.  This is confusing

22    to the jury.  They're going to look at this and they're going

23    to look at the instruction and they're going to go, "Well,

24    exactly how are we to consider this?"

25              Well, no, they're not to consider that.

1          THE COURT:  Well, I'm sure you are going to remind

2     them of that, assuming she's permitted to use the exhibit, on

3     your rebuttal argument.

4          Ultimately, if there's any confusion, if there's

5     any ambiguity, they will have only these written instructions

6     when they deliberate.  This document, after the final

7     argument from the defense, they're not going to see again.

8          So I understand what your argument is.  My concern

9     is I don't blame you for using this.  I want "guilt highly

10    unlikely" redacted, if you want to use it.  If you're going

11    to redact that, then I'm going to permit you to use it.

12          MS. SCOTT:  Thank you, Your Honor.

13          THE COURT:  All right.  Let's bring the jury back.

14          And, Ms. Rivera, remember, 40 and 20.  I'll give

15    you a five-minute warning before the end of your 40 and then

16    a five before the end of your 20.

17          Ms. Scott, you wanted an hour.  So you'll have a

18    five-minute warning.  Use whatever time you need, but I'll

19    give you the five-minute warning before your hour expired.

20          MS. SCOTT:  Yes, Your Honor.

21          (Jury present at 10:05 a.m.)

22          THE COURT:  Welcome back, ladies and gentlemen.

23    Feel free to be seated in your chairs once you arrive, and we

24    will immediately begin.

25          Ladies and gentlemen of the jury, are there any

matters of concern to report to the Court at this time?  If so, please indicate by raising your hand.

All right.  None of the hands have been raised.

I'm going to read you a set of jury instructions.  Don't feel the need to write anything down or take notes while I'm doing this.  The document I have will accompany you during your deliberations.

Members of the jury, it is my duty to instruct you on the rules of law you must use in deciding this case.  After I have completed these instructions, you will go to the jury room and begin your discussions, what we call your deliberations.

You must decide whether the government has proved the specific facts necessary to find the defendant guilty beyond a reasonable doubt.

Your decision must be based only on the evidence presented during the trial.  You must not be influenced in any way by either sympathy for or prejudice against the defendant or the government.

You must follow the law as I explain it, even if you do not agree with the law; and you must follow all of my instructions as a whole.  You must not single out or disregard any of the Court's instructions on the law.

The Indictment or formal charge against the defendant is not evidence of guilt.  The law presumes every

defendant is innocent.  The defendant does not have to prove

his innocence or produce any evidence at all.  A defendant

does not have to testify; and if the defendant chose not to

testify, you cannot consider that in any way while making

your decision.  The government must prove guilt beyond a

reasonable doubt.  If it fails to do so, you must find the

defendant not guilty.

The government's burden of proof is heavy, but it

does not have to prove a defendant's guilt beyond all

possible doubt.  The government's proof only has to exclude

any reasonable doubt concerning the defendant's guilt.

A "reasonable doubt" is a real doubt, based on

reason and common sense after you have carefully and

impartially considered all the evidence in the case.

"Proof beyond a reasonable doubt" is proof so

convincing that you would be willing to rely and act on it

without hesitation in the most important of your own affairs.

If you are convinced that the defendant has been proved

guilty beyond a reasonable doubt, say so.  If you are not

convinced, say so.

As I said before, you must consider only the

evidence that I have admitted in this case.  Evidence

includes the testimony of witnesses and the exhibits

admitted, but anything the lawyers say is not evidence and is

not binding on you.

You should not assume from anything I have said that I have any opinion about any factual issue in this case. Except for my instructions to you on the law, you should disregard anything I may have said during the trial in arriving at your own decision about the facts.

Your own recollection and interpretation of the evidence is what matters.

In considering the evidence, you may use reasoning and common sense to make deductions and reach conclusions. You should not be concerned about whether the evidence is direct or circumstantial.

"Direct evidence" is the testimony of a person who asserts that he or she has actual knowledge of a fact, such as an eyewitness.

"Circumstantial evidence" is proof of a chain of facts and circumstances that tend to prove or disprove a fact. There is no legal difference in the weight you may give to either direct or circumstantial evidence.

When I say you must consider all the evidence, I do not mean that you must accept all the evidence as true or accurate. You should decide whether you believe what each witness had to say and how important that testimony was. In making that decision, you may believe or disbelieve any witness in whole or in part. The number of witnesses testifying concerning a particular point does not necessarily

matter.

To decide whether you believe any witness, I suggest that you ask yourself a few questions:

Did the witness impress you as one who was telling the truth?

Did the witness have any particular reason not to tell the truth?

Did the witness have a personal interest in the outcome of the case?

Did the witness seem to have a good memory?

Did the witness have the opportunity and ability to accurately observe the things he or she testified about?

Did the witness appear to understand the questions clearly and answer them directly?

Did the witness's testimony differ from other testimony or other evidence?

You should ask yourself whether there was evidence that a witness testified falsely about an important fact, and ask whether there was evidence that at some other time a witness said or did something or did not say or do something that was different from the testimony the witness gave during this trial.

But keep in mind that a simple mistake does not mean a witness was not telling the truth as he or she remembers it.  People naturally tend to forget some things or

remember them inaccurately.

So if a witness misstated something, you must decide whether it was because of an innocent lapse of memory or an intentional deception.  The significance of your decision may depend on whether the misstatement is about an important fact or about an unimportant detail.

When scientific, technical or other specialized knowledge might be helpful, a person who has training or experience in that field is allowed to state an opinion about the matter, but that does not mean that you must accept the witness's opinion.  As with any other witness's testimony, you must decide for yourself whether to rely upon the opinion.

If the government offers evidence that a defendant made a statement or admission to someone after being arrested or detained, you must consider that evidence with caution and great care.  You must decide for yourself, one, whether the defendant made the statement, and, two, if so, how much weight to give it.

To make these decisions, you must consider all the evidence about the statement, including the circumstances under which it was made.

During the trial you heard evidence of acts allegedly done by the defendant on other occasions that may be similar to acts with which the defendant is currently

charged.  You must not consider any of this evidence to decide whether the defendant engaged in the activity alleged in the Indictment.  This evidence is admitted and may be considered by you for the limited purpose of assisting you in determining whether the defendant had the state of mind or intent necessary to commit the charge -- the crime charged in the Indictment.

There has also been evidence received during trial via the testimony of Mr. John Gopoian.  You may consider this evidence on any matter to which it is relevant.  However, evidence of this conduct on its own is not sufficient to prove the defendant guilty of the crime charged in the Indictment.

Bear in mind at all times that the government has the burden of proving that the defendant committed each of the elements of the offense in the Indictment, as I will explain to you shortly.  I remind you that the defendant is not on trial for any act, conduct or offense not charged in the Indictment.

You have been permitted to take notes during the trial.  Most of you, perhaps all of you, have taken advantage of that opportunity.  You must use your notes only as a memory aid during deliberations.  You must not give your notes priority over your independent recollection of the evidence, and you must not allow yourself to be unduly

1  influenced by the notes of other jurors.

2          I emphasize that notes are not entitled to any

3  greater weight than your memories or impressions about the

4  testimony.

5          It is a federal crime for anyone using any facility

6  of interstate or foreign commerce, including transmissions by

7  computer, cell phone or the Internet, to persuade, entice --

8  to persuade, induce or entice anyone under 18 years old to

9  engage in any sexual activity for which any person could be

10 charged with a criminal offense.

11         The defendant can be found guilty of this crime

12 only if the following facts are proved beyond a reasonable

13 doubt, and there are four of them:

14         One, the defendant knowingly persuaded, induced or

15 enticed an individual to engage in sexual activity, as

16 charged;

17         Two, the defendant used a computer, cell phone or

18 the Internet to do so;

19         Three, when the defendant did these acts, he

20 believed the individual was less than 18 years old; and,

21         Four, if the sexual activity had occurred, the

22 defendant could have been charged with a criminal offense

23 under Florida Statute, Subsection 794.011.

24         It is not necessary for the government to prove

25 that the individual was in fact less than 18 years old, but

it is necessary for the government to prove that the

defendant believed such individual to be under that age.

Also, the government need not prove that a real

individual under the age of 18 was involved in the offense.

It is sufficient that the defendant believed that an

individual under the age of 18 was involved.

The defendant need not communicate directly with an

individual under 18 years of age.  It is sufficient if the

defendant induces the individual to engage in unlawful sexual

activity by communicating with an adult intermediary for that

purpose.

As used in this instruction, "induce" means to

stimulate the occurrence of or to cause.

A computer, cell phone and the Internet are each

facilities of interstate commerce.  As a matter of law, the

following acts are crimes under Florida law:  Sexual battery

by a person 18 years of age or older upon a person less than

twelve years of age.

"Sexual battery" means oral, anal or vaginal

penetration by or union with the sexual organ of another or

the anal or vaginal penetration of another by any other

object.  However, sexual battery does not include an act done

for bona fide medical -- for a bona fide medical purpose.

In some cases it is a crime to attempt to commit an

offense, even if the attempt fails.  In this case the

defendant is charged with attempting to knowingly persuade, induce or entice a minor to engage in sexual activity.

The defendant can be found guilty of an attempt to commit that offense only if both of the following facts are proved beyond a reasonable doubt:

First, the defendant knowingly intended to commit the crime of persuading, inducing or enticing a minor to engage in sexual activity; and,

Second, that the defendant's intent was strongly corroborated by his taking a substantial step towards committing the crime.

A "substantial step" is an important action leading up to committing -- let me read that again.

A "substantial step" is an important action leading up to committing an offense.  It is not an inconsequential act.  It must be more than simply preparing.  It must be an act that would normally result in committing the offense.

You will see that the Indictment charges that a crime was committed on or about a certain date.  The government does not have to prove that the crime occurred on an exact date.  The government only has to prove beyond a reasonable doubt that the crime was committed on a date reasonably close to the date alleged.

The word "knowingly" means that the act was done voluntarily and intentionally and not because of a mistake or

1    by accident.

2              "Entrapment" occurs when law enforcement officers

3    or others under their direction persuade a defendant to

4    commit a crime that the defendant had no previous intent to

5    commit.

6              The defendant has claimed to be a victim of

7    entrapment regarding the charged offense.

8              The law forbids convicting an entrapped defendant.

9              But there is no entrapment when a defendant is

10   willing to break the law and the government merely provides

11   what appears to be a favorable opportunity for the defendant

12   to commit a crime.

13             For example, it is not entrapment for a government

14   agent to pretend to be someone else and offer, directly or

15   through another person, to engage in an unlawful transaction.

16             So a defendant is not a victim of entrapment if you

17   find beyond a reasonable doubt that the government only

18   offered the defendant an opportunity to commit a crime the

19   defendant was already willing to commit.

20             But if there is a reasonable doubt about whether

21   the defendant was willing to commit the crime without the

22   persuasion of the government officer or a person under the

23   government's direction, then you must find the defendant not

24   guilty.

25             When a statute specifies alternative ways in which

an offense may be committed, the Indictment may allege several ways in the conjunctive, that is, by using the word "and."

Therefore, if only one of the alternatives is proved beyond a reasonable doubt, that is sufficient for conviction, so long as the jury agrees unanimously as to at least one of the alternatives.

Members of the jury, Government Exhibit 4 has been identified as a typewritten transcript of the oral conversation heard on the tape-recording received in evidence as Government Exhibit 4.  The transcript also purports to identify speakers engaged in the conversation.

I have admitted the transcript for the limited and secondary purpose of helping you follow the content of the conversation as you listen to the tape-recording and also to help you identify the speakers.

But you are specifically instructed that whether the transcript correctly reflects the content of the conversation or the identify of the speakers is entirely for you to decide based on your own evaluation of the testimony you have heard about the preparation of the transcript and from your own examination of the transcript in relation to hearing the tape-recording itself as the primary evidence of its own contents.

If you determine that the transcript is in any

1    respect incorrect or unreliable, you should disregard it to

2    that extent.

3           I caution you that the defendant is on trial only

4    for the specific crime charged in the Indictment.  You are

5    here to determine from the evidence in this case whether the

6    defendant is guilty or not guilty of that specific crime.

7           You must never consider punishment in any way to

8    decide whether the defendant is guilty or not guilty.  If you

9    find the defendant guilty, the punishment is for the judge

10   alone to decide later.

11          Both parties have rested their case.  The attorneys

12   will now present their final arguments.  Please remember that

13   what the attorneys say is not evidence or your instruction on

14   the law.  However, do listen closely to their arguments.

15   They are intended to aid you in understanding the case.

16          Each side will have equal time to make their

17   arguments, but the government is entitled to divide its time

18   between an opening argument and a rebuttal argument after the

19   defense has spoken.

20          Ms. Rivera, are you prepared to make a closing

21   argument?

22          MS. RIVERA:  Yes, Your Honor, I am.

23          THE COURT:  I would invite you to proceed.

24          MS. RIVERA:  Thank you, Your Honor.

25          Good morning, ladies and gentlemen of the jury.

1          To the Honorable Court.

2          To the parties and everyone present.

3          From September 5 to September 10, 2015, this

4    defendant, George Adrien Brooks, 72 years of age, ventured to

5    procure, induce, influence a ten-year-old boy through an

6    adult intermediary into engaging in illicit sexual conduct,

7    specifically oral sex and possibly anal sex as well.

8          The defendant said he wanted to kiss, hold, have

9    sex.  And what gave him a thrill, the prey that he hunted for

10   in this case was among the most innocent and vulnerable

11   members of our society:  a child.

12         When you look at the evidence in this case, look at

13   what he did 44 years ago to his nephew.  His statement to

14   Special Agent Hyre that this interest in sex with children

15   started about two years ago is not accurate.  It's a lie.

16         Gopoian told you that 44 years ago -- and you can

17   do the math.  He's 72 years now.  When he was approximately

18   28 years of age he already had this sexual urge for incest,

19   and the object of his sexual desire was his nephew, who was

20   about six to seven years of age at the time.

21         So he crawled in bed with his nephew and on two or

22   three occasions as his nephew was sleeping, he woke up to

23   this defendant performing oral sex on him.

24         He still remembers this; and in particular, he

25   remembered how he used to shower with the defendant, not with

1   Mrs. Brooks, but with this defendant, and there was something

2   striking from his testimony.  And you know that he's telling

3   the truth.  He remembers that this defendant is

4   uncircumcised.  The defendant's own admissions during his

5   e-mail with the undercover officer revealed that piece of

6   information.

7           Of course, he's not going to remember every detail

8   surrounding events of when he was six to seven years of age.

9   This happened 44 years ago.  But as a child, you would

10  remember the most traumatic event, the most life-changing

11  event in your life.

12          And he couldn't groom his seven-year-old nephew.

13  He disclosed.  He told his mother.  We know that nothing

14  happened.  For 44 years this became a private matter.

15          And then he learned recently about this case.  Ms.

16  Mary Brooks told him -- this defendant's ex-wife reached out

17  to Gopoian and told him about this case.  Why would she do

18  that?

19          And then Elisha Brooks, this defendant's own

20  daughter, provided contact information for Special Agent

21  Hyre, the agent in this case.  Why would she do that?

22          Because he had something to say and he finally was

23  able to say it, and he came here and he took the stand and

24  under oath he swore to you that this happened 44 years ago.

25          He performed oral sex on two or three occasions on

his nephew, the most striking, the most devastating incident in the life of this child, probably.

And why is that important in this case?  Because it sets the background.  It shows you he had the intent.  It showed you he had the motive.  It defeats that entrapment defense, that instruction, because in this case what he was afforded was an opportunity to commit a crime he was already predisposed to commit.

And you know that not only because Gopoian took the stand and told you about that.  You know that because of his own words to Special Agent Hyre after he was arrested in this case, because of what he said during that telephone call with Special Agent Hyre.

So basically this information, this evidence regarding what happened 44 years ago, it provides context to this case.  And you can use that evidence for anything, for any bearing to which it is relevant in this case; and it is relevant to show intent, to show knowledge, to show he was not mistaken about what he was doing.

He posted the sex ad.  And what did Exhibit 1 reflect?  It says, "Family Play Time.  I know there are families out there, fathers, sons, uncles, nephews, that play together."

And you know the term "play."  That was not used in an innocent way.  This is the Casual Encounters section of

1    Craigslist.

2             You heard from the evidence that there are many

3    options there, not one for seeking a child.  Of course.  Man

4    seeking man, woman seeking woman, man seeking woman.

5             But his ad specifically targeted an incestuous

6    relationship, and he identified it as fathers or sons or

7    uncles or nephews.  And it's striking that he said, "I could

8    be your long-lost uncle."  It's full circle.  He has been

9    reminiscing for 44 years, longing for that same closeness

10   that he had with his nephew 44 years ago when they used to go

11   on camping trips together.

12            And if you recall, that was part of the

13   information, that was part of what he told Agent Hyre, that

14   he had read stories about brothers with kids that go on

15   camping trips together.  You know what he was talking about.

16   He's been longing for that same closeness he had with his

17   nephew 44 years ago.

18            So Exhibit 1 shows you that what he meant by "Play

19   time," what he was talking about, the context of these

20   communications is clear.  It was implied here.  When you do

21   this, use your common sense.  It's sex.  They were talking

22   about sex all along.  And the object of that sexual activity,

23   what they were talking about was about engaging children in

24   sexual activity.  And the agent made it very clear that he

25   was not interested in other men.  This was about the

children.

The defendant had several options at that point when he learned that this was -- if he was an innocent man looking at this, if there was no predisposition, if there was no intent to engage a child in sexual activity, when he got the response from the agent as to children being involved in this, he could have reported him to Craigslist.  He could have reported him to the police.  He could have confronted him about it and he could have stopped communicating with Agent Hyre, but he didn't.  Why?

Well, we know why.  The evidence shows why. Because he wanted to engage this child in oral sex and possibly anal sex as well.

When he learned about the -- when he learned about Special Agent Hyre having children that enjoy playing together, he said, "It sounds great.  Always up for new adventures.  Looking forward to talking more."

He told Special Agent Hyre that he was definitely interested in this encounter, and he chose to go for the boy for a start.  He said, "I'm most comfortable starting with your boy."  And we know why.  It was a ten-year-old boy, and his sexual interest in particular is in boys.  We know that from the communications with Special Agent Hyre, that he had already attempted to do this in the past with a twelve-year-old boy.  He told him.

1      So he has a particular sexual interest in very

2  young boys, and when he saw the opportunity in this case, he

3  took it.  He went for it, cautiously but assertively as well,

4  because he was concerned that he was dealing with a law

5  enforcement officer.  Not once but twice he asked, "I'll be

6  okay with this if it's not a police sting.  Can you tell me

7  anything that would assure me that you're not a police

8  officer?"

9      Of course, the agent was not going to tell him,

10  "Yes, you're dealing with a police officer."  Good-bye.  That

11  would have been the end of it.  This is the purpose of this

12  undercover operations, that the agents go and they ascertain

13  whether there are individuals out there that are seeking to

14  have sex with real children, and in order to prevent that

15  from happening, they represent themselves to be a bad dad.

16      It was up to this defendant to back out if he

17  really didn't want to go forward with this, but that was not

18  the case.

19      At the end, even though he had his concerns that it

20  may be a police sting, he decided to roll the dice and just

21  go for it, and he lost, because when he showed up, it was an

22  undercover officer who he had been talking to all along and

23  he was placed under arrest at that point.

24      The Judge already instructed you on the elements of

25  the offense, and I would just go through and review those

1  elements and basically tell you how the evidence shows that

2  we have met our burden, that we proved this defendant guilty

3  beyond a reasonable doubt.

4          The first element that the government would have to

5  prove in this case is that the defendant knowingly attempted

6  to persuade or induce or entice an individual who he believed

7  to be a minor to engage in sexual activity as charged in the

8  Indictment.

9          The Court instructed you we don't have to prove

10 that he was communicating directly with a minor.  We just

11 have to prove that he was attempting to persuade or influence

12 a minor, even through an adult intermediary, in this case a

13 person who was representing himself to be the father of the

14 minor.  That is what occurred in this case.

15         The law does not require that a real minor be

16 involved.  In fact, the law allows us to charge this case to

17 protect real potential victims.

18         The defendant need not -- he need not communicate

19 with a minor, reach out to a minor or contact a minor.  What

20 you have to look at is what was his intent.

21         And there are three prongs in this case:

22 enticement, persuasion or inducement.  If you find that any

23 of those were proved beyond a reasonable doubt, that is

24 sufficient evidence to convict.

25         Inducement.  This case falls squarely within the

definition of inducement.  According to the jury

instructions, "inducement" is to stimulate the occurrence of,

to cause.

Well, the evidence shows that the defendant

attempted to stimulate or cause a minor to engage in sexual

activity by engaging in communications with the father of

that minor regarding sexual activity with the minor,

coordinating the meeting, and then traveling to meet the

father of the minor and the minor in Gander Mountain; and

that is sufficient evidence that he was attempting to cause

this encounter, to influence a child into engaging in illicit

sexual conduct.

The enticement and persuasion prong are met as

well.  As we showed, he tried to influence and persuade the

father to believe that this was going to be a happy, fun

encounter, that he was not going to be rough with the child.

He said anal was not high on his priority list.  He

was going to make the child feel comfortable.  He was going

to make this a loving event.  He was going to abide by the

limits that the father was setting as to the sexual

encounter.

He said, "I don't want to do anything that would be

uncomfortable for you and him."

He also said, "I'm more into touching and holding

and kissing and oral."  Thereby he made it seem that this was

going to be a pleasurable experience for the child.  In that way, he attempted to persuade the father and influence a minor into engaging in illicit sexual conduct.

He also tried to establish rapport and groom the father by telling him, "Hey, you know, I'm game for this. I've read these stories of camping trips between brothers and kids, and they all play together."

And he basically again said, "I'm game for this. I've done it in the past.  I was talking to the father of a twelve-year-old.  I responded to a similar ad," to a similar ad.  So, basically, another ad, based on incest, posted by the father of a twelve-year-old, that he responded to an ad of that nature, the same that was posted here or similar, and that he had attempted to engage that minor in sexual activity, but the father stopped communicating with him.  So the event never came to fruition.

The defendant also stated that he had been thinking about the possibility of having a 13-year-old girl present in the same place where he was going to sexually molest the boy, that it would be cool if she could be present; but when the agent responded, "Well, maybe that would be too much," then he backed out of that and said, "Well, let's just start with your boy," because, again, he was trying to persuade here the father into believing, hey, I'm going to conform with the limits here.  This is going to be a comfortable situation for

 1    your child and for you as well.

 2            And immediately after that phone call on September

 3    8, he e-mailed Special Agent Hyre, and it shows you again

 4    what his intent was, because after it had already been

 5    negotiated that he was going to receive oral sex from the

 6    minor, perform oral sex on the minor, and also possibly

 7    receive anal sex, he e-mailed the agent that he was going to

 8    have his pubic hair and chest -- his chest and pubic hair

 9    trimmed as well as his scrotum, and that evidence showed that

10    he was going to follow through with his intentions.

11            And nobody forced him to write these e-mails.

12    Nobody induced him to follow up on this.  No nobody told him

13    to "Get in your car now and meet me here."  He did this out

14    of his own volition because he wanted this, and we confirmed

15    this with his own words and statements after he was arrested.

16            And before he traveled, again, when he reached out

17    to the father, Special Agent Hyre, on September 9, he asked,

18    "What did you do with them last night?"  That was not an

19    innocent question.  That was again asking, What did you do

20    with them sexually?  How do you have fun with them?  How do

21    you play with them?

22            And the agent said that he had performed light anal

23    on the boy.  He said, "Nice.

24            "Did your son get you off?  Did your son make you

25    ejaculate?"

1        I mean, he used the word "ejaculate."  That's

2    pretty clear.

3        And the agent said, "Yes."

4        And he said, "Nice."

5        Why?  Why would he ask those questions the day

6    before he was intending to travel in this case?  He was

7    setting the stage.  That's what he wanted.  That's what he

8    wanted to obtain, and he wanted to reassure the agent at that

9    point, I'm game for this.  I'm on board.  I want to make this

10   happen.

11       The defendant believed he was talking to the father

12   of the minors, that this was an individual who had control

13   over his children, and he used this father's own sexual

14   deviance in order to be able to get access to his children to

15   engage them in sexual activity; and for that reason, we've

16   met that element, clearly, beyond a reasonable doubt.

17       The second element that we would have to prove in

18   this case is that the defendant used facilities, means of

19   communication in interstate commerce.  We showed that he used

20   the Internet.  We showed that he used the cell phone, which

21   is a computer as defined by law; and that's basically the

22   allegation in the Indictment, that in attempting to commit

23   the offense in this case, he used means of communications in

24   interstate commerce, the computer, the Internet.  And that's

25   what he did.  That's what the evidence showed.  They were in

communication through e-mail and phone conversations.  We

seized the phone.

I don't think that is in dispute and it's not in

dispute that this defendant's cell phone, a Smartphone, is a

computer under the law.  So, basically, we've met that burden

as well.

The third element we had to prove is that when the

defendant did this act, he believed that the individual to be

induced or influenced to engage in sexual activity was less

than 18 years of age.  That is obvious as well, because

the -- Agent Hyre from the get-go told him that his son was

ten years of age, that his daughter was 13.  He reminded him

of that during the telephonic conversation right from the

get-go.  And then after the defendant was arrested, he

affirmed that he knew, he believe that he was meeting a

minor, a ten-year-old boy.  So that element was clearly met

as well beyond a reasonable doubt.

The fourth element we would have to prove is that

had the defendant engaged in the sexual activity that he was

intending to perform in this case, oral sex and possible anal

sex, he could have been charged with a violation of Florida

law, specifically the section that was alleged in the

Indictment.

And you already heard from the Court that as a

matter of law, for a defendant 18 years of age or older -- in

1    this case a 72-year-old man -- to engage a person less than

2    twelve years of age in this type of sexual activity

3    constitutes sexual battery under Florida law, and that

4    element was clearly met as well beyond a reasonable doubt.

5              There's an instruction, enticement, and that's

6    instruction number eleven, and you should read that in

7    conjunction with instruction twelve, the instruction on

8    attempt, because it basically defines the legal parameters in

9    this case.  It tells you what "induce" means.  It tells you

10   that the Internet and the cell phone and computer are

11   instrumentalities of interstate commerce.  It defines the

12   Florida statute that was charged in the Indictment, and it's

13   basically a roadmap to the case.

14             It also tells you that this offense can be

15   committed through an adult intermediary, that there is no

16   need for a minor to be -- a real minor to be involved.

17             Because this is an attempt case, we had to prove --

18   we have to prove that the defendant had the intent to commit

19   the offense and that his intent was strongly corroborated by

20   him taking a substantial step toward the commission of that

21   offense.

22             There is strong evidence of corroboration in the

23   defendant's planning and coordination with Agent Hyre of this

24   meeting.  Initially they coordinated for September 8 and then

25   it was coordinated for September 10.

1      Once he started coordinating what type of illicit

2  sexual conduct he was going to engage the minor in, where

3  they were going to meet, at what time, and then he traveled

4  for that purpose, that is strong corroboration of his

5  criminal intent.

6      There is no stronger evidence in this case than

7  defendant's own words.  They mark his intent.  He told

8  Special Agent Hyre after he was arrested -- and you heard

9  from the evidence he was arrested -- he said, "I knew this

10 was going to happen."

11     Well, he knew.  He suspected that he could be

12 walking into a police operation, and yet he traveled to have

13 sex with a minor, and when he got there, he said that; and

14 that's consciousness of guilt.  He knew that what he was

15 doing was illegal.  That was his first statement

16 spontaneously as he was placed under arrest after he

17 introduced himself as Gary to the undercover who was posing

18 as a decoy.

19     After he was advised of his rights, after he waived

20 those rights -- which you heard from the agent there was no

21 reservation in waiving his rights.  It was voluntary.  It was

22 a knowing waiver.  It was an intelligent waiver.  He didn't

23 appear to be under the influence of drugs or anything of that

24 nature.  He appeared to be of clear mind, and he stated what

25 he was there for.  He said, "Well, I have been in

communication over the past several days with a person I
believe to be the father of a minor," and that the substance
of those communications was about engaging that minor in oral
sex.

He said that he got up that morning.  He showered,
and he had actually followed up with trimming his private
part, his pubic and chest hair and shaving his scrotum, that
he had done that, and that he was there for the purpose of
engaging a child and influencing a child to perform oral sex.

And he expounded that about four years ago, when he
lived in Maryland, he had, yes, responded to a similar ad on
Craigslist and that it involved the father of a twelve-year-
old basically advertising the child for sex activity, and
that he had responded to that ad, that he engaged in
communications about engaging that child in sex, but it
didn't come to fruition because the father stopped
communicating with him.

He also said that his interest in this type of
activity stemmed from having read these stories online about
sex with children, and he said that this happened maybe for
the last couple of years, but that has been clearly
contradicted by the evidence and his own admissions that four
years ago he had attempted to entice a child in sexual
activity, contradicted by Gopoian's statements here to you in
court that this defendant sexually molested him when he was

1    seven years of age -- about six or seven years of age.

2            So this defendant's own words corroborated that

3    well before this case, well before he was encountered by a

4    law enforcement officer, he was sexually interested in very

5    young boys, that he had the intent and the motive to engage

6    in sexual activity, and for that reason, he was not

7    entrapped.

8            Read that instruction on entrapment and it will be

9    clear to you that he had the intent and the motive and the

10   predisposition.  This is way beyond, way beyond he was ever

11   contacted by Special Agent Hyre.

12           He gave the agents consent to search his phone and

13   his e-mail, and we found -- and we found the e-mails, pretty

14   much most of the e-mails, except for four of them that might

15   have been deleted, in his phone.

16           And his alias that he used, Gary, and his phone

17   number, that was his phone.  It was seized from his person.

18   That shouldn't be in dispute in this case, that he provided

19   consent and that we found evidence that strongly corroborated

20   everything we knew up to that point about the case.

21           This defendant's desire to engage in this activity

22   was so powerful that even though he feared, he was concerned

23   that he might be walking into a police sting, he was not

24   deterred by that possibility that he would be arrested.

25           He knew the consequences of his actions and he

1    still was willing to meet a child, a child for sex; and that

2    is the crime that this defendant has committed, and that is

3    the reason you should find him guilty.  Please find him

4    guilty as charged.  Thank you.

5              THE COURT:  Thank you.

6              Is the defense prepared to make a closing argument?

7              MS. SCOTT:  Yes, Your Honor.

8              THE COURT:  Feel free to proceed.

9              MS. SCOTT:  Thank you.

10             Before you on the screen, you see what I have

11   marked as my handy-dandy chart.  My handy-dandy chart is used

12   to help me to tell you all what I believe "reasonable doubt"

13   to be.  And the Judge has already instructed you on what

14   "reasonable doubt" is.  And the reason I'm going over this

15   first is because this is going to color everything that I

16   talk about throughout this closing argument.

17             So the Court has instructed you that "reasonable

18   doubt" is something that you would be willing to rely and act

19   upon without hesitation in the most important of your

20   affairs:  buying a house, buying a car, getting married.

21             If you have all of the information that you need to

22   make those important decisions and you have no reason to

23   doubt any of those decisions, then that is proof beyond a

24   reasonable doubt.

25             However, if it's likely that you have enough

information, that's not enough.  If it's probably that you

have enough information, that is not enough.  If you outright

don't have enough information, that is not enough.

And so when I'm going over this, all of those terms

in there that you can look at, if the scales are even, you

tip them to not guilty.  And it's only when it's guilt beyond

a reasonable doubt, excluding all reasonable doubt, for each

material element of the offense, then you can say "guilty."

Otherwise, as the Judge has instructed you, you must acquit.

You must find him not guilty.  And when you read the

instructions as they go back with you, that is the only time

you will see the "must" language.

It's equally important for the entrapment defense,

because if you don't find, there's already enough there to

say he was induced.  What you have to find and what the

government has to prove beyond a reasonable doubt is that he

was not predisposed to committing this offense, not any

offense, but this particular offense that they have charged

him with.

And let me be clear.  My reasons that I'm getting

ready to give to you that I consider a reasonable doubt do

not have to be your reasons to doubt.  You each get your own

reasons.  And when you go back in that deliberation room, you

hold on to whatever reason you have to doubt the information

that the government has provided to you and you talk about

1    that.

2           But I'm going to give you a few of what I believe

3    are reasons to doubt that, A, he committed the substantive

4    offense, which is knowingly intending to persuade, induce or

5    entice; and then, secondly, I'm going to give you reasons to

6    doubt as to why he was not predisposed to committing this

7    offense of knowingly intending to persuade, induce or entice.

8           So there's an elephant in the room, and it's hard

9    because we're not talking about apples and oranges.  We're

10   not talking about things that are so unrelated to each other

11   that the taste is just that much different.  No.  What we're

12   talking about here are lemons and limes.  But on a hot summer

13   day, a lime will not do.  You are going to want that lemon to

14   make lemonade.

15          The government was correct.  Mr. Brooks was

16   presented with an opportunity.  He was presented with an

17   opportunity to have sex with a minor.

18          The elephant in the room is that is disgusting.  We

19   don't like that.  We don't condone that.  We don't agree with

20   that.  And we don't like the fact that Mr. Brooks may have

21   wanted to have sex with a minor, that he said he wants to

22   have oral sex with a minor.  We are disgusted by that.

23          Yes.  Okay.  That's not what he's charged with.

24   And the government wants you to believe that that is what he

25   is charged with, is wanting to have sex with a minor.  No.

He is charged with knowingly intending to persuade, induce or entice the minor.

Has the government met its burden of proof?  No. And there are key elements in this case that you are able to look to.  The Judge said he will allow you to view the transcript of that audio.  He will allow you to listen to the audio as many times as you want, and he will also allow you to review the evidence that has come in in the form of those e-mails.

So let's start from the beginning.  In the mind of Agent Hyre, who has been doing this for now 15 years, who has been the coordinator for seven years, who does nothing but on a daily basis sit and try to catch a predator, his view was colored by all of this experience, and everything he did from the beginning was colored by his experience of talking to predators online every day.  So when he sent that first e-mail, he expected Mr. Brooks to have the same mindset that he had.

Well, that just can't be possible.  That's why he has that title of coordinator.  That's why he used those terms of "up," capitalized.

And what do we see from Mr. Brooks?  You can review those e-mails.  You see that Mr. Brooks mimicked everything that Agent Hyre did, when Agent Hyre wrote "up," Mr. Brooks wrote "up."  When Agent Hyre asked or told his age, Mr.

1   Brooks gave an age similar to Agent Hyre's age.  When Agent

2   Hyre said, "No rough stuff," Mr. Brooks responded, "No rough

3   stuff."

4            These were not the words from Mr. Brooks.  Mr.

5   Brooks simply mimicked everything Agent Hyre said, and Agent

6   Hyre has told you all that he is skilled in trying to use

7   this language.

8            So in the beginning of this trial I said who

9   induced who?  Who persuaded who?  Who enticed who?  Agent

10  Hyre knew exactly what to say to get the information out of

11  Mr. Brooks.

12           "Knowingly" was an element that the Judge told you

13  all is not a mistake.  It's not unintentional.  If he

14  unintentionally did this, then that is not meeting their

15  burden.  But he not only had to knowingly do it; he had to

16  intend to do it.

17           And the government talked about Mr. Gopoian and

18  that you could use what Mr. Gopoian said as evidence that he

19  in fact had the intent to do it today.

20           But no.  As horrible as it may seem that Mr. Brooks

21  may have performed oral sex on his nephew 44 years ago -- and

22  I'm not saying that happened.  I'm just saying even as

23  horrible as it may seem that he may have done that, that has

24  no bearing on whether he intended to persuade, induce or

25  entice a minor.  All that shows is he may have wanted to have

1  some type of relation with the minor, but that's not what

2  they have to prove here.

3         But let's talk about Mr. Gopoian, because what he

4  came in and presented to you is that he's been a paramedic

5  and he's been a paramedic for most of his adult life.  And

6  he's a mandatory reporter.  And that at some point during his

7  adult life, Mr. Brooks was still married to his aunt.

8         He could have reported this when he became an

9  adult.  Even though his family may have swept it under the

10  rug, he could have reported it and knew what the requirements

11 would have been and what he could have done when he became an

12 adult, and he chose not to.

13        And Mary Brooks, if you're missing information from

14 that -- the government presented her name in the beginning.

15 If you're missing information, you look to them.  If you want

16 to know more about that, you look to them.  You don't look to

17 Ms. Brooks for that information.

18        Mary Brooks could have came in and said yes, this

19 happened.  You didn't hear from her.  You heard from Mr.

20 Gopoian.

21        And you also heard from Mr. Gopoian that things

22 turned sour after his grandparents made Mr. Brooks the

23 executor on their account, on the grandmother's estate.

24 Excuse me.  That's when things turned sour.

25        You also found out that just one month prior to

today is when he found out about this case.  He was arrested

in September.  You heard that.

So Mary Brooks knew this information, Elisha Brooks

knew this information, and right until the time of trial is

when this information was presented to Agent Hyre.

And you heard that Mary Brooks was still -- that's

her ex-husband.  It was a contentious divorce.  And now, all

of a sudden, 44 years later it comes out, and the government

wants to say to you all that this is why he knowingly

intended to persuade, induce or entice?  No.

You know what it was to do.  To make you mad, to

inflame you, to say OMG.  This cannot happen.  We cannot let

him go, because he did this 44 years ago.

But the Judge, the Court also instructed you that

you have to view this evidence independently.  You have to

make sure that the government met its burden of proof

independently of any other thing that they described.  The

twelve-year-old, the Mr. Gopoian incident, all of that is

irrelevant for what they have to prove here today to you.

And it's unfortunate that we have to address

something that was never reported, never substantiated by any

claims, and even if brought to court on its own merits, would

have had to be proved beyond a reasonable doubt on each and

every one of those elements.

It's unfortunate that I have to address that today.

1  It's unfortunate if it happened 44 years ago.  It's

2  unfortunate if his family didn't report it.  But what's

3  equally unfortunate is if Mr. Brooks has to be judged on that

4  for this crime.

5          The government said he was presented with an

6  opportunity to have sex with a minor, and they say that that

7  presentation of an opportunity is enough to show that he was

8  not entrapped, that he was just purely presented with an

9  opportunity.  But that's the problem, because that's the

10  problem with the substantive offense on his own.  He was

11  always presented with the opportunity.

12          Every suggestion, every mere element of what they

13  were going to do when they met, everything came from Agent

14  Hyre.  The only thing that Mr. Brooks said is, "I'm not that

15  big on anal."

16          And the government keeps presenting to you that it

17  was oral with a possibility of anal.  Mr. Brooks is a 72-

18  year-old man -- I don't want to get too graphic.  It's a

19  ten-year-old fictitious minor.

20          Mr. Brooks is a bottom.  That means he would be

21  receiving.  That shows interest in an adult male, which is

22  when he actually explicitly said what his interests were.

23  And you can review it on page 110 of the e-mails.  "I'm

24  interested in playing with an adult male.  Your child, if you

25  want him to be present, that's fine," that details what his

1    interests are.

2             The government is asking you to imply his interest

3    and his intent from everything else.   No.   Look at his words,

4    what he said.

5             And equally look to what he said to know that he

6    didn't want to persuade, induce or entice anyone.   Every time

7    the agent said in the phone call that's ground that they have

8    not covered, this is something they have not done, Mr. Brooks

9    immediately said no, that I'm not for that.   If they're not

10   going to do that and they're not willing and you're not

11   comfortable, I'm not going to try and change your mind.

12            He didn't try and persuade, influence, induce,

13   entice, any of the terms that they listed here, for anything.

14   If he was presented with an opportunity to have sex, that's

15   not what we like to think of someone doing, but if he

16   accepted that opportunity to have sex, that is still not the

17   crime.

18            He is not guilty of the substantive offense and he

19   is not guilty, because if anything was knowingly intending to

20   persuade, induce or entice, that's the predisposition that

21   you have to find beyond a reasonable doubt, that he was

22   predisposed to knowingly intending to persuade, induce or

23   entice.

24            And the government has not met their burden by

25   showing that he had a sexual interest in children.   The

government has not met its burden by saying he previously had

sex with or previously had oral sex with someone 44 years ago

or that he previously talked to a father of a twelve-year-old

minor.  Those are not elements to show that he was

predisposed to doing this.

And it's clear.  When you get the elements, you

will be able to read them in accordance with the evidence and

find Mr. Brooks not guilty.  It's not because I'm asking you

to; it's because the law as they present it, as they craft

it, as Agent Hyre sat in his office on his computer crafting

a prosecution against someone, this is the charge they

decided to bring.

The government talked about Mr. Brooks preying on

the most vulnerable of our society.  I think it's pretty

undisputed that along the lines of children being the most

vulnerable in our society, the same is equally held for our

elderly.  The same is held for those who we consider our

senior citizens, those who are lonely, wanting communications

with someone.

And the government said, oh, well, why would his

ex-wife come in here and give that information to Gopoian?

Why would his daughter give that information to Gopoian?

That goes to show his loneliness.  He has no

family, for those that would be willing to do that against

him.  He scours the Internet for companionship.

1          MS. RIVERA:  Objection, Your Honor; assumes facts

2    not in evidence.

3          THE COURT:  Overruled.  You can continue.

4          MS. SCOTT:  And he puts out posts and says, "Family

5    play time, 18 and over."

6          And then Agent Hyre says, well, all of the

7    communications were about sex.  We're not friends.  We don't

8    have any reason to talk besides this.

9          There is reason to doubt, and I want to point out

10   something that was -- and, again, you can read this.  Don't

11   take my word for it.  But at the end of the conversation on

12   the phone, Mr. Brooks is talking to Agent Hyre and he says,

13   "Let's see.  Thursday I got to be at the airport at 8:30.

14   Yeah, that would give me plenty of time to get back, take a

15   shower and get cleaned up and head that way.  So, yeah, 11:00

16   sounds good.

17          "ROD HYRE:  Okay.  Yeah, taking a shower is a good

18   idea.

19          "MR. BROOKS:  Oh, yeah.  No, no, no.  I got to be

20   up at 6:00 in the morning.  Oh, well, a side job that I got

21   through Uber, so to speak, was somebody I picked up a few

22   weeks ago.  He is on medication and can't legally drive

23   because he could either black out or have a seizure from the

24   medication.  So until he's off the medication, starting last

25   week September 1st, he's got to be in the office every day

because he's a financial manager for an investment company."

Mr. Brooks wants somebody to talk to.  Mr. Brooks is lonely.  And when presented with the opportunity to have sex, he initially rejected that idea, said, I want to play with an adult.

When Agent Hyre rejected that idea, in an attempt to keep the conversation going, Mr. Brooks continued along the lines; but that's because he has a desire to talk to somebody, not to persuade, induce or entice someone.

And the government misstated something earlier when they said he persuaded or induced Agent Hyre.  When you review the charge, that's not an element here.  He didn't do it, but that's not an element.  He must have tried to persuade, induce or entice the minor.

There was also something said about exits.  When Mr. Brooks was given an opportunity to exit, he didn't take it.  Well, he did and we showed that.  He stopped communicating on Sunday at 12:18.  That's on page 120.

Then Mr. Brooks -- excuse me.  Agent Hyre re-initiated that contact.  That's on page 121.

And he started up that communication with sex, and Agent Hyre said, "Well, I had to do that to show him I wasn't a cop."

But then when you look on page 125, on September the 9th, which was that Tuesday -- excuse me -- the 8th,

1   which was that Tuesday, Agent Hyre started up the

2   conversation again, but he didn't mention anything about sex

3   that time.  He didn't have to mention sex the time before.

4   But there was no communication that Sunday through that

5   Tuesday morning from Mr. Brooks.

6           Agent Hyre went against his training and he led

7   this conversation each and every time he could.  Agent Hyre

8   led the conversation, and you will see that.

9           This is the hardest part of the trial for me, and

10  the reason being is because up until this point, I get to

11  talk to you.  I get to tell you what I view the evidence to

12  be.  I get to cross-examine.  I get to ask questions, and I

13  get to fight on behalf of my client and say why he's not

14  guilty, why he didn't just succumb to the government's

15  Indictment and enter a plea of guilty.

16          And it's hard for me because I don't get to go back

17  in that deliberating room with you.  I don't get to continue

18  to fight beyond this point and show you reasons why Mr.

19  Brooks is not guilty; but that's okay because I trust that

20  each and every one of you will review the evidence, and if

21  you have questions, you come back out and you ask.  If you

22  want to view the evidence again, you do so.

23          And you will see that there is reason to doubt that

24  he intended knowingly to commit this offense.  And if there's

25  any slight ability that you think he may have knowingly

1    intended to commit the offense in any way, that he was

2    entrapped in doing so, and he was not predisposed to

3    knowingly intending to persuade, induce or entice, thus he is

4    not guilty.

5           And the government is going to get up here and they

6    get the last word, and that's the way it's set up.  So they

7    may counter everything I just said and I don't get to say

8    anything back.

9           But if you have doubt, if you believe that the

10   conversations from Agent Hyre were your doubt, if you believe

11   that Mr. Brooks backing out and not continuing the

12   conversation was your doubt, if you believe that every time

13   Agent Hyre said no, they haven't been involved in this, and

14   Mr. Brooks then tried to change anybody's mind, if you

15   believe that's your doubt, hold on to it and talk about it.

16          It's not fair, it's not just to convict someone on

17   something they are not charged with.  It is not fair, it is

18   not just to convict him on something that happened 44 years

19   ago that is totally unrelated to this.

20          And we ask on behalf of Mr. Brooks' entire defense

21   team, on behalf of Mr. Brooks that you hold the government to

22   its burden, to its high burden.

23          And if you look at that chart again that's in front

24   of you, if it's anything but that top red level, you must

25   acquit.

1               Thank you.

2               THE COURT:   Thank you, Ms. Scott.

3               Would the government like to make a rebuttal

4     argument.

5               MS. RIVERA:   Yes, Your Honor.

6               This demonstrative evidence that you saw here,

7     that's not evidence.   That's not the definition of

8     "reasonable doubt."   Counsel's opinion on reasonable doubt,

9     that's not evidence.   That's not relevant.

10              What's relevant is the instruction that you receive

11    from the Court as to the law; and that instruction,

12    instruction number two, has the definition of "reasonable

13    doubt."   And it doesn't highlight any red levels.   It's very

14    straightforward.   It's simple language, and I encourage you

15    to review it.

16              She says -- counsel for the defense or the

17    defendant states that he was not predisposed to commit this

18    offense, that there was no evidence of predisposition.   Well,

19    that defies common sense in this case.

20              The evidence showed when you look at these other

21    instances, the one in particular involving Gopoian, what you

22    take from that and from that ad and from his statements about

23    the twelve-year-old boy that he tried to entice in the past,

24    that he had a sexual interest in incest and in particular in

25    boys, in very young minor boys, and that is why that evidence

1  is relevant.  That is the predisposition that we intend to

2  show in this case.

3          It's not -- it is separate and independent from the

4  Indictment because we still have to meet each element of the

5  offense, but this provides context.  It can be used by you

6  for any purpose to which it's relevant in this case,

7  including predisposition, which is relevant because they have

8  alleged entrapment.  And that instruction is instruction

9  number 14.

10          So a defendant is not a victim of entrapment if you

11  find beyond a reasonable doubt that the government only

12  offered the defendant an opportunity to commit a crime the

13  defendant was already willing to commit.

14          And let us not forget that this was not Agent

15  Hyre's ad or idea.  He posted an ad soliciting incestuous sex

16  from fathers and sons and uncles and nephews and cousins.

17          Agent Hyre merely responded to that ad.  He was

18  attempting to expound.  Okay.  What is it that he wants to do

19  here?  Because he knows that sexual predators go on

20  Craigslist looking for minors to have sex with.  This is what

21  he does.

22          And what's at issue here is not the state of mind

23  of Special Agent Hyre and why he followed up on things, but

24  the objective acts of the defendant in this case, and they

25  show that he had a sexual interest in young boys, and that

that ad was specifically targeting incestuous sex with

minors.

Why the caveat "I could be your long-lost uncle"?
Think about that.  He's talking about Mr. Gopoian.  He's
reminiscing about what he did to his nephew.

This is really a simple case.  This defendant
posted an ad on Craigslist soliciting incestuous relations
with fathers and sons.  We have an undercover posting as the
father of a ten-year-old boy and a 13-year-old girl, who
identified himself as possibly being involved in the same
type of activity as this defendant, and a defendant who used
the father, an intermediary, in an attempt to influence a
minor into engaging in sexual conduct.

Of course we cannot show that a minor was
persuaded, induced or enticed because that's not what we
charged here.  He is charged with the commission of attempt.
Did he have the knowing intent to do this?  And did he take a
step that was substantial in nature in order to accomplish
his criminal objective?

And we believe, based on the evidence, not on any
kind of speculation, and the law that he did.

And this dynamic of mimicking behavior that the
defense has highlighted, this is also called "grooming
behavior," because he was attempting to establish rapport.
He was testing the limits.

1     And when you think about it, he posted the ad and

2 he was the first one who mentioned a word, a sex word.  He

3 said, "Well, I'm not big into anal," and that was to try to

4 provide comfort to Special Agent Hyre that the child wouldn't

5 be hurt, because his intent was to attempt to influence,

6 induce and entice a minor to engage in sexual activity.

7     And this was going to be a family play time.

8 That's why he asked, "Do you have a pool?"

9     And initially he said, "Well, it would be great me

10 engaging you in sexual activity and having the child

11 present."  He said that.  That was not Special Agent Hyre.

12 He brought that up, to have the child in the same room as he

13 engaged the father in sexual activity, because his ad was

14 specifically targeting incestuous type of relations involving

15 minors, and that's what he wanted to do and that's why the

16 mimicking behavior here.  He was trying to make this father

17 feel at ease, that everything was going to be fine, that he

18 was a laid-back type of personality.

19     There's no evidence in this case that this

20 defendant is somehow lonely.  And, seriously, if he's lonely,

21 if you're going to accept that as evidence of why he did

22 this -- I mean, it assumes that he actually intended to

23 commit the crime.  Well, he did this because he was lonely.

24 It provides a different motive.  I don't understand that

25 argument, because it actually would lead one to believe then

that the reason why he did this is because he was lonely, and

because he was lonely, he attempted to receive some comfort

by receiving oral sex from a ten-year-old boy.  That doesn't

make any sense.

I believe, based on the evidence, the evidence

showed that this is not just -- this is not based on the fact

that he was lonely.  There's no evidence about that.  The

evidence was that he has a sexual interest in young boys.

And, yes, we agree with the defense that we were

disgusted by the evidence that he wanted to have sex with a

minor; but that is not the extent of the evidence in this

case.  We did show that he had the intent and that he took

substantial steps.

And I encourage you to read that instruction,

instruction eleven, on enticement, and it states the

defendant need not communicate directly with an individual

under 18 years of age.  It is sufficient if the defendant

induces the individual to engage in unlawful sexual activity

by communicating with an adult intermediary for that purpose.

As used in this instruction, "induced" means to

stimulate the occurrence of or to cause.  That is plain

language.

How was he attempting to stimulate the completion

of this offense?  By engaging in conversations with Special

Agent Hyre over the course of five days.

1          And this was not going to be the only time.  And

2     when you look at Exhibit 4 and Exhibit 5, you know he also

3     said, "Well, if everything goes well, we can make this a

4     reoccurring event," because that's exactly what he wanted,

5     this type of sexual activity with a child, and it shows his

6     intent.

7          What he had to offer here, the enticement factor --

8     I mean, he believed this father was into watching this sort

9     of thing.  So he basically was offering a fun, happy, loving,

10    comfortable setting, and he established the rapport and he

11    attempted to groom the father by talking about these stories

12    of incest, by talking about the previous occasion when he

13    tried to entice a twelve-year-old boy.

14          This case involves an agent who works towards

15    protecting children.  He investigates these crimes.  He knows

16    that opportunistic sexual predators, they hang out on

17    Craigslist; and there's absolutely nothing inappropriate

18    about the way he conducted this investigation.  Of course, he

19    has to be guided by his common sense, by what he has learned

20    in his training and experience, and that's what he did.

21    There's absolutely nothing erroneous about it; and that's why

22    that entrapment instruction is there, so you can actually

23    assess that when you go back to the deliberation room.

24          Mr. Gopoian testified here.  He came and took the

25    stand and testified under oath about something that was so

private, so embarrassing.  Why would he do that if he was not

telling the truth?  Why would he come here and subject

himself to cross-examination on a matter he knows happened 44

years ago?

        We know that he's telling the truth, because when

you look at the rest of the evidence in this case and you put

it in context, all these other instances, the incident with

the twelve-year-old boy, this case, it all shows the same

thing:  He had the motive, he had the intent because he's

sexually interested in little boys.

        There's no evidence here that Mr. Brooks has no

family support, that somehow they're all distant.  That is

just not relevant in this case.  So I would submit to you

that that should receive absolutely no weight.

        And to suggest that the government should have

called this defendant's ex-wife to testify about what

happened between Mr. Gopoian and the defendant here, again,

defies common sense.  She was not present in that room when

this defendant put his mouth on Mr. Gopoian's penis.  She was

not there.  That would have been inadmissible evidence.

        The best evidence, the clear evidence is Mr.

Gopoian's own statements.  So there's absolutely no reason

for us to even attempt to present evidence that would have

been otherwise inadmissible.

        I am not asking you to render a decision based on

passions or feelings about this case.  I'm really just asking you to look at the evidence objectively and use your common sense and follow the law, and to render a guilty verdict based on that evidence and the law.

This defendant never -- he never changed his course.  He never backed out.  There's absolutely no indicia in the evidence that was presented that he either reported Special Agent Hyre to the police, that he told him or confronted him, "Hey, you're sexually exploiting your children.  I'm reporting you," that he withdrew from his intent.

Why would he travel to Gander Mountain on September 10th?  He even told Special Agent Hyre, "I'm here to follow through on this.  Yes, that's why I'm here, to obtain oral sex from a minor."  His own words provide the strongest evidence of intent as to why he did what he did, that all along he was talking with Special Agent Hyre about engaging a child in sexual activity.

When he confessed, he said it.  "Yes, I knew this was about engaging a minor in oral sex, and that's why I'm here."

The evidence presented here did not in any way demonstrate -- and this is again not relevant, that he was some elderly person, weak or somehow not able to follow through with what he was saying.

1    He actually, in his attempt to groom, again, the

2  agent, represented himself to be younger.  He represented

3  that he was about the same age as the agent.

4    And the demeanor of Special Agent Spruill is like,

5  "He looked different when I saw him."

6    He represented himself to be an Uber driver, an

7  active man, a massage therapist.  There's absolutely no

8  evidence that he was some elderly, lonely man that was not

9  able to follow through with this.

10    And we know -- I mean, this argument on him

11  receiving more than giving, it doesn't have anything to do

12  with his ability to perform.  I believe that was the

13  inference that they were attempting to draw here.  He is

14  mostly into oral sex.  That's what he did to his nephew 44

15  years ago.

16    The defendant, again, was given plenty of

17  opportunities to back out.  He was not coerced.  He was not

18  pressuring into this.  He was just afforded an opportunity

19  that he was already predisposed and willing to engage in.  He

20  wanted to have sex with a child.  He went for it.

21    There's nothing wrong with the agent's course of

22  action in this case and how he went about it.  It was this

23  defendant's choice.  He's an adult man, an articulate man, a

24  smart man.  He knew he could have withdrawn from this; and if

25  he suspected so much that this was a police operation, well,

1    yes, he could have easily withdrawn from it.  He could have

2    stopped talking to Special Agent Hyre at any point, but he

3    didn't.  He took his chance.  He rolled the dice and he lost,

4    because when he showed up, well, you know what happened.

5            We had to prove that he took substantial steps

6    toward the commission of the offense, according to that

7    instruction on attempt, instruction number twelve, and we

8    did.  A crime was committed when he started coordinating

9    sexual activities with a minor, when he said yes, oral sex,

10   receiving, performing, the possibility of anal sex.  When he

11   said and started setting the time and the date, those are

12   substantial steps that are recognized by the law; and the

13   fact that he traveled, that is strong corroboration of his

14   intent.

15           And on top of that, his incriminating statements to

16   that effect, that's just overwhelming evidence as to what he

17   was there to do.  He was there to influence a minor, to

18   entice and persuade a minor or induce a minor into engaging

19   in sexual activity.

20           And the instruction on conjunctive charge, that's

21   instruction number 15, it basically states that where the

22   statute specifies different ways in which an offense may be

23   committed, the Indictment may allege there are several ways

24   in the conjunctive, that is, by using the word "and."

25   Therefore, if only one of the alternatives is proved beyond a

1    reasonable doubt, that is sufficient for a conviction, so

2    long as you agree on that unanimously.

3         What that means is that -- we charged attempt to

4    induce, entice, persuade.  Well, if you find that one of

5    those prongs was met, one, that is sufficient to convict.

6    That's why the instruction says "or," "entice, induce or

7    persuade."

8         We submit to you that we've proved all of them, but

9    it's up to you to decide which one we have met.

10        Again, the defendant does not need to persuade the

11   father.  The defendant only needs to use the father, a parent

12   as a channel through which he gains access to a child.  That

13   is, again, because the parent is the one who has control over

14   the child.  And in many of these cases, we're dealing with

15   toddlers, infants, children that can't speak for themselves.

16        And the defendant didn't want to communicate

17   directly with the minor because he knew he could easily

18   obtain what he wanted in this case through an adult

19   intermediary.

20        Thus, we submit to you the evidence showed beyond a

21   reasonable doubt that the defendant attempted to induce or

22   entice or persuade a minor to engage in illicit sexual

23   activity, and that he took steps that were substantial in

24   nature by traveling to meet the minor; and for that reason,

25   we ask you to find him guilty as charged.

1          Thank you for your patience.

2          THE COURT:  Your verdict, whether guilty or not

3  guilty, must be unanimous.  In other words, you must all

4  agree.

5          Your deliberations are secret and you will never

6  have to explain your verdict to anyone.

7          Each of you must decide the case for yourself but

8  only after fully considering the evidence with the other

9  jurors.  So you must discuss the case with one another and

10  try to reach an agreement.

11          While you are discussing the case, do not hesitate

12  to re-examine your own opinion and change your mind if you

13  become convinced that you were wrong; but do not give up your

14  honest beliefs just because others think differently or

15  because you simply want to get the case over with.  Remember

16  that in a very real way, you are the judges, judges of the

17  facts.  Your only interest is to seek the truth from the

18  evidence in the case.

19          When you get in the jury room, choose one of your

20  members to act as a foreperson.  The foreperson will direct

21  your deliberations and will speak for you in court.

22          A Verdict form has been prepared for your

23  convenience.  It reads as follows:  "United States District

24  Court, Middle District of Florida, Orlando division.

25          "United States of America versus George Adrien

1   Brooks."  And then the case number is cited to the right

2   margin.

3           "Verdict form.

4           "As to Count One of the Indictment, charging

5   Defendant George Adrien Brooks with a violation of Subsection

6   2422(b) of Title 18 of the United States Code, we, the

7   members of the jury, do hereby find defendant," and there are

8   two options.  I'd ask that you only check one.  The first

9   option is guilty.  The second option is not guilty.

10          Then it reads:  "So say we all."

11          The foreperson will then date, sign their name

12  above the foreperson's signature line, and then print their

13  name above the print line just below that.

14          Take the Verdict form with you to the jury room.

15  When you have all agreed on a verdict, your foreperson must

16  fill in the form, sign it, date it and carry it.  Then you

17  will return to the courtroom.

18          If you wish to communicate with me at any time,

19  please write down your message and question, and give it to

20  the marshal.  The marshal will bring it to me and I will

21  respond as promptly as possible, either in writing or by

22  talking to you in the courtroom; but I caution you not to

23  tell me how many jurors have voted one way or another at that

24  time.

25          There are a few housekeeping matters as we begin

1  the process of heading into the jury room.  The first and

2  most important question is, Mr. Aybar, once the jury begins

3  deliberating, it's going to be a very closed environment

4  where no one is going to be permitted to leave until the

5  deliberations end.

6          You described for me a very important event going

7  on in your private life.  Do you feel comfortable going in

8  and beginning deliberations at this time?

9          THE JUROR:  Yes.

10          THE COURT:  Thank you for that, and thank you for

11  being on this jury.

12          That having been said, several things are going to

13  happen now.  Miss Darleen here is going to talk to you as

14  you're entering into the jury room.  One of the basic rules

15  are if anyone knocks on the door because you have a question

16  you want to give them or we need to find out where you're at

17  in terms of timing, please stop your deliberations.

18  Deliberations are only appropriate when you are together and

19  no one else is in there.

20          Miss Darleen is going to walk into the jury room

21  with you as soon as you're heading in there to find out if

22  you have any dietary needs.  We're going to go ahead and get

23  you lunch so you can continue deliberating without that kind

24  of bulky interruption.

25          I'm going to invite counsel forward at this point,

1   to come on forward to the desk.  I'm going to ask them to

2   inspect the jury instructions, the Verdict form, the

3   Indictment, all the exhibits that have been introduced in

4   evidence; and I will hear from you at sidebar if you want to

5   take up anything.  So go on ahead and review.  Those are all

6   the items.

7           There is something referred to as a "boom box"

8   going back with the jury, so they can play the exhibit, and

9   that boom box has no ability to get on the Internet or

10  anything else.

11          Ms. Soderholm, thank you for your service.  I

12  always say this in front of the rest of the jury because one

13  time I didn't, and the rest of the jurors thought something

14  bad had happened.  You may have figured this out already, but

15  you are the alternate.  And I want to assure you that your

16  presence on this jury was of critical importance, because

17  many trials take longer than three days to try, and if it

18  does and we have a juror that falls ill or has an emergency

19  requiring their absence, then we would literally have to

20  start over from scratch.

21          So you played a very important role, and I hope

22  that you will leave here with a positive experience,

23  understanding that we absolutely needed you for this.

24          While they're reviewing those items, I'm also going

25  to invite you, if you have any cell phones or electronic

1    items that allow to you communicate outside of the

2    deliberation room, to take them out of your bags and leave

3    them on your chairs.  Your chairs will be guarded while

4    you're in there deliberating, but that's to make sure that no

5    one accidentally texts you, e-mails you or sends you

6    something that might otherwise jeopardize your ability to

7    fairly and impartially make a determination on the evidence

8    that's been presented.

9            So I'm going to invite our court security officer,

10   with the exception of our alternate juror, to escort you back

11   to the jury room.  Wait until all the items have been

12   delivered to you -- and they're being delivered now -- and

13   Miss Darleen has had a chance to ask about your dietary

14   needs.  Once all the items are in there, everyone is out, I

15   would invite you to begin deliberating.

16           When you hear a knock on the door, that will

17   probably be your lunch.  So at that time I would ask you to

18   stop deliberating, let them bring in your lunch, and as soon

19   as they exit from your deliberation room, then on.

20           So thank you and feel free to head into the jury

21   room, with the exception of our alternate.

22           Before they go in there, if you want to go in and

23   retrieve any items that you have in there, go on ahead and do

24   that now.

25           The pad and pen that you have, leave it facedown in

1   your chair.  I will oversee the destruction of those notes.

2   No one will see those.

3        But the rest of you who took notes, you're welcome,

4   once you begin your deliberations, to take them in there with

5   you and use them as you deem appropriate.

6        All right.  Do counsel want to approach sidebar to

7   discuss any of the issues in terms of your observations of

8   the items going back?

9        MS. RIVERA:  Yes, Your Honor.

10        THE COURT:  All right.  Come up sidebar.

11        (Bench conference as follows.)

12        MS. RIVERA:  Just one clarification on the

13   instruction 16.  Exhibit 5 has been identified as a

14   transcript, not Exhibit 4.

15        THE COURT:  Got it.  And is this going to stay at 5

16   down here?

17        MS. RIVERA:  No, as 4, because the audio recording

18   is Exhibit 4.  The transcript is Exhibit 5.

19        THE COURT:  Any objection to my pen and inking

20   that, from the government?

21        MS. RIVERA:  Oh, no, Your Honor.

22        THE COURT:  How about from the defense?

23        MS. SCOTT:  No.

24        THE COURT:  All right.  Anything else?

25        MS. SCOTT:  No.  This is what's going back to them,

1    though.  So I was giving it to you.

2              THE COURT:  Thank you, and I appreciate that.

3              Can I see -- all right.  So this one is turning

4    into 5?

5              MS. SCOTT:  Yes, sir.

6              THE COURT:  All right.

7              Anything else?

8              MR. SKUTHAN:  Yes, but I want to wait for the

9    prosecutor.

10             (In open court.)

11             THE COURT:  Ms. Rivera, do you have anything else?

12             (Bench conference as follows.)

13             MS. RIVERA:  No, Your Honor.

14             MR. SKUTHAN:  Your Honor, we just wanted to renew

15   our motion for judgment of acquittal.  We want to renew all

16   previous evidentiary objections, and we wanted to renew our

17   previous objections to the jury instructions.

18             THE COURT:  All right.  Thank you.  They're

19   preserved.

20             MR. SKUTHAN:  Thank you.

21             MS. SCOTT:  Thank you.

22             (In open court.)

23             THE COURT:  Thank you.  If you want to head into

24   the jury deliberation room, we will await for your decision.

25             Miss Darleen, if you want to bring all that into

1  the jury deliberation room.

2              (Jury not present.)

3              THE COURT:  Everything is going back.

4              MS. RIVERA:  Your Honor, if I may, there's one

5  housekeeping matter and it's the forfeiture --

6              THE COURT:  Yes.

7              MS. RIVERA:  -- issue.  I have not -- we submitted

8  a stipulation to the defense in case the defendant is found

9  guilty.  And if they decide to stipulate forfeiture, that

10 would be fine.  Otherwise, we're ready to proceed on the

11 forfeiture issue.  And we submitted -- our office submitted

12 your instructions on the matter in a proposed --

13             THE COURT:  I understand, and we're ready to send

14 them back if we need them to make a decision on forfeiture.

15             Does the defense want some time to talk about that

16 with their client?

17             MS. SCOTT:  Yes, Your Honor.

18             THE COURT:  Okay.

19             We'll be ready to go.  And the mechanics of that

20 are they come out, give us their decision, and we have one

21 more matter for you to take care of.  So I'll leave that up

22 to you.  But if you could give me any advance notice, that

23 certainly would be helpful.

24             In case you're wondering, Ms. Rivera, you used 27

25 minutes on your preliminary argument and exactly 20.  So you

1    had 13 left on your hour.

2            And, Ms. Scott, you used just under 26 minutes on

3    your final argument.

4            All right.  Is there any other matter to take up at

5    this time, starting with the government?

6            MS. RIVERA:  No, Your Honor.  Thank you.

7            THE COURT:  Ms. Scott?

8            MS. SCOTT:  No, Your Honor.

9            THE COURT:  All right.  Does Miss Darley have your

10   cell phone numbers or the very best way to get ahold of you,

11   assuming there are any matters that require your immediate

12   return to the courtroom?

13           MS. SCOTT:  I can provide it.

14           THE COURT:  She's going to be out in just a second.

15   When she comes out, if you could just make sure how the

16   primary way you want to be contacted if they have a question

17   or a verdict or anything else, just leave that with her.

18           And they're going to give you their cell phone

19   numbers, Miss Darleen.

20           THE COURTROOM DEPUTY:  Yes, Judge.

21           MS. SCOTT:  Are we permitted to leave the

22   courthouse?

23           THE COURT:  Anywhere you want to go, but understand

24   you don't want to go down to the Disney area to have a big

25   lunch.  So I need you within 15 minutes of the courthouse if

1   anything happens.

2              MS. SCOTT:  Yes, sir.

3              THE COURT:  Thank you.  Have a good lunch.

4              I'll be up here for just a moment.

5              Court's in recess.  Please be seated, everyone.

6              (Recess taken at 10:40 a.m., pending word from the

7   jury.)

8              (Jury not present at 12:46 p.m.)

9              THE COURT:  Please be seated, everyone.

10             Miss Darleen, has informed me that the jury has

11  reached a verdict.

12             Is there anything from the government before we

13  bring the jury back?

14             MS. RIVERA:  Your Honor, I understand if there's a

15  guilty verdict, there's going to be a stipulation as to the

16  forfeiture.  That's the only matter.

17             THE COURT:  Do you have the signed stipulation?

18             MS. SCOTT:  If I can?

19             THE COURT:  Ms. Rivera, thank you for bringing that

20  to my attention.

21             We were about to hand out jury instructions on the

22  next phase of the trial.  So that removes that stage of the

23  trial.

24             MS. SCOTT:  May I approach?

25             THE COURT:  Yes, please.

```
 1              This is only relevant assuming that the government

 2    prevails.  If the government doesn't prevail, then this is

 3    inconsequential, correct?

 4              MS. SCOTT:  Yes, Your Honor.

 5              THE COURT:  Okay.

 6              All right.  Mr. Brooks, if you would be kind enough

 7    to -- you can just stand there, but I need you to speak into

 8    a microphone.

 9              Now, no one here is aware of what's going to happen

10    here; but lawyers are about planning for eventualities,

11    things that may occur.  And so I don't know what is going to

12    happen now, but if they were to render a verdict of not

13    guilty, this is a non-issue.

14              If they render a verdict of guilty, we would move

15    on typically to the next stage of the trial where they'd make

16    a determination whether the government can establish by a

17    preponderance of the evidence as to whether or not your phone

18    is going to be forfeited based on the conviction.

19              So this is no precursor to anything that's going to

20    happen, but I need to make sure:  Did you have an opportunity

21    to discuss this joint stipulation regarding forfeiture with

22    your attorneys prior to your signing this document?

23              THE DEFENDANT:  Yes, Your Honor.

24              THE COURT:  And do you need any more time to sign

25    this document?
```

1          THE DEFENDANT:  I already signed it.

2          THE COURT:  I beg your pardon.  That was not a good

3   question.  It could have elicited an objection on that one.

4          Do you need more time to review the document with

5   your attorneys?

6          THE DEFENDANT:  No.  I'm fine.

7          THE COURT:  All right.  Thank you, Mr. Brooks.

8   Feel free to be seated.

9          I'll hold it up here, and I won't give it to my

10  clerk to file unless the need arises.

11         So is there anything further from the government

12  before we bring them back?

13         MS. RIVERA:  No, Your Honor.

14         THE COURT:  All right.

15         Ms. Scott?

16         MS. SCOTT:  No, Your Honor.

17         THE COURT:  All right.

18         Let's bring the jury back.

19         (Jury present at 12:48 p.m.)

20         THE COURT:  Welcome back, ladies and gentlemen.

21  Feel free to be seated in your chair once you arrive, and

22  we'll get started.

23         Ladies and gentlemen of the jury, please be seated.

24         THE COURTROOM SECURITY OFFICER:  Please be seated.

25         THE COURT:  All right.  Who is our foreperson?

1          (Hand raised.)

2          THE COURT:   Without tell me what the jury's

3   decision is, has the jury reached a verdict, so say you all?

4          THE JUROR:   Yes, Your Honor.

5          THE COURT:   If you would be kind enough to fold

6   that Verdict in half, and my court security officer will come

7   and retrieve that from you.

8          He's going to bring it to me, and the purpose of my

9   looking at it before it's read is to make sure everything's

10   in proper legal order.   Once I make that determination, my

11   deputy clerk of court will be instructed to read it into the

12   record.

13          Would the defendant and counsel please rise.

14          Miss Darleen, if you would be kind enough to read

15   this verdict into the record.

16          THE COURTROOM DEPUTY:   In the case of "United

17   States of America versus George Adrien Brooks.

18          "Verdict.

19          "As to Count One of the Indictment, we, the jury,

20   hereby find Defendant guilty.

21          "So say we all."

22          Dated March 4th, 2016.   Signed:   Mike Hinton,

23   Foreperson.

24          THE COURT:   Thank you.

25          Feel free to be seated.

1              Will the government be requesting that the jury be

2      polled at this time?

3              MS. RIVERA:  No, Your Honor.

4              THE COURT:  Will the defense?

5              MS. SCOTT:  Yes, Your Honor.

6              THE COURTROOM DEPUTY:  Cathryn Bryant, is this your

7      verdict?

8              THE JUROR:  Yes.

9              THE COURTROOM DEPUTY:  Victor West, is this your

10     verdict?

11             THE JUROR:  Yes.

12             THE COURTROOM DEPUTY:  Michael Hinton, is this your

13     verdict?

14             THE JUROR:  Yes.

15             THE COURTROOM DEPUTY:  Eugene Gessler, is this your

16     verdict?

17             THE JUROR:  Yes.

18             THE COURTROOM DEPUTY:  Kelvin Aybar, is this your

19     verdict?

20             THE JUROR:  Yes.

21             THE COURTROOM DEPUTY:  Rosalind Perez, is this your

22     verdict?

23             THE JUROR:  Yes.

24             THE COURTROOM DEPUTY:  Mary Bryan, is this your

25     verdict?

1          THE JUROR:  Yes.

2          THE COURTROOM DEPUTY:  Daisy Torres, is this your

3  verdict?

4          THE JUROR:  Yes.

5          THE COURTROOM DEPUTY:  Getho LaFalaise, is this

6  your verdict?

7          THE JUROR:  Yes.

8          THE COURTROOM DEPUTY:  Valerie Brady, is this your

9  verdict?

10          THE JUROR:  Yes.

11          THE COURTROOM DEPUTY:  Elizabeth Bryan, is this

12  your verdict?

13          THE JUROR:  Yes.

14          THE COURTROOM DEPUTY:  Margaret Ellis, is this your

15  verdict?

16          THE JUROR:  Yes.

17          THE COURT:  Ladies and gentlemen, I wish to thank

18  you for your time and consideration of this case.  I also

19  wish to advise you of some very special privileges enjoyed by

20  jurors.

21          No juror can ever be required to talk about the

22  discussions that occurred in the jury room except by court

23  order.  For many centuries our society has relied upon juries

24  for consideration of difficult cases.  We have recognized for

25  hundreds of years that a jury's deliberations, discussion and

1  votes should remain their private affair as long as they wish

2  it.  Therefore, the law gives you a unique privilege not to

3  speak about the jury's work.  It will be up to you to decide

4  whether to preserve your privacy as a juror.

5          With the Court's deepest gratitude, I want to thank

6  you for your time and attention during the course of this

7  trial.

8          If you would leave -- I'm going to give you a

9  chance to go back into the jury room and retrieve any items

10  you want to take with you.

11          If you would be kind enough to leave the pads and

12  pens wherever they're at facedown, Miss Darleen will be

13  instructed by me to tear the pages out and shred them so no

14  one will ever read your notes.

15          You'll be escorted back down to the jury holding

16  room where you arrived this morning.  I'll be down there in

17  just a moment to see you off and answer any questions you

18  might have, not necessarily about the case, but about your

19  experience here as a juror, parking, anything else you want

20  to make me aware of, so in the future we can make this a more

21  efficient and a smoother process for jurors coming for cases

22  down the road.

23          So thank you again for your time and patience this

24  week.  I will see you in a few minutes in the holding room.

25  Have a good day.

1          (Jury not present at 12:52 p.m.)

2          THE COURTROOM SECURITY OFFICER:  Please be seated.

3          THE COURT:  All right.  The next available

4  sentencing date is Thursday, May 19th at 10:30 a.m.

5          Would the government like to be heard on that date?

6          (No response.)

7          THE COURT:  Do you have any conflict or concerns

8  about that date?

9          And I would ask the defense to review your calendar

10  to see if that's going to work for you.

11          MS. RIVERA:  Not that I'm aware of, Your Honor.

12          THE COURT:  All right.  We can take the appropriate

13  action if it becomes an issue.

14          Does the defense want to be heard on that matter at

15  this time?

16          MS. SCOTT:  No, Your Honor.

17          THE COURT:  All right.  Are there any further

18  matters to take up --

19          MS. SCOTT:  I'm sorry, Your Honor.

20          THE COURT:  Oh, go on ahead.

21          MR. SKUTHAN:  I have a conflict on that date, but I

22  can file a motion with the Court.

23          THE COURT:  Well, that's just an extra and

24  unnecessary step and a waste of your time.

25          So find me the soonest date I'm available after May

1    19th.

2             This was a contested trial on a jury verdict.  So

3    this is an atypical sentencing hearing.  Will the defense be

4    requiring more than an hour for their sentencing?  I'm asking

5    for a best guess right now.

6             MR. SKUTHAN:  At this point, I can't say; but in an

7    abundance of caution, I would say yes.

8             THE COURT:  Let's find a two-hour block for this

9    sentencing.  If we don't use all the time, that's fine.

10            THE COURTROOM DEPUTY:  May 26th at 9:00 a.m.

11            THE COURT:  May 26th at 9:00 a.m., is that

12   acceptable to the government?

13            MS. RIVERA:  Your Honor, I have to verify because

14   I'm traveling to a conference at the end of the -- actually,

15   I stand corrected.  That should work.

16            THE COURT:  How about for the defense?

17            MR. SKUTHAN:  Can I just ask what day of the week

18   that is?

19            THE COURTROOM DEPUTY:  Thursday.

20            THE COURT:  It's a Thursday.

21            MS. RIVERA:  That should be fine.

22            MR. SKUTHAN:  That'll be fine.

23            THE COURT:  All right.  It'll be on that date, and

24   I don't want to wait because the calendars are really busy

25   right now for all the active judges here.  So we'll go on

 1    that date.  If something arises, I certainly will consider

 2    that.

 3              So anything further from the government before we

 4    end the session?

 5              MS. RIVERA:  No, Your Honor.  Thank you very much.

 6              THE COURT:  Thank you.

 7              From the defense?

 8              MR. SKUTHAN:  No, Your Honor.

 9              THE COURT:  All right.

10              Thank you all.

11              Court's in recess.  Please remain seated.  I'm

12    going to be up here for just a moment.  Feel free to go about

13    your private affairs.

14              (Proceedings concluded at 1:05 p.m.)

15                       - - - - - - - -

16                     Reporter's Certification

17    I certify that the foregoing is a correct transcript from the

18    record of proceedings in the above-entitled matter.

19                              s/Diane Peede, RMR, CRR
                                Official Court Reporter
20                              United States District Court
      Date:  May 3, 2016        Middle District of Florida
21

22

23

24

25