**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION**

**UNITED STATES OF AMERICA,**

    **Plaintiff,**

v.                                  **Case No. 6:15-CR-219-ORL-41TBS**

**GEORGE ADRIEN BROOKS,**

    **Defendant.**

_____/

**SENTENCING MEMORANDUM**

    George Adrien Brooks, by and through his undersigned counsel, respectfully submits his Sentencing Memorandum. Mr. Brooks was found guilty of Count One of the Indictment and faces a statutory mandatory minimum sentence of ten years in prison, a maximum penalty of life imprisonment and a lifetime criteria of reporting to the authorities as a sex offender.

**CIRCUMSTANCES OF THE OFFENSE**

    This is Mr. Brooks' first conviction. In fact, it is his first arrest. Brooks is 73 years old and has lived a productive life. With his former wife, he raised two children. Both are now adults and both are successful in their careers. He has always been successfully employed and he has been involved in his community.

1

On September 10, 2015, Brooks was arrested in an FBI undercover operation. He was charged with attempting to coerce, induce, persuade or entice a minor, by use of the internet, to engage in sexual activity, pursuant to Title 18 U.S.C. § 2422(b). Brooks, who was facing punishment which included a ten year mandatory minimum prison sentence, took his case to trial. He did not testify on his own behalf. On March 4, 2016, the jury found him guilty as charged. There is no dispute that there was not a real child involved in this case. Rather, the case was generated by an FBI undercover agent posing as the father of a minor. There is no evidence that Brooks ever spoke to any person who either was a minor or who portrayed themselves as a minor. The statute in question does <u>not</u> criminalize one having sexual activity with a minor. Rather, the statute was enacted to criminalize persons enticing, inducing, persuading or coercing a minor, through the use of the internet, to have sex. In this case, the Government alleged that the enticement, inducement and persuasion took place through an adult intermediary. The undersigned fully understands that the courts have held that the offense can be proven even when the communication is through an adult intermediary. Accepting that fact, the undersigned would argue that any conversations between an adult intermediary and a potential defendant is less threatening and less aggravating that a defendant having conversations directly with a minor about sexual activity. That said, the undersigned realizes that the jury returned a guilty verdict and that this Court must apply the corresponding statutes and guidelines and impose a reasonable

sentence in this case.

## APPLICABLE PENALTIES

The mandatory minimum sentence in this case is ten years. PSR ¶ 60. Thus, the Court cannot sentence Mr. Brooks to less than ten years. Mr. Brooks was 72 years old when he was arrested. He recently turned 73 years old. PSR ¶ 35. If sentenced to ten years in prison, Brooks will be 82 years old when he is released from prison. Upon release from prison, Brooks faces a mandatory minimum term of five years of supervised release. PSR ¶ 62. The maximum term of supervised release is life. He also must report as a sex offender with the state of Florida under the Adam Walsh Act. PSR ¶ 64.

The United States Probation Office has calculated Brooks' guideline range as total offense level 43, criminal history category I, for a sentencing range of life imprisonment. PSR ¶¶ 29, 33 and 61. Because Brooks contested his case at trial, he objects to any enhancements above the base offense level of 28 (PSR ¶ 20). The Government is required to prove all enhancements by a preponderance of evidence. *See United States v. Lawrence*, 47 F.3d.1559, 1567-68 (11th Circuit 1995).

Pursuant to USSG § 4B1.5(b), the Probation Office also scored Brooks with a five-level increase for a pattern of engaging in prohibited sexual conduct. PSR ¶ 27. The Probation Office supports the enhancement by stating that he molested his nephew on "multiple occasions," 44 years ago. PSR ¶ 27. The PSR also indicates that Brooks engaged

3

a father in e-mail conversations regarding sex with that person's 12 year-old son. *Id.* The undersigned would assert that there is insufficient evidence to establish that Brooks engaged in a pattern of activity involving prohibited sexual conduct, as that term is defined in § 4B1.5(b).

Having considered all of the relevant information, policies, and circumstances, including, but not limited to the Guidelines, Section 3553(a), and the seriousness of the offense of conviction, Mr. Brooks respectfully requests that this Court sentence him at the statutory mandatory minimum range of ten years, followed by a lifetime term of supervised release. Such a sentence will provide punishment sufficient, but not greater than necessary, to achieve the goals of sentencing.

## HISTORY AND CHARACTERISTICS OF GEORGE BROOKS

George Adrien Brooks was born on May 30, 1943 in New London, Connecticut. His mother was Laurette Brooks and his father was Clarence Brooks. PSR ¶ 38. He had one sibling, Jocelyn Marie Gulrud, who was his twin sister. Brooks was very close to his parents, as well as to his sister. Both he and his sister were born prematurely and had to wear special shoes for several years. PSR ¶ 38. Brooks graduated from high school in 1961 and attended college, leaving one credit shy of graduation. PSR ¶ 39.

Brooks has worked his entire life. For 14 years he was employed with Aetna Life and Casualty. PSR ¶ 52. After his divorce, he was employed for ten years with IBM Global

4

Services. He retired at the age of 64. PSR ¶ 56. After two years of retirement, he went back to work for two years in Maryland before retiring again at the age of 68. PSR ¶ 55. At the time of his arrest, he was supporting himself and meeting all of his financial obligations. PSR ¶ 57. He does not use drugs and has not used alcohol in years. PSR ¶ 50.

Brooks has a host of medical issues, which are documented in the PSR. *See* PSR ¶¶ 45-49. Brooks currently takes medication for high blood pressure and for his thyroid condition. PSR ¶ 47. Brooks has had glaucoma for several years. In 1998, he had a retinal detachment performed on his right eye. For that condition, he has been prescribed Lumigan, Biosprolol and Levothryroxine. PSR ¶ 48. In 2013, Brooks had his gall bladder removed. He also has a documented history of kidney stones. PSR ¶ 49.

The PSR indicates that the Brooks "may have attended marriage counseling" prior to his divorce. PSR ¶ 50. This information is attributed to Brooks' daughter, with whom he is no longer on speaking terms. PSR ¶¶ 41 and 42. The undersigned is not sure why the Probation Office would credit speculation of prior counseling supplied by Brooks' estranged daughter. Under the heading, "Mental and Emotional Health," the PSR further indicates that Brooks learned he was homosexual in the early 1970's, The undersigned is not quite sure why "homosexuality" is considered a mental or emotional health issue or why his estranged wife would be considered a reliable source for any documentation relating to his mental or emotional health from 40 years ago. *See* PSR ¶ 50.

5

In the late 1960's, Brooks met Ms. Mary Mayer. After dating for a period of time, they married in 1970. PSR ¶ 41. During the marriage, the couple raised two children: a son, who is a successful architect, and a daughter, who is a successful office manager at a restaurant. PSR ¶ 41. Throughout the marriage, Brooks provided for his wife and family. Additionally, after his son married and had children, Brooks was an active grandparent and visited his son's family in their out of state home. In 1997, Brooks and his wife divorced. PSR ¶ 41. By all accounts, it was a contentious divorce. After the divorce, Brooks moved in with a roommate, Christopher Clark, and lived in Orlando, Florida. They lived together for ten years.

In the early 2000's, the health of Brooks' twin sister, Jocelyn Gulrud, began to worsen due to her multiple sclerosis. PSR ¶ 39. At the time Brooks was retired and living in Florida. In order to be closer to his sister, he moved to Maryland and worked as a clerk in a hotel. He spent the next two years visiting his sister on a regular basis before she ultimately succumbed to her disease. When his mother turned 90 years old, Brooks had her move in with him and Mr. Clark and they cared for her until her death at the age of 94.

In describing the type of person Brooks was during their ten-year relationship, Christopher Clark stated the following in his letter to this Court:

> During the time we shared a home, Adrien [Brooks] brought his elderly mother to live with us. Adrien, myself and another roommate took care of her on a daily basis. We collectively cared for her, preparing meals, taking her shopping and even making clothes for her until she passed away at the age of 94. We were by her bedside when she died . . . . While I lived in

6

>Florida, I lost my sister to pancreatic cancer, my father to blood cancer and my nephew who was shot and killed. Adrien flew to Baltimore with me for all three of these funerals and was there to support me during these difficult times. After this, I returned to the Baltimore area to assist with the care of my own elderly mother. Adrien traveled with me and assisted with my move to Maryland . . . . During this time Adrien's only sibling and twin sister Jocelyn, was diagnosed with Multiple Sclerosis. In order to be closer to his sister who was in Virginia Beach, he joined me in Maryland. He took a part time job and visited his sister at least every other weekend. He encouraged her to take treatments, exercise and gave her emotional support. I was with Adrien when his sister passed away. He was very emotionally distraught. It took some time before he was back to his normal self.

*See* attached, letter of Christopher D. Clark. *See* also letters of friends, Risé Rapier Wheeler and Mike Goodenow.

At the time of his arrest, Brooks had been living with his roommate, Mike Goodenow, for two years. PSR ¶ 43.

## THE NEED TO PROTECT THE PUBLIC, TO AFFORD DETERRENCE, TO PROMOTE RESPECT FOR THE LAW AND TO PROVIDE JUST PUNISHMENT

In the instant case, the Court can consider several factors in determining a reasonable sentence. Because of the ten year mandatory minimum penalty, this Court cannot impose a sentence of less than ten years imprisonment. The first factor this Court could consider is Brooks' lack of any prior arrests or convictions. The second factor this Court can consider is what Brooks' age will be when he is released from prison. There is evidence that strongly suggests a low rate of recidivism among older citizens both as inmates and upon release from prison.

The Seventh Circuit last year provided some guidance to trial judges in considering a defendant's age at sentencing:

>There is much that federal sentencing judges are required to consider in deciding on a sentence to impose - maybe too much: the guidelines, the

7

statutory sentencing factors, the statutory and regulatory provisions relating to conditions of supervised release, presentence reports, briefs and arguments of counsel, statements by defendants and others at sentencing hearings. But in thinking about the optimal sentence in relation to the problem of the elderly prisoner, probably the judge's primary focus should be on the traditional triad of sentencing considerations: incapacitation, which prevents the defendant from committing crimes (at least crimes against persons other than prison personnel and other prisoners) until he is released, general deterrence (the effect of the sentence in deterring other persons from committing crimes), and specific deterrence (its effect in deterring the defendant from committing crimes after he's released). A sentence long enough to keep the defendant in prison until he enters the age range at which the type of criminal activity in which he has engaged is rare should achieve the aims of incapacitation and specific deterrence, while lengthening the sentence is unlikely to increase general deterrence significantly if the persons engaged in the criminal activity for which the defendant is being sentenced have a high discount rate; for beyond a point reached by a not very long sentence, such persons tend not to react to increases in sentence length by abandoning their criminal careers.

*United States v. Presley*, 790 F.3d 699, 703 (7th Cir. 2015).

In a related context, the Office of the Inspector General (OIG), for the Department of Justice, recently determined that many aging inmates in the Bureau of Prisons (BOP) have lower rates of misconduct while incarcerated and upon release. One part of the report stated the following:

> That aging inmates have fewer misconduct incidents while incarcerated and a lower rate of re-arrest after release. Our analysis concluded that aging inmates comprised 10 percent of all BOP misconduct incidents in FY 2013, while accounting for 19 percent of the entire population. Based on our research and discussions with BOP officials and staff, we consider the rate of misconduct by aging inmates during incarceration to be relatively low compared to younger inmates. In addition, we found that only 15 percent of a sample of aging inmates released from BOP custody was re-arrested for a new crime within 3 years. Based on studies by the BOP and the BJS, we also consider the rate of re-arrest for aging inmates to be relatively low compared to the re-arrest rates of younger inmates. Therefore, while individual cases will vary, aging inmates are generally less of a threat during incarceration and less likely to be a threat to society once released.

Office of the Inspector General, U.S. Dept. of Justice, The Impact of an

Aging Inmate Population on the Federal Bureau of Prisons 52 (2015), https://oig.justice. gov/reports/2015/e1505.pdf.

Additionally, the United States Sentencing Commission publication: Measuring Recidivism: The Criminal History Computation of The Federal Sentencing Guidelines (2004) reports that "[r]ecidivism rates decline relatively consistently as age increases" from 35.5% under age 21 to 12.7% for ages 41 to 50 years old for all defendants. Available at www.ussc.gov/publicat/ Recidivism_General.pdf, pages 12, 28.

Another aspect of the Defendant's advanced age, after ten years in prison, will be the adequacy of health service. In 2008, the Office of Inspector General conducted an audit of the BOP delivery of health services. Said audit found that BOP does not always provide adequate treatment for chronic conditions, does not properly monitor side effects of medication, allows possibly unqualified providers to render medical services, and does not always meet its performance target levels in the treatment of serious conditions.  See U.S. Department of Justice, Office of Inspector General Audit Division, The Federal Bureau of Prisons Efforts to Manage Inmate Health Care, ii-xix, 32-34 (2008).

Judges have considered physique as an appropriate factor to consider in imposing a sentence below the guideline range.  While Mr. Brooks would not normally have a physique which might render him the target of abuse while in prison, his age, physical ailments, and the nature of his offense, make him a potential target of physical abuse by other inmates.

In 1991, after the Sentencing Commission prohibited consideration of

9

physique as a basis for downward departure, courts continued to consider a defendant's extreme vulnerability to abuse in prison due to physical appearance. In *United States v. Long*, 977 F.2d 1264 (8th Cir. 1992), the Eighth Circuit upheld the District Court's downward departure, based on a physical impairment that the Defendant "exceedingly vulnerable to possible victimization and resultant severe and possibly fatal injuries." *Id*. at 1277. In *United States v. Meillier*, 650 F.Supp.2d. 887 (D. Minn. 2009), the district court imposed a below guideline sentence of one day imprisonment where the defendant, in a child pornography case, was mildly mentally retarded and of small physical stature. The court found that sentencing the defendant to even a short period of incarceration would be the equivalent of sentencing the defendant to be physically and sexually abused. *Id.* at 898. In so sentencing the defendant, the district court judge stated: "[T]hose convicted of crimes - even crimes as heinous as possessing child pornography - are human beings, and no two human beings are alike." *Id*. at 900.

Courts have observed that, the reduced recidivism rate that comes with age is a valid consideration, pursuant to 18 U.S.C. ' 3553(a). *Simon v. United States*, 361 F.Supp.2d 35, 48 (E.D.N.Y. 2005). Indeed, in sentencing the defendant in *Simon* to 62 months below the low end of the guideline range, the district court stated: "The Guidelines' failure to account for this phenomenon renders it an imperfect measure of how well a sentence protects the public from further crimes of the defendant." *Id.* at 48.

In the case cited above, the court granted a substantial downward variance based on the fact that, with age, comes the reduced risk of recidivism, which lessens

10

the need to deter the defendant and protect the public. Thus, this Court can take into account Mr. Brooks' age and medical condition in fashioning a sentence below the advisory guideline range.

In looking at the factors of protecting the public and specific deterrence, a ten-year sentence would clearly deter Brooks from committing any crimes in that ten-year period. Moreover, upon release, the strict conditions of sexual offender supervised release would allow federal probation officers to keep close track of Brooks and to monitor his activities.

In looking at the factors of general deterrence, promoting respect for the law, and providing just punishment, the undersigned would assert that Congress deemed this offense serious enough to require a mandatory sentence of at least ten years. Ten years in prison, for a first offense, is a very long time in prison. For Mr. Brooks, it could very well be a life sentence. Clearly, such a sentence would deter others from committing said crime. Such a sentence also promotes respect for the law and provides just punishment for this offense.

There is no doubt that Mr. Brooks must be punished for this offense and that the law mandates that he must be sent to prison for at least ten years. There can also be no doubt that, given his age and his medical condition, Mr. Brooks is not a danger to the public and has a low chance of offending at the age of 82. He will have a lifetime of reporting, to the authorities, as a sex offender. He will serve a lengthy term of supervised release. The undersigned would submit that, given the above factors, a sentence of ten years, followed by a lifetime of supervision, would be a reasonable sentence in this case.

Respectfully Submitted,

Donna Lee Elm
Federal Defender

 */s/     James T. Skuthan*
James T. Skuthan
First Assistant Federal Defender
Florida Bar Number 0544124
201 South Orange Avenue, Suite 300
Orlando, Florida 32801
Telephone: 407-648-6338
Facsimile: 407-648-6095
Email: jim_skuthan@fd.org
Attorney for George Brooks

## CERTIFICATE OF SERVICE

I hereby certify that undersigned attorney electronically filed the foregoing *Sentencing Memorandum* with the Clerk of Court (CM/ECF) by using the CM/ECF system, which will send a notice of electronic filing to Ilianys Rivera Miranda, Assistant United States Attorney, Orlando Division, this 20th day of June, 2016.

    /s/   **James T. Skuthan**
Attorney for Defendant